No. 21-10233

# United States Court of Appeals
## For the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee*.

On Appeal From The United States District Court For The
District of Nevada, No. 3:20-cr-26 (Du, C.J.)

## OPENING BRIEF FOR THE UNITED STATES

CHRISTOPHER CHIOU
Acting United States Attorney

ELIZABETH O. WHITE
Appellate Chief
PETER H. WALKINGSHAW
Assistant United States Attorney
District of Nevada

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Acting Deputy Assistant Attorney General

SCOTT A.C. MEISLER
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 307-3803
scott.meisler@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................iii

INTRODUCTION .................................................................... 1

JURISDICTION AND BAIL STATUS ...................................... 3

STATEMENT OF THE ISSUE ................................................... 3

STATEMENT OF THE CASE ..................................................... 4

      A.     Statutory Background ........................................... 4

      B.     The District Court Holds Section 1326 Unconstitutional And Dismisses The Indictment .............. 8

SUMMARY OF ARGUMENT ................................................. 14

STANDARD OF REVIEW ....................................................... 17

ARGUMENT ......................................................................... 19

I.     SECTION 1326 IS CONSTITUTIONAL UNDER RATIONAL-BASIS REVIEW, THE STANDARD APPLICABLE TO AN EQUAL-PROTECTION CHALLENGE TO A LAW THAT REGULATES THE REMOVAL OF NONCITIZENS ........................................... 19

      A.     Section 1326 Is Constitutional Under Rational-Basis Review........................................................ 19

      B.     The District Court Erred In Declining To Apply The Rational-Basis Standard .................................. 25

II.    SECTION 1326 DOES NOT VIOLATE EQUAL PROTECTION UNDER THE *ARLINGTON HEIGHTS* STANDARD ........................................................................ 32

      A.     Legal Framework ........................................... 32

B.    Section 1326's Impact on Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent........... 35

C.    The District Court's Finding of Discriminatory Intent Rests on Errors of Law and Historical Fact. ..................... 40

    1.    The district court erred in treating congressional silence as evidence of discriminatory intent ......................................... 40

    2.    President Truman's veto does not support an inference of discriminatory intent ...................... 46

    3.    The district court misapprehended the Ford letter and anti-harboring legislation................... 47

    4.    The court gave excessive weight to Congress's supposed awareness of disparate impact. ........................................................... 51

D.    The Government Showed That Congress Would Have Enacted Section 1326 Absent Discriminatory Intent......... 54

CONCLUSION........................................................................ 61

STATUTORY ADDENDUM ................................................ A1

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ii

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*,
138 S. Ct. 2305 (2018)......................................................*passim*

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ..................................................... 7

*Amaya v. United States*,
247 F.2d 947 (9th Cir. 1957) ..................................... 49

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ..................................... 39

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................. 31

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252 (1977)...............................................*passim*

*Barton v. Barr*,
140 S. Ct. 1442 (2020)................................................ 1

*Bolling v. Sharpe*,
347 U.S. 497 (1954) .................................................. 19

*Bose Corp. v. Consumers Union of United States, Inc.*,
466 U.S. 485 (1984) .................................................. 18

*Brnovich v. DNC*,
141 S. Ct. 2321 (2021).......................................... 35, 40

*City of Mobile v. Bolden*,
446 U.S. 55 (1980).............................................. 34, 35

*Comm. Concerning Community Improvement v. City of Modesto*,
583 F.3d 690 (9th Cir. 2009) ..................................... 40

iii

*Democratic National Committee v. Hobbs*,
    948 F.3d 989 (9th Cir. 2020) (en banc)......................................... 40

*Dep't of Homeland Security v. Thuraissigiam*,
    140 S. Ct. 1959 (2020)............................................................. 31

*Department of Homeland Security v. Regents of the University of California*,
    140 S. Ct. 1891 (2020)....................................................*passim*

*E. Bay Sanctuary Covenant v. Garland*,
    994 F.3d 962 (9th Cir. 2020), as amended (Apr. 8, 2021) ........................ 39

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ............................................................... 19

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020)............................................................. 59

*Fiallo v. Bell*,
    430 U.S. 787 (1977)...............................................21, 22, 25, 32

*Graham v. Richardson*,
    403 U.S. 365 (1971) ............................................................... 20

*Hampton v. Wong*,
    426 U.S. 88 (1976)................................................................. 20

*Hayden v. Paterson*,
    594 F.3d 150 (2d Cir. 2010)........................................46, 55

*Heller v. Doe*,
    509 U.S. 312 (1993) ............................................................... 21

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) ....................................................31, 36

*Hudson v. United States*,
    522 U.S. 93 (1997)................................................................. 24

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ..................................................... 18, 34, 54

iv

*Johnson v. Governor of the State of Florida*,
  405 F.3d 1214 (11th Cir. 2005) (en banc) ................................35, 42, 44, 46

*Johnson v. Kirkland*,
  290 F.2d 440 (5th Cir. 1961) ................................................................ 49

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ............................................................................ 42

*Latino Officers Ass'n, New York, Inc. v. City of New York*,
  196 F.3d 458 (2d Cir. 1999) .................................................................. 1

*Ledezma-Cosino v. Sessions*,
  857 F.3d 1042 (9th Cir. 2017) (en banc) ..................................... 21, 22, 23

*Luft v. Evers*,
  963 F.3d 665 (7th Cir. 2020) ................................................................ 34

*Mathews v. Diaz*,
  426 U.S. 67 (1976) ............................................................................ 20

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) .......................................................................... 35

*Pena-Cabanillas v. United States*,
  394 F.2d 785 (9th Cir. 1968) ........................................................... 6, 23

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) .............................................................28, 34, 53, 54

*Plyler v. Doe*,
  457 U.S. 202 (1982) .......................................................................... 32

*Pullman-Standard v. Swint*,
  456 U.S. 273 (1982) .......................................................................... 54

*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020) ....................................................................... 59

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) .......................................... 15, 30, 31, 37, 38

*Reno v. Flores,*
　　507 U.S. 292 (1993) ................................................................. 21

*Romer v. Evans,*
　　517 U.S. 620 (1996) ................................................................. 28

*Sessions v. Morales-Santana,*
　　137 S. Ct. 1678 (2017)............................................................. 20

*Trump v. Hawaii,*
　　138 S. Ct. 2392 (2018)........................................................20, 21, 22, 28

*United Stated v. Coleman,*
　　24 F.3d 37 (9th Cir. 1994) ...................................................... 53

*United States v. Amador-Bonilla,*
　　No. 21-cr-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021)............... 25

*United States v. Arenas-Ortiz,*
　　339 F.3d 1066 (9th Cir. 2003).................................................. 38

*United States v. Ayala-Bello,*
　　995 F.3d 710 (9th Cir.), *cert. denied*, 2021 WL 5284792
　　(U.S. Nov. 15, 2021).................................................... 21, 22, 24

*United States v. Barajas-Guillen,*
　　632 F.2d 749 (9th Cir. 1980) ................................................22, 26

*United States v. Calderon-Segura,*
　　512 F.3d 1104 (9th Cir. 2008)................................................. 26

*United States v. Christensen,*
　　828 F.3d 763 (9th Cir. 2016) .................................................. 18

*United States v. Corrales-Beltran,*
　　192 F.3d 1311 (9th Cir. 1999)............................................. 4, 45

*United States v. Dumas,*
　　64 F.3d 1427 (9th Cir. 1995) .................................................. 53

vi

*United States v. Evans*,
    333 U.S. 483 (1948) ............................................................................ 50

*United States v. Ferreira*,
    275 F.3d 1020 (11th Cir. 2001) ......................................................... 26

*United States v. Gallegos-Aparicio*,
    No. 19-cr-2637, 2020 WL 7318124 (S.D. Cal. Dec. 11, 2020) ................. 58

*United States v. Gutierrez-Barba*,
    No. 19-cr-1224, 2021 WL 2138801 (D. Ariz. May 25, 2021) ................... 25

*United States v. Hernandez-Guerrero*,
    147 F.3d 1075 (9th Cir. 1998) ..................................... 17, 23, 24, 25, 27, 55

*United States v. Huerta-Pimental*,
    445 F.3d 1220 (9th Cir. 2006) ............................................................ 17

*United States v. Lazarescu*,
    104 F. Supp. 771 (D. Md.), *aff'd*, 199 F.2d 898 (4th Cir. 1952) ............... 56

*United States v. Lopez-Flores*,
    63 F.3d 1468 (9th Cir. 1995) ............................................................. 26

*United States v. Machic-Xiap*,
    No. 3:19-cr-407, 2021 WL 3362738 (D. Or. Aug. 3, 2021) ..................... 47

*United States v. Mendoza-Lopez*,
    481 U.S. 828 (1987) .................................................................. 7, 44, 45

*United States v. Novondo-Ceballos*,
    No. 21-cr-383, 2021 WL 3570229 (D.N.M. Aug. 12, 2021) ..................... 25

*United States v. O'Brien*,
    391 U.S. 367 (1968) ........................................................................ 34

*United States v. Ortiz-Martinez*,
    557 F.2d 214 (9th Cir. 1977) ............................................................. 41

*United States v. Palomar-Santiago*,
    141 S. Ct. 1615 (2021) ....................................................................... 8

*United States v. Rios-Montano*,
  No. 19-cr-2123, 2020 WL 7226441 (S.D. Cal. Dec. 8, 2020) ................... 27

*United States v. Rizo-Rizo*,
  No. 20-50172, 2021 WL 5024364 (9th Cir. Oct. 29, 2021) ................23, 54

*United States v. Ruelas-Arreguin*,
  219 F.3d 1056 (9th Cir. 2000) ................................................................. 7

*United States v. Ruiz-Chairez*,
  493 F.3d 1089 (9th Cir. 2007)................................................21, 22, 24, 26

*United States v. Ruiz-Rivera*,
  No. 3:20-MJ-20306, 2020 WL 5230519 (S.D. Cal. Sept. 2, 2020)............ 25

*United States v. Rundo*,
  990 F.3d 709 (9th Cir. 2021), *petition for cert. filed*, No. 21-5952
  (Oct. 8, 2021) ...................................................................................... 17

*United States v. Samuels-Baldayaquez*,
  No. 4:20-cr-83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021)............25, 47

*United States v. Sugden*,
  226 F.2d 281 (9th Cir. 1955) ................................................................ 49

*United States v. Suquilanda*,
  No. 21-cr-263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021) ................... 59

*United States v. Vasilatos*,
  209 F.2d 195 (3d Cir. 1954)................................................................... 56

*United States v. Washington*,
  797 F.2d 1461 (9th Cir. 1986)................................................................ 18

*United States v. Wence*,
  No. 3:20-cr-27, 2021 WL 2463567 (D. V.I. June 16, 2021) ................25, 52

*Vartelas v. Holder*,
  566 U.S. 257 (2012) ............................................................................... 8

*Washington v. Davis,*
    426 U.S. 229 (1976) ................................................................. 32

*Wayte v. United States,*
    470 U.S. 598 (1985) ...........................................................20, 53

*Wong v. United States,*
    373 F.3d 952 (9th Cir. 2004) .................................................. 28

*Wong Wing v. United States,*
    163 U.S. 228 (1896) ...........................................................26, 27

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ................................................................. 30

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017)............................................................. 31

*Zuber v. Allen,*
    396 U.S. 168 (1969) ................................................................. 42

