Case No. 21-10233

# United States Court of Appeals for the Ninth Circuit

United States of America,

       Plaintiff/Appellant,

v.

Gustavo Carrillo-Lopez,

       Defendant/Appellee.

D.C. No. 3:20-cr-00026-MMD-WGC
(Reno, Nevada)

Appeal from the United States District Court
for the District of Nevada

## Appellee Gustavo Carrillo-Lopez's Answering Brief

Rene L. Valladares
Federal Public Defender
Lauren Gorman*
Ellesse Henderson*
Amy B. Cleary*
Wendi L. Overmyer*
Assistant Federal Public Defenders
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Lauren_Gorman@fd.org
Ellesse_Henderson@fd.org
Amy_Cleary@fd.org
Wendi_Overmyer@fd.org

*Counsel for Appellee Carrillo-Lopez

# Table of Contents

Table of Contents .................................................................ii

Table of Authorities.............................................................v

Jurisdictional Statement......................................................1

Detention Status .................................................................1

Issue Presented for Review ..................................................1

Relevant Constitutional Provisions and Statutes ..................1

Introduction........................................................................2

Statement of the Case ..........................................................4

I.     8 U.S.C. § 1326 charge ....................................................4

II.    Motion to Dismiss.........................................................5

    A.    Rampant anti-Latino racism and discrimination in the 1920s led to criminalizing illegal reentry. ..............6

    B.    Against this discriminatory backdrop, Congress criminalized illegal reentry in the "Undesirable Aliens Act" of 1929. ..............9

    C.    Anti-Latino animus continued influencing federal immigration legislation in the 1950s.........................12

    D.    For the past century, Latino persons have constituted nearly all arrests and prosecutions for illegal reentry. .........................17

III.   District court's decision................................................18

Summary of Argument.......................................................20

Argument..........................................................................22

I.     Standard of Review ......................................................22

II.   The district court correctly held *Arlington Heights* applies..........23

   A.   Immigration cases from this Court and the Supreme Court
        apply *Arlington Heights* to equal protection challenges. ...........24

   B.   *Regents* and *Ramos* align with Supreme Court cases about
        Congress's "plenary power" over immigration. .........................28

      1.   Courts apply *Arlington Heights* when statutes affect the
           rights of people within the United States..............................29

      2.   Criminal statutes receive higher scrutiny...............................30

   C.   The cases the government relies on are inapposite. .................33

III.  The district court correctly held 8 U.S.C. § 1326 violates the
      Fifth Amendment. ...........................................................37

   A.   The district court properly considered the intent of both the
        1929 and the 1952 legislatures...................................................39

   B.   The district court properly analyzed the *Arlington Heights*
        factors to hold Congress enacted § 1326 with a discriminatory
        purpose. ........................................................................47

      1.   The disparate impact of § 1326 provides powerful evidence
           of discriminatory intent. .........................................................48

      2.   Congress passed the Undesirable Aliens Act and the
           McCarran-Walter Act during times of widespread public
           anti-Latino animus.................................................................56

      3.   The events surrounding the criminalization of  illegal
           reentry support the legislatures' discriminatory intent..........58

      4.   Both legislatures departed from normal procedures in
           enacting and reenacting the illegal reentry provision. ...........59

      5.   Discriminatory intent appears in the legislative history of
           both the 1929 enactment and 1952 reenactment...................60

C.    The government failed to prove § 1326 would have been
      enacted without the impermissible racist motivations. ............68

   1.   Amendments after 1952 failed to purge the law of its racial
        animus and carried forward the same or similar language. ....69

   2.   Carrillo-Lopez's expert testimony, quoted out of context,
        does not support the government's argument. ........................72

Conclusion ..........................................................................................75

Statement of Related Cases

Certificate of Compliance

Certificate of Service

Addendum

iv

# Table of Authorities

## Federal Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ......................................................... *passim*

*Alexander v. Youngstown Bd. of Ed.,*
675 F.2d 787 (6th Cir. 1982) .................................................. 23, 56

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ............................................................. 71

*Aman v. Cort Furniture Rental Corp.,*
85 F.3d 1074 (3d Cir. 1996) ................................................... 57, 66

*Anderson v. Bessemer City,*
470 U.S. 564 (1985) ......................................................... 22, 23, 74

*Anderson v. Pac. Coast S.S. Co.,*
225 U.S. 187 (1912) ................................................................ 42

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015) ............................................... *passim*

*Arthur v. Nyquist,*
573 F.2d 134 (2d Cir. 1979) ....................................................... 52

*Ave. 6E Invs., L.L.C. v. City of Yuma,*
818 F.3d 493 (9th Cir. 2016) ............................................... *passim*

*Brown v. Bd. of Educ.,*
347 U.S. 483 (1954) ................................................................. 57

*California v. U.S. Dep't of Homeland Sec.,*
476 F. Supp. 3d 994 (N.D. *Cal.* 2020) ......................................... 30

*CASA de Maryland, Inc. v. Trump,*
355 F. Supp. 3d 307 (D. Md. 2018) ............................................. 30

*Castaneda v. Partida,*
430 U.S. 482 (1977) ........................................................... *passim*

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................................ 48, 51

*City of Cleburne v. Cleburne Living Center, Inc.,*
    473 U.S. 432 (1985) ................................................................... 73

*Columbus Bd. of Educ. v. Penick,*
    443 U.S. 449 (1979) ............................................................ 48, 49

*Cook Cnty. v. Wolf,*
    461 F. Supp. 3d 779 (N.D. Ill. 2020) ............................................. 30

*Dent v. Sessions,*
    900 F.3d 1075 (9th Cir. 2018) ..................................................... 24

*Easley v. Cromartie,*
    532 U.S. 234 (2001) ............................................................ 22, 23

*Espinoza v. Montana Dep't of Revenue,*
    140 S. Ct. 2246 (2020) ................................................... 41, 45, 53

*Fiallo v. Bell,*
    430 U.S. 787 (1977) .................................................................. 30

*Flores v. Merced Irrigation Dist.,*
    758 F. Supp. 2d 986 (E.D. Cal. 2010) ........................................... 65

*Galdamez v. Potter,*
    415 F.3d 1015 (9th Cir. 2005) ..................................................... 66

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ............................................................ 49, 50

*Guinn v. United States,*
    238 U.S. 347 (1915) ............................................................. 49-50

*Hampton v. Mow Sun Wong,*
    426 U.S. 88 (1976) ................................................................... 34

*Hernandez v. Texas,*
    347 U.S. 475 (1954) .................................................................. 57

*Hunter v. Underwood,*
    471 U.S. 222 (1985) ........................................................... *passim*

*Immigration & Naturalization Serv. v. Lopez-Mendoza,*
    468 U.S. 1032 (1984) ..................................................... 31

*Jean v. Nelson,* 711 F.2d 1455 (11th Cir. 1983),
    *on reh'g,* 727 F.2d 957 (11th Cir. 1984) ........................... 40, 56, 60

*Keene Corp. v. United States,*
    508 U.S. 200 (1993) ...................................................... 42

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963) ...................................................... 33

*Kwai Fun Wong v. United States,*
    373 F.3d 952 (9th Cir. 2004) ........................................ 25

*Lahoti v. VeriCheck, Inc.,*
    586 F.3d 1190 (9th Cir. 2009) ............................... 23, 49

*Lane v. Wilson,*
    307 U.S. 268 (1939) ...................................................... 49

*League of Women Voters of Fla., Inc. v. Lee,* ___ F. Supp. 3d ___,
    2022 WL 969538 (N.D. Fla. Mar. 31, 2022) ................................ 67

*Ledezma-Cosino v. Sessions,*
    857 F.3d 1042 (9th Cir. 2017) ...................................... 34

*Lewis v. Ayers,*
    681 F.3d 992 (9th Cir. 2012) ................................... 23, 49

*Loving v. Virginia,*
    388 U.S. 1 (1967) ................................................... 31, 57

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ............................................... 29, 34

*Miller v. Johnson,*
    515 U.S. 900 (1995) ...................................................... 39

*Regents of the Univ. of Cal. v. Dept. of Homeland Security,*
    908 F.3d 476 (9th Cir. 2018), ........................................... 20, 25, 26

*Pac. Shores Props., L.L.C.* v. *City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ................................................. 55-56

*Pavon v. Swift Transp. Co.,*
    192 F.3d 902 (9th Cir. 1999) ....................................................... 65

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ............................................................. 37, 51

*Plyler v. Doe,*
    457 U.S. 202 (1982) ............................................................. 29, 57

*Pullman-Standard, Div. of Pullman v. Swint,*
    456 U.S. 273 (1982) .................................................................. 24

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ........................................ 41, 43, 44, 67, 70

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ............................................... *passim*

*Reno v. Bossier Par. Sch. Bd.,*
    520 U.S. 471 (1997) ............................................................. 48, 49

*Reynoso v. Giurbino,*
    462 F.3d 1099 (9th Cir. 2006) ..................................................... 19

*Rogers v. Lodge,*
    458 U.S. 613 (1982) .................................................................. 56

*Sessions v. Morales-Santana,*
    137 S. Ct. 1678 (2017) .............................................................. 36

*Smith v. Clarkton,*
    682 F.2d 1055 (4th Cir. 1982) ............................................... 37, 67

*Smith v. Doe,*
    538 U.S. 84 (2003) .................................................................... 32

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ..................................................... 26, 29, 30

*Tun-Cos v. Perrotte,*
    922 F.3d 514 (4th Cir. 2019) ........................................... 31

*United States v. Amador-Bonilla,* No. CR-21-187-C,
    2021 WL 5349103 (W.D. Okla. Nov. 16, 2021) ........................... 35

*United States v. Ayala-Bello,* 995 F.3d 710 (9th Cir.),
    *cert. denied*, 142 S. Ct. 513 (2021). ....................................... 34, 35

*United States v. Barajas-Guillen,*
    632 F.2d 749 (9th Cir. 1980) ........................................... 34

*United States v. Bussell,*
    504 F.3d 956 (9th Cir. 2007) ........................................... 22

*United States v. Calderon-Segura,*
    512 F.3d 1104 (9th Cir. 2008) ........................................... 34

*United States v. Coleman,*
    24 F.3d 37 (9th Cir. 1994) ........................................... 53, 54

*United States v. Depue,*
    912 F.3d 1277 (9th Cir. 2019) ........................................... 19

*United States v. Dumas,*
    64 F.3d 1427 (9th Cir. 1995) ........................................... 54

*United States v. Ferreira,*
    275 F.3d 1020 (11th Cir. 2001) ........................................... 34

*United States v. Fordice,*
    505 U.S. 717 (1992) ........................................... 44

*United States v. Gutierrez-Barba,* No. CR-119-01224-001-PHX-DJH,
    2021 WL 2138801 (D. Ariz. May 25, 2021) ........................... 35-36

*United States v. Hernandez-Guerrero,*
    147 F.3d 1075 (9th Cir. 1998) ........................................... 32, 33

ix

*United States v. Joya-Martinez,*
    947 F.2d 1141 (4th Cir. 1991) ..................................................... 31

*United States v. Martinez-Ramos,*
    184 F.3d 1055 (9th Cir. 1999) ..................................................... 31

*United States v. Mendoza-Lopez,*
    481 U.S. 828 (1987) ..................................................... 28

*United States v. Novondo-Ceballos,*
    554 F. Supp. 3d 1114 (D.N.M. 2021) ..................................... 35, 36

*United States v. Ruiz-Chairez,*
    493 F.3d 1089 (9th Cir. 2007) ..................................................... 34

*United States v. Ruiz-Rivera,* No. 3:20-MJ-20306-AHG,
    2020 WL 5230519 (S.D. Cal. Sept. 2, 2020) ............................... 36

*United States v. Rundo,*
    990 F.3d 709 (9th Cir.) ................................................................ 22

*United States v. Ryder,*
    110 U.S. 729 (1884) ..................................................... 42

*United States v. Samuels-Baldayaquez,* No. 4:20-CR-83,
    2021 WL 5166488 (N.D. Ohio Nov. 5, 2021) ......................... 35, 36

*United States v. Thomas,*
    211 F.3d 1186 (9th Cir. 2000) ..................................................... 75

*United States v. Vasquez-Escobar,*
    30 F. Supp. 2d 1364 (M.D. Fla. 1998) ........................................ 31

*United States v. Wence,* No. 3:20-CR-0027,
    2021 WL 2463567 (D.V.I. June 16, 2021) ................................... 35

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................... *passim*

*Washington v. Davis,*
    426 U.S. 229 (1976) ..................................................... 38, 54, 67

*Washington v. United States Dep't of Homeland Sec.*,
No. 4:19-CV-5210-RMP, 2021 WL 6206983
(E.D. Wash. Feb. 1, 2021) ............................................................ 30

*Wong Wing v. United States*,
163 U.S. 228 (1896) ............................................................... 31, 32

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ...................................................................... 50

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ................................................................. 28, 29

**Federal Statutes**

5 U.S.C. § 701(2) ................................................................................ 26

8 U.S.C. § 1326 .......................................................................... *passim*

**State Statutes**

Nev. Rev. Stat. § 453.366(2)(d) (2021) ......................................... 5

