No. 21-10233

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLANT

*v.*

GUSTAVO CARRILLO-LOPEZ,
DEFENDANT-APPELLEE.

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA, NO. 3:20-CR-26-MMD-WGC*

---

## Consented to Brief of Legal Service Providers and Immigrant Rights Organizations as Amici Curiae in Support of Appellant

---

Ann Garcia
Khaled Alrabe
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave. NW,
Suite 200, Washington, DC 20007
Tel: (617) 227-9727
ann@nipnlg.org
khaled@nipnlg.org

Sarah Thompson
NATIONAL IMMIGRANT JUSTICE
CENTER
PO Box 124975
San Diego, CA 92112
T: (312) 660-1327
F: (312) 660-1505
sthompson@heartlandalliance.org

Counsel for *Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, each amicus party states that it does not have a parent corporation and no publicly held corporation owns 10 percent or more of the stock of any amicus.

s/ Khaled Alrabe

Khaled Alrabe
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave. NW,
Suite 200, Washington, DC 20007
Tel: (617) 227-9727
khaled@nipnlg.org

Dated: April 15, 2022

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION AND STATEMENT OF AMICI ................................. 1

ARGUMENT ....................................................................................... 4

   I.   Recent implementation of 8 U.S.C. § 1326 demonstrates the profound human cost of such prosecutions and the Government's disproportionate reliance on Section 1326. ............................................ 4

     A.  Section 1326 and the Clinton Administration. ............................ 5

     B.  Section 1326 and the Bush Administration. ................................. 7

     C.  Section 1326 and the Obama Administration. ............................. 8

     D.  Section 1326 and the Trump Administration. ........................... 11

     E.  Section 1326 and the Biden Administration............................. 12

  II.  The Human Cost: Unlawful Reentry Prosecutions Lead to Family Separation, Obstruct the Right to Seek Asylum, Deny Due Process Protections, and Lead to Dehumanizing and Racist Treatment ........ 15

     A.  Prosecutions for unlawful reentry systematically separate families and deprive refugees of a meaningful opportunity to seek protection from persecution. ............................................... 15

     B.  Immigrants' strong equities and ties to the United States are often discounted by federal officials making discretionary decisions related to the prosecution of unlawful reentry cases. ..................... 18

     C.  Unlawful reentry prosecutions inherently lead to due process violations............................................................................... 22

CONCLUSION ................................................................................. 35

CERTIFICATE OF COMPLIANCE ...................................................... 37

CERTIFICATE OF SERVICE ............................................................. 38

APPENDIX A ................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Ms. L. v. ICE*, Case No. 3:18-CV-428-DMS (S.D. Cal.) ........................... 12

*Ramos v. Nielsen,* 321 F. Supp. 3d 1083 (N.D. Cal. Aug. 6, 2018) ......... 11

*S.A. v. Trump,* No. 18-CV-03539-LB, 2018 WL 6470253 (N.D. Cal. Dec. 10, 2018) .............................................................................................. 11

*Vega-Anguiano v. Barr*, 982 F.3d 542 (9th Cir. 2019) ............................. 5

**Statutes**

8 U.S.C. § 1101(a)(3) ................................................................................. 1

8 U.S.C. § 1225(b)(1)(A)(ii) ..................................................................... 24

8 U.S.C. § 1229a ....................................................................................... 9

8 U.S.C. § 1231(a)(5) ................................................................................ 4

8 U.S.C. § 1326 ................................................................................ *passim*

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279 (Apr. 24, 1996) ................... 5, 6

Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059 (Nov. 29, 1990) ......................................................................... 5

Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996) ......................................................................................... 5, 6

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (Sept. 13, 1994) ...... 5, 6

**Other Authorities**

Am. Immigration Council, *Aggravated Felonies: An Overview* (Dec. 16, 2016), https://bit.ly/3hJqx2U. ........................................................... 6

Clara Long & Grace Meng, Human Rights Watch, *Systemic Indifference: Dangerous & Substantial Medical Care in US Immigration Detention* (May 2017), https://bit.ly/3IrB4ed ................................. 33

Doug Keller, *Sentencing Enhancements in Illegal Re-Entry Cases*, 51 BOSTON COLLEGE L. REV. 719, 737 (2010), https://bit.ly/3w2m6c3 . 7

*Effectiveness of DHS's "Consequence Delivery System" Questioned*, IMMIGRATION IMPACT, Apr. 3, 2015, https://bit.ly/3KpAEGp ......... 14

Exec. Order No. 13,767, 82 Fed. Reg. 8793 (Jan. 25, 2017), https://bit.ly/35wcGdX .................................................................... 11

German Lopez, *Report: Black Men Get Longer Sentences for the Same Federal Crime as White Men*, VOX, Nov. 17, 2017, https://bit.ly/3MtUSAK. ................................................................. 6

Jeffrey S. Passel et al., Pew Research Ctr., *U.S. Immigration Enforcement* (Apr. 23, 2012), https://pewrsr.ch/34qXiyY ............... 7

Jeremy Slack et al., *In Harm's Way: Family Separation, Immigration Enforcement Programs and Security on the US Mexico Border,* 3 J. MIGRATION AND HUMAN SECURITY 109–28 (2015), https://bit.ly/35xtph1 ................................................................. 9, 14

Joanna Jacobbi Lydgate, *Assembly-Line Justice: A Review of Operation Streamline*, 98 CALIFORNIA L. REV. 481, 483 (2010), https://bit.ly/35WBw6q .................................................................. 7

Margaret Edwards, The Understandings and Human Cost of 'Prevention Through Deterrence,' As Seen Amongst Advocates in the United States and Mexico, SIT GRADUATE INSTITUTE INDEPENDENT STUDY PROJECT COLLECTION (Spring 2019), https://bit.ly/3tFA0xG .................................................................. 14

Memorandum from John Kelly, Sec'y of U.S. Dep't of Homeland Sec., to Kevin McAleenan, Acting Comm. U.S. Customs and Border Protection, et al. (Feb. 20, 2017), https://bit.ly/3IPT0jj. ............... 11

Memorandum from Monty Wilkinson, Acting Att'y Gen., Memorandum for All Federal Prosecutors: Rescinding the Zero-Tolerance Policy for Offenses Under 8 U.S.C. § 1325(a) (Jan. 26, 2021), https://bit.ly/3MHkw5h. ............................................................... 12

Michelle Alexander, *Why Hillary Clinton Doesn't Deserve the Black Vote*, THE NATION, Feb. 10, 2016, https://bit.ly/3sNpNjr ................ 5

Nat'l Immigrant Justice Ctr*., A Legacy of Injustice* 5 (July 2020), https://bit.ly/3HR4MJh ....................................................... 14

Nat'l Immigrant Justice Ctr., *Request for Investigation into U.S. and International Violations of Asylum Rights Resulting from*

iv

*Criminal Prosecutions of Migrants* (December 17, 2019), https://bit.ly/3MX3RKR.................................................. 26

Nat'l Immigrant Justice Ctr., Transparency Project, *Exposing Human Rights Violations Behind Laws That Criminalize Migration*, https://bit.ly/3KQULO6................................................... 9, 13

Office of the Inspector Gen., Dep't of Homeland Sec., OIG-15-95, Streamline: Measuring Its Effect on Illegal Border Crossing (May 2015), https://bit.ly/3KP2MCS ........................................ 10

Office of the Inspector Gen., Dep't of Homeland Sec., OIG-21-30, Violations of Detention Standards amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ (Mar. 30, 2021), https://bit.ly/3u6lUph ................................................... 33

Physicians for Human Rights, 'You Will Never See Your Child Again': the Persistent Psychological Effects of Family Separation (Feb. 5, 2020), https://bit.ly/3q9tbU7. ........................................ 12

Rafael Bernal, *DHS Formally Bans Family Separations for Illicit Border Crossings*, THE HILL, May 28, 2021, https://bit.ly/3HTGzlk .............................................................................. 13