## STATUTES AND CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ...................................................................... 19

U.S. Const. art. I., § 8, cl. 4 ......................................................... 32

8 U.S.C. § 1324............................................................................... 50

8 U.S.C. § 1325............................................................................... 25

8 U.S.C. § 1326...................................................................*passim*

18 U.S.C. § 3231 ............................................................................... 3

18 U.S.C. § 3731 ............................................................................... 3

Act of March 4, 1929,
    Pub. L. No. 70-1018, 45 Stat. 1551 ........................................5

Act of Oct. 16, 1918,
    Pub. L. No. 65-221, 40 Stat. 1012...........................................4

Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, 108 Stat. 1796 ........................................................ 7

Immigration Act of 1917,
    Pub. L. No. 64-301, 39 Stat. 874 ......................................................... 4, 5

Immigration Act of 1990,
    Pub. L. No. 101-649, 104 Stat. 4978 ............................................. 7, 57, 58

Immigration and Nationality Act of 1952,
    Pub. L. No. 82-414, 66 Stat. 163 ............................................. 6, 7, 44, 45

Omnibus Consolidated Appropriations Act of 1997,
    Pub. L. No. 104-208, 110 Stat. 3009 ..................................................... 8

Pub. L. No. 100-690, 102 Stat. 4181 (1988) ................................................. 7

Pub. L. No. 104-132, 110 Stat. 1214 (1996) ........................................... 8, 57

Pub. L. No. 82-283, 66 Stat. 26 (1952) ...................................................... 50

## OTHER AUTHORITIES

70 Cong. Rec. 3542 (1929).................................................................... 5

70 Cong. Rec. 4952 (1929)..................................................................... 5

98 Cong. Rec. 5169 (1952)..................................................................... 41

98 Cong. Rec. 5768 (1952)..................................................................... 41

98 Cong. Rec. 791 (1952) ...................................................................... 51

98 Cong. Rec. 794 (1952) ...................................................................... 51

98 Cong. Rec. 795 (1952) .................................................................51, 56

DHS, 2019 Yearbook of Immigration Statistics, Table 41, at
    https://www.dhs.gov/immigration-
    statistics/yearbook/2019/table41......................................................... 38

E.P. Hutchinson, *Legislative History of American Immigration Policy, 1798-1965* (1981) ............................................................................ 5, 51

H.R. Rep. No. 70-2418 (1929) ....................................................... 6

Harry S. Truman, "Special Message to the Congress on the Employment of Agricultural Workers from Mexico" (July 13, 1951), at https://www.trumanlibrary.gov/library/public-papers/154/special-message-congress-employment-agricultural-workers-mexico ....................................................................... 49

S. 2842, 82d Cong., 2d Sess. (Mar. 12, 1952) .............................. 41

S. 716, 82nd Cong., 1st Sess. (Jan. 29, 1951) .............................. 50

S. Rep. No. 70-1456 (1929) ....................................... 6, 24, 55, 56

S. Rep. No. 81-1515 (1950) ............................................... 6, 45

# INTRODUCTION

For almost a century, federal law has made it a crime for a noncitizen previously ordered removed from the United States to reenter without proper authorization.[1]  Neither then nor now has the statutory language distinguished among noncitizens by their race or ethnicity, instead imposing criminal penalties on "any alien" who, after removal, enters, attempts to enter, or is found in the United States.  8 U.S.C. § 1326(a).

The district court in this case nevertheless held that Section 1326 violates the equal-protection component of the Fifth Amendment by discriminating against Mexican and Latinx individuals.  1-ER-2, 9.  The court concluded that Section 1326 has a disparate impact on such individuals; the Congresses that enacted both a predecessor statute in 1929 and Section 1326 in 1952 were motivated at least in part by discriminatory intent; and the amendments since that time do not suffice to "cleanse[] the statute" of its alleged taint.  1-ER-43.

As the court recognized, its ruling invalidating a facially neutral federal statute based on the supposedly discriminatory intent of prior Congresses is

---

[1] Except when quoting from a statute or judicial decision, this brief uses the term "noncitizen" as equivalent to the statutory term "alien."  *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).  It uses the term "Latino" interchangeably with "Latinx," the term employed by the district court.  *Cf. Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 460 n.1 (2d Cir. 1999).  Citations are to the Excerpts of Record (ER).

"unprecedented." 1-ER-35. It is also wrong. The court committed a threshold legal error by probing the motives of legislators decades ago rather than reviewing the current statute under the rational-basis standard, which is the metric that governs equal-protection challenges to laws—such as Section 1326— that pertain to immigration controls. Section 1326 plainly passes constitutional muster under that standard because it serves the legitimate purpose of deterring violations of the country's immigration laws.

But even if more searching review were appropriate, the district court made multiple mistakes of law and fact that require reversal. The court contravened one recent Supreme Court decision by treating the share of Latinx individuals among Section 1326 defendants as evidence of discriminatory intent, despite the obvious alternative explanation that those numbers are attributable to geography and the high percentage of such individuals among the population of noncitizens unlawfully in the United States. Contrary to another recent decision, the court faulted the Congress that enacted the Immigration and Nationality Act (INA) in 1952 for failing to purge the discriminatory taint that the court found in the 1929 law. The court also misconstrued key aspects of the historical record in ascribing discriminatory intent to the Congress that enacted the INA, a centerpiece of modern immigration law. And the court cast aside Congress's repeated amendments to the illegal-reentry statute, and the sound

2

justifications for the law, in finding insufficient evidence that Section 1326 would have been enacted absent any discriminatory motive.

In committing these errors, the district court invalidated a widely applied statute and reached a result at odds with the decisions of every other court to consider the question. This Court should reverse.

## JURISDICTION AND BAIL STATUS

The United States appeals the district court's August 18, 2021 order dismissing the indictment against defendant-appellee Gustavo Carrillo-Lopez (Carrillo). 1-ER-44. The government timely noticed an appeal on August 19, 2021. 4-ER-608-09. The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 18 U.S.C. § 3731.

Carrillo is currently in the custody of the Nevada Department of Corrections serving an indeterminate state sentence, with parole eligibility beginning in June 2029. *See* https://ofdsearch.doc.nv.gov/form.php (entry for Gustavo Lopez, Offender ID 1231425).

## STATEMENT OF THE ISSUE

Whether the illegal-reentry statute, 8 U.S.C. § 1326, intentionally discriminates against Mexican and Latinx individuals in violation of the equal-protection component of the Fifth Amendment's Due Process Clause.

3

## STATEMENT OF THE CASE

### A. Statutory Background

This appeal concerns the constitutionality of the federal illegal-reentry statute, which makes it a crime when "any alien who ... has been," *inter alia*, "denied admission, excluded, deported, or removed ... enters, attempts to enter, or is at any time found in, the United States," without appropriate authorization. 8 U.S.C. § 1326(a). The base offense is punishable by a fine and up to two years' imprisonment. *Id.* Higher maximum sentences of 10 and 20 years apply if the defendant was removed after being convicted for certain crimes, depending on their nature or gravity. *Id.* § 1326(b)(1)-(4).

Section 1326 traces its roots to 1917, when Congress enacted the first criminal reentry statute. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999) (1917 law was a "precursor" to Section 1326). That provision made it a misdemeanor for a limited class of noncitizens deported for immoral acts to "attempt thereafter to return to or to enter the United States." Immigration Act of 1917, Pub. L. No. 64-301, § 4, 39 Stat. 874, 878-879. The following year, Congress made it a felony punishable by up to five years' imprisonment for those deported for being a member of the anarchistic and similar classes to "return to or enter the United States or attempt to" do so. Act of Oct. 16, 1918, Pub. L. No. 65-221, § 3, 40 Stat. 1012.

4

In cases not involving these two classes of noncitizens, however, no sanction other than repeatedly deporting illegal reentrants existed until 1929. *See* Pub. L. No. 64-301, § 19, 39 Stat. 889. That year, Congress passed "[a]n Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law." Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 ("1929 Act").[2] Section 1(a) of the Act provided that "any alien ... arrested and deported in pursuance of law" would "be excluded from admission to the United States" and that, "if he enters or attempts to enter the United States" thereafter, "he shall be guilty of a felony" punishable by a fine and up to two years' imprisonment. The 1929 Act responded to concerns expressed by Congress and the Department of Labor— which at the time administered the immigration laws—that the possibility of renewed deportation was insufficient to dissuade those who had been removed from returning and that criminal penalties were therefore needed as an added

---

[2] The 1929 Act was *not* titled "the Undesirable Aliens Act," as Carrillo asserted and the district court stated. 1-ER-7 & n.9; 4-ER-557, 572, 578. A more expansive bill bearing that name was introduced in the House. *See* H.R. Rep. No. 70-2418, at 12 (Feb. 7, 1929) (Sec. 10); 70 Cong. Rec. 3542 (Feb. 15, 1929). But the Senate rejected several portions of that proposal, including its title. *See* E.P. Hutchinson, *Legislative History of American Immigration Policy, 1798-1965*, pp. 209-10 (1981). And the House ultimately relented. *See* 70 Cong. Rec. 4952 (Mar. 1, 1929) (explaining the development of the Act and "[t]hat the House recede[d] from its amendment to the title of the bill").

deterrent. *See* S. Rep. No. 70-1456, at 1-2 (Jan. 17, 1929); H.R. Rep. No. 70-2418, at 6 (Feb. 7, 1929).

Congress revisited the criminal reentry statute 23 years later as part of the Immigration and Nationality Act of 1952 (INA), Pub. L. No. 82-414, 66 Stat. 163. The INA "represents the final product of a most intensive and searching investigation and study over a three[-]year period." *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968). Congress had authorized the Senate Judiciary Committee "to make a full and complete investigation of our entire immigration system" and to provide "recommendations for changes in the immigration and naturalization laws as it may deem advisable." S. Rep. No. 81-1515, at 803 (1950). As relevant here, the Committee's resulting 925-page report described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area." *Id.* at 654-55. It also noted that existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor." *Id.* at 655.

Congress responded with Section 276 of the INA, codified as Section 1326. In line with the Judiciary Committee's recommendation, the INA eliminated the disparate penalties applicable to reentry defendants depending on the

6

basis for their deportation, creating instead a single offense that subjected all reentry defendants to the same penalties as the 1929 Act: two years' imprisonment and a fine. Pub. L. No. 82-414, § 276, 66 Stat. 230; *see United States v. Mendoza-Lopez*, 481 U.S. 828, 835-36 (1987). The statute also sought to offset some difficulties in enforcing prior statutes by adding a new basis for liability: "being 'found in' the United States" after a prior deportation, a "continuing" offense that "commences with the illegal entry, but is not completed until" the defendant is discovered. *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000) (quoting 8 U.S.C. § 1326(a)(2)); *see* 3-ER-437.

Section 1326 has been amended on several occasions since 1952, often with an eye toward increasing its deterrent effect. 1-ER-7-9 & nn.9-11 (describing the changes). In 1988, Congress enacted what is now Section 1326(b) to prescribe enhanced penalties for defendants with prior felony convictions. Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (1988); *see Almendarez-Torres v. United States*, 523 U.S. 224, 229 (1998). Congress increased the applicable fines two years later in the Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059, and again upped the penalties in the Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023. In 1996, Congress enacted Section 1326(d) in response to the Supreme Court's decision in *Mendoza-Lopez*, *supra*, which had held that the

7

statute may violate due process absent an opportunity for the defendant to challenge the validity of the prior removal order. Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279; *see United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619 (2021). Later that year, Congress updated Section 1326 to add a new penalty provision, to expand the class of prosecutable defendants to include those who "ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding," and to align the statute with other changes to immigration law enacted in 1996. Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629; *see Vartelas v. Holder*, 566 U.S. 257, 261-62 (2012).