Nev. Rev. Stat. § 453.3385(1)(c) (2019) ....................................... 5

**Enacted Legislation**

Emergency Quota Act of 1921, Pub. L. No. 67-5,
42 Stat. 5 (May 19, 1021) ............................................................. 7

Immigration and Nationality Act of 1952 (McCarran-Walter Act of
1952), Pub. L. No. 82-414, § 276, 66 Stat. 229
(June 27, 1952) ......................................................... 14, 56, 61, 63

Johnson-Reed National Origins Act of 1924, Pub. L. No. 68-139,
43 Stat. 153 (May 26, 1924) ........................................................ 7

Undesirable Aliens Act of 1929, Pub. L. No. 70-1018,
45 Stat. 1551 (March 4, 1929) .......................................... 12, 47, 56

**Legislative Materials**

65 Cong. Rec. 5841 (1924) ................................................................. 8, 60

70 Cong. Rec. 2086, 2091-92 (1929) .................................................... 11

70 Cong. Rec. 3542 (1929) ................................................................. 9

70 Cong. Rec. 3619 (1929) ................................................................. 60

70 Cong. Rec. 5200 (1929) ................................................................. 61

98 Cong. Rec. 791-800 (1952) ............................................................ 13

98 Cong. Rec. 793-94 (1952) ........................................................ 13, 55

98 Cong. Rec. 799 (1952) ................................................................... 55

98 Cong. Rec. 4314 (1952) ............................................................ 15, 63

98 Cong. Rec. 4315-21 (1952) ............................................................ 15

98 Cong. Rec. 4318, 4320 (1952) ................................................... 14, 15

98 Cong. Rec. 4403 (1952) ................................................................. 15

98 Cong. Rec. 4442 (1952) ............................................................ 15, 41

98 Cong. Rec. 5773-74 (1952) ............................................................ 62

98 Cong. Rec. 5766 (1952) ............................................................ 15, 58

98 Cong. Rec. 8214-25, 8253-68 (1952) ............................................... 16

98 Cong. Rec., Index to the Proceedings, 82nd Congress (1952) .......... 62

99 Cong. Rec. 1517-18 (1953) ............................................................ 63

165 Cong. Rec. E1571-72 (2019) ........................................................... 44

S. Rep. No. 81-1515 (1950) ......................................................... *passim*

*Eugenical Aspects of Deportation, Hearings before the*
   *Committee on Immigration and Naturalization*, 70th Cong.
   (1928) H*earings before the Subcomm. of the S. Comm. on*
   *Appropriations*, 82nd Cong. (1951) ............................................. 10

*Hearings before the Subcomm. of the S. Comm. on Appropriations:*
   *H.R. 4974*, 83rd Cong. (1953) ...................................................... 62

*Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before*
   *the Subcomms. on the Judiciary*, 82d Cong. (1951) .................... 47

## Pending Legislation

New Way Forward Act, H.R. 536, 117th Congress (2021) ................... 44

## Other Government Materials

U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses,*
   *Fiscal Year 2019* (May 2020) ........................................................ 18

U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses,*
   *Fiscal Year 2020* (May 2021) ........................................................ 18

## Secondary Sources

*Harry Laughlin and Eugenics*, Truman State University (2020) .......... 7

## Jurisdictional Statement

Appellee Carrillo-Lopez agrees with the government's jurisdictional statement. OB-3.

## Detention Status

Carrillo-Lopez is serving a drug-related state sentence in the Nevada Department of Corrections. 4-ER-600–601.

## Issue Presented for Review

Whether the district court correctly held 8 U.S.C. § 1326 violates the Fifth Amendment under *Arlington Heights*.

## Relevant Constitutional Provisions and Statutes

The attached Addendum contains the relevant materials.

# Introduction

After extensive fact-finding and analysis, the district court correctly applied precedent to hold, under the totality of circumstances, Congress violated the Fifth Amendment's prohibition against race discrimination by enacting 8 U.S.C. § 1326 with a discriminatory purpose. 1-ER-2; *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). The decision below accurately considered the reprehensible anti-Latino intent and history undergirding § 1326.[1] The government did not attempt to argue the law was not infected by this racial animus, nor did it prove the law would have been enacted in its absence. 1-ER-2. This Court should affirm the district court's well-reasoned opinion dismissing the indictment. 1-ER-2–45.

---

[1] "Latino" refers to people from Latin American countries, including Mexico. The terms "Hispanic" (people from predominately Spanish-speaking countries) or "Mexican" (people from Mexico) have at times been used interchangeably. For the sake of clarity and inclusiveness, the general term "Latino" will be used when discussing earlier law.

Section § 1326 originated in 1929 when openly racist "nativist"[2] congressmen wanted to keep the American bloodline "white and purely Caucasian," 1-SER-223, while still maintaining a cheap, exploitable Latino workforce. *See* 1-ER-25; 2-ER–94–95. For two decades, the illegal reentry law worked as intended, ensnaring tens of thousands of Latinos in the cycle of entry–labor–prosecution–deportation. 1-ER-26.

By 1952, several of the same 1929 legislators held positions of authority in Congress and the White House. They faced a crucial choice about the future of illegal reentry: (1) carry forward the illegal reentry provision without debate, including any discussion of its known discriminatory purpose and effect; (2) debate the provision and reenact it; or (3) repeal it. Congress chose the first option. 1-ER-18–19.

Relying on unrebutted evidence, the district court correctly concluded Congress enacted § 1326 with discriminatory intent and that the government failed to prove the same law would have been passed absent discriminatory intent. 1-ER-27. Both below and on appeal, the

---

[2] "Nativists" were legislators opposed to non-white immigration, based on beliefs of white supremacy and eugenics. 1-ER-14, 16, 22, 43; 2-ER-89.

government does not challenge the historical record. Instead, the government misreads well-established precedent, insisting that congressional immigration power exempts the § 1326 criminal law from the close judicial review applied to facially-neutral yet racially-discriminatory statutes. This Court should decline the government's unprecedented attempt to insulate criminal laws from equal protection challenges and affirm dismissal.

## Statement of the Case

### I.    8 U.S.C. § 1326 charge

Carrillo-Lopez was brought to the United States as a child. Immigration authorities removed him from the United States in 1999 and 2012 after addiction-related state drug and alcohol convictions. 4-ER-606–607.

In June 2019, police broke down the door to his family home and found a baggie containing 28 grams or more of methamphetamine. 2-SER-317–324. At that time, non-violent drug possession fell under

Nevada's "trafficking" statute.[3]  4-ER-579; 2-SER-319.  Carrillo-Lopez

pled guilty in state court and received a life sentence with the

possibility of parole after ten years.  2-SER-326–329.

Despite the life sentence he is now serving, the federal

government pursued an "illegal reentry" charge under 8 U.S.C. § 1326

in June 2020.  4-ER-606–607.

## II.  Motion to Dismiss

Carrillo-Lopez moved to dismiss the indictment under the Fifth

Amendment's Due Process Clause.  4-ER-556–590; 1-SER-37–300; 2-

SER-301–329.  An oral argument, evidentiary hearing, and

supplemental briefing followed, with two defense experts detailing the

racist history of the illegal reentry statute.  1-ER-16 n.10; 2-ER-47–259;

4-ER-445–505; 1-SER-2–36.[4]

---

[3] *See* Nev. Rev. Stat. § 453.3385(1)(c) (2019).  Today, this offense
constitutes "unlawful possession not for purpose of sale" and carries a
10-year maximum sentence.  Nev. Rev. Stat. § 453.366(2)(d) (2021).

[4] This legislative record for 8 U.S.C. § 1326 is also detailed in the
Affidavit of Dr. S. Deborah Kang, Associate Professor of History at the
University of Virginia, filed in *United States v. Munoz-De La O*, No.
2:20-cr-00134-RMP, ECF No. 78-B (E.D. Wash. Dec. 22, 2021).

In its opening brief the government truncates the legislative record, minimizing the law as a congressional attempt to "dissuade those who had been removed from returning." OB-4–8. Because the district court relied on the full legislative record from the 1920's forward, Carrillo-Lopez summarizes the history of § 1326 to assist this Court's review.

## A. Rampant anti-Latino racism and discrimination in the 1920s led to criminalizing illegal reentry.

Congress criminalized illegal reentry at the end of the 1920s, a decade in which "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." 2-ER-88–89; 4-ER-584. In the southwestern United States, a system of "Juan Crow" Latino segregation developed, paralleling "Jim Crow" segregation of Black Americans in the South. 1-ER-14; 2-ER-93–94, 120–21; 4-ER-586. "Police violence against Mexicanos was common. And, 'No Negroes, Mexicans, or Dogs' signs were posted on restaurant doors." 4-ER-586. Latino immigrants lived segregated, disenfranchised lives, stereotyped and degraded by popular eugenics theorists, who preached the supremacy of white Northern and Western Europeans. 1-ER-14; 2-ER-88–89, 93–94; 4-ER-584–586.

6

This racist sentiment pervaded the highest levels of government, including Congress. Based on eugenics, Congress worked towards a "Whites-only" federal immigration system. 4-ER-584–585. Congress received testimony and four reports from leading eugenics theorist Dr. Harry H. Laughlin, whose beliefs were adopted by the Third Reich of Nazi Germany.[5] 1-ER-15; 1-SER-106–108.

Swayed by Dr. Laughlin's theories, Congress passed immigration legislation throughout the 1920s to exclude "undesirable" immigrants. 1-ER-16; 4-ER-584–585. In 1921, Congress passed its first numerical immigration restrictions based on race. *See* Emergency Quota Act of 1921, Pub. L. No. 67-5, 42 Stat. 5. Then in 1924, Congress refined the "quota" system to keep the nation predominantly Anglo-Saxon. *See* Johnson-Reed National Origins Act of 1924, Pub. L. No. 68-139, 43 Stat. 153; *see also* 1-ER-13–14; 2-ER-88–89, 128–129; 4-ER-585. Nearly all immigration quota slots—96%—were reserved for white Europeans. 1-ER-13; 4-ER-585.

---

[5] 4-ER-563 (citing *Harry Laughlin and Eugenics*, Truman State University (2020), https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/).

Yet there was a problem—the National Origins Act did not set quotas on Latino immigrants because agribusiness interests successfully lobbied to keep the country open to exploitable Latino labor. 1-ER-14; 2-ER-88–91; 4-ER-585; 4-ER-585–586. Texas Representative John Box complained Latino immigrants were unchecked because southwestern farms were "interested in the importation of these poor peons." 1-SER-199. Illinois Representative Martin Madden added the 1924 bill "leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon." 65 Cong. Rec. 5841 (1924). Connecticut Representative Patrick O'Sullivan criticized the lack of restrictions on Latino immigrants compared to white Italian immigrants: "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." 1-ER-216. Legislators "proposed bill after bill" restricting Latino immigration, but none could survive the powerful agribusiness lobbyists. 1-ER-14; 4-ER-587.

**B.     Against this discriminatory backdrop, Congress criminalized illegal reentry in the "Undesirable Aliens Act"[6] of 1929.**

To resolve the standoff between agribusiness and the legislature, "proud and unreconstructed white supremacist" South Carolina Senator Coleman Blease proposed approaching immigration criminally.  *See* 4-ER-565–566.  By criminalizing illegal reentry rather than impose civil restrictions at the border, Latino laborers could work during the growing season, then be expelled through criminal prosecution after the harvest.  *See* 4-ER-565–566*;* 2-ER-95, 193.

The House of Representatives' powerful Immigration and Naturalization Committee pushed forward the 1929 Act.  4-ER-566. This Committee's Chairman was Rep. Albert Johnson, for whom the 1929 Act was named, a "vehement racist and nativist," who was "especially concerned for the racial purity of the country."  4-ER-566.

_____

[6] The government attempts to create a factual dispute on appeal about the 1929 statute's official name.  OB-5 n.2.  But the government does not dispute the "Undesirable Aliens Act" is the title the Senate provided.  70 Cong. Rec. 3542 (1929).  Nor did the government dispute this title is widely accepted, as explained by Carrillo-Lopez's unrebutted expert testimony.  1-ER-142–143, 147–148, 150–152, 156–157, 163, 193, 202, 242.

The House Immigration Committee held a eugenics hearing with Dr. Laughlin as the principal witness. 1-SER-104–192; 4-ER-567; *Eugenical Aspects of Deportation, Hearings before the Committee on Immigration and Naturalization*, 70th Cong. 2 (1928). Representatives Thomas Jenkins and Adolph Sabath, who remained in office through 1952, were members of the Immigration Committee and attended the hearing. Chairman Johnson praised Dr. Laughlin's reports on race crossing as "priceless" resources "bear[ing] intimately on immigration policy," 1-SER-108; 4-ER-568, and "of great use to the [immigration] committee in its deliberations." 1-SER-116; 4-ER-568. Dr. Laughlin told the committee "[i]mmigration control is the greatest instrument which the Federal Government can use in promoting race conservation of the Nation." 1-SER-124. He compared Congress to "successful breeders of thoroughbred horses," who should never consider "acquiring a mare or a stallion not of the top level" for their "stud farm." 1-SER-149.