Rey Koslowski, *Immigration and Insecurity: Post 9/11 Fear in the United States*, SOCIAL SCIENCE RESEARCH COUNCIL (July 28, 2006), https://bit.ly/35ZcymP ............................................... 7

Susan Katzenelson et al., *Non-U.S. Citizen Defendants in the Federal Court System*, 8 Federal Sentencing Reporter 259, 263 (1996), https://bit.ly/3vNItlm ..................................................... 7

TRAC, *Lead Charges for Criminal Immigration Prosecutions, FY 1986– FY 2011* (2011), https://bit.ly/3vTFGqu ........................... 7

U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search, October 2015, Personal Property, https://bit.ly/361sTrF (Mar. 15, 2022) ............................ 31

U.S. Dep't of Justice, *Department of Justice Prosecuted a Record-Breaking Number of Immigration-Related Cases in Fiscal Year 2019* (Oct. 17, 2019), https://bit.ly/3sR4JJe .................................... 8

U.S. Dep't of Justice, Offs. of the United States Att'ys, *Prosecuting Immigration Crimes Report (PICR)* (Jan. 5, 2022), https://bit.ly/3HK3Shu. ................................................. 13

U.S. Gov't Accountability Office, GAO-17-66, Actions Needed to Improve
   Oversight of Post-Apprehension Consequences 13 (2017),
   https://bit.ly/3KjhYbg ...................................................................... 10

U.S. Sentencing Comm'n, *Quick Facts: Illegal Reentry Offenses* (Mar. 7,
   2022), https://bit.ly/3pK00H2 ........................................................ 15

## INTRODUCTION AND STATEMENT OF AMICI[1]

The government seeks to prosecute Gustavo Carrillo-Lopez for illegal reentry of a previously removed "alien"[2] under 8 U.S.C. § 1326 ("Section 1326"). Amici[3] urge this Court to affirm the district court's dismissal of his charge and support Mr. Carrillo-Lopez's arguments that Section 1326 violates the equal protection clause of the Constitution. Other amicus briefs address the racial animus underlying the passage of Section 1326 and the discriminatory impact of its ongoing use. Amici write separately to highlight the collateral harms flowing from Section 1326 prosecutions, which fall almost entirely on immigrants of color, in particular Latinx people. These harms are relevant, in amici's view, because they demonstrate how this law is used punitively against

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than amici and their counsel, made a monetary contribution to the preparation or submission of the brief.

[2] Amici use the statutory term, "alien," only as necessary to cite statutes, caselaw, and other sources. *See* 8 U.S.C. § 1101(a)(3). Otherwise, amici will use the terminology, "noncitizen" or "undocumented noncitizen," to refer to people who are immigrants and/or in the United States without lawful status.

[3] A full statement of amici is attached as Appendix A.

1

noncitizens who often have strong family ties in the United States and who may be coming to the United States in search of refugee protections.

This brief describes the recent historical context and policies driving Section 1326 prosecutions and highlights stories that illustrate the abuses and rights violations associated with these policies. First, amici address the latest chapter of the contemptible and discriminatory history of Section 1326;[4] its skyrocketing use in the last thirty years and the increasingly punitive manner of these prosecutions. These prosecutions typically happen in parallel with immigration enforcement measures, including the reinstatement of a prior removal order which already bars nearly all immigration relief, adding a further layer of criminal punishment to the already-severe immigration penalties that exist for unauthorized reentry into the United States. Second, amici provide stories that illustrate the devastating, harmful impacts that Section 1326 prosecutions have had. These stories demonstrate how the government's increasing pursuit of Section 1326 prosecutions has led to a pattern of dehumanizing, discriminatory, and punitive treatment of people with significant ties to the United States. Such harm is

---

[4] Appellee's Opening Br., ECF No. 25.

particularly relevant to Mr. Carrillo-Lopez's argument because the government has consistently and pretextually held up Section 1326 under the rational basis standard, ignoring available evidence and claiming the statute's use is justified as a deterrence tool.

Amici are legal service providers and immigrant rights organizations with a strong interest in ending the criminalization of migration. Individually and collectively, amici have decades of experience representing and serving immigrants who have been convicted of illegal reentry and barred from immigration relief because of that prosecution. Amici are Al Otro Lado, American Gateways, Black Alliance for Just Immigration, California Collaborative for Immigrant Justice, Capital Area Immigrants' Rights Coalition, Chacón Center for Immigrant Justice at Maryland Carey Law, Civil Rights Education and Enforcement Center, Comunidad Maya Pixan Ixim, Detention Watch Network, Doctors for Camp Closure, Federal Defenders of Eastern Washington and Idaho, Florence Immigrant & Refugee Rights Project, Immigrant Legal Defense, Immigrant Legal Resource Center, Immigration Equality, National Immigrant Justice Center, National Immigration Project of the National Lawyers Guild, Oregon Justice Resource Center, Public

Counsel, Rocky Mountain Immigrant Advocacy Network, San Francisco Public Defender's Office, Texas Civil Rights Project, Washington Defender Association, and Young Center for Immigrant Children's Rights. A full description of each amicus organization is provided in Appendix A.

## ARGUMENT

### I. Recent implementation of 8 U.S.C. § 1326 demonstrates the profound human cost of such prosecutions and the Government's disproportionate reliance on Section 1326.

The United States government's use of criminal sanctions against noncitizens has grown exponentially in recent decades as part of intentionally punitive, anti-immigrant policymaking. In the 1990s, Congress increased custodial sentences for individuals subject to Section 1326. Then after September 11, 2001, the Bush Administration instituted policies that led to a major surge in migration-related prosecutions, which continued at high rates under President Obama. The Trump administration further weaponized these laws to devastating impact.

The result is that Section 1326 has added a criminal layer of punishment on top of the already punitive nature of civil immigration enforcement measures like the reinstatement of a prior removal order

4

under 8 U.S.C. § 1231(a)(5), which has the effect of depriving noncitizens of access to almost all immigration remedies and of the right to challenge the validity of an underlying removal order except where there has been a "gross miscarriage" of justice. *See generally Vega-Anguiano v. Barr*, 982 F.3d 542, 547–48 (9th Cir. 2019). To this day, the Biden administration continues to prioritize Section 1326 prosecutions against people with strong family ties in the country as well as those seeking protection from persecution abroad.

**A. Section 1326 and the Clinton Administration.**

"Tough-on-crime" lawmaking in the 1990s significantly increased the most punitive aspects of immigration law and increased prison time for Section 1326 convictions.[5] The 1994 Crime Bill—cited as a key contributor to mass incarceration with lasting harm for Black and Latinx

---

[5] Section 1326 was amended numerous times in the 1990s. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059 (Nov. 29, 1990); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (Sept. 13, 1994) (codified at 8 U.S.C. § 1326 (1994)) [hereinafter 1994 Crime Bill]; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279 (Apr. 24, 1996) (codified at 8 U.S.C. § 1326 (2000)); Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629 (Sept. 30, 1996).

communities[6]—increased the statutory maximum sentence for Section 1326 violations where the noncitizen had been deported following a conviction for an "aggravated felony."[7] Just two years later, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[8] and the Antiterrorism and Effective Death Penalty Act (AEDPA)[9] dramatically expanded the "aggravated felony" definition to include 21 categories, including hundreds of relatively minor offenses.[10] The combined result of these changes was that a noncitizen convicted in state court of a simple theft offense, if considered an aggravated felony and committed after that person was previously removed, could face up to 20 years' incarceration under Section 1326 even if the time served for the underlying theft offense was mere days. By 2000, Section 1326

---

[6] Michelle Alexander, *Why Hillary Clinton Doesn't Deserve the Black Vote*, THE NATION, Feb. 10, 2016, https://bit.ly/3sNpNjr. *See also* German Lopez, *Report: Black Men Get Longer Sentences for the Same Federal Crime as White Men*, VOX, Nov. 17, 2017, https://bit.ly/3MtUSAK.