## B. <u>The District Court Holds Section 1326 Unconstitutional And Dismisses The Indictment</u>

1. Carrillo is a citizen of Mexico who was removed from the United States on two prior occasions, most recently in 2012. 4-ER-607. Following that removal, Carrillo reentered the United States at an unknown time. He came to the attention of immigration authorities in June 2019 after being convicted on state drug charges, for which he was sentenced to life imprisonment with the possibility of parole after 10 years. 4-ER-600, 606.

In June 2020, the grand jury charged Carrillo with illegal reentry following a prior removal, in violation of Section 1326(a). 4-ER-606-07. The indictment further alleged that Carrillo was subject to the enhanced penalties in Section

8

1326(b) because of his prior convictions, 4-ER-607; 1-ER-42 n.43, which include a felony conviction for possessing controlled substances and a misdemeanor conviction for inflicting corporal injury on a spouse. 4-ER-600-02.

2.  Carrillo moved to dismiss the indictment, arguing that Section 1326 violates the Fifth Amendment's equal-protection guarantee. He contended that the 1929 predecessor to Section 1326 was motivated at least in part by discriminatory animus toward Latinx individuals and that more recent statutes applying the same prohibition "do not cleanse the law of its original taint." 4-ER-574. Carrillo supported his position with a declaration from a professor who had written on the history and politics of immigration. 4-ER-582-90. And he argued that, under the framework set forth in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the proof he presented of discriminatory intent and disparate impact on Latinx individuals shifted the burden to the government to show that the law would have been passed absent discriminatory purposes. 4-ER-559-77.

In opposing the motion, the government argued that *Arlington Heights* was the wrong framework and that Carrillo's challenge should be subject to rational-basis review under precedents requiring deference to the political branches in the immigration context. 4-ER-523-31. But the claim failed even under *Arlington Heights*, the government argued, because the relevant law was not the 1929 Act

but Section 1326 as enacted in 1952 and subsequently amended; Carrillo cited no evidence that *those* laws have a discriminatory motive; and his claim of disparate impact on Latinx individuals was likewise misplaced. 4-ER-531-45.

The district court heard argument on Carrillo's motion and, over the government's opposition (4-ER-489), later held an evidentiary hearing to take testimony from two defense experts. 2-ER-62-259. The court then ordered briefing on whether any discriminatory intent found to have motivated the 1929 Act tainted Section 1326 as enacted in 1952. 1-ER-16 n.18.

3. After considering the post-hearing submissions, the district court granted Carrillo's motion to dismiss, holding that Section 1326 "violates the equal protection guarantee of the Fifth Amendment." 1-ER-2.

a. The district court declined to review Carrillo's challenge under the deferential standard applicable in other immigration-related contexts. 1-ER-3-6. The court instead reasoned "that greater protections under the Fifth Amendment necessarily apply" when criminal punishment is at issue. 1-ER-4. It also relied on recent appellate decisions applying the *Arlington Heights* standard to federal actions that withdrew previously granted immigration benefits. 1-ER-4-5. In particular, the court understood the Supreme Court to have endorsed this Court's application of the *Arlington Heights* standard in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020)

10

(*Regents*). 1-ER-4 n.4. Other Ninth Circuit criminal cases that conducted rational-basis review were distinguishable, in the court's view, because they involved classifications based on "alienage," not "race and national origin." 1-ER-4.

b. The district court next concluded that Carrillo made the required showings under the *Arlington Heights* framework. Citing reports that between 85 and 97 percent of persons apprehended at the border "were of Mexican de[s]cent," the court concluded that Section 1326 has a disparate impact on Mexican and Latinx defendants. 1-ER-10. The court rejected as "circular and inconclusive" the government's argument that the disparity was attributable to geography and the fact that Mexican citizens make up a disproportionately high percentage of the overall population of noncitizens illegally in the United States. 1-ER-10-12. Although the government based that argument on the reasoning in *Regents*, *supra*, the court distinguished *Regents* on the ground that it addressed "disparate impact alone," not the combination of impact and intent. 1-ER-12 & n.6.

The district court concluded that both the first general illegal-reentry statute passed in 1929 and Section 1326 as enacted in 1952 were motivated at least in part by discriminatory intent. 1-ER-13-35. The court noted at the outset that, at the motions hearing, the government had conceded "that discriminatory

11

intent motivated the passage of the [1929] Act." 1-ER-13 & n.17.[3] Apart from the concession, the court relied on testimony from a defense expert that the 1929 Act was passed under the influence of nativists and eugenics supporters, as well as statements in the legislative record. 1-ER-14-16.

The court then turned to Section 1326's enactment as part of the INA in 1952. 1-ER-16-35. In so doing, the court appeared to reject the government's argument that, under *Abbott v. Perez*, 138 S. Ct. 2305 (2018), the 1952 Act was entitled to a presumption of good faith despite a finding of past discrimination. 1-ER-18 & n.21. The court took the view that, if *Abbott* is applicable at all outside of the redistricting context, it does not shield subsequent legislation from the taint of prior discrimination in situations where the "reenacted statute is nearly identical to its improper predecessor," *id.*, which the court found to be true of Section 1326. 1-ER-28-31, 34-35.

The court identified five considerations that, in their "totality,"

---

[3] To be clear, the cited concession was limited: the prosecutor agreed only that the record contained information satisfying Carrillo's burden under the first step of the *Arlington Heights* analysis, 4-ER-482-83, *not* that the 1929 Act was ultimately unconstitutional. Although the government does not seek to revisit that concession for purposes of this appeal, we have come to believe that even that limited concession was improvidently made. The United States has accordingly argued in other cases that the historical record does not support the conclusion that Congress as a whole was motivated in part by discriminatory intent in enacting the 1929 Act.

"demonstrate that racial animus was at least one motivating factor behind the enactment of Section 1326" in 1952. 1-ER-19. The court first deemed it significant that the 1952 Congress did not engage in "[r]obust [d]ebate" over Section 1326, whereas it did over "[o]ther instances of discriminatory immigration policy." *Id.* Next, the court observed that Congress passed Section 1326 over President Truman's objection that the INA had not gone far enough to remove race-related restrictions—a fact the court found to evince "at least indifference to the nativist motivations of the" 1929 Act. 1-ER-22. The court also believed that the only "substantive" change from the 1929 Act—the creation of the continuing offense of being an alien "found in" the United States after deportation—had been proposed in a Justice Department letter that quoted a separate report referring to Mexicans as "wetbacks." 1-ER-22-24. In a similar vein, the court found it problematic that the INA was enacted only a few months after anti-harboring legislation that some Members of Congress had colloquially called the "Wetback Bill." 1-ER-24-26. Lastly, the court gave weight to Congress's decision to "expand the grounds for deportation and carceral punishment" despite its supposed "knowledge that Section 1326 continued to disparately impact Mexican and Latinx people." 1-ER-27.

c. After rejecting the reasoning of other decisions addressing the same constitutional challenge to Section 1326, the district court held that the

13

government failed to show the statute would have been enacted absent discriminatory intent. 1-ER-35-43. The court rejected the argument that three interests acknowledged by defense experts—economic competition, maintaining national security, and foreign relations—were factors independent of race that would have prompted passage. 1-ER-36-39. The court also "decline[d] to infer that Section 1326's utility to the overall immigration scheme," as recognized by this Court, "justifies an inference of nondiscriminatory motive." 1-ER-39-40. And the court took the view that Congress's repeated amendments to Section 1326 since 1952 did not show that it would have enacted the statute absent discriminatory intent. The court reasoned that the amendments were not "'substantive'" and "merely work[ed] to increase Section 1326's deterrent value," and that at no time had Congress "attempt[ed] ... to grapple with the racist history of Section 1326 or remove its influence on the legislation." 1-ER-41-42.

## SUMMARY OF ARGUMENT

**I.** Carrillo's challenge to Section 1326 is subject to—and fails under— rational-basis review. Under Supreme Court and circuit precedent, that standard applies in equal-protection challenges to federal laws that regulate the admission and removal of noncitizens. Section 1326's text, history, and purpose confirm that it is such a law. And because the provision serves the legitimate

14

legislative end of deterring violations of the country's immigration laws, it passes muster under rational-basis review.

The district court's reasons for subjecting Section 1326 to more searching scrutiny under the *Arlington Heights* framework lack merit. This Court's decisions, including one rejecting a challenge to the illegal-reentry sentencing guideline, refute the suggestion that a higher standard necessarily applies in criminal cases. Application of the rational-basis standard would also not, as the court below feared, immunize from judicial review congressional enactments inexplicable on grounds other than racial animus. Nor do two recent decisions addressing particular Executive Branch policies—*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), and *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020)—foreclose reviewing the challenge to this federal immigration statute under the rational-basis standard.

**II.** Section 1326 is constitutional even under the *Arlington Heights* framework. In concluding otherwise, the district court started from the mistaken premise that the high percentage of Mexican and Latinx defendants in Section 1326 prosecutions gives rise to an inference of discriminatory intent, when that effect is instead readily explained by geographical factors (the United States' shared border with Mexico) and the characteristics of the noncitizen population

15

unlawfully present in this country.  The district court's contrary conclusion disregards the logic of *Regents* and *Ramos* and amounts to legal error.

The district court also committed several other clear errors of law and historical fact that require reversal.  It declined to afford Section 1326 a presumption of good faith despite (i) the substantive changes between the statute as enacted in 1952 and the predecessor law the court found to be tainted, and (ii) the absence of evidence that the 1952 Congress was even aware of the history underlying the 1929 Act.  The court erroneously inferred discriminatory intent from President Truman's veto of the INA, which did not expressly address Section 1326 or allege discrimination against Latinx individuals; from the appearance in the legislative debates of the term "wetback," which did not necessarily have in 1952 the same offensive connotations it has today; and from pre-INA legislative and executive materials that the court misinterpreted.  With those errors corrected, the historical record cannot support a finding of discriminatory intent.

Even if that finding were supportable, the district court separately erred in determining that Congress would not have enacted Section 1326 absent its supposed intent to discriminate against Mexican and Latinx persons.  The government bore the burden on that issue and carried it by identifying obviously valid objectives served by Section 1326, which this Court has called "a necessary

piece of the immigration-regulation framework" because of its deterrent purpose. *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). That purpose is confirmed by the legislative history of Section 1326's predecessor and the numerous amendments that Congress has made to the statute since 1952—changes that the district court erroneously dismissed as non-substantive. And, although Carrillo's own expert recognized that Congress had valid, non-discriminatory reasons for enacting Section 1326 (rooted in foreign policy and national security), the district court discounted that testimony after failing to consider the legitimate reasons in their totality.

For these reasons, the district court's order invalidating Section 1326—which is contrary to the decisions of all other courts to consider the same equal-protection challenge—should be reversed.