Congressmen openly discussed the need to keep immigration limited to white Northern and Western Europeans. Representatives lamented Mexican "hordes" coming in "droves," and argued, from a

10

"moral standpoint," Latinos were "poisoning the American citizen" because they are "of a class" "very undesirable." 1-SER-199–200. Representative Box characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization," and he referred to Mexican citizens as having "negro slave blood" creating "the Mexican peon" "different from us in character, in social position." 1-SER-219–220; *see* 4-ER-566. Florida Representative Robert Green advocated for imposing quotas on immigration from countries south of the United States he characterized as "composed of mixture blood of White, Indian, and negro" that endangered America from keeping its "blood white and purely Caucasian." 1-SER-223; 4-ER-567.

The Senate easily passed the bill, without debate, by a unanimous quorum. 1-SER-261–279; 70 Cong. Rec. 2086, 2091–92 (1929). The House passed the bill after debate and minor amendment. 1-SER-201. President Hoover signed the Act into law on March 22, 1929. 1-SER-281–282. The statute read: "[I]f any alien has been arrested and deported in pursuance of law . . . and if he enters or attempts to enter

the United States . . . he shall be guilty of a felony." Undesirable Aliens Act of 1929, Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551.

Between 1929 and 1936, over 40,000 Latino migrants were imprisoned under the illegal reentry law. 4-ER-590. Latinos often comprised 99% of defendants each year. 1-ER-11; 4-ER-589–590. "[N]o other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison during those years." 4-ER-590.

## C.   Anti-Latino animus continued influencing federal immigration legislation in the 1950s.

When the Great Depression ended in 1941, agribusiness labor demands led to the Bracero Program (1942–1964), a temporary guest-worker program allowing continued exploitation of Latino labor. 2-ER-110–111, 134–139, 149–150, 154–156, 186–188. Bracero agricultural immigrants experienced routine gassings with DDT and invasive physical inspections. They were racially stereotyped as "fit" only "for agricultural labor," unlike their white immigrant counterparts. 1-ER-37.

In 1952—the midpoint of the Bracero Program—criminalization of Latino immigration continued. Thirty congressmen from the 1929

12

Congress remained in office, many holding positions of authority, including five Senators. Former Sen. Alben Barkley (KY), who served in the 1929 Senate, was now the U.S. Vice President and thus Senate President. The 1950 senate report chaired by Nevada Senator Pat McCarran is replete with racism, particularly denigrating Latino immigrants. S. Rep. 81-1515, at 150-52, 176 (1950); *see infra*, pp. 17, 55, 61–62.

One of the first immigration laws passed in 1952 was the "Wetback Bill," making "it an offense to harbor or to transport or to bring in wetbacks," but exempting employers from prosecution. 1-ER-24; 98 Cong. Rec. 791–800 (1952); 2-ER-158–159. During debates for the "Wetback Bill," legislators explained an upcoming bill—the § 1326 statute—would go even further to curb the "wetback problem." 98 Cong. Rec. 793–94 (1952). In debates the legislators repeatedly called Latino migrants "wetbacks" and stated Latino immigrants were "of inferior quality." 2-ER-158–173; 98 Cong. Rec. 791–800 (1952).

Two months after passing the Wetback Bill, Congress passed the Immigration and Nationality Act of 1952 (often called the McCarran-Walter Act of 1952), Pub. L. No. 82-414, § 276, 66 Stat. 229. *See* 1-ER-

29.  This Act recodified the 1929 illegal reentry statute and continued

the national-origins immigration quotas of the 1920s.  Congressional

debate focused on the national-origins provisions, not the illegal reentry

statute reenactment.  1-ER-26.  Thus, the reenactment carried forward

almost identical language: "Any alien who—(1) has been arrested and

deported or excluded and deported, and thereafter (2) enters, attempts

to enter, or is any time found in, the United States … shall be guilty of

a felony[.]"  McCarran-Walter Act, § 276; 1-ER-26–27; 2-ER-191–193.

The 1952 McCarran-Walter Act's legislative history shows racial

animus motivated its passing.  1-ER-27; 2-ER-190–193.  Senator

McCarran, the bill's co-author, stated immigration law must "preserve

the sociological and cultural balance in the population of the United

States."  S. Rep. No. 81-1515, at 455.  Congressmen implored their

colleagues to limit immigration to white Europeans.  Senator Walter

George reminded colleagues that when he voted for the 1920s

immigration laws, the purpose was to "preserve something of the

homogeneity of the American people."  98 Cong. Rec. 5774 (1952).

During the House debates, the focus remained on keeping America

predominantly white, with even "liberal" congressmen opposing racial

mixing. 98 Cong Rec. 4320 (1952) (statement of Rep. Celler). Representatives even praised Hitler, despite the then-recent atrocities of Hitler's eugenics-based terror. 98 Cong. Rec. 4314 (1952) (at 2-ER-177–178) (Idaho Rep. Wood stating, "It seems to me the question of racial origins—though I am not a follower of Hitler—there is something to it."). Representative John Rankin, who had served in 1929, decried immigration reform as efforts to "destroy the white race" and "white gentiles." 98 Cong. Rec. 4315-21 (1952). Representative Jenkins, who also served in 1929, stated the House debate "has been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now." 98 Cong. Rec. 4442 (1952).

Governmental use of the slur "wetback" surrounded the 1952 immigration bills. Deputy Attorney General Peyton Ford quoted the slur in a May 1951 letter to the Judiciary Committee endorsing § 1326. 3-ER-439; 2-ER-160. And the slur was repeatedly used during the debates. 98 Cong Rec. 5167–68, 5317–21, 5766, 5787 (1952). Pennsylvania Representative Francis Walter, cosponsor of the Act,

15

likewise used the slur to refer to the "so-called wetback bill." 98 Cong. Rec. 4403 (1952).

President Harry Truman vetoed the 1952 Walter-McCarran Act because of its discriminatory provisions. 2-ER-176–177; 3-ER-420–430. President Truman warned Congress the bill "would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhuman aspects of our immigrations procedures." 3-ER-421; 2-ER-177. He disagreed with the bill's broadened deportation grounds and limited discretionary relief. 3-ER-427. President Truman pointedly explained, "[t]he price is too high, and in good conscience, I can't agree to pay it." 3-ER-421; 2-ER-177. Congress overrode the veto, including yea votes by several congressmen remaining in office since 1929, and § 1326 took effect June 27, 1952.[7] 3-ER-430; 98 Cong. Rec. 8214–25, 8253–68 (1952). Following passage of the Act, the INS began "Operation

---

[7] Congress has amended § 1326 five times, each time increasing its punitive nature without addressing its racist origins. *See infra,* pp. 69–71.

Wetback" in 1954—a mass deportation program that ultimately

removed 1.1 million Latinos from the United States, many of whom

were U.S. citizens.  2-ER-185–186; 3-ER-309–310.

**D.  For the past century, Latino persons have constituted nearly all arrests and prosecutions for illegal reentry.**

The government did not dispute below that § 1326 "bears more

heavily" on Latino persons.  1-ER-10.  In the decade after 1929, Latinos

made up "84% to 99% of defendants" for border crimes. 1-ER-11 (citing

4-ER-572).  The extensive 1950 senate report, noted by the government

(OB-6), found the majority of illegal immigrants being removed were

Latinos: "Deportations and voluntary departures to Canada were very

small, since approximately 90 percent of the cases were Mexicans."  S.

Rep. 81-1515, at 635 (1950); *see also id.* at 630–34 (finding Latinos

made up 90% or more of deportations and voluntary departures in

1946–47).  These numbers continue today, with nearly *all*

prosecutions—99%—involving Latino defendants.[8]  Yet Latinos are less

than 80% of the undocumented population.[9]

Illegal reentry accounts for over 30% of all federal criminal

prosecutions.[10]  At the time of the motion to dismiss, DOJ policy was to

prosecute "'100%' of southern border crossings."  1-ER-10 (citing U.S.

Dep't of Justice, Statements of AG Sessions (Apr. 6, 2018)); *see also* 4-

ER-575–576.  Section 1326 thus continues to be wielded as a

discriminatory tool driving the mass incarceration of Latino people.

## III.  District court's decision

Applying *Arlington Heights* review, the district court found

Carrillo-Lopez proved discriminatory intent motivated both the 1929

and 1952 enactments of § 1326.  1-ER-9.  Overt racist "nativism and

---

[8] U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020* (May 2021), https://www.ussc.gov/sites/default/ files/pdf/research-and-publications/quick-facts/Illegal_Reentry_ FY20.pdf (99.1% Hispanic); *see also* U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2019* (May 2020), https:// www.ussc.gov/sites/default/files/pdf/research-and-publications/quick- facts/Illegal_Reentry_FY19.pdf (99% Hispanic).

[9] *Profile of the Unauthorized Population: United States*, Migration Policy Institute, https://www.migrationpolicy.org/data/unauthorized- immigrant-population/state/US.

[10] *Supra* n.8, *Illegal Reentry Offenses, Fiscal Year 2020.*

eugenics . . . fueled the Act's passage in 1929." 1-ER-16. And racism also "motivated the 1952 enactment." 1-ER-17–18. The burden thus "shift[ed] to the government to establish that 'the same decision would have resulted even had the impermissible purpose not been considered.'" 1-ER-35 (quoting *Arlington Heights*, 429 U.S. at 270 n.21).

Because the government produced no evidence on this point and conceded racial animus motivated the 1929 law,[11] the court found the government failed its burden. 1-ER-35–44. And the court found the government's alternative arguments, which claimed the 1929 law's racial taint was cleansed by later reenactment and amendments, were unsupported by the legislative record. 1-ER-35–44. The court therefore granted Carrillo-Lopez's motion to dismiss in a 45-page order. 1-ER-2–45.

---

[11] Although the government attempts to retract this concession, OB-12 n.3, it cannot. The government "is bound by its concessions." *Reynoso v. Giurbino*, 462 F.3d 1099, 1110 (9th Cir. 2006); *see also United States v. Depue*, 912 F.3d 1277, 1232 (9th Cir. 2019) (en banc). The district court noted and confirmed the concession repeatedly, which the government did not contest. 1-ER-13 n.17; 2-ER-76–77; 4-ER-496.

## Summary of Argument

The district court correctly held that Section 1326 violates the Fifth Amendment's prohibition on racial discrimination. *Arlington Heights*, 429 U.S. 252. The *Arlington Heights* framework demands that courts engage in a sensitive inquiry into such circumstantial and direct evidence of intent as may be available, examining, *inter alia*, disparate impact, legislative history, and historical background of a law. Doing so here, the district court correctly concluded Congress's discriminatory intent was "a motivating factor in the decision" to enact and reenact the illegal reentry law, rendering it unconstitutional. *Id.* at 265–66.

The government's claim that rational-basis review applies to Carrillo-Lopez's equal protection claim is foreclosed by precedent applying *Arlington Heights* to other immigration laws and policies. *Compare* OB-22, *with Regents of the Univ. of Cal. v. Dept. of Homeland Security*, 908 F.3d 476, 518–20 (9th Cir. 2018), *reversed on other grounds*, 140 S. Ct. 1891, 1915–16 (2020); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020). The precedent upon which the government relies applies to official actions regulating the admission and exclusion of foreign nationals. Here, the statute challenged criminalizes conduct of

persons inside the United States—warranting *Arlington Heights* review.

There is no serious dispute that Congress enacted the statute in 1929 out of racial animus, as nearly every page of the statute's legislative history contains overt bigotry. Yet the Government contends it can prevail even under *Arlington Heights*, insisting that the statute's reenactment in 1952 purged the discriminatory taint from the original statute. But the district court properly credited the overwhelming evidence in this record refuting that claim. The Congress that—in the very same law—enacted a racist immigration quota *over President Truman's veto* carried forward the 1929 law because of, not in spite of racial animus. Indeed, many of the same legislators enacted both statutes. The district court did not commit clear error in crediting the extensive expert testimony and uncontested legislative history supporting that conclusion. Finding Carrillo-Lopez carried his burden, and the government failed to meet its burden, the district court did not clearly err in holding the law violates the Fifth Amendment and dismissing the indictment.

## Argument

### I.    Standard of Review

A statute's constitutionality and a district court's dismissal of an indictment are both reviewed de novo.  *United States v. Rundo*, 990 F.3d 709, 713 (9th Cir.), *cert. denied*, 142 S. Ct. 865 (2022).

Clear error review applies to the district court's findings underlying dismissal.  "[A] finding of intentional discrimination is a finding of fact[.]"  *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *see Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018); *Hunter v. Underwood*, 471 U.S. 222, 229 (1985).  The deferential clear error standard determines "whether, 'on the entire evidence,' [the reviewing court] is 'left with the definite and firm conviction that a mistake has been committed.'"  *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citation omitted); *see also United States v. Bussell*, 504 F.3d 956, 962 (9th Cir. 2007).

Contrary to the government's claim, federal courts reject the argument that findings relying on documents "may more readily be" clear error.  OB-18–19.  "The clearly erroneous standard applies notwithstanding the fact that the appellate record may consist entirely

22

of documentary evidence." *Alexander v. Youngstown Bd. of Ed.*, 675 F.2d 787, 795–96 (6th Cir. 1982).