[7] The Crime Bill increased the maximum sentence for unauthorized reentry from 15 to 20 years. *See* 1994 Crime Bill, *supra* note 5, at Title XIII, Criminal Aliens and Immigration Enforcement.

[8] Pub. L. No. 104-208, 110 Stat. 3009-546 (Sep. 30, 1996).

[9] Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).

[10] *See* Am. Immigration Council, *Aggravated Felonies: An Overview* (Dec. 16, 2016), https://bit.ly/3hJqx2U.

prosecutions reached 8,000 annually, up from just over 1,000 a decade earlier.[11] The length of sentences imposed for Section 1326 convictions doubled from the prior decade.[12]

## B. Section 1326 and the Bush Administration.

After 9/11, the United States government increased its prosecutions for migration-related violations even further.[13] In 2005, the Bush administration directed U.S. Attorneys to adopt an "enforcement with consequences" strategy,[14] including the launch of Operation Streamline, an assembly line approach to migration-related prosecutions in which courts heard up to eighty cases per day, with initial appearances, arraignments, pleas, and sentencing often occurring in one hearing.[15]

---

[11] TRAC, *Lead Charges for Criminal Immigration Prosecutions, FY 1986–FY 2011* (2011), https://bit.ly/3vTFGqu.

[12] Doug Keller, *Sentencing Enhancements in Illegal Re-Entry Cases*, 51 BOSTON COLLEGE L. REV. 719, 737 (2010), https://bit.ly/3w2m6c3. *See also* Susan Katzenelson et al., *Non-U.S. Citizen Defendants in the Federal Court System*, 8 Federal Sentencing Reporter 259, 263 (1996), https://bit.ly/3vNItlm.

[13] Rey Koslowski, *Immigration and Insecurity: Post 9/11 Fear in the United States*, SOCIAL SCIENCE RESEARCH COUNCIL (July 28, 2006), https://bit.ly/35ZcymP.

[14] Jeffrey S. Passel et al., Pew Research Ctr., *U.S. Immigration Enforcement* (Apr. 23, 2012), https://pewrsr.ch/34qXiyY.

[15] Joanna Jacobbi Lydgate, *Assembly-Line Justice: A Review of Operation Streamline*, 98 CALIFORNIA L. REV. 481, 483 (2010), https://bit.ly/35WBw6q.

Large groups of people in handcuffs and leg shackles entered guilty pleas, without any safeguards to ensure that those pleas were informed or voluntary and without consideration of whether the individual might have a claim to refugee protections.[16] Thanks to the creation of Streamline courts, prosecutions for Section 1326 violations reached over 20,000 by Fiscal Year (FY) 2009.[17]

### C. Section 1326 and the Obama Administration.

The Obama administration further increased resources for immigration enforcement programs, and prosecutions under Section 1326 again hit new records.[18] In FY 2013 alone, there were 20,159 such prosecutions, an increase from 12,881 in FY 2007.[19] This increase had an especially debilitating impact on families. The United States Sentencing Commission reported in 2015 that nearly 50 percent of people sentenced under Section 1326 had at least one child living in the United States.[20]

---

[16] *Id.* at 481–83.

[17] U.S. Dep't of Justice, *Department of Justice Prosecuted a Record-Breaking Number of Immigration-Related Cases in Fiscal Year 2019* (Oct. 17, 2019), https://bit.ly/3sR4JJe [hereinafter DOJ 2019 Prosecution Statistics].

[18] *Id.*

[19] DOJ 2019 Prosecution Statistics, *supra* note 17.

[20] U.S. Sentencing Comm'n, *Illegal Reentry Offenses* (Apr. 2015), https://bit.ly/3hO8cla.

The Obama administration renamed Operation Streamline the "Criminal Consequence Initiative,"[21] part of the "Consequence Delivery System" (CDS). The CDS incorporated punitive immigration enforcement programs that include criminal prosecutions designed to deter reentry.[22] For example, CDS prioritized the issuance of expedited and reinstated removal orders.[23] This change was significant because the Department of Homeland Security (DHS) has long had the option of placing individuals into standard removal proceedings under 8 U.S.C. § 1229a, which would allow for a more robust opportunity to seek protection from removal, whereas expedited and reinstated removal proceedings curtail most of those options. Of the CDS programs, Section

---

[21] Operation Streamline was renamed the "Criminal Consequence Initiative" in 2016. *See Declining Deportations and Increasing Criminal Alien Releases – The Lawless Immigration Policies of the Obama Administration: Hearing Before the Sen. Judiciary Comm.*, 114th Cong. (2016) (statement of Ronald Vitiello, Border Patrol Acting Chief), https://bit.ly/3hJSw2j.

[22] *See* Jeremy Slack et al., *In Harm's Way: Family Separation, Immigration Enforcement Programs and Security on the US Mexico Border,* 3 J. MIGRATION AND HUMAN SECURITY 109–28 (2015), https://bit.ly/35xtph1. *See also* Nat'l Immigrant Justice Ctr., Transparency Project, *Exposing Human Rights Violations Behind Laws That Criminalize Migration*, https://bit.ly/3KQULO6 [hereinafter NIJC Transparency Project].

[23] *See* Slack et al., *supra* note 22, at 109–28

9

1326 is the only measure that carries felony criminal charges and prison sentences.

Even as the Government grew these programs in the name of deterrence, their studies have shown that the metrics used to defend Section 1326 and CDS programs are flawed. In 2015, the DHS Office of the Inspector General (OIG) found that Border Patrol was not accurately measuring the effect of mass prosecutions as a deterrence measure.[24] In January 2017, the Government Accountability Office (GAO) reported that weaknesses in CBP's methodology for calculating recidivism rates limited its usefulness in assessing CDS' effectiveness.[25] Yet, this lack of evidence regarding Section 1326's efficacy as a deterrent did not dissuade the Obama administration or subsequent administrations from using this law.

//

//

---

[24] Office of the Inspector Gen., Dep't of Homeland Sec., OIG-15-95, Streamline: Measuring Its Effect on Illegal Border Crossing (May 2015), https://bit.ly/3KP2MCS.
[25] U.S. Gov't Accountability Office, GAO-17-66, Actions Needed to Improve Oversight of Post-Apprehension Consequences 13 (2017), https://bit.ly/3KjhYbg.

## D. Section 1326 and the Trump Administration.

Under the Trump Administration, this already dangerous and discriminatory system was used to even more alarming effect, and with transparently racist motives. Numerous courts have recognized that comments made by former President Trump reflected racial animus and discrimination against Mexicans and Central Americans.[26] Such animus was further displayed starting in January 2017, when the Trump administration directed significant additional resources towards drastically increasing prosecutions for unauthorized entry and reentry violations.[27] Such prosecutions increased by nearly 50 percent from FY 2017 to FY 2019,[28] making up around 60 percent of *all* criminal prosecutions in federal courts at that time.[29]

---

[26] *See, e.g.*, *Ramos v. Nielsen,* 321 F. Supp. 3d 1083 at 1099–100 (N.D. Cal. Aug. 6, 2018); *S.A. v. Trump,* No. 18-CV-03539-LB, 2018 WL 6470253, at *7 (N.D. Cal. Dec. 10, 2018).

[27] Exec. Order No. 13,767, 82 Fed. Reg. 8793 (Jan. 25, 2017), https://bit.ly/35wcGdX. *See also* Memorandum from John Kelly, Sec'y of U.S. Dep't of Homeland Sec., to Kevin McAleenan, Acting Comm. U.S. Customs and Border Protection, et al. (Feb. 20, 2017), https://bit.ly/3IPT0jj.

[28] *See* DOJ 2019 Prosecution Statistics, *supra* note 17.

[29] TRAC, *Prosecutions for 2020* (May 2020), https://bit.ly/3hIqiVX.