## STANDARD OF REVIEW

This Court reviews de novo "the constitutionality of a statute as a question of law," *United States v. Huerta-Pimental*, 445 F.3d 1220, 1222 (9th Cir. 2006), as well as "the dismissal of an indictment on the ground that the underlying statute is unconstitutional," *United States v. Rundo*, 990 F.3d 709, 713 (9th Cir. 2021), *petition for cert. filed*, No. 21-5952 (Oct. 8, 2021). Whether the district court applied the correct legal standard—here, whether it erred in declining to conduct

rational-basis review—is also a question of law reviewed de novo. *United States v. Washington*, 797 F.2d 1461, 1470 n.12 (9th Cir. 1986).

The district court's constitutional ruling under the framework in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), turned on its subsidiary determination that Section 1326 was motivated in part by a discriminatory purpose. That determination is a factual finding reviewed for clear error. *See Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018); *Hunter v. Underwood*, 471 U.S. 222, 229 (1985). A finding is clearly erroneous when "it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *United States v. Christensen*, 828 F.3d 763, 779 (9th Cir. 2016) (quotation marks omitted). While that standard is deferential, *id.*, it "does not inhibit an appellate court's power to correct errors of law" that "infect" a district court's factual findings, *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501 (1984), including errors in applying the burden of proof. *See Abbott*, 138 S. Ct. at 2326 ("[W]hether the court applied the correct burden of proof is a question of law subject to plenary review."). In addition, when, as here, a court's finding of discriminatory intent did not follow a trial, was not based on credibility evaluations, and turned on the kind of publicly available legislative materials that appellate courts routinely examine, a reviewing court may more readily be "left with the definite and firm conviction that a mistake

18

has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242-43 (2001) (quotation marks omitted).

## ARGUMENT

## I. SECTION 1326 IS CONSTITUTIONAL UNDER RATIONAL-BASIS REVIEW, THE STANDARD APPLICABLE TO AN EQUAL-PROTECTION CHALLENGE TO A LAW THAT REGULATES THE REMOVAL OF NONCITIZENS

The district court held 8 U.S.C. § 1326 unconstitutional after inquiring into the motivations of multiple Congresses. But the court never should have undertaken that inquiry. Because Section 1326 is part of the immigration-regulation framework, equal-protection challenges to it should be reviewed under the rational-basis standard. The statute passes muster under that metric.

### A. Section 1326 Is Constitutional Under Rational-Basis Review

1. Carrillo's challenge to Section 1326 arises under the Fifth Amendment to the Constitution. Unlike the Fourteenth Amendment (which applies to the States), the Fifth Amendment does not contain an express equal-protection provision. Since 1954, however, the Supreme Court has construed the Amendment's guarantee of "due process of law" for all "person[s]," U.S. Const. amend. V, to provide analogous protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). And the Court has generally applied the same equal-protection standards in both contexts, *see Wayte v. United States*, 470 U.S. 598, 608 n.9

19

Case: 21-10233, 11/19/2021, ID: 12293159, DktEntry: 5, Page 32 of 78

(1985), meaning that any law drawing (for example) gender-based lines would have to satisfy heightened scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689-90 (2017).

Federal immigration laws are an exception to that general rule. *See Hampton v. Wong*, 426 U.S. 88, 100 (1976). While state statutes that distinguish between citizens and noncitizens remain subject to heightened scrutiny, *see Graham v. Richardson*, 403 U.S. 365, 371-72 (1971), the Supreme Court has taken a different approach to federal laws drawing such distinctions, in deference to the federal government's exclusive authority over immigration matters. "For reasons long recognized as valid," the Court has explained, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Mathews*, 426 U.S. at 81). "The reasons that preclude judicial review of political questions" thus "also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," *Mathews*, 426

20

U.S. at 81-82—including congressional enactments that "regulate the admission and exclusion of aliens." *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977).

This Court has equated that narrow standard of review with the rational-basis test applied to other classifications that do not affect "fundamental rights nor proceed along suspect lines," *Heller v. Doe*, 509 U.S. 312, 319 (1993) (quotation marks omitted). *See, e.g.*, *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc). "Under the rational basis test, a federal policy survives an equal protection challenge if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *United States v. Ayala-Bello*, 995 F.3d 710, 715 (9th Cir.) (quotation marks omitted), *cert. denied*, 2021 WL 5284792 (U.S. Nov. 15, 2021). That form of review is deferential. The government need not articulate the purpose underlying its policy, *id.*, or "produce evidence to sustain [its] rationality," *Heller*, 509 U.S. at 320. Rather, "[t]he burden falls on the party" challenging the law "to disprove the rationality" of the classification made, *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007), including by negating any conceivable basis that could support it, *see Ayala-Bello*, 995 F.3d at 715.

The Supreme Court and this Court have applied this "unexacting" standard, *Reno v. Flores*, 507 U.S. 292, 306 (1993)—or arguably more deferential ones, *see Hawaii*, 138 S. Ct. at 2419—to an array of challenges in civil and

21

criminal cases. The Court in *Fiallo*, for example, applied minimal scrutiny to a law that drew a gender-based distinction by giving special immigration preferences to mothers, but not fathers, of U.S. citizen children. 430 U.S. at 792-99. In *Ledezma-Cosino*, this Court reviewed under the rational-basis standard a law that barred "habitual drunkards" from qualifying for cancellation of removal. 857 F.3d at 1048-49. And in the criminal context, this Court has employed that standard in rejecting equal-protection challenges to provisions of the Sentencing Guidelines applicable to "illegal reentrants," *Ruiz-Chairez*, 493 F.3d at 1091; to a deportation order that formed the basis for a later illegal-reentry prosecution under Section 1326, *see United States v. Barajas-Guillen*, 632 F.2d 749, 752 (9th Cir. 1980); and to an Executive Branch policy treating the crime of illegally entering the United States differently from other petty offenses, *Ayala-Bello*, 995 F.3d at 714-15. These decisions, and others, confirm the Supreme Court's recent statement that "a circumscribed [judicial] inquiry applies to any constitutional claim concerning the entry of foreign nationals." *Hawaii*, 138 S. Ct. at 2420 n.5.

2. Carrillo's constitutional challenge to Section 1326 is likewise subject to—and fails under—the rational-basis standard. That standard applies to his equal-protection challenge because Section 1326 is a law that regulates the admission and removal of noncitizens. *See Fiallo*, 430 U.S. at 792-93 & n.5.

Long ago, this Court described Section 1326 as "a regulatory statute enacted to assist in the control of unlawful immigration by aliens." *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968); *see United States v. Rizo-Rizo*, No. 20-50172, 2021 WL 5024364, at *4 (9th Cir. Oct. 29, 2021) (reaffirming this language). Several aspects of the statute bear out that description. Section 1326 was enacted as part of the INA in 1952. *See* pp. 6-7, *supra*. It is codified in Title 8 alongside other immigration provisions. Most important, its "text ... plainly reveals its immigration-regulation purpose." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). "By threatening with criminal prosecution any alien found in the United States who has previously been 'excluded, deported, or removed,'" this Court has explained, "Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." *Id.* (quoting 8 U.S.C. § 1326(a)). The statute is thus "a necessary piece of the immigration-regulation framework." *Id.* And because Section 1326 is part of that framework, equal-protection challenges to it are subject to the same standard that applies to other claims in the immigration context: rational-basis review. *See Ledezma-Cosino*, 857 F.3d at 1049 & n.4.

A contrary conclusion would lead to a stark anomaly. Decisions such as *Fiallo* and *Hawaii* foreclose a searching judicial inquiry into legislative or executive motivations even when the political branches have drawn express

23

distinctions that would trigger close scrutiny outside of the immigration context. It would be strange if courts were nonetheless required to probe deeply into legislative motives—"a substantial intrusion into the workings of" a coequal branch, *see Arlington Heights*, 429 U.S. at 268 n.18—when an immigration law that draws no such distinction on its face is alleged to discriminate based on race or national origin. Applying rational-basis review to challenges such as Carrillo's avoids that odd result.

3. Section 1326 is constitutional under the rational-basis standard. The relevant question is whether the challenged provision "bears some rational relation to a legitimate government interest or purpose." *Ruiz-Chairez*, 493 F.3d at 1092. In *Ruiz-Chairez*, this Court recognized that "deterring illegal reentry" *is* such an interest. *Id.*; *see also Hudson v. United States*, 522 U.S. 93, 105 (1997) (calling deterrence "a traditional goal of criminal punishment"); *Ayala-Bello*, 995 F.3d at 715 ("[T]he federal government has a legitimate interest in controlling our borders."). And Section 1326 is rationally designed to advance that interest. "[I]ts clear purpose is to deter aliens who have been forced to leave the United States from reentering the United States." *Hernandez-Guerrero*, 147 F.3d at 1078 (ellipses and quotation marks omitted); *see* S. Rep. No. 70-1456, at 1-2 (1929). Indeed, "without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no

bite." *Hernandez-Guerrero*, 147 F.3d at 1078. As every district court to apply rational-basis review to analogous challenges has held,[4] Section 1326 is therefore constitutional under that standard.

### B. The District Court Erred In Declining To Apply The Rational-Basis Standard

The district court did not dispute that Section 1326 passes constitutional muster under rational-basis review or attempt to explain how the expansive *Arlington Heights* inquiry that it deemed applicable can be reconciled with the principle that it is "not the judicial role … to probe and test the justifications for" legislative policies in the immigration field. *See Fiallo*, 430 U.S. at 799. Instead, the court gave two reasons for departing from the rational-basis standard: (1) the standard is inapplicable in a challenge to a criminal statute such as Section 1326, and (2) precedent requires application of *Arlington Heights*. 1-ER-3-6. Neither reason withstands scrutiny.

1. First, this Court's decisions refute any suggestion that a standard more

---

[4] *See, e.g.*, *United States v. Amador-Bonilla*, No. 21-cr-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20-cr-83, 2021 WL 5166488, at *2 (N.D. Ohio Nov. 5, 2021); *United States v. Novondo-Ceballos*, No. 21-cr-383, 2021 WL 3570229, at *4 (D.N.M. Aug. 12, 2021); *United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567, at *10 (D. V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. 19-cr-1224, 2021 WL 2138801, at *5 (D. Ariz. May 25, 2021); *see also United States v. Ruiz-Rivera*, No. 3:20-MJ-20306, 2020 WL 5230519, at *4 (S.D. Cal. Sept. 2, 2020) (same for the illegal-entry statute, 8 U.S.C. § 1325).

25

searching than rational basis must apply merely because Section 1326 prescribes criminal penalties. As explained above, p. 22, *supra*, this Court has applied the rational-basis standard to equal-protection challenges raised in criminal cases, including a challenge to a Sentencing Guideline that implements Section 1326 and provides for a greater enhancement for "illegal reentrants … than other felons with the same prior criminal record." *Ruiz-Chairez*, 493 F.3d at 1091; *see also Barajas-Guillen*, 632 F.2d at 752 (applying rational-basis standard to defendant's collateral attack on a deportation order in a criminal case); *United States v. Calderon-Segura*, 512 F.3d 1104, 1107 (9th Cir. 2008) (same); *United States v. Lopez-Flores*, 63 F.3d 1468, 1471-75 (9th Cir. 1995) (same standard applies to criminal statute that "classifies offenders on the basis of the offender's and the victim's nationality"). While the district court distinguished some of these decisions as addressing alienage classifications rather than neutral laws alleged to discriminate based on race or ethnicity (1-ER-6), the cases nonetheless demonstrate that the mere existence of a criminal penalty in an immigration statute has not been understood to demand greater scrutiny. *Cf. United States v. Ferreira*, 275 F.3d 1020, 1025-26 (11th Cir. 2001) (rejecting a civil-criminal distinction).