Appellate courts "will not reverse a lower court's finding of fact simply because [they] 'would have decided the case differently.'" *Easley*, 532 U.S. at 242 (citing *Anderson*, 470 U.S. at 573). Nor is the weight a district court places on a factor an appropriate area to challenge on clear error review. *See Lewis v. Ayers*, 681 F.3d 992, 998–99 (9th Cir. 2012); *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Lewis*, 681 F.3d at 999.

## II. The district court correctly held *Arlington Heights* applies.

The district court correctly held, under well-established precedent from this Court and the Supreme Court, *Arlington Heights* provides the test for analyzing § 1326's constitutionality. 1-ER-5. "The federal government's plenary power over immigration does not give it license to

enact racially discriminatory statutes in violation of equal protection."[12]

1-ER-4, 7 (quoting *Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir.

2018)).

### A. Immigration cases from this Court and the Supreme Court apply *Arlington Heights* to equal protection challenges.

As the district court correctly explained, this Court has settled

whether *Arlington Heights* applies to certain types of official actions,

regardless of whether they are part of "the immigration-regulation

framework." 1-ER-4; OB-54. It does.

First, in *Kwai Fun Wong v. United States*, this Court considered

an equal protection claim against the INS for "decisions involving

adjustment of status, advance parole, and revocation of temporary

---

[12] Should this Court disagree, it would be improper to apply
rational-basis in the first instance on appeal. *See Pullman-Standard,
Div. of Pullman v. Swint*, 456 U.S. 273, 291–92 (1982). Further
litigation in the district court is particularly necessary here, where the
government proposes a factual reason as the rational-basis for the law
that is subject to debate. *Compare* OB-2, 5–7, 13, 15–16, 24, 55–59
(arguing Congress had a rational-basis for passing § 1326 to "deter
violations of the country's immigration laws"), *with* Michael Corradini
et al., *Operation Streamline: No Evidence that Criminal Prosecution
Deters Migration*, Vera Institute of Justice, p. 8 (June 2018) (finding "no
measurable deterrent effect of illegal entry prosecutions").

parole." 373 F.3d 952, 968 (9th Cir. 2004). Rather than review under rational-basis, this Court looked to the alleged discriminatory animus underlying the immigration decisions, concluding the plaintiff had stated a valid claim for relief under the Fifth Amendment's equal protection component. *Id.*

Next, in *Regents*, this Court applied *Arlington Heights* in an equal-protection challenge to the government's rescission of the Deferred Action for Childhood Arrivals (DACA) program, although the program is a component of the nation's immigration regulation framework. 908 F.3d at 518–20. In reviewing *Regents*, the Supreme Court did not disturb that part of the holding (although it reversed for other reasons). *See Regents*, 140 S. Ct. at 1915–16; *id.* at 1917–18 (Sotomayor, J., concurring in part, dissenting in part).

After the Supreme Court's decision, this Court considered another discrimination claim arising in an immigration framework in *Ramos v. Wolf*, 975 F.3d at 896. Again, this Court applied *Arlington Heights*. While this Court rejected an equal protection challenge to the government's termination of the Temporary Protected Status (TPS) program for four countries, *id.* at 896, it explicitly rejected the same

argument the government makes here—that "in light of *Trump v. Hawaii*, the district court erred by applying the standard from *Arlington Heights*." *Id.* at 895. This Court decided *Ramos* after the Supreme Court decided *Regents*, demonstrating that this Court's original holding in *Regents* applying *Arlington Heights* remains good law.

The government's arguments challenging these holdings are unpersuasive. The government first minimizes *Regents* by asserting the Supreme Court faced a choice between an unreviewable administrative selective enforcement claim (as the government argued) or one governed by *Arlington Heights* due to racial animus (as the claimants argued but failed to prove). OB-29. The government's argument misunderstands the choice the Supreme Court faced. The parties in *Regents* disputed only whether a narrow *exception* to *Arlington Heights* applied—one not applicable here.[13] *Regents*, 140 S. Ct. at 1915. The Supreme Court avoided answering that question by concluding that the respondents'

---

[13] The narrow issue was whether the challenged executive agency decision fell within a limited category of unreviewable agency decisions under 5 U.S.C. § 701(2). *Regents*, 140 S. Ct. at 1905.

claim failed regardless. But what was not an option is the position the government is now advocating for—that rational-basis applies because the claim involved the Executive's immigration powers.

The government also fails to distinguish *Ramos*. The government first incorrectly claims DHS's termination of TPS designation for four countries was facially discriminatory. OB-29–30. It was not. While the TPS program makes country-based distinctions, it does so based on criteria that are facially neutral *regarding race*. *See Ramos v. Wolf*, 975 F.3d at 878. The government also tries to muddle *Ramos*'s holding by citing this Court's description of the plaintiffs as foreign nationals "lawfully" residing in the United States. OB-30–31. But *Ramos* did not rely on lawful status in its reasoning; as the government acknowledges, it distinguished instead between people who have "effected an entry into the United States" and those stopped on the threshold of entry. OB-30 (quoting *Ramos v. Wolf*, 975 F.3d at 896). Last, the government wrongly asserts the "foreign policy and national security implications" of § 1326 are "greater than those at play in *Ramos*." OB-31. That is nonsensical. The statute in *Ramos* required the DHS Secretary to cooperate with the State Department, required foreign countries to

specifically request protected status, and has long functioned as a

critical tool of American foreign policy. *Ramos v. Wolf*, 975 F.3d at 910

n.5. Here, the DOJ is solely responsible for prosecuting alleged § 1326

violators, with no foreign or diplomatic involvement.

**B.** ***Regents* and *Ramos* align with Supreme Court cases about Congress's "plenary power" over immigration.**

Although no panel of this Court could disregard *Regents* and

*Ramos*, their application of *Arlington Heights* to race discrimination

claims arising in the immigration context finds ample support in

Supreme Court doctrine. The Supreme Court has long held that: (1)

Congress has "plenary power" over immigration, and (2) "plenary

power" is a not monolithic concept. Persons within the United States

possess more constitutional rights, regardless of citizenship, than those

outside its borders. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

And all criminal defendants, including those charged with violating

§ 1326, are entitled to due process of law under the Fifth Amendment,

regardless of citizenship. *United States v. Mendoza-Lopez*, 481 U.S.

828, 837 (1987); *see* 1-ER-3–6.

1. **Courts apply *Arlington Heights* when statutes affect the rights of people within the United States.**

A long line of Supreme Court caselaw distinguishes between people already in the United States—regardless of citizenship—and those outside its borders. Noncitizens physically present in the United States, regardless of their legal status, are recognized as persons guaranteed Fifth Amendment due process and equal protection. *Plyler v. Doe*, 457 U.S. 202, 215–16 (1982). "Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *see also Zadvydas*, 533 U.S. at 693.

*Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018), on which the government heavily relies, is an *initial admission* case, proving this distinction. OB-20–22, 28. In *Hawaii*, the Supreme Court examined an executive order restricting entry by foreign nationals of select Muslim countries. 138 S. Ct. at 2418. The Court's analysis focused on initial entry cases: "the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* at

2418 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).[14]  Thus, *Hawaii* held the plaintiff's challenge was subject to rational-basis review.

The Supreme Court did *not* hold in *Hawaii* what the government is asking this Court to hold—that the plenary power doctrine applies to criminal statutes targeting persons already in the United States.  That position is foreclosed by *Ramos* and inconsistent with *Regents* and *Kwai Fun Wong*, which applied rigorous equal protection review to claims brought by people already on U.S. soil.[15]

### 2. Criminal statutes receive higher scrutiny.

The district court correctly followed over a century of Supreme Court caselaw in holding "greater protections under the Fifth

---

[14] In *Fiallo*, the Supreme Court addressed the gender-based special preference immigration status available to some children of United States citizens.  430 U.S. at 788–89.  Reviewing the claim only under rational-basis, the Court emphasized Congress's power over "the *admission* of aliens."  *Id.* at 791 (emphasis added).

[15] Many district courts reject the government's reading of Hawaii. *See California v. U.S. Dep't of Homeland Sec.*, 476 F. Supp. 3d 994, 1022–23 (N.D. Cal. 2020); *Washington v. United States Dep't of Homeland Sec.*, No. 4:19-CV-5210-RMP, 2021 WL 6206983, at *2 (E.D. Wash. Feb. 1, 2021); *Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779, 789–90 (N.D. Ill. 2020); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322–24 (D. Md. 2018).

Amendment necessarily apply when the government seeks to "punish[] by deprivation of liberty and property." 1-ER-4 (quoting *Wong Wing v. United States*, 163 U.S. 228, 237 (1896)). Thus, while noncitizens inside the U.S. raising civil immigration matters may *continue* to be protected by *Arlington Heights* review, the challenged law here is criminal— where defendants receive more protections than in civil law. *See Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984); *Tun-Cos v. Perrotte*, 922 F.3d 514, 524 (4th Cir. 2019). As the Supreme Court stated in *Loving v. Virginia*, "[a]t the very least, the Equal Protection Clause demands that racial classifications, *especially suspect in criminal statutes*, be subjected to the most rigid scrutiny." 388 U.S. 1, 11 (1967) (emphasis added).

Here, § 1326 is a purely criminal law with carceral punishment as its core function. *See United States v. Martinez-Ramos*, 184 F.3d 1055, 1058 (9th Cir. 1999); *United States v. Joya-Martinez*, 947 F.2d 1141, 1144 (4th Cir. 1991); *United States v. Vasquez-Escobar*, 30 F. Supp. 2d 1364, 1370 (M.D. Fla. 1998). Thus, the highest constitutional protections apply.

The government dismisses §1326's criminal function, mischaracterizing it as a "regulatory statute enacted to assist in the control of unlawful immigration by aliens." OB-23. And the government repeatedly cites this Court's statement characterizing § 1326 as "a necessary piece of the immigration regulation framework," without which "Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." OB-16–17, 23–25, 54–55 (quoting *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998)). The government's arguments are unpersuasive.

Placing § 1326 within the immigration section of the United States Code is irrelevant. "The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." *Smith v. Doe*, 538 U.S. 84, 94 (2003). For example, in *Wong Wing*, despite congressional labels to the contrary, the Supreme Court held a sentence of imprisonment with hard labor rendered the proceeding a "criminal prosecution." 163 U.S. at 234. Thus, the affected noncitizens were entitled to criminal trial protections. *Id*. at 238. Since *Wong Wing*, the Supreme Court continues to hold that official actions amounting to "punishment" are afforded full constitutional protection,

32

even if they occur in the context of immigration. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165–67 (1963).

In addition, this Court's statement in *Hernandez-Guerrero* does not affect this issue, as the district court explained. 1-ER-6, 9. *Hernandez-Guerrero* addressed only whether Congress can functionally use criminal law for immigration-related purposes. 147 F.3d 1075. There is a sharp distinction between Congress's power to enact a criminal law under its immigration powers and whether Congress chose a constitutionally impermissible means of doing so. *Hernandez-Guerrero* "establishes only that Congress did not exceed its constitutional authority under its immigration powers when it enacted Section 1326." 1-ER-6, 9. But "[t]he question is not whether Congress functionally had the authority to pass a criminal immigration statute, but whether the motivation behind Section 1326's enactment was racially discriminatory in violation of the Equal Protection Clause." 1-ER-40, 43.

## C. The cases the government relies on are inapposite.

The government relies on several cases the district court found inapplicable, none of which involved a race-based challenge to a

criminal law. OB-22, 26; 1-ER-6. In *United States v. Ruiz-Chairez*, this Court addressed an equal protection challenge based on alienage, not race. 493 F.3d 1089, 1091 (9th Cir. 2007). Alienage was also the classification in *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100–03 (1976), *Mathews*, 426 U.S. at 81–83, *United States v. Lopez-Flores*, 63 F.3d 1468, 1471–75 (9th Cir. 1995), and *United States v. Ferreira*, 275 F.3d 1020, 1026 (11th Cir. 2001). In *United States v. Barajas-Guillen*, this Court addressed an indigency-based classification, not a race-based one. 632 F.2d 749, 752 (9th Cir. 1980). In *United States v. Calderon-Segura*, this Court applied rational-basis review to the decision to apply expedited removal proceedings to some aggravated felons but not others. 512 F.3d 1104, 1107 (9th Cir. 2008). In *Ledezma-Cosino v. Sessions*, this Court applied rational-basis review to a classification affecting "habitual drunkards." 857 F.3d 1042, 1048–49 (9th Cir. 2017) (en banc). And in *United States v. Ayala-Bello*, this Court held the distinction at issue was between defendants based on criminal conduct and noted that, even if the classification were alienage, rational-basis review applied. 995 F.3d 710, 715 (9th Cir.), *cert. denied*, 142 S. Ct. 513 (2021). Along with its irrelevancy here, the concurring opinion observed

the Supreme Court "has never held that federal *criminal* classifications based on alienage are subject only to rational basis review." *Id.* at 717 (Watford, J., concurring).