Under this intensified commitment to Section 1326 prosecutions[30] and through the creation of the "Zero Tolerance" policy, thousands of adults traveling to the United States with their children were detained and prosecuted while their children were sent to the custody of the Office of Refugee Resettlement (ORR).[31] Most of the families were not reunited until litigation forced it,[32] and some still remain separated. This family separation led to national outcry and continues to cause ongoing harm for impacted families.[33]

### E. Section 1326 and the Biden Administration.

Although the Biden administration rescinded the Trump administration's Zero Tolerance directive,[34] and banned family

---

[30] Memorandum from Jeff Sessions, Att'y Gen., Memorandum for All Federal Prosecutors: Renewed Commitment to Criminal Immigration Enforcement (Apr. 11, 2017), https://bit.ly/3MTz3uA.

[31] *See* Office of the Inspector Gen., Dep't of Homeland Sec., OIG-18-84, Special Review—Initial Observations Regarding Family Separation Issues under the Zero Tolerance Policy (Sept. 27, 2018), https://bit.ly/37yvoCi.

[32] *Ms. L. v. ICE*, Case No. 3:18-CV-428-DMS (S.D. Cal.).

[33] *See* Physicians for Human Rights, 'You Will Never See Your Child Again': the Persistent Psychological Effects of Family Separation (Feb. 5, 2020), https://bit.ly/3q9tbU7.

[34] *See* Memorandum from Monty Wilkinson, Acting Att'y Gen., Memorandum for All Federal Prosecutors: Rescinding the Zero-Tolerance Policy for Offenses Under 8 U.S.C. § 1325(a) (Jan. 26, 2021), https://bit.ly/3MHkw5h.

separations for illegal entry prosecutions,[35] it continues to rely on Section 1326. The Department of Justice (DOJ) charged 13,533 people under Section 1326 from January to December 2021.[36] Further, CBP has continued to refer people for prosecution as part CDS's spectrum of punitive enforcement programs.[37]

Examining Section 1326 alongside the other enforcement programs in CDS illustrates that these prosecutions do not actually serve a rational immigration-related purpose, but instead add layers of punishment onto a population that already faces devastating and nearly insurmountable civil immigration penalties. This harm disproportionately impacts people who have family in the United States or individuals seeking refugee protections. Studies show that the CDS programs, including Section 1326, do not have a strong deterrent effect on future border crossing intentions. Previously deported individuals have strong ties to the United States and those ties may inform migrants' behaviors in the future as

---

[35] Rafael Bernal, *DHS Formally Bans Family Separations for Illicit Border Crossings*, THE HILL, May 28, 2021, https://bit.ly/3HTGzlk.
[36] *See* U.S. Dep't of Justice, Offs. of the United States Att'ys, *Prosecuting Immigration Crimes Report (PICR)* (Jan. 5, 2022), https://bit.ly/3HK3Shu.
[37] *See* NIJC Transparency Project, *supra* note 22.

13

they seek to reunite with their loved ones.[38] A survey conducted by amicus National Immigrant Justice Center (NIJC) of people facing migration-related prosecutions found that more than 80 percent of the people interviewed had family members in the United States and indicated they were trying to rejoin their family and thirty-three percent were hoping to reunite with their children.[39] This outcome is not surprising given that a removal order generally carries a 10-year or permanent ban on reentry, regardless of family ties.

Despite these realities, and without proper evidence to support any rational use of Section 1326, the government continues to defend prosecutions as a legitimate form of deterrence. Meanwhile, Congress has amended Section 1326 to further penalize those who attempt to reenter the country multiple times and for those with criminal backgrounds. The harsher penalties, in tandem with increased

---

[38] Slack et al., *supra* note 22, at 111. *See also* Margaret Edwards, The Understandings and Human Cost of 'Prevention Through Deterrence,' As Seen Amongst Advocates in the United States and Mexico, SIT GRADUATE INSTITUTE INDEPENDENT STUDY PROJECT COLLECTION (Spring 2019), https://bit.ly/3tFA0xG. *See also Effectiveness of DHS's "Consequence Delivery System" Questioned*, IMMIGRATION IMPACT, Apr. 3, 2015, https://bit.ly/3KpAEGp.

[39] *See* Nat'l Immigrant Justice Ctr*., A Legacy of Injustice* 5 (July 2020), https://bit.ly/3HR4MJh.

prosecutions, resulted in more Latinx individuals in prison over the years.[40] The punitive nature of Section 1326 prosecutions carries an incredible human toll on immigrants and their families, as addressed below.

## II. The Human Cost: Unlawful Reentry Prosecutions Lead to Family Separation, Obstruct the Right to Seek Asylum, Deny Due Process Protections, and Lead to Dehumanizing and Racist Treatment

### A. Prosecutions for unlawful reentry systematically separate families and deprive refugees of a meaningful opportunity to seek protection from persecution.

The Trump administration's Zero Tolerance policy has ended, but families continue to face separation because of Section 1326. When migrants travel with their families or seek to reunite with family in the United States, prosecutions often and routinely separate loved ones, sometimes permanently.

**Fermín**[41] illustrates this point. Fermín first came to the United States when he was 18, but he returned to Mexico in 2004 on voluntary

---

[40] U.S. Sentencing Comm'n, *Quick Facts: Illegal Reentry Offenses* (Mar. 7, 2022), https://bit.ly/3pK00H2.

[41] Names used in this amicus brief are pseudonyms unless otherwise noted.

departure after a DUI conviction. In Mexico, Fermín started a new life, married, and had three children. However, in 2016, cartel members kidnapped and held him for ransom, and they cut off the tip of his finger. Afterward, Fermín and his family fled to the border and requested asylum at a port of entry. CBP permitted his family to enter to pursue asylum, but Fermín was separated from them and detained, and DHS rejected his claim. Fermín received no explanation for this different treatment. Fermín chose not to appeal the denial of his protection claim because he did not want to remain detained and separated from his family. He was deported to Mexico through expedited removal and eventually managed to enter the United States without inspection to reunite with his family.

In April 2019, ICE became aware of Fermín's presence and arrested him. He was charged under Section 1326 and offered a plea deal, but he rejected the offer because it involved jail time, which would once again separate him from his family. His family's asylum case is still pending.

**Raúl's** family was separated when he was referred for Section 1326 prosecution. He first came to work in the United States almost 20 years ago. In 2004, DHS deported Raúl to Guatemala, but he returned

occasionally out of economic necessity. Raúl had not intended to make a life for himself and his family in the United States, but in 2018 a local gang tried to forcibly recruit Raúl's teenage son and threatened to kill Raul, his son, and their family if the son persisted in resisting them. When Raúl and his son arrived at the border in March 2018, Border Patrol officers separated them, telling him the separation would only last two hours. Two hours became a year.

Without asking him about his fear of return to Guatemala, and after taking away his son, Border Patrol referred Raúl for prosecution under Section 1326. Raúl remembers the humiliation he felt in a federal courthouse with leg and hand restraints and later being strip searched. Raúl pleaded guilty after he was warned that fighting his case could result in a long sentence—he needed to get back to his son. He received 75 days imprisonment and fell into a deep depression. He had no news about his son but managed to reach his wife in Guatemala who was experiencing preeclampsia, which was tied to the stress of her husband's and son's treatment in the United States. It was not until he was transferred to ICE custody that he was able to speak with his son. Days later, he reached a family member in Guatemala who told him his wife

had been taken to a hospital and could die from complications from the pregnancy. Raúl returned to Guatemala to support his wife. His wife and baby survived the childbirth, but Raúl remained in hiding in Guatemala until he was paroled back into the United States to be reunited with his son a year after their separation.

### B. Immigrants' strong equities and ties to the United States are often discounted by federal officials making discretionary decisions related to the prosecution of unlawful reentry cases.