The decision in *Wong Wing v. United States*, 163 U.S. 228 (1896), cited by the district court (1-ER-4), is not to the contrary. *Wong Wing* addressed an 1892 statute providing that certain Chinese immigrants could "be imprisoned at hard

26

labor for a period of not exceeding one year" before they were removed from the United States. 163 U.S. at 235. The Supreme Court held that the period of pre-deportation imprisonment authorized under the statute was a criminal punishment that could be imposed only after a "judicial trial" subject to the protections of the Fifth and Sixth Amendments. *Id.* at 237-38; *see also Hernandez-Guerrero*, 147 F.3d at 1077 (discussing *Wong Wing*). But *Wong Wing* did not involve an equal-protection challenge; indeed, it predated by 60 years the Supreme Court's application of equal-protection principles to federal action. *See* p. 19, *supra*. The Court's decision therefore does not indicate what standard governs in such a challenge, much less mandate exacting scrutiny for immigration statutes that impose criminal penalties.

The district court also worried that applying rational-basis review would render criminal immigration laws "free from constitutional equal protection constraints" and "license [Congress] to enact racially discriminatory statutes." 1-ER-4. Other courts have similarly suggested that, under the rational-basis standard, courts would be "unable to review a criminal law that, on its face, targets a particular racial group," such as a law that "explicitly prescribed harsher penalties for immigrants of Latin American descent." *United States v. Rios-Montano*, No. 19-cr-2123, 2020 WL 7226441, at *2 (S.D. Cal. Dec. 8, 2020). Those concerns are unfounded. Applying rational-basis review (rather than

27

*Arlington Heights*) in a challenge to a facially neutral statute such as Section 1326 would not necessarily dictate the standard governing review of a statute that drew an explicit racial classification—a context in which an *Arlington Heights* analysis would be unnecessary in any event. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272-74 (1979) (distinguishing "racial classification[s]," which are "presumptively invalid," from "neutral law[s]" subject to analysis under *Arlington Heights*).

Nor would the rational-basis standard immunize discriminatory measures from all judicial scrutiny. As the Supreme Court recently reiterated in an immigration case, "a common thread" in its decisions invalidating laws "under rational basis scrutiny ... has been that the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group." *Hawaii*, 138 S. Ct. at 2420 (ellipses and quotation marks omitted). Accordingly, an immigration law that drew a distinction for reasons "inexplicable by anything but animus," *id.* (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)), would likely be invalid even under the rational-basis standard. *Cf. Wong v. United States*, 373 F.3d 952, 974 n.29 (9th Cir. 2004) (suggesting that a noncitizen allegedly denied status adjustment "solely on the basis of her race, ethnicity, or religion, and for no immigration-related reason or other governmental purpose … could prevail even under the 'wholly irrational' standard applied in *Mathews* [*v. Diaz*, *supra*]"). And

28

if that is so, then concerns over licensing racist legislation provide no sound basis for applying more searching scrutiny to a law, such as Section 1326, that does *not* draw race- or ethnicity-based lines on its face.

2.  The district court's second reason for declining rational-basis review— that precedent required that result, 1-ER-4-5—is equally flawed.  The court believed that, even as it reversed this Court on the merits, the Supreme Court in *Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) (*Regents*), nevertheless endorsed a prior panel's decision to apply *Arlington Heights* in the immigration context.  *See* 1-ER-4 n.4.  But the Supreme Court in *Regents* only assumed, without deciding, that *Arlington Heights* applied.  *See* 140 S. Ct. at 1915.  And in any event, the choice in *Regents* was not, as here, between rational-basis review and scrutiny of legislative motivation under *Arlington Heights*.  Rather, the government had argued in *Regents* that the plaintiffs' claim raised the type of "selective enforcement" challenge that is not cognizable in immigration cases.  *See id.*  As a result, the choice before the Supreme Court was between *Arlington Heights* and no judicial review at all—a choice the *Regents* plurality avoided by determining that the claim failed even under the standard (*Arlington Heights*) more favorable to the plaintiffs.  *Id.*

The district court correctly observed (1-ER-4) that, in partial reliance on *Regents*, this Court later applied the *Arlington Heights* standard in an equal-

protection challenge to an Executive Branch action terminating four countries from a congressionally created humanitarian program administered by the Department of Homeland Security. *Ramos v. Wolf*, 975 F.3d 872, 895-96 (9th Cir. 2020). *Ramos*, however, differs in key respects from this case. The Court there considered an Executive Branch policy that applied to the nationals of specific countries, rather than a facially neutral statute. In so doing, the Court emphasized the "'distinction'" drawn in immigration cases between noncitizens who have "'effected an entry into the United States'" and those who have not, *id.* at 896 (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)), and declined to apply the standards for evaluating executive action regarding the exclusion of foreign nationals to the "administration of a humanitarian relief program established by Congress for *foreign nationals who have lawfully resided in the United States for some time*," *id.* (emphasis added).

Unlike *Ramos*, this case does not involve challenges brought by a noncitizen who "lawfully resided" in the United States for any time, let alone for a lengthy period and under the auspices of a congressionally sanctioned program. *See Ramos*, 975 F.3d at 896. Section 1326 instead applies to noncitizens (such as Carrillo) who may never have been lawfully present in the country, were previously excluded or ordered removed, and are alleged to have returned without authorization. 4-ER-606-07; *see also Dep't of Homeland Security v. Thuraissigiam*,

30

140 S. Ct. 1959, 1981-83 (2020) (holding that a noncitizen who had entered the United States unlawfully acquired no procedural rights not conferred by Congress in its exercise of the "'sovereign prerogative,'" and the political branches' "plenary authority," to decide who will be admitted or excluded). Furthermore, as a law that regulates noncitizens who cross or attempt to cross the country's borders, Section 1326 has "foreign policy and national security implications," 975 F.3d at 896, greater than those at play in *Ramos*. *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (noting the national security concerns raised by crossings at the U.S.-Mexico border); *Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (federal government's authority over "immigration and the status of aliens" rests in part on "its inherent power as sovereign to control and conduct relations with foreign nations").

Finally, to the extent the district court believed that deference is owed principally to executive (rather than congressional) action in the immigration context, the court erred. 1-ER-5 n.5. Immigration laws implicate foreign-policy and national-security concerns committed to both political branches of government, not one or the other. *See Arizona*, 567 U.S. at 396-97; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) ("National-security policy is the prerogative of the Congress and President."). Moreover, the Supreme Court has stated that Congress's role in the immigration field stems from "its plenary

31

authority with respect to foreign relations and international commerce," *Plyler v. Doe*, 457 U.S. 202, 225 (1982), as well as its power to "establish an uniform Rule of Naturalization," U.S. Const. art. I., § 8, cl. 4, and that *Congress's* immigration policies are unsuited for "prob[ing] and test[ing]" by the courts. *See Fiallo*, 430 U.S. at 799. Nothing in *Ramos* (or *Regents*) justifies retreating from those principles and, for the first time, subjecting an Act of Congress in the immigration field to invasive review under *Arlington Heights*.

## II. SECTION 1326 DOES NOT VIOLATE EQUAL PROTECTION UNDER THE *ARLINGTON HEIGHTS* STANDARD

Even if the *Arlington Heights* standard governs, Section 1326 is constitutional. The district court's contrary ruling rests on critical errors of law and fact. And because, when stripped of those errors, the historical record supports only the conclusion that the statute is constitutional, the court's judgment should be reversed outright.

### A. Legal Framework

The Supreme Court confirmed decades ago that claims based on disparate impact alone are not cognizable under the Equal Protection Clause, and instead that "[p]roof of racially discriminatory intent or purpose is required to show a violation of" that Clause. *Arlington Heights*, 429 U.S. at 265; *see Washington v. Davis*, 426 U.S. 229, 239-42 (1976). When the law alleged to discriminate against individuals of a particular race or national origin is neutral on its face,

courts evaluate the existence of such intent using the framework from *Arlington Heights*, 429 U.S. at 265-68. Under that framework, "[t]he impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Id.* at 266 (quotation marks and citation omitted). But outside of extreme circumstances not alleged here, disparate "impact alone is not determinative," and courts must assess other evidence in deciding whether a racially discriminatory purpose was "a motivating factor in the decision." *Id.* at 265-66. Pertinent evidence includes "[t]he historical background of the decision," "[t]he specific sequence of events leading up to" it, "departures" from "[s]ubstantive" or "procedural" norms, and "[t]he legislative and administrative history ... , especially ... contemporary statements by members of the decisionmaking body." *Id.* at 267-68. If the challenger proves that the provision was motivated in part by the prohibited intent, the burden shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

Several principles inform how courts conduct the "sensitive inquiry" into official motivation required under *Arlington Heights*. *See* 429 U.S. at 266. First, discriminatory motive has a particular meaning in the equal-protection context. A challenger must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,'

33

not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. That standard requires more than proof that the legislature had "awareness of [the] consequences" for the affected group, that those consequences were "foreseeable," *id.* at 278-79, or that it acted "with indifference to" the effect on that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020).

Second, while statements by a bill's proponents may be relevant to the inquiry into intent under *Arlington Heights*, it remains the case that the motives of individual legislators cannot necessarily be equated with the intent of the whole legislature. *See, e.g.*, *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (noting that "the difficulties in determining the actual motivations of the various legislators that produced a given decision increase" when a larger legislative body is at issue).

Third, a legislature alleged to have acted with discriminatory intent is not automatically saddled with the sins of its predecessors. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). In conducting the intent inquiry, courts generally presume that the legislature acted in good faith and require a movant to come forward with evidence that the challenged law—not just a prior one—was motivated in part by a discriminatory purpose. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018); *see*

*also City of Mobile*, 446 U.S. at 74 (discriminatory intent must be "proved in a given case"). Such evidence may include proof that earlier legislatures had discriminatory intent when enacting particular laws, *Abbott*, 138 S. Ct. at 2327, but the probative value of such evidence decreases when it is remote in time, *see Regents*, 140 S. Ct. at 1916; *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), or attributable to a legislature with "a substantially different composition," *Brnovich v. DNC*, 141 S. Ct. 2321, 2349 n.22 (2021) (quotation marks omitted).

**B. Section 1326's Impact on Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent.**

The district court misapplied the foregoing principles in holding Section 1326 unconstitutional. The court erred at the outset in inferring discriminatory intent from Section 1326's impact on Mexican and Latinx defendants. 1-ER-9-13, 17, 19, 26-28. The court appeared to view the disparate-impact inquiry under *Arlington Heights* as a matter of numbers alone, concluding that Carrillo had made the requisite showing because statistics indicate that upwards of 85% of "persons apprehended at the border" between 2000 and 2010 "were of Mexican descent" and, under Department of Justice directives, "many, if not all, apprehensions are ultimately prosecuted." 1-ER-10.[5] Believing those

---

[5] The district court cited both these 21st-century numbers and statistics from the 1930s. 1-ER-10-11. The contemporary numbers could be relevant if the court had focused on the *current* version of Section 1326, but they shed little light on the knowledge or intent of the 1952 Congress. *See Johnson v. Governor of*

"numbers" to be "in line with other successful *Arlington Heights* challenges," 1-ER-11, the court deemed Section 1326's impact on Latinx individuals to support an inference of discriminatory intent despite obvious alternative explanations for the disparity that are relevant in the immigration context: *i.e.*, (1) the almost 2,000-mile border the United States shares with Mexico, *see Hernandez*, 140 S. Ct. at 746; and (2) the undisputed fact (1-ER-11) that Latinx individuals make up a disproportionately high percentage of those illegally in the United States and thus an outsized share of those eligible for prosecution under Section 1326.