The government lists district courts that have applied rational-basis review to § 1326 equal protection challenges.[16]  OB-25 & n.4.  But multiple district courts agree that *Arlington Heights* review, not rational-basis review, applies to § 1326 equal protection challenges.  1-ER-32–36 (reviewing cases).  And the courts coming to the contrary conclusion relied on caselaw involving admission, exclusion, or alienage. *See United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103, at *1 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20-CR-83, 2021 WL 5166488, at *2 (N.D. Ohio Nov. 5, 2021); *United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114 (D.N.M. 2021); *United States v. Gutierrez-Barba,* No. CR-119-01224-

---

[16] The government erroneously includes *United States v. Wence* in its list of cases applying rational-basis review to § 1326 equal protection challenges.  OB-25 & n.4 (citing *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D.V.I. June 16, 2021)).  *Wence* applied *Arlington Heights*, "find[ing] no support for the proposition that criminal laws enacted by Congress, even when they are enacted in furtherance of Congress's broad immigration power, are otherwise immune from Constitutional review."  2021 WL 2463567, at *2–4.

001-PHX-DJH, 2021 WL 2138801, at *2 (D. Ariz. May 25, 2021). In addition, at least one district court misapplied binding Supreme Court precedent, which applied heightened scrutiny, not rational-basis, to an unwed father's Fifth Amendment claim. *Samuels-Baldayaquez*, 2021 WL 5166488, at *2 (relying on but misinterpreting *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693–94 (2017)). Other district courts ignored foundational precedent providing greater constitutional protections to criminal defendants than civil litigants. *Novondo-Ceballos*, 554 F. Supp. 3d at 1114; *United States v. Ruiz-Rivera*, No. 3:20-MJ-20306-AHG, 2020 WL 5230519, at *4 (S.D. Cal. Sept. 2, 2020). As a result, these district courts erroneously expanded rational-basis review to a race-based criminal law challenge.

The district court correctly expressed concern that applying rational-basis review would render criminal immigration laws "free from constitutional equal protection constraints" and "give [Congress] license to enact racially discriminatory statutes in violation of equal protection." 1-ER-4. This concern is well-founded. The government's proposed narrowing of the Constitution's protections undermines decades of Supreme Court and Ninth Circuit precedent striking laws

36

"taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267; *see, e.g.*, *Hunter,* 471 U.S. at 233; *Ramos v. Wolf*, 975 F.3d at 896.

The government claims the district court's concerns are illusory, speculating that applying rational-basis review to any facially neutral law would not dictate the standard of review applicable to a law drawing an explicit racial classification. OB-27–28. Analysis under *Arlington Heights* is necessary, however, precisely because government actors "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate." *Smith v. Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982). The government's position would read *Arlington Heights* out of existence. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) (explaining a facially discriminatory law and a law meeting the *Arlington Heights* standard are both unconstitutional).

## III.  The district court correctly held 8 U.S.C. § 1326 violates the Fifth Amendment.

The district court, after "consider[ing] the briefing, arguments of counsel, and expert testimony," correctly found § 1326 "was motivated, at least in part, by discriminatory intent." 1-ER-2–3. Under the Fifth Amendment's equal protection principles, a law motivated by

37

discriminatory intent is invalid. *See Hunter*, 471 U.S. at 227–28; *Arlington Heights*, 429 U.S. at 264–66; *Ave. 6E Invs., L.L.C. v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016).

To determine whether a facially neutral law is a pretext for unconstitutional discrimination, courts consider "the totality of the relevant facts," including the: (1) law's disparate impact on a racial group; (2) historical background against which the law was enacted; (3) sequence of events leading to the law's enactment; (4) legislature's departure from normal procedures; and (5) legislative history. 1-ER-7 (citing *Arlington* Heights, 429 U.S. at 264–68); *see also Washington v. Davis*, 426 U.S. 229, 241–42, 266–67 (1976); *Ave. 6E Invs.*, 818 F.3d at 504.

*Arlington Heights* does not require the challenger to "establish any particular element in order to prevail." *Ave. 6E Invs.*, 818 F.3d at 504 (cleaned up). Nor must a challenger show discriminatory purpose was the "sole[]" or even a "primary" motive for the legislation. *Id.* at 265–66. The challenger need only show by a preponderance of the

evidence that discrimination was "a motivating factor." *Id.*; *Hunter*, 471 U.S. at 225.[17]

Because Carrillo-Lopez satisfied that burden, it shifted to the government to establish the law would have been passed even if the impermissible purpose had not been considered. 1-ER-7; *see Castaneda v. Partida*, 430 U.S. 482, 497 (1977) (explaining government's burden and citing with approval government's evidentiary presentation in previous case). The district court correctly concluded the government failed to meet its burden here.

## A. The district court properly considered the intent of both the 1929 and the 1952 legislatures.

Congress originally enacted the illegal reentry provision in 1929, then reenacted a nearly identical provision in 1952. The government

---

[17] Relying on *Abbott*, 138 S. Ct. 2305, the government erroneously argues this Court must apply a presumption of good faith to Congress's actions. OB-34–35. In *Abbott*, the Supreme Court considered a lower federal court's intervention in a state's election redistricting plans. In that limited circumstance, involving "a serious intrusion on the most vital of *local* functions," the Supreme Court explained *state* governments are presumed to act in good faith. *Id*. at 2324–25 (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995)) (emphasis added). The government cites no case applying that presumption outside *Abbott*'s factual scenario.

acknowledges evidence of a prior legislature's intent and statements of a bill's proponents can provide important historical background and context for determining a later legislature's intent. OB-34; *see also Abbott*, 138 S. Ct. at 2324–25. In making its factual findings, the district court thus properly considered the intent of both the 1929 and the 1952 legislatures.

And, contrary to the government's claim, OB-34–35, legislator changes and passing time mattered little here, for two reasons. *See Hunter*, 471 U.S. at 233 (striking down in 1985 a constitutional provision adopted in 1901); *see also Jean v. Nelson*, 711 F.2d 1455, 1491–92 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). First, several key legislators remained the same, including representatives that served on the 1929 Immigration Committee. *See supra*, pp. 3, 12–13, 21. Thus, many members of the reenacting legislature actually knew the discriminatory intent of the original law, which by itself strongly suggests that the same discriminatory motivations remained.

These continuing congressmen praised their 1952 colleagues for preserving the purpose of the 1929 Act. Senator Walter George

reminded colleagues that when he voted for the 1920s immigration laws, the purpose was to "preserve something of the homogeneity of the American people" and the "desire to protect American labor." 98 Cong. Rec. 5774 (1952). Representative Jenkins praised colleagues for maintaining the 1920s immigration laws he had promulgated, stating the House debate "has been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now." 98 Cong. Rec. 4442 (1952).

Second, even had all the original legislators been gone by 1952, the 1929 enactment remains relevant for more than historical background and context. As the Supreme Court explained in a trio of modern cases, when a legislature reenacts a statute without significantly altering it, the later legislature's intent does not supplant the earlier legislature's. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring in part); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2274 (2020) (Alito, J., concurring); *Hunter*, 471 U.S. at 233; *cf. Abbott*, 138 S. Ct. at 2325. "[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to

change their effect unless such intention is clearly expressed."
*Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198–99 (1912); *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) ("[W]e do not presume that the revision worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.'" (alterations in original)); *United States v. Ryder*, 110 U.S. 729, 740 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed.").

In *Hunter*, the Supreme Court considered a challenge to Alabama's facially-neutral voter disenfranchisement law, which was adopted in 1901 to "establish white supremacy" in the state. 471 U.S. at 227–29. In the decades after the 1901 adoption of the provision, courts struck down "[s]ome of the more blatantly discriminatory selections." *Id.* at 232–33. Writing for a unanimous court, Chief Justice Rehnquist rejected the argument that these changes rendered the provision constitutional, reasoning "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." *Id.* at 233; *see*

42

*also Abbott*, 138 S. Ct. at 2325. Thus, without deciding whether the law "would be valid if enacted today without any impermissible motivation," the Supreme Court in *Hunter* unanimously held the law "violates equal protection under *Arlington Heights*." *Id.* at 233.

Next, in *Ramos v. Louisiana*, the Supreme Court considered the constitutionality of Louisiana's nonunanimous jury verdict system, developed for the "avowed purpose" "to 'establish the supremacy of the white race.'" 140 S. Ct. at 1394. Despite focusing on the Sixth Amendment, *Ramos*'s plurality still analyzed "the racially discriminatory reasons" for adopting the "rule[] in the first place," explaining its "respect for 'rational and civil discourse'" could not excuse "leaving an uncomfortable past unexamined." *Id.* at 1401 & n.44, 1417–18. Those discriminatory reasons led the plurality to reject Justice Alito's dissenting opinion that recodification of the jury non-unanimity rule cleansed it of its racist intent. *Id.* As the plurality explained, in "assess[ing] the functional benefits" of a law, courts cannot "ignore the very functions those rules were"—at inception—"adopted to serve." *Id.* 1401 & n.44.

Justice Sotomayor concurred in *Ramos,* agreeing the non-unanimous jury rules are now "fully—and rightly—relegated to the dustbin of history." 140 S. Ct. at 1410. But she elaborated how a law with racist origins could be free of racial bias: "Where a law *otherwise is untethered to racial bias*—and perhaps also where a legislature *actually confronts a law's tawdry past in reenacting it*—the new law may well be free of discriminatory taint." *Id.* (emphases added); *see also United States v. Fordice*, 505 U.S. 717, 728 (1992) ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its [explicitly segregated system]."). But Justice Sotomayor added "[t]hat cannot be said of the laws at issue here," where Louisiana legislators had made no real "effort to contend with the law's discriminatory purpose and effects." *Ramos*, 140 S. Ct. at 1410.[18]

Last, in *Espinoza* the Supreme Court reviewed the Montana Supreme Court's decision to exclude religious schools from the state

―――――――――――

[18] One method for confronting a law's "tawdry past" is repeal, as shown by the recent introduction of a bill to repeal § 1326 because of its racist origins. New Way Forward Act, H.R. 536, 117th Cong. (2021) (reintroducing 2019 bill). The bill's sponsor specifically recognizes and repudiates the racist 1920's origin of the illegal reentry statute. 165 Cong. Rec. E1571–72 (2019).

scholarship program. 140 S. Ct. at 2251. In reversing the decision, the Court discussed the "checkered tradition" and "shameful pedigree" of similar religious exclusions, born of anti-Catholic bigotry in the 1870s. *Id.* at 2258–59. Although Montana reenacted its religious exclusion in the 1970s, purportedly "for reasons unrelated to anti-Catholic bigotry," the Court rejected the reenactment as a relevant consideration in its First Amendment analysis, explaining the more recent changes "hardly evince a tradition that should inform [its] understanding of the Free Exercise Clause." *Id.*

These three cases teach that a statute's prior versions, when known to be motivated by racial animus, infect the current version unless Congress actively confronts the statute's racist past and chooses to reenact it for race-neutral reasons notwithstanding that history. *Hunter*, 471 U.S. at 232–33. The Supreme Court's recent decision in *Abbott* is entirely consistent with this rule. *Abbott* considered Texas's redistricting plans, enacted in 2013 after a court determined prior plans were unconstitutionally discriminatory. 138 S. Ct. at 2313. The Court rejected the argument the 2013 plans merely carried forward the discriminatory intent from the earlier plans. *Id.* at 2313–14. But the

45

Court did not rule evidence of a prior legislature's intent was always irrelevant—just the opposite. The Court explained a prior legislature's intent is relevant "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the 2013 Legislature." *Id.* In *Abbott*, the prior legislature's intent did not give rise to an inference about the 2013 legislature because that legislature's plan was *not* reenacted in 2013. *Id.* at 2325.

The facts here fall outside the specific scenario in *Abbott*, where Congress expressed no contrary intent. Despite adopting almost identical language and knowing the disparate impact of the law, Congress never debated or even acknowledged the racist origins of the 1929 statute when it reenacted it in 1952. 1-ER-19–26; 2-ER-191–193. And the core focus of the two statutes—allowing for arrest, prosecution, and imprisonment of Latinos—is identical. 1-ER-27–28. The district court thus appropriately looked to the intent underlying § 1326's first enactment in assessing Carrillo-Lopez's discrimination claim. 1-ER-13–16.

The government points to two changes between the 1929 and 1952 versions of the law, insisting they render the statute "substantially

altered." OB at 44–45. They do not, as neither change "alter[ed] the intent with which the [statute], including the parts that remained, had been adopted." *Abbott*, 138 S. Ct. at 2325; *see Hunter*, 471 U.S. at 233. The first change encapsulated multiple provisions into one penalty scheme. The second change allowed prosecutors to enforce the 1929 provision "any time" a defendant was "found in" the United States unlawfully, removing the need for the government to prove the defendant's entry point. *Compare* 8 U.S.C. § 1326 (1952), *with* Undesirable Aliens Act, 45 Stat. 1551; *see also Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 before the Subcomms. of the Comms. on the Judiciary*, 82d Cong. 716 (1951). Far from repudiating the racism of the 1929 legislature, both changes furthered the provision's racist purpose. *See Hunter*, 471 U.S. at 233; *contra Abbott*, 138 S. Ct. at 2325. And neither even suggests repudiation of the law's racist origins.