Many people prosecuted for Section 1326 violations are longstanding residents of the United States, often with U.S. citizen relatives. Even though Section 1326 prosecutions are supposed to deter migration, immigration officials—who have full discretion on decisions regarding case referrals to the United States Attorney's office—make no exception for people with preexisting lives in the United States. Accordingly, these decisions wreak havoc on families and communities. The cases of Edgar López, Eliseo, and Rosario illustrate this point.

**Edgar López**[42] had lived in the United States for over 22 years when he was arrested in August 2019 during one of the largest workplace

---

[42] Edgar's name is not a pseudonym.

immigration raids in history. He and his wife had settled in Carthage, Mississippi. They raised a family, devoutly attended church, and worked at the local chicken plants. After the raids, about half of the 680 people arrested were released on the basis that they had family in the United States and no criminal record. Despite meeting these criteria, Edgar was not released. Instead, he was charged under Section 1326 because he had been removed from the United States 22 years prior.

The judge in his unlawful reentry case assessed a bond, and his family paid $10,000 for his release. ICE officers, however, transferred him into immigration detention before he could be released. Edgar pleaded guilty to unlawful reentry, and the judge sentenced him to one day in jail. Despite Edgar having completed his sentence, ICE continued to detain him. Edgar spent the next eight months being transferred between ICE facilities as COVID-19 cases surged. After 11 months behind bars, Edgar was deported.

In Guatemala, Edgar desperately wanted to reunite with his family. Edgar traveled to the United States border with Mexico and was tragically killed, along with 18 other migrants, for trying to return home to Mississippi.

**Eliseo** came to the United States in 2007 to escape increasing violence in Guatemala. His wife came soon after, and they settled in New Orleans. In 2012, Eliseo was arrested by ICE and deported while his wife was pregnant. He managed to reenter without authorization in time for the birth of his child. Then, in 2016, ICE agents came to Eliseo's home. They had no arrest warrant and they were looking for someone else, but they arrested Eliseo anyway. The arrest traumatized the family, and Eliseo's absence caused them further hardship: Eliseo's wife was once again left alone to maintain the household and care for their family, while his son was left without a father and with a profound fear of police. Eliseo was charged under Section 1326 and detained.

Following his arrest, the New Orleans community came together to support Eliseo. The Congress of Day Laborers, an organization that helped rebuild the city after Hurricane Katrina, in which Eliseo was a leader, held a 24-hour vigil to protest his arrest. Eliseo remained in jail for 10 months, pleaded guilty to a reduced charge, and was sentenced to time served. He was transferred to immigration custody and later released following a request for prosecutorial discretion. Without the prosecution under Section 1326, Eliseo could have avoided the 10-month

detention and separation from his family, with the accompanying trauma.

**Rosario** was born in Mexico and has lived in the United States for over 20 years, since she was a child. Her husband is a permanent resident, and they have four U.S. citizen children and a child with Deferred Action for Childhood Arrivals. After her mother became ill, Rosario traveled to Mexico to visit her. While she was there, Rosario's nephew was attacked, and her friend's son was murdered. Fearful of becoming a victim herself, Rosario decided to return home. On her way back to the United States, Rosario was herself attacked, robbed, and thrown into the Rio Grande River.

Still injured, Rosario presented herself at a port of entry and tried to explain her situation. But a CBP officer grabbed her and told her to "sit down and shut up," twisting her arm in the process and aggravating her injuries to the point of making her cry. CBP told Rosario to return to Mexico, so she decided to enter the United States without authorization. Upon entry, she was apprehended and charged under Section 1326—the government considered her assault by a CBP agent at the port of entry as a previous deportation. Rosario was granted bond but was then

transferred to ICE custody. She was ultimately convicted for crossing the border.

**Devon** was born in Jamaica and has lived most of his life in the United States where he has five children and four grandchildren, all U.S. citizens. Before being deported in 2013, he expressed fear of returning to Jamaica, but was not given a credible fear interview. He was charged with unlawful reentry when he attempted to return in 2021. A federal judge ordered his release on bond to reunite with his family, but the United State Marshals Service transferred him to ICE custody instead. Devon is in poor health and misses his family every day but it is nearly impossible to communicate with them from detention. As a Black immigrant, he feels that the federal government has discriminated against him and has unjustly punished him for attempting to return to his family. He remains detained in San Diego, fighting for his release and the opportunity to reunite with his family.

## C. Unlawful reentry prosecutions inherently lead to due process violations.

Due process violations are widespread in the immigration removal process. ICE and CBP's treatment of people they refer for prosecution under Section 1326 compounds these issues, leading to untold suffering.

As the following stories illustrate, the violations that unfold regularly through the course of Section 1326 prosecutions include failing to screen people for asylum, destroying their documents, placing them in dangerous conditions of confinement, violating rules of criminal procedure, getting coerced pleas, and providing inadequate language access.

### 1. Failure to screen for protection-based claims

Criminal prosecution of a refugee for an offense related to their "illegal entry or presence" violates the United States' obligations under Article 31(1) of the 1951 United Nations Convention Relating to the Status of Refugees, which prohibits the imposition of any penalty "on account" of a refugee's "illegal entry or presence."[43] Nonetheless, people are regularly referred for Section 1326 prosecutions in spite of their fear to return of returning to their home country. These individuals, while not eligible for asylum because of their prior removal order, are still entitled

---

[43] Incorporated into the 1967 United Nations Protocol Relating to the Status of Refugees, which was ratified by the United States in 1968. Article 31(1) imposes some conditions, which are that a refugee must: come directly from territory where life or freedom threatened; present self without delay to authorities; show good cause for illegal entry or presence.

to seek other forms of protection known as "withholding of removal" and protection under the Convention Against Torture (CAT) which protect that person from being deported to a country where they will face persecution. Those seeking these ancillary refugee protections following an unlawful reentry generally must be referred to an asylum officer screening.[44]

Nonetheless, Border Patrol consistently fails to properly screen arriving immigrants for persecution-based claims and instead refers them for criminal prosecution. For first-time arrivals who are otherwise eligible for asylum, an immigration officer's failure to screen for asylum can cause their immediate deportation, without a hearing. That deportation will forever disqualify them from seeking asylum, and it can also serve as the basis for later Section 1326 prosecutions even if that person never saw an immigration judge. The cycle of abuse has tragic consequences, particularly for people seeking to reunite with family in the United States. A conviction for unauthorized border crossing also impacts future bond determinations and significantly reduces the ability of detained individuals to secure release and gain access to counsel for

---

[44] *Id.* § 1225(b)(1)(A)(ii).

representation in immigration proceedings. Simón's and Domingo's cases illustrate these harms.

**Simón** fled El Salvador in 2018 to escape threats and extortion from the MS-13 gang, who targeted him because he was a well-known leader in his church. Border Patrol apprehended him and referred him for prosecution under Section 1326, based on a previous, 10-year-old deportation order. Simón pleaded guilty, served a year-long sentence, and was transferred to ICE custody. In immigration custody, Simón told ICE officers he was afraid to return to El Salvador. He had a reasonable fear interview, but ultimately ICE officers pressured him into signing a document in English, not his best language, consenting to his deportation.

Back in El Salvador, members of the MS-13 gang tried to murder Simón and he fled again. He was apprehended and referred for unlawful reentry prosecution in late 2019, without being screened for fear of return to El Salvador. Simón was convicted and spent a year and eight months in federal criminal custody while his family resettled in Indiana. He contracted COVID while in custody and his mental health suffered immensely. He was then transferred to ICE detention, where he

remained for six more months. While in ICE custody, Simón finally got a reasonable fear interview, which he passed. He is currently pursuing protection, a process he could have started earlier but for his prosecution under Section 1326.