Recent decisions of the Supreme Court and this Court undercut the district court's reasoning. In *Regents*, for example, beneficiaries of the deferred-action immigration program argued that the disparate impact of the program's rescission "on Latinos from Mexico, who represent 78% of" the program's beneficiaries, supported an inference that the recission was driven by an invidious discriminatory purpose. 140 S. Ct. at 1915. Eight Justices rejected that argument. *Id.* at 1915-16 (plurality); *id.* at 1919 n.1 (Thomas, J., concurring in part and dissenting in part); *id.* at 1936 (Kavanaugh, J., concurring in part and dissenting in part). The Court's lead opinion explained that the disparity did

---

*the State of Florida*, 405 F.3d 1214, 1222 n.17 (11th Cir. 2005) (en banc) (rejecting reliance on "present" day evidence of disparate impact where the plaintiffs challenged a 1968 law as discriminatory).

not, "either singly or in concert" with other factors, make out a "plausible equal protection claim." *Id.* at 1915. The plurality reasoned that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program." *Id.* And "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 1916.

This Court later reached a similar conclusion in *Ramos*, 975 F.3d at 898. The movants there challenged on equal-protection grounds the Executive Branch's decision to terminate four countries—Sudan, Nicaragua, Haiti, and El Salvador—from the temporary-protected-status (TPS) program, which affords relief to noncitizens who cannot safely return to their home nation for certain reasons. *Id.* at 879, 883. In rejecting that challenge, this Court afforded no weight to the asserted disproportionate impact that the program's termination had on individuals from countries with "predominantly 'non-white' populations." *Id.* at 898. The Court explained that, while the four countries at issue in the case were "'non-European' with predominantly 'non-white' populations, the same [was] true for" most other countries involved in the TPS program since 1990. *Id.* ("[V]irtually every country that has been designated for TPS … has been 'non-European' … and most have majority 'non-white'

37

populations."). Were a disparity of that nature to suffice, this Court continued, "almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim"—which "cannot be the case." *Id.*

*Regents* and *Ramos* reflect the sensible proposition that outsized effects on certain populations are an expected byproduct of broad-based immigration regulations and do not necessarily give rise to the same inference of discriminatory intent that might exist in other settings. And that principle applies squarely to Carrillo's challenge to Section 1326. Because a dispro-portionate share of the individuals excluded or removed from the U.S. are Mexican or Latinx,[6] it stands to reason that a high share of those prosecuted for illegally returning after removal will likewise be Latinx. That is all the more true when taking into account the proximity of the United States to Mexico and Central America, and the possibility of returning to the United States from those locations over land. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003) (explaining, in the context of a selective-prosecution claim, the "common sense" notion "that it would be substantially more difficult for an

---

[6] *See, e.g.*, DHS, 2019 Yearbook of Immigration Statistics, Table 41 (in FY2019, 61 percent of all removed aliens—215,205 of 359,885—were Mexican), at https://www.dhs.gov/immigration-statistics/yearbook/2019/table41.

alien removed to China to return to the United States than for an alien removed to Mexico to do so"); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 973 (9th Cir. 2020), as amended (Apr. 8, 2021) (recognizing that noncitizens "traveling overland from El Salvador, Honduras, or other countries south of Guatemala" can enter the United States through Mexico).

The district court, for its part, did not acknowledge the disparate-impact analysis in *Ramos*. And the court thought *Regents* distinguishable on the ground that the plurality there "found that disparate impact *alone* had not been demonstrated," whereas Carrillo sought to meet his burden "through a showing of disparate impact coupled with intent." 1-ER-12. That reading of *Regents*, however, cannot be reconciled with the plurality's explanation that the 78% statistic cited by the plaintiffs did not, "either singly *or* in concert" with their two other categories of evidence, "raise a plausible inference that the rescission was motivated by animus." *Regents*, 140 S. Ct. at 1915-16 (emphasis added).

The district court also relied on decisions of this Court that "found disparate impact in situations where 'geography' might arguably explain the disparity." 1-ER-12. But all of those cases addressed state and local measures, not a federal immigration law. *See Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015); *Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 704-

06 (9th Cir. 2009).[7]  And none involved "geography" in the sense relevant here—*viz.*, that the federal law's application is affected by Mexico's proximity to the United States and the factors that drive migration from Mexico and Central America to this country.  Those factors, not discriminatory intent, readily explain the high percentage of Latinx defendants in Section 1326 prosecutions.

### C.  The District Court's Finding of Discriminatory Intent Rests on Errors of Law and Historical Fact.

The district court inferred from five factors, taken together, that "[t]he 1952 enactment of Section 1326 was also motivated by discriminatory intent." 1-ER-18.  As explained below, however, each aspect of the court's analysis is marred by fundamental errors of law or historical fact.  When those errors are corrected, the court's finding cannot stand.

#### 1.  The district court erred in treating congressional silence as evidence of discriminatory intent

The district court determined that the absence of legislative debate on Section 1326, when "compared to robust Congressional debate" about the INA's national-origins quotas, supported an inference "that discriminatory intent was

---

[7] A third cited decision, *Democratic National Committee v. Hobbs*, 948 F.3d 989, 1004 (9th Cir. 2020) (en banc), was reversed by the Supreme Court in *Brnovich v. DNC*, 141 S. Ct. 2321 (2021).

a motivating factor in" Section 1326's reenactment. 1-ER-19. According to the court, that inference was warranted either because Congress "ignored the express nativist intent behind the [1929] Act" or, if it was aware of that intent, bypassed the "opportunity to either adopt its racial animus or refute its improper motivation and clarify a [permissible] purpose for the statute." 1-ER-20.

The court's reasoning suffers from three fatal flaws. First, it overlooks the INA's historical context. That Act was controversial in part because it maintained the system of national-origin quotas in effect since 1924, which did *not* apply to Mexico and other Western Hemisphere countries. *See* 2-ER-90; 3-ER-278-79. Section 1326, by contrast, was an uncontroversial and widely supported provision. Indeed, the competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic, *see, e.g.*, 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman)—contained an illegal-reentry law identical to what became Section 1326. *See* S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952). It is therefore unsurprising that congressional debate centered on the contested quotas yet omitted discussion of a provision accepted by the INA's proponents and opponents alike. *Cf. United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but §§ 1325 and 1326 were not among the debated sections.").

41

Second, the district court's reasoning contravenes the Supreme Court's warning against "[d]rawing meaning from [Congressional] silence." *Kimbrough v. United States*, 552 U.S. 85, 103 (2007). Just as courts do not lightly treat Congress's "silence [as] tantamount to acquiescence" in judicial or agency decisions, *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969), they should not give weight to a legislature's failure to expressly grapple with the history underlying earlier laws—especially when the legislators are unlikely to be aware of that decades-old history. *See Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005) (en banc).

Third, the court's reasoning repeats the error the Supreme Court corrected in *Abbott*, 138 S. Ct. 2305. *Abbott* involved a 2013 districting plan enacted by the Texas legislature after its original 2011 plan was challenged in two courts. *Id.* at 2316-17. Although the legislature adopted the 2013 plan from a version preliminarily approved by a three-judge court, that same court later invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id.* at 2318. The Supreme Court reversed. In so doing, the Court reaffirmed that discriminatory purpose must be shown as to the actual law being challenged, not just a predecessor; the legislature that enacted the successor statute is generally afforded a presumption of

42

good faith; a finding of past discrimination does not "flip[] the evidentiary burden" to the government to prove that the successor statute is free from discriminatory intent, *id.* at 2324-25; and a successor legislature does not have a "duty to expiate its predecessor's bad intent," *id.* at 2325; *see id.* at 2326 n.18.

By holding against the 1952 Congress its failure to engage with the history of the 1929 Act, the district court ran afoul of *Abbott*. And as in *Abbott*, that aspect of the court's rationale "cannot be dismissed as stray comments," 138 S. Ct. at 2325, because it pervaded the court's analysis. *See* 1-ER-19-20; 1-ER-16 (1952 law "did not cleanse Section 1326 of its racist origins"); 1-ER-27, 33-34, 41, 43 (similar).

The district court's efforts to distinguish *Abbott* are unavailing. The court suggested that the result in *Abbott* turned "on the legislature's active response and engagement with the prior challenged statute," 1-ER-29, and read the decision "to require that the reenacting legislature make some substantive change before known racial animus is cleansed," 1-ER-34. But the Court in *Abbott* could look to the 2013 legislature's "response" only because allegations of discriminatory intent had been aired in legal challenges to the original 2011 plan brought in multiple federal courts. *See* 138 S. Ct. at 2315-17. It is unrealistic to expect an "active response," by contrast, in cases where the legislature has no notice of allegations that a law it is revisiting may have been motivated by

43

discriminatory intent. As the en banc Eleventh Circuit has explained, demanding legislative engagement with a law's history in such cases "establishes an insurmountable burden" because it is "unlikely that the present day legislators would be aware of the past discrimination" that supposedly taints the law. *Johnson*, 405 F.3d at 1225 n.21. That concern is directly implicated here, where the district court identified no evidence that the 1952 Congress—which had experienced a 96% turnover since 1929, 4-ER-554 n.8—was even aware of the history underlying the illegal-reentry provision that the court found to taint the 1929 Act.

Moreover, assuming *arguendo* that an earlier law must be "substantially altered" (1-ER-18) before a presumption of good faith applies under *Abbott*, Section 1326 satisfies that criterion because the 1952 Congress changed the law governing illegal reentry in at least two material ways.[8] First, Congress added

---

[8] We say "at least two" because Section 1326's text reflects additional relevant changes from the 1929 Act. Congress (1) expanded the prohibition to reach those "excluded and deported," not just those "arrested and deported," INA § 276, 66 Stat. 229; and (2) omitted a phrase in the 1929 Act ("in pursuance of law") that the Supreme Court later identified as a potential textual basis for allowing defendants to challenge the validity of their deportation orders in the illegal-reentry prosecution. *See United States v. Mendoza-Lopez*, 481 U.S. 828, 836 (1987); *see also id.* at 831 n.2 (noting the language in Section 1326, added in 1952, that "excepts those aliens who have either received the express consent of the Attorney General to reapply for admission or who otherwise establish that they were not required to obtain such consent").

the "found in" clause now in Section 1326(a), creating a "substantive offense[]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999). As the district court itself recognized elsewhere in its opinion, the addition of this clause made a "substantive change" to existing law by "expand[ing] the government's authority to enforce the" reentry prohibition. 1-ER-24. Second, the 1952 Congress enacted Section 1326 to serve as a single illegal-reentry statute that applied the same penalties to all defendants, repealing other provisions that had prescribed different penalties for defendants deported for subversive or immoral activities. *See* INA § 403, 66 Stat. 279-80; S. Rep. No. 81-1515, at 646-47, 655-56 (1950); *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 & n.10 (1987). Those alterations qualify as "substantive change[s]" under any reasonable understanding of that term. 1-ER-34.