**B.    The district court properly analyzed the *Arlington Heights* factors to hold Congress enacted § 1326 with a discriminatory purpose.**

Considering the totality of the circumstances for both the initial enactment in 1929 and the reenactment in 1952, the district court

correctly found the illegal reentry statute was enacted with a
discriminatory purpose.

### 1. The disparate impact of § 1326 provides powerful evidence of discriminatory intent.

The Supreme Court has identified disparate impact as one factor
for determining whether a law was passed with a discriminatory
purpose.[19] *Arlington Heights*, 429 U.S. at 266; *see Columbus Bd. of
Educ. v. Penick*, 443 U.S. 449, 464–65 (1979). In cases with particularly
"stark" patterns of racial impact, this factor alone can be determinative.
*Arlington Heights*, 429 U.S. at 266. Even in cases with less stark
impact, this information "provide[s] an important starting point." *Id.*;

---

[19] In discriminatory intent cases, the Supreme Court at times
discussed disparate impact seemingly outside the context of the
*Arlington Heights* factors. *See Hunter*, 471 U.S. at 227–28; *Castaneda*,
430 U.S. at 495–96. But in other more recent cases, both the Supreme
Court and this Court have considered disparate impact as one of the
factors relevant to discriminatory intent. *See, e.g.*, *Reno v. Bossier Par.
Sch. Bd.*, 520 U.S. 471, 487 (1997); *Church of Lukumi Babalu Aye v.
City of Hialeah*, 508 U.S. 520, 535–38 (1993); *see also Ave. 6E Invs.*, 818
F.3d at 507–08; *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015). As
the more recent cases establish, neither disparate impact nor any other
single factor must be shown to establish discriminatory intent under
*Arlington Heights*. Regardless, the district court correctly concluded
that the evidence of disparate impact here amply supports an inference
of intentional discrimination. 1-ER-2, 7, 9–13; *cf. Arlington Heights*,
429 U.S. at 264–65.

*see Columbus Bd. of Educ.*, 443 U.S. at 464–65; *Ave. 6E Invs.*, 818 F.3d at 507–08. As the Supreme Court has explained, the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno*, 520 U.S. at 487. The district court correctly concluded this factor favors finding discriminatory intent.[20] 1-ER-9–13.

The racially disparate impact of § 1326 is stark. An overwhelming percentage of prosecutions for illegal reentry—regularly surpassing 99% each year—are against Latino defendants.[21] The Supreme Court has found such impact sufficient—even absent other evidence—to infer discriminatory intent. *See Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (99% of affected voters); *Lane v. Wilson*, 307 U.S. 268, 275–77 (1939) (most potential voters); *Guinn v. United States*, 238 U.S. 347,

---

[20] The government complains of the "excessive weight" the district court placed on this factor. OB-54. That objection cannot support reversal on clear error review. *Lewis*, 681 F.3d at 998–99; *Lahoti*, 586 F.3d at 1196.

[21] *See, e.g.*, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020*, United States Sentencing Commission, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

364–65 (1915) (similar); *Yick Wo v. Hopkins*, 118 U.S. 356, 365–66, 374 (1886) (100% of businesses affected by ordinance); *see also Arlington Heights*, 429 U.S. at 266 (reaffirming continued application of rule that particularly stark disparate impact can suffice to show discriminatory intent).

In *Yick Wo*, the Supreme Court considered a San Francisco ordinance that, although facially neutral, affected all the Chinese-run laundries in the city. 118 U.S. at 365–69. And, in *Gomillion*, the Supreme Court considered an Alabama law that removed most Black voters, but not a single white voter, from the boundaries of the City of Tuskegee. 364 U.S. at 341. The Supreme Court explained in both cases that facially neutral laws violate equal protection when their impact is borne almost exclusively by a protected class. *Yick Wo*, 118 U.S. at 365–69; *Gomillion*, 364 U.S. at 341, 347–48.

The same rationale in *Yick Wo* and *Gomillion* applies here—the impact on Latino immigrants is so stark, "a clear pattern, unexplainable on grounds other than race, emerges[.]" *Arlington Heights*, 429 U.S. at 266. Of course, here, these statistics serve only as the starting point for determining the legislature's intent in passing

50

§ 1326. *Arlington Heights*, 429 U.S. at 266. The 1929 legislature criminalized reentry specifically to target Latino migrants. *See infra*, pp. 6–12. By 1952, it was clear the 1929 legislature had achieved its goals with exacting precision. *See* 4-ER-589–590. When a legislature enacts a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," discriminatory intent is established. *Feeney*, 442 U.S. at 279 & n.25; *see Church of Lukumi Babalu Aye*, 508 U.S. at 535–38; *see also* 2-ER-133 (connecting disparate impact of § 1326 to discriminatory purpose). This Court has held similar disparities relevant when considering equal protection claims under the *Arlington Heights* framework. *See Ave. 6E Invs.*, 818 F.3d at 508; *Arce*, 793 F.3d at 978.

The government does not dispute that nearly everyone prosecuted under § 1326 is Latino. Instead, the government focuses on the nondiscriminatory reasons, in its view, this disparate impact exists: the 2,000-mile border between the United States and Mexico and the percentage of Latino people "illegally in the United States." OB-36. As the district court correctly explained, the government's circular arguments misapprehend the disparate impact analysis. 1-ER-12–13.

51

The 1929 legislature knew the high percentage of Latino immigrants who crossed the southern border each year. 1-SER-199–200. And the legislature, *for that reason*, created a law focused on those immigrants. *See Arthur v. Nyquist*, 573 F.2d 134, 144–45 (2d Cir. 1979) (finding discriminatory intent when "plan which resulted in the school's having a student population over 99% black was selected"). Most obviously, it could have criminalized overstaying a visa. But it did not, because doing so would not have served its racist goals.

Then, the 1952 legislature, with 23 years of data about illegal reentry prosecutions and with members still in office who voted for the 1929 law, reenacted the law, perpetuating the intended disparate impact. In similar cases, both this Court and the Supreme Court have concluded disparate impact supports a finding of discriminatory intent. *See Church of Lukumi Babalu Aye*, 508 U.S. at 535–38; *Ave. 6E Invs.*, 818 F.3d at 508; *Arce*, 793 F.3d at 978.

The cases the government relies on differ. OB-36–39, 52–53. In *Ramos v. Wolf*, this Court rejected an equal protection challenge to Executive Branch decisions terminating the TPS program for some countries (but not others), based on the challengers' "glaring lack of

evidence tying the President's alleged discriminatory intent to the specific TPS terminations." 975 F.3d at 878–83, 897. Although the four countries canceled from the program had largely non-white populations, the remaining countries had similar demographics. *Id.* at 898. And the challengers presented no evidence tying then-President Trump's discriminatory statements to the cancellation. *Id.* Similarly, in *Regents*, the Supreme Court rejected an equal protection argument based *only* on disparate impact, explaining, "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." 140 S. Ct. at 1915–16. Both cases thus differ from this one, where the legislature, intending to create a disparate impact, enacted a law specifically targeting Latino immigrants out of a desire to engineer the country's racial composition.

The two cases the government cites about the "crack-powder" sentencing disparity are inapposite. In *United States v. Coleman*, the defendant presented no evidence of either disparate impact or discriminatory purpose, instead arguing discriminatory intent could be inferred from Congress's failure to amend the law. 24 F.3d 37, 38–39

(9th Cir. 1994). But *Arlington Heights* is concerned with "official action," not inaction. 429 U.S. at 264–65. The next year, the defendant in *United States v. Dumas* added to the argument statistics showing disparate impact, but there was still no evidence showing discriminatory purpose by the 1986 legislature that created the crack-powder disparity. 64 F.3d 1427, 1429–30 (9th Cir. 1995). This Court, therefore, held that "disparate impact alone is insufficient to support a finding of invidious racial discrimination in a facially neutral law." *Id.* (quoting *Davis*, 426 U.S. at 239). Here, as the district court repeatedly explained, it did not solely rely on disparate impact, but also considered extensive evidence on the remaining *Arlington Heights* factors. 1-ER-6–35.

Finally, the government challenges the district court's factual finding that the 1952 legislature knew the disparate impact of the illegal reentry provision. OB-52 (citing 1-ER-26). As the government notes, OB-44, thirty congressional members who debated and voted for the 1929 law were still in office in 1952. *See infra*, pp. 12–13. And the government admits the disparate impact of the law would have been obvious given the southern border. OB-35–36. Carrillo-Lopez also

presented unrebutted evidence Congress was specifically concerned
about the "Wetback problem," *i.e.*, undocumented immigration over the
southern border. *See* 2-ER-158–171, 180–183; 98 Cong. Rec. 793–794,
799 (1952); *see also* 3-ER-437. In addition, the extensive 1950 senate
report that prompted the INA found that 90% or more of illegal
immigrants removed from the United States were Latino. S. Rep. 81-
1515, at 630–35. The district court relied on this 1950 report, noting
the 1952 legislators heard INS testimony about the Mexican border
being specifically problematic for illegal reentry prosecutions. 1-ER-27
(quoting 3-ER-412–414 (excerpt of S. Rep. 81-155 at 654–56)). Given
these reports and testimony, the 1952 Congress was well aware that
continuing criminal illegal reentry prosecutions disparately impacted
Latinos.

Thus, it was reasonable—and not clearly erroneous—for the
district court to conclude the 1952 legislature was aware it was
perpetuating the disparate impact by reenacting the illegal reentry
provision. *See Ave. 6E Invs.*, 818 F.3d at 508 (concluding circumstantial
evidence established government officials' awareness of disparate
impact); *see also Pac. Shores Props., L.L.C. v. City of Newport Beach*,

730 F.3d 1142, 1158–59 (9th Cir. 2013) (discriminatory intent can be proven by circumstantial evidence); *Alexander*, 675 F.2d at 791 (same).

> **2.  Congress passed the Undesirable Aliens Act and the McCarran-Walter Act during times of widespread public anti-Latino animus.**

The historical background and widespread racist sentiment against which illegal reentry was criminalized also provides important information about the legislature's discriminatory intent.  1-ER-7, 9, 23, 25–27, 32.  During both the 1920s and 1950s, "discriminatory practices were commonly utilized."  *Rogers v. Lodge*, 458 U.S. 613, 625 (1982); *see Ave. 6E Invs.,* 818 F.3d at 504–05; *Jean*, 711 F.2d at 1491–92.

During the overtly racist 1920s, Latino immigrants in the southwestern United States lived segregated, disenfranchised lives, attending separate and unequal schools, then toiling in literally backbreaking employment.  1-ER-14; 2-ER-93–94, 120–121; 4-ER-586.  And Latinos both inside and outside the United States were stereotyped and degraded by popular eugenics theorists who preached the supremacy of Western European immigrants.  2-ER-88–89; 4-ER-584.

Although some of the language changed after the 1920s with the waning popularity of eugenics theories, the anti-Latino animus did not.

*See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082–83 (3d Cir. 1996) (explaining discriminatory intent can be implicit in coded comments); *see also Hernandez v. Texas*, 347 U.S. 475, 479–80 (1954) (describing differences in treatment of white Americans versus Latino Americans).  It was not until 1946 that this Court struck down *de jure* segregation of Latino students in unequal California schools. *Westminster Sch. Dist. v. Mendez*, 161 F.2d 774 (9th Cir. 1947).  The 1952 reenactment occurred two years *before* the Supreme Court struck down school segregation, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), and fifteen years before it struck down a law banning interracial marriage, *Loving*, 388 U.S. 1.  And fifteen more years passed before the Supreme Court required Texas officials to provide educational services to undocumented Latino children.  *Plyler*, 457 U.S. 202.

Throughout this time, Latino immigrants were regularly subjected to inhumane treatment at the border and places of employment, before being arrested, imprisoned, and deported.  2-ER-37, 110–111, 134–139, 147–158, 185–188; 3-ER-309–310.  And, as noted previously, the federal government unlawfully arrested and "deported" thousands of Latinos,

including many American citizens, in "Operation Wetback," in the years following passage of the 1952 reenactment. *See supra*, pp. 3, 16–17.

### 3. The events surrounding the criminalization of illegal reentry support the legislatures' discriminatory intent.

In addition to evidence of bias in the community, crucial here was the extent to which those biases were explicitly incorporated into the criminalization of illegal reentry. *See Ave. 6E Invs.,* 818 F.3d at 504–05 (concluding plaintiffs sufficiently alleged discrimination by government action designed to appease anti-Hispanic constituents). Business owners wanted an exploitable, temporary laborer class, clashing with those wanting to permit only Western Europeans to immigrate. Despite their sometimes-adverse goals, both groups viewed Latino immigrants as "undesirable." The slur "wetback" was repeatedly used during the 1952 debates, which as Senator McCarran explained, "is applied to labor from across the Rio Grande." 98 Cong. Rec. 5766 (1952).

Thus, when Congress criminalized illegal reentry, § 1326 incorporated the biases of both groups, supporting the district court's conclusion § 1326 violates equal protection. *Arce*, 793 F.3d at 978–81; *Ave. 6E Invs.,* 818 F.3d at 504–505. Even now, the government never

58

explains why any of the legislatures that reenacted this provision chose to criminalize illegal entry and reentry, but not overstaying visas—which would have affected a more racially diverse segment of immigrants.