**Domingo**, an indigenous farmer from Guatemala, fled the country with his 12-year-old son in May 2018 after a local gang began extorting and threating him and his family. When they arrived at the border, Domingo told Border Patrol agents that he was afraid to return to Guatemala. The agents told him that he would be sent before a judge who would determine what sentence to give him, and that he would then be deported. Border Patrol agents said "the President does not want you; the border is closed to Guatemalans." They told Domingo to sign documents in English, a language he does not understand, and separated Domingo from his son. On their records, the agents wrote that Domingo did not have any fear of return to Guatemala.[45]

---

[45] CBP's failure to screen people for fear-based claims and misrepresent information in their documentation is a common occurrence. *See*, *e.g.*, Nat'l Immigrant Justice Ctr., *Request for Investigation into U.S. and International Violations of Asylum Rights Resulting from Criminal Prosecutions of Migrants* (December 17, 2019), https://bit.ly/3MX3RKR.

Federal agents took Domingo into custody and ordered him to put on a dirty jumpsuit. They placed hand and leg restraints on him and presented him before a district court judge. Domingo pleaded guilty to unlawful reentry under Section 1326 because he was desperate to reunite with his son as quickly as possible. After serving his time, Domingo was transferred to ICE custody where he spent two emotionally and physically agonizing months before ICE deported him. He was never given an opportunity to establish his fear of return to Guatemala.

### 2. *Procedural errors by federal agents*

As with any human process, immigration agents sometimes make mistakes. In the best of circumstances, agency errors are remedied before an immigrant receives an order of removal or is deported. It is not infrequent, however, for immigrants to be deported due to an agency error and for them to seek to re-enter the United States to return to their community and family. The ICE or CBP agent that refers the case for Section 1326 prosecution may not look beyond the fact of the removal order when making the decision to refer the immigrant's case for prosecution. The cases of Gerardo, Nazario and Lucio illustrate this point.

27

**Gerardo** a Mexican national, had lived in El Paso, Texas, for over 25 years. He was married to a U.S. citizen and had minor children. In 2010, the Department of State's National Visa Center sent Gerardo a letter misinforming him of his eligibility to become a permanent resident and in 2019, he applied for adjustment of status based on this misinformation. Within weeks, ICE detained Gerardo. From detention, ICE referred his case for prosecution under Section 1326.

Gerardo had no prior contact with the criminal legal system and only a single prior removal from 2002. Nevertheless, he was denied bond. The Court dismissed the Section 1326 charge for violating the statute of limitations, but Gerardo was ultimately deported, leaving behind his family.

**Nazario** was first brought to the United States as a teenager to work and send money to his family in Mexico. In 2001, he was ticketed by a police officer, and ICE subsequently initiated removal proceedings. ICE misstated Nazario's address on the Notice to Appear and did not set a date or time for Nazario's hearing. As a result of ICE's error, Nazario did not receive the notice of hearing and was ordered removed *in absentia*. Had he attended the hearing, he would have been eligible for

28

and likely received voluntary departure, which would not have resulted in a removal order.

Nazario continued with his life unaware of the removal order. He married, had a U.S. citizen child, and raised his wife's existing child as his own. Then, in 2009, he was deported after a traffic stop revealed his removal order and resulted in his removal to Mexico. While in Mexico, Nazario learned that his wife was pregnant and that it was a high-risk pregnancy, so he re-entered the United States without authorization to be with her.

In 2018 Nazario was arrested again and charged with illegal reentry. During discovery, Nazario learned about his 2001 *in absentia* removal order and ICE's error in recording his address. Nazario filed a motion to dismiss, but it was rejected. An appeal of his criminal case is pending and he has filed a motion to reopen his immigration case.

**Lucio** fled Mexico at the age of 15 after being sexual abused. He is now 38 and has five U.S. citizen children. In 2008, he was stopped by police while walking and was referred to ICE even though there were no criminal charges brought against him. ICE officers interviewed him and incorrectly told him he was not eligible for bond. He asked to see an

immigration judge, but the officers presented him with a Stipulated Removal order and told him he would be in jail for a long time if he did not sign it. The officers did not inform him he would be eligible for cancellation of removal or voluntary departure and denied him access to an attorney. He signed the order and was removed to Mexico the same day, without seeing an immigration judge. Despite its obvious due process defects, that same removal order later formed the basis of Lucio's Section 1326 prosecution.

Lucio has returned to the United States various times to reunite with his family and due to persecution and threats he has received in Mexico. In 2020, Border Patrol referred him for unlawful entry prosecution and reinstated his 2008 deportation order. A federal judge recognized the due process issues in his original order and dismissed one of the charges, and the United States Attorney's office ultimately dropped the other charge. However, Lucio still had to come to court on the day he knew his criminal case would be dismissed and he was arrested by ICE at the courthouse. He spent more than a year in ICE custody fighting his case, which is still ongoing.

//

### 3. Destruction and non-return of personal possessions

When Border Patrol apprehends an immigrant who has recently crossed into the country, they typically transport them to a Border Patrol station. There, they confiscate the individuals' possessions, including clothing, their cell phones with critical contact information, identity documents, and other important documents they may have brought. Despite clear guidance against it,[46] Border Patrol agents routinely dispose of these items or fail to return or transfer them once the immigrant is referred for Section 1326 prosecution and transferred to ICE or Marshal Service custody. This pattern of destruction or non-return of property undermines immigrants' ability to establish their identity and the parentage of any children they bring with them, and ultimately to provide evidence for their claim for relief from removal. Pedro's case exemplifies these abuses.

**Pedro**, a Honduran asylum-seeker, was separated from his eight-year-old daughter at the border and charged under Section 1326. He had no prior contacts with the criminal legal system and only a single

---

[46] U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search, October 2015, at § 7 Personal Property, https://bit.ly/361sTrF.

deportation eight years prior. During the arrest, Border Patrol agents confiscated Pedro's documents establishing paternity of his daughter. Border Patrol processed his daughter as an "unaccompanied child" and placed her in a shelter in New York City. Pedro managed to contact his daughter from jail and obtained replacement documents from his daughter's mother in Honduras. Still, the government refused to acknowledge his paternity. Pedro requested a DNA test but was unable to afford the $500 fee. Ultimately, Pedro pleaded guilty to the Section 1326 charge. He and his daughter agreed to deportation because it was the only way they could reunite.

### 4. Detention under dangerous conditions

The United States detains migrants and asylum-seekers in dangerous conditions. In addition to needing to worry about fighting their immigration case, people who face Section 1326 prosecutions are exposed to unhygienic and unsafe environments. Their treatment runs counter to international human rights law and public health standards. The inadequate medical care, squalid conditions, freezing temperatures, overcrowding, and tragic deaths that stem from the detention of immigrants by the United States government has been well documented

for years by civil and human rights organizations as well as by the government's own internal watch dog agencies.[47] The cases of Durvi Martínez and Horacio show that Section 1326 prosecution can trap immigrants in prolonged detention in dangerous conditions.

**Durvi Martínez**,[48] a transgender woman and advocate for immigrant and LGBTQ rights, was prosecuted under Section 1326 in January 2020 after local police transferred them to Border Patrol custody. They spent three months in detention, where they were held in an all-male Section of the prison, denied diabetes medication, and suffered severe weight loss. In March 2020, Durvi was awaiting a credible fear interview, which they hoped to pass in order to apply for asylum based on the violence and persecution they experienced in Mexico as a transgender person, when COVID-19 began spreading through detention centers. Rather than releasing Durvi, ICE chose to quickly deport them

---

[47] *See, e.g.,* Clara Long & Grace Meng, Human Rights Watch, *Systemic Indifference: Dangerous & Substantial Medical Care in US Immigration Detention* (May 2017), https://bit.ly/3IrB4ed; Office of the Inspector Gen., Dep't of Homeland Sec., OIG-21-30, Violations of Detention Standards amid COVID-19 Outbreak at La Palma Correctional Center in Eloy, AZ (Mar. 30, 2021), https://bit.ly/3u6lUph.
[48] Durvi's name is not a pseudonym.

without notifying their attorney and without providing the fear interview they were owed. Durvi died on July 1, 2020, from COVID-19 in Mexico.