The district court, however, appeared to believe that a law is "substantive[ly]" altered in the relevant sense only if it has been "expressly revis[ed]" to be "more race-neutral." 1-ER-30-31. But the court did not explain how Congress could have made a law already silent as to the offender's race "more race-neutral." 1-ER-31. Nor do the felon-disenfranchisement cases cited by the court suggest that Congress was *required* to do so in order for the presumption of good faith to apply. The change deemed "substantive in scope"

45

in *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010), for example, was a constitutional amendment that merely required the state legislature to pass a felon-disenfranchisement law, rather than leaving the matter "to the legislature's discretion." *Id.* at 167.  And it is unlikely that the 1968 Florida legislature acted "in an attempt to make [its law] less racially targeted" (1-ER-31) when, "at the [relevant] time … , no one had ever alleged that the [earlier] provision was motivated by racial animus," *Johnson*, 405 F.3d at 1224.

Accordingly, even if *Abbott* required "substantive" changes before applying a presumption of good faith to a successor statute, 1-ER-18 & n.21, Section 1326 was entitled to the presumption here.  By failing to afford that presumption to the 1952 Congress (or the multiple Congresses that have amended the statute since), the district court committed reversible legal error.

### 2. President Truman's veto does not support an inference of discriminatory intent

The district court erred in inferring discriminatory intent from Congress's decision to enact the INA over President Truman's veto.  The court noted Truman's view that the INA perpetuated a "discriminatory policy" of the past and his remarks urging Congress to "reexamin[e]" the approach taken in that act.  3-ER-423, 428.  And the court found that "Congress' failure to heed President Truman's" message, "while simultaneously making the INA, and

particularly Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." 1-ER-22.

Truman's veto statement, however, "does little to advance [Carrillo's] argument." *United States v. Machic-Xiap*, No. 3:19-cr-407, 2021 WL 3362738, at *13 (D. Or. Aug. 3, 2021). For one thing, the statement says "nothing about what President Truman thought about § 1326 specifically." *Id.*; *see United States v. Samuels-Baldayaquez*, No. 4:20-cr-83, 2021 WL 5166488, at *3 n.6 (N.D. Ohio Nov. 5, 2021). The district court itself recognized that "Truman did not explicitly address racism as to Mexican or Latinx individuals" in the veto statement, which "largely objected to the national origin quota system, not Section 1326." 1-ER-21-22. Indeed, Truman opened his veto message by noting that the bill "contains certain provisions that meet with [his] approval." 3-ER-420. And as explained above (p. 41, *supra*), opponents of the national-quota system at the time of the 1952 Act (such as Senator Lehman) still supported the criminal punishment of unlawful reentry in the fashion required by Section 1326. President Truman's veto message, like the floor statements of the INA's congressional opponents, therefore "do[es] not prove that racial animus motivated Congress to enact § 1326." *Machic-Xiap*, 2021 WL 3362738, at *13.

### 3. The district court misapprehended the Ford letter and anti-harboring legislation

The district court made basic mistakes of historical fact in inferring

discriminatory intent from a 1951 letter by Deputy Attorney General Peyton Ford commenting on a draft of the INA, and from Congress's enactment of legislation known colloquially as the "Wetback Bill." 1-ER-22-26. Starting with the Ford letter, the court believed the letter indicative of discriminatory intent because Congress supposedly followed its recommendation to add the "found in" clause to Section 1326; that clause made the statute more punitive; and the recommendation came in a letter that, in quoting a report by President Truman's Commission on Migratory Labor, referred to Mexicans as "wetback[s]," 3-ER-439. *See* 1-ER-23-24, 34-35. The court's reasoning is unsound.

As an initial matter, the court erred in inferring discriminatory intent from the presence of the term "wetback" in congressional debates and other executive and legislative materials. 1-ER-19, 22, 23, 25, 28, 31. That term, if used today, would unquestionably be understood as a "racial epithet" (1-ER-25) indicative of animus. But it must be recognized that linguistic norms change over time and that, in the early 1950s, the term was often used to refer to an undocumented worker from Mexico without necessarily indicating discriminatory intent. *See* 2-ER-228 (testimony by Carrillo's expert that prominent Mexican-American advocate Cesar Chavez used the term to distinguish between legal and illegal Mexican immigrants). Opinions of this Court and others used the term in

precisely that manner.[9]  So did President Truman,[10] lauded elsewhere by the district court for his sensitivity to discrimination when vetoing the INA.  1-ER-22.  Accordingly, while the court's reaction to the term is understandable, the court erred in treating the appearance of that particular term in congressional debates of that era as evidence of discriminatory purpose.

Moreover, the district court misunderstood the nature and significance of the recommendations made in the Ford letter.  Even accepting the premise that the "found in" clause made the illegal-reentry statute more "punitive" (and that such an effect is itself suggestive of animus), Ford did not propose the relevant language.  He wrote in "response" to the Senate Committee's request for the Justice Department's views on a draft bill that *already contained* the "found in"

---

[9] *See Amaya v. United States*, 247 F.2d 947, 947-48 (9th Cir. 1957); *United States v. Sugden*, 226 F.2d 281, 282 (9th Cir. 1955); *see also Johnson v. Kirkland*, 290 F.2d 440, 441 (5th Cir. 1961) (describing a statute's purpose as "protect[ing] migrant Mexican workers—referred to traditionally as 'wetbacks' because of their illegal entry across the Rio Grande—from exploitation by American employers whose normal economic power was enhanced by the illegal status of the workers").

[10] Harry S. Truman, "Special Message to the Congress on the Employment of Agricultural Workers from Mexico" (July 13, 1951) ("The really crucial point, which this Act scarcely faces, is the steady stream of illegal immigrants from Mexico, the so-called 'wetbacks,' who cross the Rio Grande or the western stretches of our long border, in search of employment."), at https://www.trumanlibrary.gov/library/public-papers/154/special-message-congress-employment-agricultural-workers-mexico.

clause. 3-ER-432; *see* S. 716, § 276, 82nd Cong., 1st Sess. (Jan. 29, 1951).[11] The court therefore erred in stating that "the only change" between the 1929 Act and Section 1326 "was motivated by the Ford Letter," and imputing to Congress discriminatory intent inferred from the appearance of the term "wetback" in a part of the letter that was not even addressing Section 1326. 1-ER-34-35; *see* 1-ER-27-28 ("The 1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents[.]").

The district court's understanding of legislation colloquially known as the "Wetback Bill" was also flawed. 1-ER-24-26. As Carrillo's own expert testified, the bill was an "anti-harboring" measure that targeted those involved in transporting and otherwise facilitating noncitizens' entry into the United States. 2-ER-158; *see* Pub. L. No. 82-283, 66 Stat. 26 (1952) ("An Act To assist in preventing aliens from entering or remaining in the United States illegally"), codified as amended at 8 U.S.C. § 1324(a). It had been proposed in the same draft bill sent to Deputy Attorney General Ford for comment (§ 274 of S. 716); was deemed a necessary response to the decision holding an earlier anti-harboring law unenforceable in *United States v. Evans*, 333 U.S. 483 (1948), *see* 3-

---

[11] Congress did adopt Ford's suggestion to clarify other language in the draft Section 1326 that he thought "somewhat obscure." 3-ER-437. But that language addressed not whether to add the found-in clause, but the wording of the affirmative defense now in Section 1326(a)(2)(B).

ER-437; and was passed on an emergency basis, at the behest of the Truman Administration, to secure extension of an existing migratory-labor agreement with Mexico, *see* 98 Cong. Rec. 791-92, 795 (1952). The law did have a controversial proviso that exempted employers from liability for the bare act of hiring a noncitizen. *Id.* at 794; E.P. Hutchinson, *Legislative History of American Immigration Policy, 1798-1965*, pp. 302-03 (1981). But whatever else it did, the law did not punish only "the laborers themselves" or "criminaliz[e] Mexican immigrant laborers" to the exclusion of all others. 1-ER-25-26. The court therefore erred in viewing the substance of the legislation as showing "the racially discriminatory motives and intent of the same Congress [that] enacted Section 1326." 1-ER-26.

### 4. The court gave excessive weight to Congress's supposed awareness of disparate impact.

As a final consideration, the district court concluded that Congress's decision to expand the illegal-reentry bar, "despite its knowledge of the disparate impact of this provision on Mexican and Latinx people, is some evidence that racial animus was a motivating factor" in Section 1326's passage. 1-ER-27. That conclusion lacks merit, for three reasons.

First, as explained in Part II.B above, the impact of an immigration-related measure such as Section 1326 on Mexican and Latinx individuals does not give rise to the same inference of discriminatory intent as in other settings.

51

*See United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567, at *10 (D. V.I. June 16, 2021). Second, the district court's statement that Congress knew that the 1929 Act had disproportionately affected Latinx people is unsupported. The court relied on data from the 1930s supplied by Carrillo's expert, but without any evidence that those statistics were available to or shared with the 1952 Congress. 1-ER-26; 4-ER-589-90. The court's only other source—a passage in the Senate report describing the difficulties of obtaining convictions in the "Mexican border area," 1-ER-27—addresses laws "relating to illegal entry and smuggling of aliens," and was not specific to the illegal *reentries* covered by Section 1326. 3-ER-413. It also makes no express reference to the race or national origin of those who were prosecuted under the 1929 Act. *Compare* 3-ER-436 (passage in the Ford letter noting that "[m]any European aliens are specifying Mexico or Canada as the country to which they wish to be deported" and that, if their requests were granted, "reentry from such territory in an illegal manner is easily possible").

Third, even assuming the 1952 Congress was aware that the existing reentry prohibition produced a disparate impact, awareness is not enough. The Supreme Court's decision in *Feeney* instead requires proof that Congress acted in part *because of* Section 1326's adverse effect on Mexican and Latinx defendants, not simply that the effect was known or foreseeable. *Feeney*, 442

52

U.S. at 278-79; *see Wayte*, 470 U.S. at 610. This Court soundly applied that teaching when criminal defendants raised equal-protection challenges to the former crack cocaine sentencing regime. The Court explained in those cases that defendants could not rest on evidence that "the crack/powder cocaine sentencing disparity ha[d] a disproportionate impact on African-Americans" and that this impact was known to Congress. *United States v. Dumas*, 64 F.3d 1427, 1429-30 (9th Cir. 1995); *see United Stated v. Coleman*, 24 F.3d 37, 39 (9th Cir. 1994). And the Court declined to infer the required "discriminatory purpose" from other aspects of the legislative record, including "the racism which [had] permeated" the passage of a predecessor drug law enacted decades earlier. *Dumas*, 64 F.3d at 1430. Carrillo's challenge to Section 1326 should meet the same fate.

\* \* \*

The foregoing errors of law and fact permeate the district court's finding that Congress was motivated in part by discriminatory intent—a finding that no other court to consider challenges to Section 1326 has accepted. *See* 1-ER-32 & nn.33-34 (recognizing that "no court that has addressed this issue has found that Section 1326 is unconstitutional under *Arlington Heights*," and listing cases). And because the record, with those errors corrected, "permits only one

resolution of the" intent question, *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982), this Court should reverse the intent finding outright.