### 4. Both legislatures departed from normal procedures in enacting and reenacting the illegal reentry provision.

The district court also properly relied on the legislators' departure from normal procedures in its drive to criminalize illegal reentry. *See Arlington Heights*, 429 U.S. at 267; *Arce*, 793 F.3d at 980. Several aspects of the 1929 and 1952 legislative processes distinguish § 1326 from other statutes.

The 1920s immigration legislation, including the 1929 Act, uniquely relied openly on the racist theory of eugenics, and the illegal reentry provision is one of its last remnants. 1-ER-16. Legislative debates during both periods focused on the southern border—even though Canadians were also entering the United States in record numbers. 1-SER-201.

Moreover, Congress deliberately decided not "to punish employers who hired illegal immigrants and instead only punish[ed] the laborers

59

themselves," to appease the "hunger of the agricultural industry for exploitable labor and the desire to keep America's identity white." 1-ER-25. These facts amply support the district court's finding that Congress departed from normal procedures in 1929 and 1952 precisely to discriminate against Latino immigrants. 1-ER-16; *see Jean*, 711 F.2d at 1490–92.

> **5. Discriminatory intent appears in the legislative history of both the 1929 enactment and 1952 reenactment.**

The 1920s Congress that initially criminalized illegal reentry was unapologetically racist. *See supra*, pp. 6-12. The legislators, including those who continued in office through 1952, enthusiastically courted eugenics theorists, embracing the popular view "undesirable" immigrants from nonwhite countries would pollute America's bloodstream. 1-SER-104–192, 200, 223; 4-ER-584–585; *see also supra*, pp. 12–17. Congressmen openly called Latino migrants "peons" and "mongrels." 1-ER-216; 4-ER-586; 1-SER-199, 219–220, 256; 70 Cong. Rec. 3619 (1929); 65 Cong. Rec. 5841 (1924). The bill's sponsor specifically focused on curbing Latino immigration: "Unless we stop them right soon we will have in 15 or 20 years a great race problem in

all of the southwestern part of the United States.  The Mexican peon will fill the fertile valleys of California and Arizona and the rich plains of Texas, crawling farther north every year.  We must stop it."  70 Cong. Rec. 5200 (1929).  The government conceded this anti-Latino racism was enough to satisfy Carrillo-Lopez's burden about the initial enactment of the illegal reentry statute in 1929.  4-ER-482–483; *see* 1-ER-13 & n.17; OB-11–12.

It is against the background of the racist, nativist 1929 Act and the heels of the Wetback Bill that Congress continued entrenchments of racism into the McCarran-Walter Act of 1952.  The 1952 Congress, which included several members from the 1929 Congress, did not confront the blatantly racist and nativist immigration laws of 1929.

The 1950 senate report by McCarran, relied on for the 1952 Act, is replete with racism—starting with an introductory chapter dividing the world population into various races.  S. Rep. 18-1515.  This report believed Latino immigrants were "coming into the United States illegally at a rate of 20,000 per month," and that people entering illegally after being deported is "principally a southern border problem."  S. Rep. 18-1515, at 364-65.  McCarran's report denigrated Latino

immigrants as particularly undesirable due to alleged: low-percentage of English speakers; inability to assimilate to "Anglo-American" culture and education, with Latino students believed to be "as much as 3 years behind"; and a high number receiving "public relief." S. Rep. 81-1515, at 150-52. And overt racism continued in both House and Senate debates of the INA. *See*, *e.g.*, 98 Cong. Rec. 5773–74 (1952) (statement of Sen. George: "Mr. President, I hope the time has not come when one must apologize for being a hateful Anglo-Saxon."); *see also supra,* pp. 12–17.

In addition, the slur "wetback" features prominently in the congressional record from the 1952 Act—as evidenced by repeated index entries. *See, e.g.,* 98 Cong. Rec., Index to the Proceedings, 82nd Congress, at 439 ("Wetbacks. See Mexico."); *see also Hearings before the Subcomm. of the S. Comm. on Appropriations*, 82nd Cong. 124 (1951); *Hearings before the Subcomm. of the S. Comm. on Appropriations: H.R. 4974*, 83rd Cong. 245–46 (1953); 2-ER-158–171; 3-ER-437, 439. Deputy Attorney General Peyton Ford perpetuated the derogatory racial slur by including it in a letter to McCarran supporting § 1326 specifically. 1-ER-22. Hitler's eugenics-based beliefs were lauded on the House floor.

62

*See* 98 Cong. Rec. 4314 (1952) (at 2-ER-177–78). The result was a law that, like its 1929 predecessor, disproportionately favored white, Western European immigrants. 99 Cong. Rec. 1517–18 (1953); *see also* 1-SER-19–20.

These same aspects of the bill led to President Truman's veto and condemnation as "legislation which would perpetuate injustices of long standing" and "intensify the repressive and inhumane aspects of our immigration procedures." 3-ER-21–27. Two days later, Congress overrode the veto and passed the Act despite presidential concerns about discrimination. As the district court correctly found, "Congress' failure to heed President Truman's call to 'reimagine' immigration while simultaneously making [the Act], more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor." 1-ER-22.

The government focuses on these two underlying facts— enactment of the McCarran-Walter Act over President Truman's veto and use of the slur "wetback"—to argue the district court improperly concluded the 1952 legislature enacted § 1326 with discriminatory intent. OB-46–51. The district court properly considered both these

63

undisputed facts as part of the totality of the circumstances in concluding discriminatory intent existed.  *Arce*, 793 F.3d at 979–80 (considering legislative and administrative proceedings).  At a minimum, neither finding comes close to clear error.

Turning first to President Truman's veto, OB-46–47, true enough, Truman said nothing about § 1326 specifically—either positive or negative.  But when President Truman discussed the portions of the bill he approved, he focused on the permissive provisions expanding immigration to the United States.  3-ER-421.  When discussing the portions of the bill he found concerning, in contrast, he focused on the restrictive provisions, limiting immigration from certain countries, broadening the grounds for deportation, and curbing discretionary relief.  3-ER-421–427.  Thus, when President Truman explained the "few improvements" in the bill were "heavily outweighed by other provisions," it strains credulity to presume he grouped the restrictive illegal reentry provision with the permissive provisions of the INA— particularly when the disparate impact of the 1929 provision was so obvious.  3-ER-421; *see* 1-ER-26–27.  The district court did not clearly

err in relying on § 1326's enactment over President Truman's veto to
infer discriminatory intent.  1-ER-21–22.

Second, the government insists the court "misapprehended" the
slur "wetback" in the Ford letter and legislative history for anti-
harboring legislation passed two months before § 1326.  OB-47–51.  The
district court did not commit clear error in concluding the term is a
racist slur.  That finding is supported by unrebutted evidence
establishing that the slur "wetback" was used in the 1950s to refer in a
derogatory way to Latino immigrants.  1-ER-23 n.5; 2-ER-149–151, 153,
156–171, 174–175, 180, 186, 190–192, 223–231, 237–238.  Several
courts have rightly recognized the term as racially derogatory.  *See, e.g.*,
*Pavon v. Swift Transp. Co.*, 192 F.3d 902, 909 (9th Cir. 1999); *Flores v.
Merced Irrigation Dist.*, 758 F. Supp. 2d 986, 998 (E.D. Cal. 2010).

Like all slurs, the term "wetback" has a complicated history.  As
Carrillo-Lopez's expert acknowledged, Caesar Chavez (a U.S. citizen)
used the term to derogatively refer to undocumented Latino migrants,
who were competing for jobs with the documented Latino union
members for whom Chavez advocated.  1-ER-225–230.  But the racial
identity of the speaker in one instance—or use of the slur by federal

courts and the president, OB-48–49 & n.9—does not render legislators' use of the slur race neutral. *Cf. Castaneda*, 430 U.S. at 499–500 (rejecting argument that inclusion of Mexican-Americans in grand jury selection process insulated that process from claims of anti-Latino discrimination). Rather, it illustrates that anti-Latino sentiment was sufficiently mainstream—unsurprising at a time when interracial marriage was banned and segregation widespread. *See Ave. 6E Invs.*, 818 F.3d at 506 (explaining "words themselves are only relevant for what they reveal—the intent of the speaker"); *Galdamez v. Potter*, 415 F.3d 1015, 1024 n.6 (9th Cir. 2005).

Here, using a racialized term to refer in a derogatory way to a protected group is a clear sign of discriminatory intent. *See Ave. 6E Invs.*, 818 F.3d at 505–06; *Galdamez*, 415 F.3d at 1024 n.6; *Aman*, 85 F.3d 1074. The district court did not err in relying on this evidence as part of the *Arlington Heights* analysis. And, at a minimum, it did not err in concluding that a legislature that used this slur was not simultaneously "confront[ing]" the law's "tawdry past" of race discrimination with the intend to purge the racist intent that the slur

66

itself expresses. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring in part).

In addition, by only addressing these two factual findings, the government ignores a wealth of other evidence on which the district court relied to establish that the 1952 legislature harbored anti-Latino animus. *See, e.g.*, 1-ER-9–13 (stark disparate impact); 1-ER-13–14 (nativists in Congress driving 1929 Act); 1-ER-14–16 (congressional reliance on eugenics); 1-ER-16 (racist vitriol directed at immigrants crossing southern border but not northern border); *see also Davis*, 426 U.S. at 242 ("[I]nvidious discriminatory purpose may often be inferred from the totality of the relevant facts[.]"); *League of Women Voters of Fla., Inc. v. Lee*, ___ F. Supp. 3d ___, 2022 WL 969538, at *16 (N.D. Fla. Mar. 31, 2022) (same). The government disregards that the standard for discriminatory intent recognizes "officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority." *Arce*, 793 F.3d at 978 (quoting *Smith*, 682 F.2d at 1064, 1066). Here, the direct and circumstantial evidence of discriminatory intent from both the 1929 and 1952

legislatures amply supports the district court's dismissal of Carrillo-

Lopez's indictment.

### C. The government failed to prove § 1326 would have been enacted without the impermissible racist motivations.

Once Carrillo-Lopez met his burden of proof under *Arlington*

*Heights*, the government had to prove "that the same decision would

have resulted even had the impermissible purpose not been considered."

1-ER-35 (quoting *Arlington Heights*, 429 U.S. at 270 n.21).  The

government offered no independent evidence in the district court to

make that showing.  *See Castaneda*, 430 U.S. at 497–99 (emphasizing

importance of rebuttal evidence for government to satisfy its burden

under *Arlington Heights*).  Now, on appeal, the government relies on

amendments to § 1326 in the 1980s and 1990s, along with testimony

from Carrillo-Lopez's experts.

The government's arguments conflate its burden with rational-

basis review.  It is not enough to point to any plausible rationale for

discriminatory government action; the government must instead show

*the same law* would have passed *at the same time* without

discriminatory intent.  *See Arlington Heights*, 429 U.S. at 270 n.21;

68

*Castaneda*, 430 U.S. at 497–98; *see also Hunter*, 471 U.S. at 233 (rejecting reliance on contemporary rationales to support provision passed long ago with discriminatory intent).

That error alone is fatal to the government's position. Moreover, when understood in their proper context, neither the amendments nor expert testimony support the government's argument, and the district court correctly concluded the government did not satisfy its burden. 1-ER-35–44.

### 1. Amendments after 1952 failed to purge the law of its racial animus and carried forward the same or similar language.

The district court considered amendments to § 1326 (in 1988, 1990, 1994, and twice in 1996), concluding they were insufficient for the government to meet its burden. 1-ER-7–9, 40–44. Yet the government maintains this argument on appeal, asserting Congress "repeatedly expanded Section 1326's scope" and its "penalties without any evidence of discriminatory intent," which it purports to mean "the law would have passed in the first instance absent any impermissible motive." OB-69. This claim is meritless. Congressional actions in the 1980s and

1990s did not confront the racist origins of § 1326.  *See Abbott*, 138 S.

Ct. at 2325; *Hunter*, 471 U.S. at 233.

The district court correctly read Supreme Court precedent as

requiring Congress to express its intent to break from legislative racist

origins, concluding no such expression exists here.  1-ER-40–44.  As the

Supreme Court explained in *Abbott*, the discriminatory taint of a law

remains unless something is done to "alter the intent with which the

[original] article, *including the parts that remained*, had been adopted."

*Abbott*, 138 S. Ct. at 2325 (emphasis added).  The district court correctly

found that no amendment sought to "grapple with the racist history of

Section 1326 or remove its influence on the legislation" or "reflect[ed]

any change of Congressional intent, policy, or reasoning."  1-ER-41–42

(citing *Espinoza*, 140 S. C. at 2274) (Alito, J., concurring); *Ramos*, 140 S.