**Horacio** was brought to the United States from Guatemala at age six and lived in the United States for almost three decades as a permanent resident. He is married to a U.S. citizen and has four young children. In 2019, Horacio was placed into removal proceedings due to a criminal conviction and in January 2020, he was deported when a lawyer failed to submit an essential document with an appellate court. Gang members began targeting Horacio in Guatemala. He was attacked and beaten so badly he lost consciousness. Horacio escaped, fled Guatemala and returned to the United States, only to be apprehended by Border Patrol.

Even though his previous removal order was due to ineffective assistance of counsel, Border Patrol referred him for criminal prosecution for unlawful reentry. Ultimately, the government dropped all charges, but he was still held in criminal custody from early April through June 2020, at the beginning of the COVID-19 pandemic. Horacio was terrified for himself and his family. A U.S. district court judge ultimately ordered him released from criminal custody on a $20,000 personal appearance

bond, which required his family to put up a significant percentage of their assets just when his wife had lost her job due to the pandemic. Even after posting bond in his criminal case, he was transferred to ICE custody at the Imperial Regional Detention Facility amidst another COVID-19 outbreak.

Once in ICE custody, he was able to begin the process of asserting his claim of fear of return to Guatemala, but the prosecution delayed that process for several months. Horacio's detention—significantly prolonged by his Section 1326 prosecution—was detrimental to his health. Physical pain and confinement triggered extreme anxiety, paranoia, insomnia, flashbacks, and mentally painful thoughts, especially in the early days of the pandemic.

## CONCLUSION

The United States government uses Section 1326 as a punitive enforcement program designed to achieve deterrence goals and has dramatically increased this practice despite evidence demonstrating that these prosecutions do not meet the stated goal of deterrence. Instead, Section 1326 prosecutions deliver grievous harms, primarily to Black, Latinx and Indigenous immigrants. The human costs of these

prosecutions are impossible to quantify but felt deeply by those separated from their loved ones, detained in punishing conditions, and deprived of asylum and due process rights. Amici urge this Court to hold Section 1326 unconstitutional and reverse Mr. Carrillo-Lopez's conviction.

Respectfully submitted,

s/ Khaled Alrabe

Khaled Alrabe
Ann Garcia
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave. NW,
Suite 200, Washington, DC 20007
Tel: (617) 227-9727
ann@nipnlg.org
khaled@nipnlg.org

Sarah Thompson
NATIONAL IMMIGRANT JUSTICE
CENTER
PO Box 124975
San Diego, CA 92112
T: (312) 660-1327
F: (312) 660-1505
sthompson@heartlandalliance.org

Dated: April 15, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-10233

I am the attorney or self-represented party.

**This brief contains** | 6,993 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
  29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
  *(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Khaled Alrabe | **Date** | 04/15/2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

# CERTIFICATE OF SERVICE

U.S. Court of Appeals Docket No. 21-10233

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 15, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Khaled Alrabe

Khaled Alrabe
NATIONAL IMMIGRATION PROJECT
OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Ave. NW,
Suite 200, Washington, DC 20007
Tel: (617) 227-9727
khaled@nipnlg.org

Dated: April 15, 2022

## APPENDIX A
Statements of Interest of Amici Curiae

**Al Otro Lado** is a binational nonprofit serving refugees, deportees, and other migrants on both sides of the U.S. - Mexico border. Al Otro Lado has documented thousands of cases where refugees crossing the U.S. border are unlawfully denied their right to access the U.S. asylum system and removed; they then re-enter the United States between ports of entry because they cannot safely remain in Mexico and are potentially subject to 1326 prosecution. Al Otro Lado also serves other individuals who were removed from the United States in violation of their rights, and who re-enter between ports of entry for compelling humanitarian or security reasons that should not subject them to criminal liability. Despite having ample evidence of due process violations in prior removals, Al Otro Lado is almost always unable to successfully intervene to prevent our clients from being convicted under 1326 due to a variety of factors. Prosecutions under 1326 also formed the basis of numerous family separations at the border between 2017 and the present, and dozens of our clients convicted under 1326 remain separated from their children.

39

**American Gateways** (formerly the Political Asylum Project of Austin) was founded in 1987 and serves the low income immigrant population in central Texas, through legal representation and advocacy for thousands of immigrants before the Department of Homeland Security and the Immigration Courts. Our mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict and human trafficking through exceptional immigration legal services at no or low cost, education, and advocacy. As an agency that serves 23 counties in Texas and 4 immigration detention centers, we have seen first-hand through the clients we serve how the use of section 1326 has led to the failure to screen for asylum, prolonged detention, lack of language access, and procedural errors.

**Black Alliance for Just Immigration (BAJI)** was founded in April 2006 and is a racial justice and immigrant rights organization with offices in New York, Atlanta, Los Angeles, Miami, Oakland, and DC, and members across the country. BAJI educates and engages African American and Black immigrant communities to organize and advocate for racial, social, and economic justice. Therefore, BAJI is

committed to tackling the over-criminalization of Black immigrants as depicted in Section 1325 & 1326.

The **California Collaborative for Immigrant Justice (CCIJ)** is a non-profit organization that utilizes coordination, advocacy, and legal services to fight for the liberation of immigrants in detention in California. CCIJ is committed to uplifting the voices of those most impacted by our criminal and immigration systems, particularly Black and Latinx community members who are disproportionately targeted and double-punished by prosecutions under Section 1326 and immigration proceedings.

The **Capital Area Immigrants' Rights Coalition ("CAIR Coalition")** is a nonprofit, legal services organization providing legal services to individuals detained by the Department of Homeland Security (DHS) throughout Virginia and Maryland. The outcome in this case is central to the Coalition's ongoing mission to advance the rights and dignity of all immigrants, particularly those who are vulnerable to immigration detention and deportation. CAIR Coalition has dealt extensively with the issue at the heart of this case as its attorneys have

represented many individuals who have been racially discriminated against through 8 U.S. Code § 1326.

The **Chacón Center for Immigrant Justice at Maryland Carey Law** represents individual immigrants and refugees in immigration-related proceedings, including people prosecuted for unlawful reentry under Section 1326, with the goal of ensuring due process and improving the administration and fairness of U.S. immigration law. Center goals include ensuring racial equity and fully valuing our immigrant neighbors and family.

The Immigration Detention Accountability Project (IDAP) of the **Civil Rights Education and Enforcement Center (CREEC)** works at the intersection of immigrant and disability justice. Through impact litigation, direct representation, and education, we fight for people in contact with our country's ableist immigration system. Our project believes that immigration detention must be abolished. To that end, we strategize towards accountability, decarceration, and full human rights for survivors of ICE, CBP, and immigration courts, primarily working with those who are disabled. The abuses caused by the enforcement of

Section 1326—including prolonged detention, dangerous conditions, and lack of due process—are issues central to our work.

**Comunidad Maya Pixan Ixim** is an organization of the Maya Community dedicated to improving the health and well-being of Mayan people through community development strategies in Omaha, Nebraska and Q'anjob'al Maya territory. Our work is consistent with the Q'anjob'al Maya system of social organization and the United Nations Declaration on the Rights of Indigenous Peoples. As the only Indigenous-founded and led organization in the United States providing legal support to those caught up in the United States immigration system, Comunidad Maya Pixan Ixim has an inherent interest in ensuring that Indigenous migrants are afforded equal protection under United States immigration law. In our experience and in the experience of our community and clients, that is not the status quo.

**Detention Watch Network (DWN)** is a coalition of approximately 200 organizations and individuals working to end immigration detention in the United States. DWN has a substantial interest in the outcome of this litigation. Founded in 1997, DWN has worked for more than two decades to fight abuses in detention. DWN

43

members are lawyers, activists, community organizers, advocates, social workers, doctors, artists, clergy, students, formerly detained immigrants, and affected families from around the country. They are engaged in individual case and impact litigation, documenting conditions violations, local and national administrative and legislative advocacy, community organizing and mobilizing, teaching, and social service and pastoral care. For years, DWN and its members have carefully documented egregious abuses inside of detention. DWN has an interest in this litigation because 1326 prosecutions directly lead to the criminalization and mass incarceration of immigrants and run contrary to DWN's advocacy for a humane, welcoming border that does not include the use of detention.