### D. The Government Showed That Congress Would Have Enacted Section 1326 Absent Discriminatory Intent

Having erroneously found discriminatory intent, the district court reached the final step of the *Arlington Heights* inquiry, at which the government bears the burden of showing that Section 1326 would have been enacted absent the discriminatory purpose the court found. *See Hunter*, 471 U.S. at 225; *Arlington Heights*, 429 U.S. at 270 n.21. The government made the requisite showing, and the district court compounded its other errors in concluding otherwise. 1-ER-35-43.

1. To start, the district court erred in rejecting the obviously valid federal immigration objectives served by an illegal-reentry law as an indication that Section 1326 would have been enacted absent discriminatory intent. *See Feeney*, 442 U.S. at 275 (recognizing that, "notwithstanding [disparate] impact[, ]the legitimate noninvidious purposes of a law cannot be missed"). "[C]ontrol[ling] unlawful immigration … is a normal regulatory function of the sovereign." *Rizo-Rizo*, 2021 WL 5024364, at *4. And imposing a sanction on those who repeatedly violate U.S. immigration laws (and territorial boundaries) is a basic feature of a controlled border. That is why this Court described Section 1326 as "a *necessary piece* of the immigration-regulation framework," without which

"Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078 (emphasis added). It is also why, as the government pointed out, many countries criminalize unlawful entry and reentry in some form. *See* 2-ER-58-59 & n.7; *see also Hayden*, 594 F.3d at 167-68 (concluding that the widespread adoption of felon-disenfranchisement laws across states and over time confirmed "the obvious, noninvidious purpose" of such laws).

The district court never addressed the prevalence of illegal-entry laws. And it dismissed *Hernandez-Guerrero* as having answered the distinct question of whether Congress had the constitutional authority to enact Section 1326 in the first place. 1-ER-39-40. But *Hernandez-Guerrero* did not merely describe a deterrence rationale that could have justified Congress's enactment of an illegal-reentry prohibition; its rationale tracks the reasons actually given when Congress passed Section 1326's predecessor. The Senate Report preceding the 1929 Act quotes Department of Labor submissions explaining that existing law provided no penalty, "other than repeated deportation," for most of the reentering noncitizens, and calling it "academic that no prohibitive law can successfully be enforced without a deterrent penalty." S. Rep. No. 70-1456, at 1-2.[12] If the

---

[12] The Labor Department also stated that "[m]any of the aliens who are required to be deported enter as seamen, and it goes without saying that deportation as passengers aboard regular passenger steamers is no penalty in this class

55

district court were correct that Congress's discriminatory motivations in 1929 carried over to 1952, then there is no good reason why these earlier *non-*discriminatory (and legitimate) reasons should not also be considered in evaluating what Congress would have done in 1952.

The need for a deterrent penalty would have been especially obvious (and important) to Congress given the post-1929 historical developments that the district court noted, including migratory-labor agreements with Mexico. 1-ER-37, 39. As a report in the record explained, Mexico was "increasingly concerned about the continuing high level of illegal immigration, which it viewed as something of a diplomatic embarrassment," 3-ER-308, and was willing to extend existing labor agreements only if the United States strengthened its laws against harboring and transporting noncitizens. *See* pp. 50-51, *supra*; 98 Cong. Rec. 795 (Sen. Ellender). It is implausible to conclude that Congress, faced with that landscape, would have forgone an illegal-reentry law and accepted a return to the situation described in the 1929 Senate Report—or that it would have

---

of cases." S. Rep. No. 70-1456, at 2. It seems unlikely that concerns about seamen unlawfully reentering the country were focused on Mexican immigration. *Cf. United States v. Lazarescu*, 104 F. Supp. 771, 773 (D. Md.) (prosecution of Romanian seamen under the 1929 Act), *aff'd*, 199 F.2d 898 (4th Cir. 1952); *United States v. Vasilatos*, 209 F.2d 195, 196 (3d Cir. 1954) (Greek seamen).

insisted on passing such a law solely because of a desire to discriminate against Mexican and Latinx persons.

2. More fundamentally, the repeated amendments to Section 1326 since 1952 obviate any need to speculate about whether Congress would have enacted the statute absent discriminatory motives. Congress has revisited Section 1326 five times—in 1988, 1990, 1994, and twice in 1996. 1-ER-7-9 nn.9-11. Many of the amendments increased the statute's "financial and carceral penalties," 1-ER-41, while others adjusted its scope (by "broaden[ing] the definition of 'deportation,'" 1-ER-8-9 n.11) and established criteria for raising a common defense to prosecution, *see* Pub. L. No. 104-132, § 441, 110 Stat. 1214, 1279 (1996) (codified as Section 1326(d)). Carrillo has not alleged, and the district court did not find, that *any* of these amendments was motivated by discriminatory intent. And the fact that Congress has repeatedly expanded Section 1326's scope or penalties without any evidence of discriminatory intent indicates that the law would have passed in the first instance absent any impermissible motive.

The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, is particularly illustrative of Congress's efforts to increase Section 1326's deterrent value in legislation that lacks any hint of racial animus. That Act authorized greater fines for Section 1326 violations, *id.* § 543, 104 Stat. 5059, a measure that

57

Carrillo's expert acknowledged to serve a valid deterrent purpose. 2-ER-119. Yet in the same Act, Congress more than doubled the then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to increase the number of visas provided to countries that were underrepresented in admission to the United States. Pub. L. No. 101-649, §§ 131, 303, 104 Stat. 4997-99, 5036-37. That Section 1326 was amended as part of legislation that marks "an about face away from the racist trope that accompanied" earlier immigration laws, *United States v. Gallegos-Aparicio*, No. 19-cr-2637, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020), confirms that Congress viewed the statute as an important deterrence measure separate and apart from any discriminatory motive.

The district court's two reasons for dismissing the relevance of these post-1952 actions are unavailing. The first—that the amendments "do not reflect any change of Congressional intent, policy, or reasoning," 1-ER-42—reveals a basic misunderstanding of the legislative process.[13] The decision to alter a statute's maximum penalties and penalty structure necessarily means that Congress has

---

[13] The court's additional suggestion that penalty increases are not "'substantive'" (1-ER-41) is both incorrect and in significant tension with its earlier conclusion that an amendment that makes a statute more "punitive in nature" *is* a "substantive change," 1-ER-24.

evaluated existing policy, decided it does not strike the right balance, and altered that balance. *See United States v. Suquilanda*, No. 21-cr-263, 2021 WL 4895956, at *5 (S.D.N.Y. Oct. 20, 2021) (post-1952 amendments have served "to enhance penalties or otherwise rebalance the deterrent effect of the law"). The court's second reason was that "at no point has Congress confronted the racist, nativist roots of Section 1326." 1-ER-43. But the court recognized that no "binding precedent" supported such a requirement and instead drew it from solo concurrences in two recent Supreme Court decisions. 1-ER-42-43 (citing *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2274 (2020) (Alito, J., concurring); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring in part)). And a requirement that Congress "grapple" (1-ER-42) with prior laws makes little sense in a scenario like this one, where allegations that such laws were driven by discriminatory intent have been aired only recently, *see* p. 44, *supra*.

3. Finally, the district court erred in concluding that the record failed to establish that considerations of economic protection, national security, and foreign relations would have not ensured the passage of Section 1326 absent any discriminatory intent. 1-ER-36-39. The government presented evidence on those considerations through its questioning of Carrillo's expert witnesses, *e.g.*, 2-ER-102-08, 111-14, 206-08, 210-14, and buttressed points covered in that

59

testimony with a report prepared for a Senate subcommittee on U.S. immigration law and policy, 3-ER-265-411. In analyzing the government's evidence on these points, however, the district court took the opposite approach to its treatment of Carrillo's evidence of discriminatory intent: it considered each permissible motive for passing Section 1326 in isolation, rather than evaluating those motives in their "totality." 1-ER-34. Moreover, the court discounted evidence that these considerations motivated the passage of Section 1326 largely because Carrillo's expert, while conceding that they were motivating factors, maintained that "'racial animus is *also* at play.'" 1-ER-38-39 (emphasis added). But a court reaches this stage of the *Arlington Heights* inquiry only if it has found (or assumed) that a discriminatory purpose is at play to some degree. A witness's belief that dual motives existed for enacting Section 1326, one discriminatory and one legitimate, therefore does not preclude a conclusion that the legitimate motive was sufficiently powerful to ensure the statute's passage.

**CONCLUSION**

The judgment of the district court should be reversed.

Respectfully submitted,

CHRISTOPHER CHIOU
Acting United States Attorney

ELIZABETH O. WHITE
Appellate Chief
PETER H. WALKINGSHAW
Assistant United States Attorney
District of Nevada

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Acting Deputy Assistant Attorney General

s/  Scott Meisler
SCOTT A.C. MEISLER
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 307-3803
scott.meisler@usdoj.gov

November 19, 2021

# STATUTORY ADDENDUM

**An Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, Pub. L. No. 70-1018, 45 Stat. 1551 (March 4, 1929).**

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this Act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

\* \* \*

Sec. 2.  Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for not more than one year or by a fine of not more than $1,000, or by both such fine and imprisonment.

**Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 229 (June 27, 1952).**

 Any alien who -

    (1) has been arrested and deported or excluded and deported, and thereafter

A1

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

## 8 U.S.C. § 1326 (as last amended in 1996)

### (a) In general

Subject to subsection (b), any alien who—

(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under title 18, or imprisoned not more than 2 years, or both.

### (b) Criminal penalties for reentry of certain removed aliens

Notwithstanding subsection (a), in the case of any alien described in such subsection—

(1) whose removal was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or

A2

both, or a felony (other than an aggravated felony), such alien shall be fined under title 18, imprisoned not more than 10 years, or both;

(2) whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both;

(3) who has been excluded from the United States pursuant to section 1225(c) of this title because the alien was excludable under section 1182(a)(3)(B) of this title or who has been removed from the United States pursuant to the provisions of subchapter V, and who thereafter, without the permission of the Attorney General, enters the United States, or attempts to do so, shall be fined under title 18 and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence. or

(4) who was removed from the United States pursuant to section 1231(a)(4)(B) of this title who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under title 18, imprisoned for not more than 10 years, or both.

For the purposes of this subsection, the term "removal" includes any agreement in which an alien stipulates to removal during (or not during) a criminal trial under either Federal or State law.

**(c) Reentry of alien deported prior to completion of term of imprisonment**

Any alien deported pursuant to section 1252(h)(2) [2] of this title who enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be incarcerated for the remainder of the sentence of imprisonment which was pending at the time of deportation without any reduction for parole or supervised release. Such alien shall be subject to such other penalties relating to the reentry of deported aliens as may be available under this section or any other provision of law.

**(d) Limitation on collateral attack on underlying deportation order**

In a criminal proceeding under this section, an alien may not challenge the

A3

validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that—

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

A4

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Ninth Cir. R. 32-1(a), I hereby certify that this brief contains 13, 796 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)) and has been prepared in a proportionally spaced, 14-point typeface using Microsoft Word 2013.

s/ Scott Meisler
Scott A.C. Meisler

## STATEMENT OF RELATED CASES

The same constitutional challenge at issue in this appeal is presented in *United States v. Vasquez-Ortiz*, No. 21-10309. It is also likely to be among the questions presented in *United States v. Gutierrez-Barba*, No. 21-10232 (opening brief due Dec. 20, 2021); and in *United States v. Machic-Xiap*, No. 3:19-cr-407 (D. Or.), once appeal is taken from the final judgment in that case.

s/ Scott Meisler
Scott A.C. Meisler