Ct. at 1410 (Sotomayor, J., concurring in part)).  The amendments thus

did not cleanse the original law of its discriminatory taint.  *See Abbott*,

138 S. Ct. at 2325; *Hunter*, 471 U.S. at 233.[22]

_____

[22] While Congress did not reference the racist history of § 1326
when passing immigration legislation in the 1980s and 1990s, many of

And none of the amendments, as the district court correctly found, "substantively altered the original provision" or "change[d] the operation of § 1326." 1-ER-41–42. This finding is in accord with the Supreme Court's holding that the § 1326 amendments did not alter the meaning of the substantive offense, describing the 1990 amendment in particular as mere "housekeeping." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998). Analyzing the legislative record for the amendments, the Supreme Court noted the amendments merely increased penalties and "updated and simplified" the statute. *Id.* at 233. The Supreme court held the "history" of the amendments "contains no language at all that indicates Congress intended to create a new substantive crime." *Id.* at 234.

The government is incorrect to suggest Carrillo-Lopez did not allege, and the district court did not make, this conclusion. *Compare* OB-57, *with* 1-ER-40–43, *and* 1-SER-33–35; 2-ER-171–172, 200–201, 210–220; 4-ER-477, 489. The dismissal order concludes the

_____

the statements it did make appealed to racist stereotypes of immigrants as criminals, perpetuating and enhancing § 1326's racist origins. 2-ER-171–173.

71

"amendments do not reflect any change of Congressional intent, policy, or reasoning" from "the racism that initially motivated the Act of 1929 or the discriminatory intent that was contemporaneous with the 1952 reenactment." 1-ER-41–42.

Because the government cannot prove clear error in the district court's finding that the amendments did not cleanse the original law of its discriminatory taint, this Court should affirm. The opposite conclusion the government proposes defies common sense, allowing legislatures to shield legislation from equal protection review by simply reenacting or amending every racist statute without debate.

## 2. Carrillo-Lopez's expert testimony, quoted out of context, does not support the government's argument.

The district court considered other purportedly race-neutral motivations for § 1326, none of which it found viable—economic competition, national security, and foreign relations. 1-ER-35. The government repeats those reasons on appeal, quoting Carrillo-Lopez's experts out of context. As the district court explained, the unrebutted expert testimony "'convincingly' demonstrate[d] that the government's proffered reasons are so intertwined with racial animus," the

government cannot satisfy its burden of proving § 1326 would have

been enacted absent racist motivations. 1-ER-36; *see* 2-ER-78–247.

The government's resort to these purportedly race-neutral reasons

conflates its burden under *Arlington Heights* with rational-basis review.

Under rational-basis review, courts consider only whether a challenged

provision is "rationally related to a legitimate governmental purpose."

*City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446

(1985). *Arlington Heights*, on the other hand, requires the government

to prove actual—not theoretical—reasons *other than race-based animus*

that would have actually supported the government action at the time it

was taken. *See Arlington Heights*, 429 U.S. at 270 n.21; *Castaneda*, 430

U.S. at 497–98.

In addition, although the government suggests alternative reasons

Congress now might want to reenact § 1326, the district court correctly

found each proffered alternative would not have motivated the Congress

that enacted the statute. 1-ER-36–39.

As the district court noted, Professor Lytle Hernandez testified to

the belief surrounding criminalization of illegal reentry "that increased

border enforcement would improve job security." 1-ER-36 (quoting 1-

ER-104–105). But Professor Lytle Hernandez explained this economic belief was rooted in discrimination, segregation, and driven by an inaccurate, racialized belief of a "zero sum game of jobs." 1-ER-36–37 (quoting 2-ER-104–105).

As for national security and foreign relations, the district court correctly found, based on Professor Lytle Hernandez's testimony, these concerns were also rooted in racial animus, as "the story of race transcends the border." 1-ER-37–38 (quoting 2-ER-114). In addition, the relationship between Mexico and the United States was not an equal one: "Mexico 'is a junior partner' in the two countries' partnership' and … 'they're not dictating, by any means, to the United States Government about how this is going to go.'" 1-ER-38–39 (quoting 2-ER-108).

The district court's decision to credit that testimony was not clear error. Under clear error review, the district court has "expertise" in "determinations of credibility" and "determination[s] of fact." *Anderson*, 470 U.S. at 574. Thus, "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility." *Id.*

74

The government also complains the district court reviewed the alternative theories individually, instead of in their totality. OB-60. But as the district court explained, because none of the government's proffered reasons can be separated from racial animus, the combination of those factors enhances, rather than detracts from, the racism underlying § 1326. 1-ER-36–39; *cf. United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000) (explaining the "sum of zeros" is still zero). The government simply provided no evidence to support its position. The district court committed no clear error in holding the government to its burden of proof.

## Conclusion

The district court correctly applied the *Arlington Heights* equal protection framework to analyze § 1326's constitutionality. Congress's power to enact immigration laws is powerful, but its power is not limitless. Federal courts bear the duty to uphold the Constitution, and Congress cannot dilute the constitutional protections of criminal defendants to assert, and fully and fairly develop, a Fifth Amendment Equal Protection challenge. Carrillo-Lopez asks this Court to affirm the

district court's application of *Arlington Heights* in dismissing the

indictment.

**Dated:** April 8, 2022.

Respectfully submitted,

RENE L. VALLADARES
Federal Public Defender

*s/ Lauren Gorman*

LAUREN GORMAN
Assistant Federal Public Defender

*s/ Ellesse Henderson*

ELLESSE HENDERSON
Assistant Federal Public Defender

*s/ Amy B. Cleary*

AMY B. CLEARY
Assistant Federal Public Defender

*s/ Wendi L. Overmyer*

WENDI L. OVERMYER
Assistant Federal Public Defender

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** | 21-10233

The undersigned attorney or self-represented party states the following:

○ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> the following pending cases challenging the constitutionality of 8 U.S.C. §1326 under the equal protection component of the Fifth Amendment Clause, though the record in each varies: United States v. Vasquez-Ortiz, 9th Cir. Case No. 21-10309 (government appeal of motion to dismiss 8 U.S.C. §1326 charge under the equal protection component of the Fifth Amendment Clause stayed pending resolution of United States v. Carrillo-Lopez); and United States v. Rodrigues-Barios, 9th Cir. 21-50145 (defense appeal of denial of motion to dismiss 8 U.S.C. §1326 charge under the equal protection component of the Fifth Amendment Clause, opening brief filed March 14, 2022)

**Signature** | s/ Lauren D. Gorman | **Date** | April 8, 2022

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 17**      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-10233

I am the attorney or self-represented party.

**This brief contains** | 13,802 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ( ) it is a joint brief submitted by separately represented parties;

    ( ) a party or parties are filing a single brief in response to multiple briefs; or

    ( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated      .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Lauren D. Gorman     **Date** | April 8, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**      *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 21-10233

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Mr. Gustavo Carrillo-Lopez, #1231425
Ely State Prison
P.O. Box 1989
4569 North State Route 490
Ely, Nevada 89031

**Description of Document(s)** *(required for all documents)*:

Appellee Answering Brief

**Signature** | s/Lauren D. Gorman | **Date** | April 8, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# ADDENDUM

# Addendum

## Constitutional Provisions

U.S. Const., amend. V ...................................................................**A1**

## Federal Statutes

8 U.S.C. § 1326 (as last amended in 1996) ...................................**A2**

Immigration and Nationality Act of 1952
  (McCarran-Walter Act of 1952), Pub. L. No. 82-414, § 276,
  66 Stat. 229 (June 27, 1952)  ....................................................**A4**

Undesirable Aliens Act of 1929,
  Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551
  (March 4, 1929) .......................................................................**A5**

Case: 21-10233, 04/08/2022, ID: 12416631, DktEntry: 25, Page 95 of 100

Amendment V. Grand Jury Indictment for Capital Crimes;..., USCA CONST Amend....

| United States Code Annotated |
| Constitution of the United States |
| Annotated |
| Amendment V. Grand Jury; Double Jeopardy; Self-Incrimination; Due Process; Takings |

U.S.C.A. Const. Amend. V full text

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. **A1** 1

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter II. Immigration
                Part VIII. General Penalty Provisions

8 U.S.C.A. § 1326

§ 1326. Reentry of removed aliens

Effective: September 30, 1996
Currentness

**(a) In general**

Subject to subsection (b), any alien who--

**(1)** has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

**(2)** enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

**(b) Criminal penalties for reentry of certain removed aliens**

Notwithstanding subsection (a), in the case of any alien described in such subsection--

**(1)** whose removal was subsequent to a conviction for commission of three or more misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under Title 18, imprisoned not more than 10 years, or both;

**(2)** whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both;

**(3)** who has been excluded from the United States pursuant to section 1225(c) of this title because the alien was excludable under section 1182(a)(3)(B) of this title or who has been removed from the United States pursuant to the provisions of subchapter V, and who thereafter, without the permission of the Attorney General, enters the United States, or attempts to do so, shall be fined under Title 18 and imprisoned for a period of 10 years, which sentence shall not run concurrently with any other sentence. [1] or

**(4)** who was removed from the United States pursuant to section 1231(a)(4)(B) of this title who thereafter, without the permission of the Attorney General, enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be fined under Title 18, imprisoned for not more than 10 years, or both.

For the purposes of this subsection, the term "removal" includes any agreement in which an alien stipulates to removal during (or not during) a criminal trial under either Federal or State law.

**(c) Reentry of alien deported prior to completion of term of imprisonment**

Any alien deported pursuant to section 1252(h)(2) [2] of this title who enters, attempts to enter, or is at any time found in, the United States (unless the Attorney General has expressly consented to such alien's reentry) shall be incarcerated for the remainder of the sentence of imprisonment which was pending at the time of deportation without any reduction for parole or supervised release. Such alien shall be subject to such other penalties relating to the reentry of deported aliens as may be available under this section or any other provision of law.

**(d) Limitation on collateral attack on underlying deportation order**

In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) or subsection (b) unless the alien demonstrates that--

**(1)** the alien exhausted any administrative remedies that may have been available to seek relief against the order;

**(2)** the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

**(3)** the entry of the order was fundamentally unfair.

## CREDIT(S)

(June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.)

66 STAT.]        PUBLIC LAW 414—JUNE 27, 1952                    229

REENTRY OF DEPORTED ALIEN

SEC. 276. Any alien who—

(1) has been arrested and deported or excluded and deported, and thereafter

(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,

shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000, or both.

A4

**CHAP. 690.**—An Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law.

March 4, 1929.
[S. 5094.]
[Public, No. 1018.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) if any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment.

Immigration.
Deported alien attempting to reenter, guilty of a felony.

Punishment for.

(b) For the purposes of this section any alien ordered deported (whether before or after the enactment of this Act) who has left the United States shall be considered to have been deported in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

Alien ordered deported, who has left the United States, considered lawfully deported.

(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen.

Ship employee liable to exclusion not permitted to land.

(d) So much of section 3 of the Immigration Act of 1917 [U. S. C. Title 8, § 136(j)] as reads as follows: "persons who have been deported under any of the provisions of this Act, and who may again seek admission within one year from the date of such deportation unless prior to their reembarkation at a foreign port or their attempt to be admitted from foreign contiguous territory the Secretary of Labor shall have consented to their reapplying for admission" is amended to read as follows: "persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Secretary of Labor has consented to their reapplying for admission".

Restriction on readmissions.
Matter stricken out.
Vol. 39, p. 876, amended.
U. S. Code, p. 132.

Matter substituted.

(e) So much of section 18 of the Immigration Act of 1917 [U. S. C. Title 8, § 154] as reads as follows: "or knowingly to bring to the United States at any time within one year from the date of deportation any alien rejected or arrested and deported under any provision of this Act, unless prior to reembarkation the Secretary of Labor has consented that such alien shall reapply for admission, as required by section 3 hereof" is amended to read as follows: "or knowingly to bring to the United States any alien excluded or arrested and deported under any provision of law until such time as such alien may be lawfully entitled to reapply for admission to the United States". The amendment made by this subsection shall take effect on the expiration of sixty days after the enactment of this Act, but the provision amended shall remain in force for the collection of any fine incurred before the effective date of such amendment.

Bringing in deported alien.
Matter stricken out.
Vol. 39, p. 888, amended.
U. S. Code, p. 138.

Matter substituted.

Effective in 60 days.

Sec. 2. Any alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials, or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact, shall be guilty of a misdemeanor and, upon conviction, shall be punished by imprisonment for not more than one year or by a fine of not more than $1,000, or by both such fine and imprisonment.

Punishment for illegal entry.

Alien under sentence deported, after termination of imprisonment.

SEC. 3. An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment. For the purposes of this section the imprisonment shall be considered as terminated upon the release of the alien from confinement, whether or not he is subject to rearrest or further confinement in respect of the same offense.

Detailed record of convictions to be notified to Secretary of Labor.

SEC. 4. Upon the final conviction of any alien of any offense under this Act in any court of record it shall be the duty of the clerk of the court to notify the Secretary of Labor, giving the name of the alien convicted, the nature of the offense of which convicted, the sentence imposed, and, if imprisoned, the place of imprisonment, and, if known, the place of birth of such alien, his nationality, and the time when and place where he entered the United States.

Terms in Immigration Act applicable to this Act.

SEC. 5. Terms defined in the Immigration Act of 1924 shall, when used in this Act, have the meaning assigned to such terms in that Act.

Approved, March 4, 1929.