**Doctors for Camp Closure (D4CC)** is a non-partisan organization of over 2,200 physicians and health care professionals from all specialties who oppose inhumane treatment of migrants and asylum seekers. D4CC advocates for an end to mass incarceration of immigrants, including through the decriminalization of the act of migration. We call on our government to end family separation and

inhumane border policies, and to provide appropriate and confidential medical care in detention facilities.

**Federal Defenders of Eastern Washington and Idaho.** One of our clients' stories is presented in this brief. More generally, we have seen firsthand through the prosecutions of our clients the discriminatory impact that Section 1326 prosecutions have on immigrants, particularly Latinx persons.

**The Florence Immigrant & Refugee Rights Project ("Florence Project")** provides free legal and social services to immigrant adults and children detained in immigration custody in Arizona. Every year, the Florence Projects provided free legal and social services to thousands of non-citizens facing removal in Arizona. Many of the adults we serve, particularly those from Mexico and Central America, have faced criminal prosecution for entry or re-entry prior to coming to immigration custody despite having valid claims for protection and/or significant community ties in the United States. The Florence Project has a direct interest in ensuring that U.S. laws are not applied in a discriminatory or abusive way.

45

**Immigrant Legal Defense (ILD)** is a nonprofit organization based in Oakland, California, dedicated to providing legal services to marginalized immigrant communities in California and throughout the United States. ILD strives to pursue robust due process protections for these communities, including a meaningful and fair right to be heard in the courts. Among those that ILD represents and advocates for are asylum-seekers and long-term residents of the U.S. who suffer the inhumane and harsh consequences of prosecutions under 8 U.S.C. §§ 1325 and 1326, including the denial of recognized rights under U.S. and international law. Because of the due process and racial implications inherent in the application of these statutory provisions, ILD has a strong interest in the issues presented in this case.

The **Immigrant Legal Resource Center (ILRC)** works with and educates immigrants, community organizations and the legal sector to continue to build a democratic society that values diversity and the rights of all people. The ILRC is recognized as a national leader in criminal immigration law and the immigration consequences of crimes. We provide critical support to immigration attorneys and criminal defenders through analysis, policy work, trainings, technical assistance,

and developing and disseminating best practices. Through ILRC's policy and advocacy efforts, we promote a vision of racial justice that advances the rights of all immigrants. One main thrust of our policy work is to dismantle the arrest to deportation pipeline and disrupt racial disparities in the immigration and criminal legal systems. As such, we fight to end the criminalization of immigrants and advocate for the repeal of policies and laws, including 8 U.S.C. §1326, which are rooted in racial animus and have caused untold harm to the thousands of immigrants of color who are their targets.

**Immigration Equality** is a national nonprofit organization that has provided free legal services and advocacy to thousands of indigent lesbian, gay, bisexual, transgender, queer ("LGBTQ") and HIV-positive immigrants for over 25 years, including individuals who have been negatively impacted by Section 1326 prosecutions.

The **National Immigrant Justice Center (NIJC)**, a program of Heartland Alliance, is a nonprofit organization dedicated to ensuring human rights protections and access to justice for all immigrants, refugees, and asylum seekers. With more than 2,000 pro bono partners from the nation's leading law firms, NIJC serves approximately 9,000

noncitizens annually. NIJC regularly represents noncitizens who had been previously prosecuted under 8 U.S.C. §1326 when they later seek protection in the immigration courts and before the Board of Immigration Appeals (BIA), and federal courts. NIJC has significant experience in the immigration context challenging the detention and removal of people previously charged with or convicted for 8 U.S.C. §1326 and other immigration-related offenses.

The **National Immigration Project of the National Lawyers Guild (NIPNLG)** is a nonprofit membership organization of immigration attorneys, legal workers, grassroots advocates, and others working to defend immigrants' rights and secure a fair administration of the immigration and nationality laws. NIPNLG provides legal training to the bar and the bench on removal defense and the immigration consequences of criminal convictions. NIPNLG has participated as amicus in several significant immigration related cases, including 8 U.S.C. § 1326 cases, before the Supreme Court, the courts of appeals, and the Board of Immigration Appeals.

The **Oregon Justice Resource Center (OJRC)** is a Portland based, nonprofit organization founded in 2011. OJRC works to promote

civil rights and improve legal representation to traditionally underserved communities, including noncitizens. OJRC serves this mission by focusing on the principle that our legal systems should be founded on fairness, accountability, and evidence-based practices. The OJRC's Immigrant Rights Project (IRP) provides personalized advice to public defense providers regarding the immigration consequences of pleas and convictions for noncitizens.

**Public Counsel's** Immigrants' Rights Project provides pro bono legal representation to asylum seekers before U.S. Citizenship and Immigration Services, the Executive Office for Immigration Review and the federal courts. Our work includes representation of vulnerable asylum seekers who have been harmed by 1326 prosecutions.

The **Rocky Mountain Immigrant Advocacy Network ("RMIAN")** is a nonprofit organization that provides free immigration legal services to individuals in immigration detention, as well as to children and families throughout Colorado and the Mountain West region. RMIAN serves clients who are prosecuted for unlawful entry or reentry under 8 USC § 1326, including parents who were separated from their children under the family separation policy through the

weaponization of this criminal prosecution regime. RMIAN has a deep interest in ensuring that noncitizens have equal access to the protections afforded by U.S. immigration law, which is currently not possible given the racist motivation and impact of 8 USC § 1326.

The **San Francisco Public Defender's Office** provides legal services to people charged with crimes committed in San Francisco who are unable to afford an attorney, and represents approximately 25,000 people annually. In 2017, the San Francisco Public Defender launched the Immigration Defense Unit, which provides complex deportation defense. The Immigration Defense Unit represents hundreds of individuals in removal proceedings, as well as non-citizens in San Francisco charged with crimes. They routinely meet clients who have been prosecuted under Section 1326, or who are at risk of future prosecution, the vast majority of Latinx descent. They have an interest in seeing that their clients are not unjustly subject to prosecution as a result of racist and anti-immigrant federal prosecutions; and that their clients are not subject to due process violations during that process.

The **Texas Civil Rights Project (TCRP)** is a 501(c)(3) legal advocacy organization with offices across Texas. TCRP, through its

Beyond Borders Program, is dedicated to advancing human dignity, protecting the freedom of movement of those in migration, and advocating on behalf of Texas border communities. Over the last five years in particular, TCRP has witnessed first-hand the trauma heaped upon individuals charged with illegal re-entry. In furtherance of this work, TCRP has conducted intakes with numerous adults charged under this scheme who were separated from their children. TCRP continues to identify family separations resulting directly from this policy, long after the federal government has ceased the so-called "Zero Tolerance" policy. TCRP works with these families to locate their children and reunite them, and advocates for an end to this practice, including within the domestic legal system and at the Inter-American Commission on Human Rights.

**Washington Defender Association (WDA)** is a statewide non-profit organization of public defender agencies, and those working to improve the quality of indigent defense in Washington State. In 1999, WDA established our Immigration Project to focus on reducing the immigration consequences to noncitizens of criminal legal system

involvement. WDA has provided amicus briefs in support of cases at all levels of state and federal courts, including this Court.

The **Young Center for Immigrant Children's Rights** is a federally appointed independent Child Advocate for unaccompanied and separated immigrant children in eight locations in the U.S., and advocates with federal agencies to consider children's best interests in every decision. Since 2017, the Young Center has been appointed as the Child Advocate for hundreds of children who have been separated from their parents at the border, including those prosecuted under section 1326. In working with these children, we have seen firsthand the devastating harm and trauma to children and families caused by these unnecessary and unjust separations.