## Docket No. 21-10233

# In the United States Court of Appeals For the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

*Appeal from a Decision of the United States District Court for the District of Nevada, No. 3:20-cr-00026-MMD-WGC-1 · Honorable Miranda M. Du*

**BRIEF OF *AMICI CURIAE* ADVOCATES FOR BASIC LEGAL EQUALITY, JUSTICE STRATEGIES, LATINOJUSTICE PRLDEF, LEGAL AID JUSTICE CENTER, MASSACHUSETTS LAW REFORM INSTITUTE, NATIONAL IMMIGRATION LAW CENTER AND OFFICE OF THE MARIN COUNTY PUBLIC DEFENDER IN SUPPORT OF DEFENDANT-APPELLEE FOR AFFIRMANCE**

MAX S. WOLSON, ESQ.
NATIONAL IMMIGRATION LAW CENTER
Post Office Box 34573
Washington, District of Columbia 20043
(202) 216-0261 Telephone
wolson@nilc.org

NICHOLAS DAVID ESPIRITU, ESQ.
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Boulevard, No. 108-62
Los Angeles, California 90010
(213) 639-3900 Telephone
espiritu@nilc.org

LOURDES ROSADO, ESQ.
ANDREW CASE, ESQ.
NATHALIA VARELA, ESQ.
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, New York 10115
(212) 219-3360 Telephone
lrosado@latinojustice.org
acase@latinojustice.org
nvarela@latinojustice.org

*Attorneys for Amici Curiae*

 

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* Advocates for Basic Legal Equality is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* Justice Strategies is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* LatinoJustice PRLDEF is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* Legal Aid Justice Center is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* Massachusetts Law Reform Institute is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* National Immigration Law Center is a not-for-profit charitable organization that has no parent organization and does not issue stock.

*Amicus Curiae* Office of the Marin County Public Defender is an agency within the Marin County, California government and does not issue stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................1

SUMMARY OF ARGUMENT .............................................................4

ARGUMENT ..................................................................................6

    A.    Neither Federal Law nor the Sentencing Guidelines Require Incarceration for Section 1326 Convictions..........................................7

    B.    Individuals Convicted of Violating Section 1326 are Almost Exclusively Latino, and are more likely to be Sentenced to a Term of Incarceration than Similarly Situated Individuals.................10

    C.    The Disproportionate Conviction of Latinos Under Section 1326 Leads to Extremely Punitive Results .........................................13

    D.    Section 1326 Reinforces Stereotypes of Latinos as Criminals ..........18

        1.    Those Convicted Under Section 1326 are Designated as "Criminal Aliens" and Falsely Portrayed as Dangerous...........18

        2.    Local Law Enforcement Relies on the "Criminal Alien" Designation to Racially Profile Latinos....................................20

        3.    Racial Profiling Encouraged by the "Criminal Alien" Designation Drives the Racial Disparity in Section 1326 Convictions .............................................................25

CONCLUSION....................................................................................29

CERTIFICATE OF COMPLIANCE....................................................................30

APPENDIX A: Declaration of Matthew Light, *United States v. Machic-Xiap,* No. 3:19-cr-407 (D. Or. Mar. 31, 201), ECF No. 52-1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Commonwealth v. Hilaire,*
437 Mass. 809 (2002) ..................................................................3

*Fong Yue Ting v. United States,*
149 U.S. 698 (1893) .................................................17

*Gomillion v. Lightfoot,*
364 U.S. 339 (1960) .................................................13

*Guinn v. United States,*
238 U.S. 347 (1915) .................................................13

*Lane v. Wilson,*
307 U.S. 268 (1939) .................................................13

*Lee v. United States,*
137 S. Ct. 1958 (2017) ................................................17

*Melendres v. Arpaio,*
989 F. Supp. 2d 822 (D. Ariz. 2013) *aff'd in part, vacated in part,*
784 F.3d 1254 (9th Cir. 2015) .................................................23

*Ng Fung Ho v. White,*
259 U.S. 276, 284 (1922) .........................................6, 17

*Olivas-Motta v. Whitaker,*
910 F.3d 1271 (9th Cir. 2018) .................................................18

*Padilla v. Kentucky,*
559 U.S. 356 (2010) .................................................17

*Rita v. United States,*
551 U.S. 338 (2007) ..................................................7

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) .................................................18

*United States v. Carty,*
520 F.3d 984 (9th Cir. 2008) (*en banc*) .........................................7

*United States v. Carrillo-Lopez,*
555 F. Supp. 3d 996, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) ...............5

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) .................................................6, 13

*Washington v. Davis*,
    426 U.S. 229 (1976)........................................................................6

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)......................................................................13

## STATUTES

8 U.S.C. § 1231 ...............................................................................17

8 U.S.C. § 1325 .................................................................................2

8 U.S.C. § 1326 .........................................................................*passim*

8 U.S.C. § 1357 ...............................................................................22

18 U.S.C. § 3553 ...............................................................................7

18 U.S.C. § 3561 .............................................................................10

## RULES

Rule 29(a)(4)(E) .................................................................................1

## REGULATIONS

28 C.F.R. § 540.41 ..........................................................................15

28 C.F.R. § 540.51 ..........................................................................15

## OTHER AUTHORITIES

Aarti Kholi, Peter L. Markowitz, Lisa Chavez, *Secure Communities by
    the Numbers: An Analysis of Demographics and Due Process*,
    The Chief Justice Earl Warren Inst. on Law and Social Pol'y, Univ. of
    California, Berkeley Law School Research Report 1, 6 (Oct. 2011)
    https://www.law.berkeley.edu/files/Secure_Communities_by_the_Nu
    mbers.pdf ...................................................................................25

Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*,
    63 UCLA L. Rev. 594 (Mar. 2016) .............................................23

Cecilia Menjívar, *The Racialization of "Illegality,"*
    Am. Acad. of Arts & Sci. (2021),
    https://pdfs.semanticscholar.org/3e52/f029af94b2a41ce6912b7ea34bf
    96381e43b.pdf?_ga=2.9445173.1614526225.1646849793-
    1156744503.1646849793 ...........................................................21

Debbie Cenziper, Madison Muller, Monique Beals, Rebecca Holland,
  Andrew Ba Tran**,** Under Trump, ICE aggressively recruited sheriffs as
  partners to question and detain undocumented immigrants,
  Washington Post, Nov. 23, 2021,
  https://www.washingtonpost.com/investigations/interactive/2021/trum
  p-ice-sheriffs-immigrants-287g ...................................................................26

Dep't of Homeland Security, U.S. Immigration and Customs Enforcement,
  *Budget Overview Fiscal Year 2022*
  (Describing current use of Secure Communities),
  https://www.dhs.gov/sites/default/files/publications/u.s._immigration_
  and_customs_enforcement.pdf ...................................................................22

Dep't of Justice, Prosecuting Immigration Crimes Report,
  8 USC 1326 Defendants Charged Fiscal Year 2021,
  https://www.justice.gov/usao/page/file/1441961/download
  (last visited Mar. 18, 2022)........................................................................11

Deroy Murdock, *Fugitive Cities Have Harbored 10,000 Criminal-Alien
  Recidivists*, National Review, Mar. 9, 2018,
  https://www.nationalreview.com/2018/03/fugitive-cities-have-
  harbored-10000-criminal-alien-recidivists ..................................................19

Emma Kaufman, *Segregation by Citizenship,*
  132 Harv. L. Rev. 1379 (2019).........................................................14, 16, 17

Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017)........................21

Hiroshi Motomura, *The Discretion That Matters: Federal Immigration
  Enforcement, State and Local Arrests, and the Civil-Criminal Line*, 58
  UCLA L. Rev. 1819 (Aug. 2011) ...........................................................21, 23

Immigration Legal Resource Center, *Life Under PEP-COMM*, (Oct. 2016),
  https://www.ilrc.org/life-under-pep-comm ..................................................21

Ingrid V. Eagly, *Prosecuting Immigration*,
  104 Nw. Univ. L. Rev. 1281 (2010)................................................14, 15, 16

Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, Rolling Stone,
  Aug. 2, 2012, https://www.rollingstone.com/culture/culture-news/the-
  long-lawless-ride-of-sheriff-joe-arpaio-231455 ...........................................23

Justice Strategies published Indefensible: A Decade of Mass Incarceration
  of Migrants Prosecuted for Crossing the Border – available at
  https://www.justicestrategies.org/publications/2016/indefensible-
  decade-mass-incarceration-migrants-prosecuted-crossing-border .................2

Katie R. Quandt & Alexi Jones, *Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health*, Prison Policy Initiative (May 13, 2021), https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts ..........15

Leisy Abrego *et al.*, *Making Immigrants into Criminals: Legal Processes of Criminalization in the Post-IIRIRA Era*, 5 J. on Migration & Hum. Security 694, 706-08 (2017), https://journals.sagepub.com/doi/pdf/10.1177/233150241700500308 .........21

Maxine Bernstein, *Oregon sheriff violated federal law by holding woman in jail solely on immigration detainer, suit alleges*, The Oregonian, June 11, 2019, https://www.oregonlive.com/crime/2019/06/douglas-county-sheriff-violated-federal-law-by-holding-woman-in-jail-solely-on-immigration-detainer-suit-alleges.html ...................24

Mem. from Att'y Gen. to All Fed. Prosecutors, *Renewed Commitment to Criminal Immigration Enforcement,* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download ...............19

Memorandum from Jeh Johnson, Sec'y, U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, Nov. 20, 2014, https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf [hereinafter Priorities Memo].........................18

Migration Policy Institute, *Profile of the Unauthorized Population: Arizona*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ ....................................................27

Migration Policy Institute, *Profile of the Unauthorized Population: California*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/CA ....................................................27

Migration Policy Institute, *Profile of the Unauthorized Population: Nevada*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NV ....................................................27

Migration Policy Institute, *Profile of the Unauthorized Population: New Mexico*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NM ....................................................27

Migration Policy Institute, *Profile of the Unauthorized Population: Texas*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX ....................................................27

Migration Policy Institute, *Unauthorized Immigrant Population Profiles*, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles ................. 27

President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/20/remarks-President-address-nation-immigration .............. 19

Press Release, U.S. Immigration and Customs Enforcement, *Cooperation between ICE, local law enforcement makes for safer communities,* (June 17, 2019) *https://www.ice.gov/news/releases/cooperation-between-ice-local-law-enforcement-makes-safer-communities#* ................. 22

Robert S. Warshaw, *Twenty-Ninth Report of the Independent Monitor for the Maricopa County Sheriff's Office, Melendres v. Arpaio*, Case No. 2:07-cv-02513, ECF No. 2725 ...................................... 24

Savanna Strott, *Chance encounter with law enforcement is nearly life-altering in last Nevada jurisdiction overtly partnering with ICE*, Nevada Independent, Jan. 10, 2021, https://thenevadaindependent.com/article/chance-encounter-with-law-enforcement-is-nearly-life-altering-in-last-nevada-jurisdiction-overtly-partnering-with-ice ......................................................................... 25

Transcript, *Immigration Newsmaker:* A Conversation with ICE Deputy Director Tom Homan, June 5, 2018, https://cis.org/Transcript/Immigration-Newsmaker-Conversation-ICE-Deputy-Director-Tom-Homan ....................................................... 20

U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification,* Ch. 5, at 9 (9/12/2006), *available at* http://www.bop.gov/policy/progstat/5100_008.pdf ................. 14

U.S. Dep't of Just., Fed. Bureau of Prisons, *Program Statement No. 5510.15 Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities* 6-18 (2013), https://www.bop.gov/policy/progstat/5510_015.pdf .................................. 15

U.S. Gov't Accountability Office, GAO-18-433, *Criminal Alien Statistics: Information on Incarcerations, Arrests, Convictions, Costs, and Removals* (July 2018) [hereinafter "GAO Report"] https://www.gao.gov/assets/gao-18-433.pdf ................................................ 19

U.S. Immigration and Customs Enforcement, *News Release: Secure Communities* (archived), https://www.ice.gov/secure-communities.............25

U.S. Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2021) .............................................8, 9, 10, 11, 12

U.S. Sentencing Guidelines Manual Supp. to Appx. C (U.S. Sentencing Comm'n 2021) ....................................................................9

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

**Advocates for Basic Legal Equality, Inc.** (ABLE) is a 501(c)(3) non-profit law firm with offices in Toledo, Dayton, and Defiance, Ohio. ABLE attorneys and advocates represent low-income immigrants, including farmworkers, in immigration, civil rights, employment, and employment discrimination cases throughout Ohio. ABLE's mission is to provide high-quality legal assistance in civil matters to help eligible low-income individuals and groups achieve self-reliance, equal justice, and economic opportunity. ABLE represents immigrants in a wide variety of immigration law cases and immigrant civil rights actions for discriminatory treatment. The organization thus has a strong interest in opposing the erosion of protections for immigrants, especially discriminatory actions.

**Justice Strategies**, a small non-profit policy research organization, began work in the late 1990s when the U.S. Bureau of Prisons first announced its "Criminal Alien Requirements" contracting initiative, a program which resulted in construction of more than a dozen privately owned and operated segregated immigrant prisons. Justice Strategies published a number of articles and reports that documented the seriously substandard conditions of confinement in these

---

[1] Pursuant to this Court's Rule 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and no person other than *amici* and their counsel made a monetary contribution to the preparation or submission of this brief. The parties have consented to the filing of this brief.

1

prisons before conducting a major research project on federal prosecution policies and practices under 8 U.S.C. §§ 1325 and 1326. In 2016, Justice Strategies published Indefensible: A Decade of Mass Incarceration of Migrants Prosecuted for Crossing the Border – available at https://www.justicestrategies.org/publications/2016/indefensible-decade-mass-incarceration-migrants-prosecuted-crossing-border.

**LatinoJustice PRLDEF**, founded in 1972 as the Puerto Rican Legal Defense and Education Fund, is a national not-for-profit civil rights organization that advocates for and defends the constitutional rights of Latinos under the law. LatinoJustice has challenged discriminatory policies and practices in the areas of criminal justice and immigrant rights by suing police departments, correctional institutions, and federal law enforcement agencies, including the Department of Homeland Security and Immigration & Customs Enforcement. During its nearly fifty-year history, LatinoJustice has also brought impact litigation to address discrimination against Latinos in education, employment, fair housing, language rights, redistricting, and voting rights.

**The Legal Aid Justice Center** (LAJC) is a Virginia-based nonprofit organization that provides legal and advocacy services to low-income communities. Through its Immigrant Advocacy Program, LAJC represents immigrants in their efforts to access justice, promotes systemic reforms to reduce

the abuse and exploitation of immigrants, and advocates for state and local policies that promote immigrants' wellbeing and prevent aggressive immigration enforcement. LAJC defends Virginia immigrants in removal proceedings, especially those who are arrested or detained by Immigration and Customs Enforcement by virtue of prior contact with the criminal justice system.

**The Massachusetts Law Reform Institute** (MLRI) is a statewide non-profit law and poverty center and a principal support center for Massachusetts civil legal aid agencies. Its mission is to advance economic, social, and racial justice for low-income persons and communities. For over fifty years, MLRI has engaged in legislative, administrative, and judicial advocacy on national, state, and local issues that affect these communities. Addressing public and institutional policies and procedures that either contribute to, or perpetuate, the cycle of poverty, and advancing racial equity, are two of the three fundamental frameworks guiding MLRI's mission. MLRI  has participated in amicus briefs on issues affecting immigrants of color, such as *Commonwealth v. Hilaire,* 437 Mass. 809 (2002), (educating the court about the importance of oral immigration warnings for Creole-language speakers and those with limited literacy skills) and has engaged in advocacy to reform sentencing disparities that disproportionately harm Latino immigrants and state criminal records policies that increase poverty among and prevent equal access to wealth for people of color.

3

**The National Immigration Law Center** (NILC) is a national organization exclusively dedicated to defending and advancing the rights and opportunities of low-income immigrants and their families. Over the past 35 years, NILC has won landmark legal decisions protecting fundamental rights, and has advanced policies that reinforce the nation's values of equality, opportunity, and justice. NILC focuses on issues that affect the well-being and economic security of immigrant communities: discriminatory enforcement practices, health care and safety net programs, education and training, workers' rights, and other federal and state policies affecting immigrants.

**The Office of the Marin County Public Defender** represents clients from Latin America and has a strong interest in ending the perpetuation of racist stereotypes of "criminal aliens" caused by prosecution and conviction under Section 1326.

## SUMMARY OF ARGUMENT

Facially neutral laws violate the Fifth Amendment's equal protection guarantee when they are enacted with an invidious discriminatory purpose. The existence of racially disparate impact is probative of whether such impermissibly discriminatory purpose exists. Here, data from the U.S. Sentencing Commission reveal that 8 U.S.C. § 1326 disparately—indeed virtually exclusively—harms Latinos.

4

While the District Court properly identified Section 1326's discriminatory purpose, including through disparate impact consistent with that intent,[2] expert analysis of Sentencing Commission data presented in another court in this Circuit further demonstrates the disparate harms.[3] Specifically, these data show that almost all individuals convicted under Section 1326 are Latino. They also show that this nearly-entirely Latino population is almost invariably sentenced to incarceration. Individuals convicted of Section 1326 are more likely to receive incarceration than other offenders, even when controlling for statutory minimums, offense severity, and criminal history. Moreover, Section 1326 is a substantial reason why Latinos are more likely overall to be sentenced to federal incarceration than white individuals.

This racially disparate punishment is exacerbated in two ways. First, people incarcerated for Section 1326 offenses are likely to face harsher circumstances during their prison sentences. Second, these individuals are subject to post-

---

[2] *See United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 2021 WL 3667330, at *5-7 (D. Nev. Aug. 18, 2021) (holding that Section 1326's disparate impact on Latinos supports finding of discriminatory intent); *see also* Appellee's Opening Brief at 17-18, *United States v. Carrillo-Lopez*, No. 21-10233 (Apr. 8, 2022) Doc. 25 (explaining that Latinos account for nearly all people charged under Section 1326).

[3] Decl. of Matthew Light at 2, *United States v. Machic-Xiap*, No. 3:19-cr-407 (D. Or. Mar. 31, 2021), ECF No. 52-1. A copy of Professor Light's declaration is attached to this brief as Appendix A.

sentencing removal, which can result "in the loss of . . . all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). The disparate rate at which Latinos are subjected to Section 1326 prosecutions is not coincidental or a mere feature of geography. Rather, the racist legacy of laws like Section 1326 promulgates a narrative that being Latino is in and of itself suspicious and fosters racial profiling by local law enforcement against Latinos. And the more recent phenomenon of targeting "criminal aliens" provides another tool for this discrimination.

## ARGUMENT

Facially neutral laws, like Section 1326, run afoul of the Fifth Amendment's equal protection guarantee when they are enacted with an invidious discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977). Determining whether such purpose was a "motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* One important starting point for this inquiry is whether the official action "bears more heavily on one race than another." *Id*. (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Here, data from the U.S. Sentencing Commission reveal that Section 1326 disparately—indeed virtually exclusively— harms Latinos.

6

**A.      Neither Federal Law nor the Sentencing Guidelines Require Incarceration for Section 1326 Convictions.**

"The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*) (quoting 18 U.S.C. §§ 3553(a), (a)(2)). The sentencing court is further tasked with ensuring that its selected sentence considers, among other things, "the nature and circumstances of the offense[,] the history and characteristics of the defendant . . . [and] the need to avoid sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* (citing 18 U.S.C. §§ 3553(a)(1)-(7)).

In imposing a sentence, the court is required to consider the sentencing range provided by the Sentencing Guidelines as "the starting point and the initial benchmark" of a sentencing proceeding. *Id.* (internal quotation and citations omitted). The Sentencing Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007).

7

To do this, the Guidelines attempt to identify the severity of a conviction's nature and circumstances by requiring the calculation of a final offense level. The offense level calculation begins by determining a base offense level for the corresponding offense(s) of conviction, which is then adjusted, including based upon specific offense characteristics. U.S. Sentencing Guidelines Manual § 1B1.1(a)(2) (U.S. Sentencing Comm'n 2021). The final offense level is then paired with a criminal history score to identify the recommended sentencing range on the Guidelines sentencing matrix. *Id.* §§ 1B1.1(a)(6)-(7); *see also id.* § 5 Pt. A (sentencing matrix).

Section 2L1.2 of the Sentencing Guidelines, "Unlawfully Entering or Remaining in the United States," identifies offense levels for violating section 1326.[4] U.S. Sentencing Guidelines Manual § 2L1.2. Section 2L1.2 begins all calculations with a base offense level of 8, and then provides for various increases based upon the existence, nature, and timing of any prior convictions. Assuming credit for acceptance of responsibility, a single conviction for violating Section 1326 can result in a final offense level as low as 6, and no higher than 29, a

---

[4] Sentences pursuant to Section 1326 make up 99.2% of § 2L1.2 cases. While § 2L1.2 also applies to other offenses, between 2015 and 2019, 99.2 percent of people sentenced pursuant to that section were sentenced for violating section 1326. *Id.* at 2.

relatively low minimum and maximum offense level for a 43-level matrix.[5]
*Compare, e.g., id.* § 2L1.2 *with id.* § 2D1.1(a)(1), (c)(14) (setting as 12 lowest base
offense level for most controlled substance trafficking and 43 as highest).

The Guidelines acknowledge that a substantial number of offense-and-
offender combinations can warrant non-carceral sentences—providing for zones in
which an entirely non-carceral sentence may be consistent with the Guidelines. *See
id.* § 5B1.1 (describing circumstances in which a probationary sentence is
authorized). Most any person convicted of reentry without prior criminal history is
likely to fall into a non-carceral-inclusive zone.[6]

In any event, given the advisory nature of the Guidelines, all Section 1326
offenses are statutorily eligible for non-carceral sentences because Section 1326
does not mandate incarceration. *Accord generally* 8 U.S.C. § 1326(a)-(b)

---

[5] Professor Light's analysis of Sentencing Commission data, *see supra* note 3,
analyzed data that included the time both preceding and following the Sentencing
Commission amending § 2L1.2. *See* U.S. Sentencing Guidelines Manual Supp. to
Appx. C, pp. 140-44, 187-89 (U.S. Sentencing Comm'n 2021) (amending § 2L1.2
in 2016 and 2018). The amended guideline provides less severe enhancements for
certain pre-removal criminal history events, while adding enhancements for certain
post-removal criminal history events. *Id.* at 146.

[6] All offense level increases under § 2L1.2 are based upon an individual having
prior criminal convictions. A person without criminal history would thus have a
final offense level 6 or 8, depending upon whether they received credit for
acceptance of responsibility. A final offense level of 6 and 8 both fall within a
probation-inclusive zone for a person without criminal history points. *See* U.S.
Sentencing Guidelines Manual Ch. 5 Pt. A.

9

(providing sentencing ranges without minimums and at-most 20 years' imprisonment) *with* 18 U.S.C. § 3561(a)(1)-(2) (foreclosing probation for felonies with maximum possible imprisonment terms of 25 or more years and where statutes expressly bar probation).

**B.    Individuals Convicted of Violating Section 1326 are Almost Exclusively Latino, and are more likely to be Sentenced to a Term of Incarceration than Similarly Situated Individuals.**

For another district court case in this circuit, Professor Michael T. Light analyzed the Sentencing Commission's 2015-2019 data and uncovered evidence of Section 1326's disparate impact.[7] Analysis of these data resulted in two major findings: Latinos are disproportionately likely to be the subject of a Section 1326 sentencing, and Section 1326 offenses are disproportionately likely to be sentenced to imprisonment.

Latinos accounted for **99 percent** of the nearly-88,000 people sentenced pursuant to § 2L1.2 between 2015 and 2019, creating a near-certainty that convictions pursuant to Section 1326 are convictions of Latinos.[8] The Government's statistics further bear out this disparate rate; in the most recently completed fiscal year, 98.6 percent of the people charged with violating Section 1326 whose nationalities were known were nationals of Mexico, Central or South

---

[7] Decl. of Matthew Light, *supra* note 3.

[8] *Id.* at 2-3.

America, or Spanish-speaking Caribbean nations.[9] The sentencing data show that **97 percent** of § 2L1.2 sentences included incarceration.[10] This 97-percent imprisonment rate places § 2L1.2 as more likely to receive carceral sentences than all but three of the ten most frequently applied Guideline sections.[11] Or, put another way, this almost-exclusively-Latino group is nearly certain to be sentenced to a term of incarceration.[12]

The overwhelming likelihood of a carceral sentence cannot be explained away by the specifics of the people sentenced pursuant to § 2L1.2; adjusting for statutory minimums, offense severity, and criminal history scores, the disparate incarceration rate is only worse. Specifically, when controlling for offenders of equal offense and criminal history scores, a person sentenced pursuant to § 2L1.2

---

[9] *See* Dep't of Justice, Prosecuting Immigration Crimes Report, 8 USC 1326 Defendants Charged Fiscal Year 2021, https://www.justice.gov/usao/page/file/1441961/download (last visited Mar. 18, 2022) (identifying 13,494 people as nationals of Mexico, Central or South America, or Spanish-speaking Caribbean nations among 14,036 total so-charged with an additional 341 of "unknown" nationality). Even including the people of unknown nationalities in the overall total, nationals of Mexico, Central or South America, or Spanish-speaking Caribbean nations still accounted for 96.1 percent of charged individuals. *See id.*

[10] Decl. of Michael Light, *supra* note 3 at 4-5.

[11] *Id.*

[12] In total, Professor Light's assessment entailed 87,841 sentencings. *Id.* at 2. At 99 percent Latino and 97 percent receiving incarceration, Section 1326 resulted in incarcerating no fewer than 84,353 Latino people over a five-year period.

11

is more likely to be sentenced to incarceration than all but one of the most commonly used sentencing guidelines.[13] In fact, the likelihood of incarceration is between six and over-30 percent higher for a person sentenced under § 2L1.2 than for a similarly situated individual sentenced under eight of the other most commonly applied Guidelines.[14]

The disparate sentencing outcomes of § 2L1.2 offenses contribute significantly to the disproportionate likelihood of incarceration between white and Latino offenders in federal sentencings. Controlling for any statutory mandatory minimums as well as offender and offense level scores, Latinos have a 13.5-percent greater likelihood of receiving a sentence of incarceration than similarly situated white individuals.[15] However, when § 2L1.2 cases are factored out, the relative incarceration gap between white and Latino offenders decreases substantially, down to an 8-percentage-point gap.[16] "In other words, adjusting for the punitive sanctions 2L1.2 offenders receive decreases the amount of Hispanic-white disparity in federal sentences by roughly 40 percent . . . ."[17] Section 1326's

---

[13] *Id.* at 7-8.

[14] *Id.* at 8.

[15] *Id.* at 8-9.

[16] *Id.*

[17] *Id.* at 8.

harms thus include serving as a substantial driver of the disparate rate at which Latinos are incarcerated generally.

The Section 1326 data thus demonstrate several stark racialized patterns: 99 percent of those convicted are Latino, despite the statute being implicated for any person returning without authorization, and 97 percent of those convicted are incarcerated despite the absence of a mandatory minimum and with neither offense level nor criminal history score appearing to be the cause. In other circumstances, such a "stark pattern" as demonstrated in Section 1326 convictions and sentencings has rendered the "impact alone determinative" of a finding of discriminatory intent. *Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915); *Lane v. Wilson*, 307 U.S. 268 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).

## C. The Disproportionate Conviction of Latinos Under Section 1326 Leads to Extremely Punitive Results.

The harms of the disparate conviction and sentencing rate for Latinos is compounded because individuals convicted under Section 1326 receive disproportionately harsh sentences. First, individuals convicted under Section 1326 are necessarily noncitizens and are thus more likely to be either functionally ineligible for minimum-security incarceration than other similarly situated persons, or sent to designated all-foreign prisons that have been described as "an emergent

13

penology in which noncitizens are punished differently than citizens of the United States."[18] Second, the nature of the underlying offense virtually guarantees that this disproportionately Latino population will be subject to removal.

Individuals convicted under Section 1326 are more likely to receive a disproportionately punitive term of incarceration because the Bureau of Prisons (BOP) treats being a noncitizen as a public safety factor in classifying a prisoner's security status.[19] As a result, noncitizens convicted under Section 1326 have a higher security classification than would a citizen convicted of a comparable offense, resulting in lessened likelihood to serve his or her sentence in a minimum-security facility. Moreover, this higher security classification is "applied without a finding of dangerousness or risk of flight and despite the fact that studies have suggested that deportable [noncitizens] do not have higher recidivism rates."[20]

Higher security classifications impose greater restrictions on noncitizens convicted under Section 1326, including more restrictive visitation from children,

---

[18] Emma Kaufman, *Segregation by Citizenship,* 132 Harv. L. Rev. 1379, 1408 (2019)

[19] U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification,* Ch. 5, at 9 (9/12/2006), *available at* http://www.bop.gov/policy/progstat/5100_008.pdf.

[20] Ingrid V. Eagly, *Prosecuting Immigration*, 104 Nw. Univ. L. Rev. 1281, 1318 (2010) (footnotes omitted).

parents, spouses, and other relatives.[21] This kind of separation and detachment

from families and other social networks has serious detrimental effects on mental

wellbeing.[22] In addition, persons incarcerated in medium or high-security

institutions are faced with highly invasive body cavity searches before and after

visits, and their visitors may also be subject to invasive searches.[23] The realities of

modern prisons—including federal penitentiaries, which suffer from issues such as

overcrowding, solitary confinement, and routine exposure to violence—have

further negative effects on mental wellbeing.[24]

Noncitizens subject to removal "may be rendered ineligible to participate in

prison programming, which can include paid work, educational courses,

occupational training, and drug abuse treatment."[25] That ineligibility becomes

doubly problematic; "[g]iven that successful completion of certain programs can

---

[21] *See, e.g.*, 28 C.F.R. § 540.41 (noting that only persons incarcerated at minimum- or low-security institutions are eligible for visitation outside the institution's security perimeter).

[22] *E.g.* Katie R. Quandt & Alexi Jones, *Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health*, Prison Policy Initiative (May 13, 2021), https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

[23] *See* 28 CFR § 540.51(f); U.S. Dep't of Just., Fed. Bureau of Prisons, *Program Statement No. 5510.15 Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities* 6-18 (2013), https://www.bop.gov/policy/progstat/5510_015.pdf.

[24] *See* Quandt & Jones, *supra* note 22. https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/

[25] Eagly, *supra* note 20 at 1319.

15

make inmates eligible for earlier release, bars on participation have the practical result of lengthening the sentences of noncitizens."[26] Relatedly, being a noncitizen subject to removal, an inevitability in all Section 1326 convictions, "can also render [the individual] ineligible for the program option of serving the last six months of one's sentence in a community corrections setting."[27]

The carceral realities of the all-foreign prisons are similarly bleak. Approximately half of the noncitizens in federal prisons are serving time in all-foreign prisons, and about 87% of those individuals were born in Spanish-speaking countries.[28] Emergent information about these prisons reveals they are "institutions with unusually poor healthcare; overcrowding; higher rates of solitary confinement, lockdowns, and deaths in custody than comparable BOP institutions; and a dearth of rehabilitative programs such as drug treatment and education courses, which are offered in other federal prisons."[29] Additionally, there is evidence that these facilities "lack law libraries, training and educational programs, and recreational equipment,"[30] have reduced technological contact with

---

[26] *Id*.

[27] *Id.*

[28] Emma Kaufman, *Segregation by Citizenship,* 132 Harv. L. Rev. 1379, 1403, 1405 (2019).

[29] *Id.* at 1409.

[30] *Id.*

the outside world,[31] and have an increased likelihood that prisoners will be more geographically inaccessible from their families and loved ones in the United States.[32]

The punitive aspects of conviction under Section 1326 go beyond the four walls of incarceration; the harsh reality is a strong probability of removal from the country as well as family, property, and any semblance of security. Removal of an individual from his or her family—parents, spouses, siblings, and even children— is a permanent separation.[33] Federal laws like Section 1326 make deportation "an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010) (footnote omitted). For this reason, the Court has repeatedly recognized, "deportation is always a particularly severe penalty," *Lee v. United States*, 137 S. Ct. 1958, 1968 (2017); *Padilla*, 559 U.S. at 365; *Fong Yue Ting v. United States*, 149 U.S. 698, 740 (1893), which can result "in loss of both property and life . . . ." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). As such, it "may be of greater

---

[31] *See id.* (noting that "no all-foreign prison offers access to TRULINCS, an email system that exists in all other federal prisons.)

[32] *See id.* at 1411-12.

[33] For those individuals who do not face removal, often due to withholding of removal under 8 U.S.C. § 1231(b)(3), the aforementioned combination of a disproportionate rate of incarceration with a dearth of available programs during custody means that people return to their communities having had all of the detriments of incarceration and few, if any, services.

17

concern to a convicted [noncitizen] than 'any potential jail sentence,'" *Olivas-Motta v. Whitaker*, 910 F.3d 1271, 1281 (9th Cir. 2018) (quoting *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018)).

Accordingly, prosecutions and convictions under Section 1326 not only disparately target Latinos, but they also subsequently result in disproportionately carceral sentences despite the heightened severity of during- and post-incarceration sentencing.

**D.    Section 1326 Reinforces Stereotypes of Latinos as Criminals**

**1.    Those Convicted Under Section 1326 are Designated as "Criminal Aliens" and Falsely Portrayed as Dangerous**

In 2014, the Department of Homeland Security issued a memorandum reflecting "new policies for the apprehension, detention, and removal of aliens in this country."[34] Among those noncitizens who were prioritized for removal under the Priorities Memo were "aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration status."[35] When the memo was released, the

---

[34] Memorandum from Jeh Johnson, Sec'y, U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, Nov. 20, 2014, https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial _discretion.pdf [hereinafter Priorities Memo].

[35] *Id.* at 3.

government encouraged the use of the term "criminal alien" to describe people who were subject to removal when convicted of a crime, and described them as "felons," "criminals," and "gang members."[36]

In 2018 the Government Accountability Office issued a report on "Criminal Alien Statistics," emphasizing that "Members of the alien population that have been arrested and convicted of crimes in the United States are referred to as criminal aliens."[37] And media outlets use the term "criminal alien" to emphasize danger; one outlet argued that sanctuary city laws, for example, "protect foreign lawbreakers, often with dangerous and deadly results for law-abiding American citizens."[38] Subsequent to the Priorities Memo, the Office of the Attorney General emphasized increased prosecutions under the statute, ordering that "Each District shall consider prosecution of 8 U.S.C. § 1326 for each illegal reentrant."[39]

---

[36] *See* President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/20/remarks-President-address-nation-immigration.

[37] U.S. Gov't Accountability Office, GAO-18-433, *Criminal Alien Statistics: Information on Incarcerations, Arrests, Convictions, Costs, and Removals* (July 2018) [hereinafter "GAO Report"] https://www.gao.gov/assets/gao-18-433.pdf.

[38] Deroy Murdock, *Fugitive Cities Have Harbored 10,000 Criminal-Alien Recidivists*, National Review, Mar. 9, 2018, https://www.nationalreview.com/2018/03/fugitive-cities-have-harbored-10000-criminal-alien-recidivists/.

[39] Mem. from Att'y Gen. to All Fed. Prosecutors, *Renewed Commitment to Criminal Immigration Enforcement,* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

Because Section 1326 is a federal felony, those convicted under it are considered a top priority for removal under the Priorities Memo and have been demonized through rhetoric suggesting they present danger to the community. For example, in 2018, Immigration and Customs Enforcement Deputy Director Tom Homan told an interviewer that "Number one, when you release a criminal alien from a jail, that criminal alien is going to return to his community and victimize the very communities in which he lives."[40]

The majority of those designated as "criminal aliens" on the basis of a federal conviction were convicted of illegal reentry. In Fiscal Year 2016, 66% were convicted of immigration offenses, and 91% of these were convicted of illegal reentry.[41] Thus most of those demonized by the charged rhetoric of being called "criminal aliens" for a federal conviction were guilty of nothing more than seeking a better life twice.

**2.    Local Law Enforcement Relies on the "Criminal Alien" Designation to Racially Profile Latinos**

These "processes of lawmaking and enforcement practices [that] produce the notion of 'criminal aliens,'" create rhetorical frameworks that encourage targeting

---

[40] Transcript, *Immigration Newsmaker:* A Conversation with ICE Deputy Director Tom Homan, June 5, 2018, https://cis.org/Transcript/Immigration-Newsmaker-Conversation-ICE-Deputy-Director-Tom-Homan.

[41] GAO Report at 84.

of Latinos.[42] Undocumented legal status has been increasingly used as a proxy for race,[43] and this, combined with the designation of those who are convicted under Section 1326 as "criminal aliens," has incentivized racial profiling by local law enforcement.

Recent decades have seen a "dramatic expansion of the state and local role in bringing removable noncitizens into contact with federal enforcement."[44] This expansion included the "Secure Communities" program, under which biometric data for those arrested by local law enforcement are shared with the Department of Homeland Security to determine if someone is subject to deportation,[45] and the

---

[42] Leisy Abrego *et al.*, *Making Immigrants into Criminals: Legal Processes of Criminalization in the Post-IIRIRA Era*, 5 J. on Migration & Hum. Security 694, 706-08 (2017), https://journals.sagepub.com/doi/pdf/10.1177/233150241700500308

[43] Cecilia Menjívar, *The Racialization of "Illegality,"* Am. Acad. of Arts & Sci. (2021), https://pdfs.semanticscholar.org/3e52/f029af94b2a41ce6912b7ea34bf96381e43b.pdf?_ga=2.9445173.1614526225.1646849793-1156744503.1646849793.

[44] Hiroshi Motomura, *The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line*, 58 UCLA L. Rev. 1819, 1858 (Aug. 2011).

[45] *See* Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017). Under the Obama administration, Secure Communities was replaced with the "Priority Enforcement Program," or "PEP-COMM," under which FBI continued "sharing fingerprints with the Department of Homeland Security so that ICE can still detect immigrants in local and state law enforcement custody," though with different priorities than under the original Secure Communities initiative. Immigration Legal Resource Center, *Life Under PEP-COMM*, (Oct. 2016), https://www.ilrc.org/life-under-pep-comm. While the executive order establishing Secure Communities was

287(g) program, under which local sheriff's offices are granted the power to enforce some aspects of federal immigration law.[46] The Department of Homeland Security has continually promoted the use of local law enforcement, and emphasized the alleged dangerousness of those prosecuted as "criminal aliens" through this cooperation. ICE itself commends local law enforcement agencies for "cooperating with ICE to apprehend criminal aliens at the time of their release from local custody."[47]

These programs create a framework where local law enforcement becomes the first point of contact for those eventually convicted of federal immigration crimes. And because cases are quickly transferred to the federal system, "state and local officers can make arrests without regard to federal enforcement priorities, yet they are insulated from many of the tempering influences that prosecutors exert on

---

rescinded by President Obama, the program is still operational, though the enforcement priorities within in it have changed. *See* Dep't of Homeland Security, U.S. Immigration and Customs Enforcement, *Budget Overview Fiscal Year 2022*, at 140 (Describing current use of Secure Communities), https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement.pdf.

[46] *See* 8 U.S.C. § 1357(g).

[47] Press Release, U.S. Immigration and Customs Enforcement, *Cooperation between ICE, local law enforcement makes for safer communities,* (June 17, 2019) *https://www.ice.gov/news/releases/cooperation-between-ice-local-law-enforcement-makes-safer-communities#.*

arrest patterns when they decide not to bring criminal charges."[48] Moreover, federal reliance on the validity of local arrests "tends to mask local law enforcement agents' racial and ethnic preferences and prejudices (even as biases vary in severity from jurisdiction to jurisdiction)."[49]

Local agencies rely on the rhetoric of dangerousness associated with the "criminal alien" moniker to engage in racial profiling of Latinos. Most notably, Sheriff Joe Arpaio targeted the Latino population of Maricopa County both while his department had 287(g) authority and after it was revoked. [50] As the District of Arizona found in 2013, the Maricopa County Sheriff's Office "institutionalize[d] the systematic consideration of race as one factor among others in forming reasonable suspicion or probable cause in making law enforcement decisions," in violation of both the Fourth and the Fourteenth Amendments. *Melendres v. Arpaio*, 989 F. Supp. 2d 822, 898 (D. Ariz. 2013) *aff'd in part, vacated in part*, 784 F.3d 1254, 1260 (9th Cir. 2015) (affirming district court's finding that the Sheriff's Office's unconstitutional reliance on race "applied across-the-board to all [of its]

---

[48] Motomura, *supra* note 44 at 1848.

[49] Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 650 (Mar. 2016).

[50] When bringing visitors to his Tent City Jail, Arpaio would ask "Want to see the tent where all the Mexicans are?" and Latinos held there were subjected to racial slurs. Joe Hagan, *The Long, Lawless Ride of Sheriff Joe Arpaio*, Rolling Stone, Aug. 2, 2012, https://www.rollingstone.com/culture/culture-news/the-long-lawless-ride-of-sheriff-joe-arpaio-231455/.

law enforcement decisions"). The department has been overseen by a federal monitor for over a decade, and is still not in compliance.[51] As the monitor found in November 2021, "[s]tops involving Latino drivers were more likely to be longer and to result in a citation, arrest, or search when compared with stops involving white drivers."[52]

Across the circuit, local law enforcement agencies have been regularly found to profile Latinos, often in concert with efforts to enforce immigration laws. The local jails in Oregon have improperly held people subject to release "based on immigration enforcement alone" even after the practice was found unconstitutional in 2014.[53] The Montana Highway Patrol agreed to being placed under monitorship in 2015 for targeting Latino drivers specifically to investigate their immigration status. *Rios-Diaz v. Butler*, No. 2:13-cv-00077, Doc. 39 (D. Mont. Apr. 3, 2015). In Nye County, Nevada, which still operates a 287(g) program, Latinos are

---

[51] *See* Robert S. Warshaw, *Twenty-Ninth Report of the Independent Monitor for the Maricopa County Sheriff's Office, Melendres v. Arpaio*, Case No. 2:07-cv-02513, ECF No. 2725, at 5.

[52] *Id.* at 84.

[53] Maxine Bernstein, *Oregon sheriff violated federal law by holding woman in jail solely on immigration detainer, suit alleges*, The Oregonian, June 11, 2019, https://www.oregonlive.com/crime/2019/06/douglas-county-sheriff-violated-federal-law-by-holding-woman-in-jail-solely-on-immigration-detainer-suit-alleges.html (referencing *Lopez-Flores v. Douglas County*, No. 6:19-cv-00904 (D. Or. 2020) and *Miranda-Olivares v. Clackamas County,* No. 3:12-cv-02317, 2014 WL 1414305 (D. Or. Apr. 11, 2014)).

regularly swept into the immigration system after being stopped for minor

offenses.[54]

### 3. Racial Profiling Encouraged by the "Criminal Alien" Designation Drives the Racial Disparity in Section 1326 Convictions.

In 2017, ICE boasted that 363,400 "criminal aliens" had been deported

through Secure Communities since its founding in 2008.[55] Researchers found that

93% of those identified for deportation through Secure Communities were Latino,

and found support for the claim that this results from local law enforcement

agencies "targeting Latinos for minor violations and pre-textual arrests with the

actual goal of initiating immigration checks through the Secure Communities

system."[56] And 287(g) programs rely on the "criminal alien" designation to funnel

individuals into federal criminal and immigration courts as well. A *Washington*

---

[54] Savanna Strott, *Chance encounter with law enforcement is nearly life-altering in last Nevada jurisdiction overtly partnering with ICE*, Nevada Independent, Jan. 10, 2021, https://thenevadaindependent.com/article/chance-encounter-with-law-enforcement-is-nearly-life-altering-in-last-nevada-jurisdiction-overtly-partnering-with-ice (detailing story of a man who had been granted asylum decades ago who was turned over to ICE by local law enforcement after being stopped for having a dog without a leash).

[55] U.S. Immigration and Customs Enforcement, *News Release: Secure Communities* (archived), https://www.ice.gov/secure-communities.

[56] Aarti Kholi, Peter L. Markowitz, Lisa Chavez, *Secure Communities by the Numbers: An Analysis of Demographics and Due Process*, The Chief Justice Earl Warren Inst. on Law and Social Pol'y, Univ. of California, Berkeley Law School Research Report 1, 6 (Oct. 2011) https://www.law.berkeley.edu/files/Secure_Communities_by_the_Numbers.pdf.

*Post* study from last year showed that from 2016 through 2019, arrest rates for sheriffs' departments rose beginning in 2016, and increased particularly in agencies participating in the 287(g) program.[57] And it found that "about one-third of the 1,751 immigrants detained in Frederick County under 287(g) were arrested for lower-level offenses, including traffic violations and misdemeanors." *Id.*

The government has argued, in litigating claims regarding Section 1326, that this disparity results from the proximity of Mexico to the United States, but as the District of Oregon correctly held in a related case, the fact that "an innocent explanation may exist for the disparity does not eliminate the disparity." *United States v. Machic-Xiap*, No. 3:19-cr-407, 2021 WL 3362738 at *11 (D. Or. Aug. 3 2021).

But the disparity is far larger than mere geography would dictate. The overwhelming percentage of Latino defendants in Section 1326 prosecutions far exceeds the demographic breakdown of any estimates of the undocumented population in the Ninth Circuit. The non-partisan Migration Policy Institute calculates that 79% of the undocumented population in California traces its

---

[57] Debbie Cenziper, Madison Muller, Monique Beals, Rebecca Holland, Andrew Ba Tran, *Under Trump, ICE aggressively recruited sheriffs as partners to question and detain undocumented immigrants*, *Washington Post*, Nov. 23, 2021, https://www.washingtonpost.com/investigations/interactive/2021/trump-ice-sheriffs-immigrants-287g/.

ancestry from Mexico, Central America, or South America.[58] In Arizona, that figure is 86%,[59] while in Nevada it is 81%.[60] In other Ninth Circuit states, Latinos make up an even smaller portion of the undocumented population: 79% in Idaho, 67% in Washington, and 77% in Oregon.[61] The proportion of people convicted under Section 1326 who are Latino likewise exceeds the overall Latino proportion of the undocumented population in the other southern border states.[62] Thus, while Latinos and Latinas make up a majority of the undocumented population in the

---

[58] *See* Migration Policy Institute, *Profile of the Unauthorized Population: California*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/CA.

[59] *See* Migration Policy Institute, *Profile of the Unauthorized Population: Arizona*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/AZ.

[60] *See* Migration Policy Institute, *Profile of the Unauthorized Population: Nevada*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NV.

[61] *See* Migration Policy Institute, *Unauthorized Immigrant Population Profiles*, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles. Only 6% of the undocumented population in Hawaii is Latino, and the Migration Policy Institute does not estimate the demographics of the Alaskan undocumented population.

[62] *See* Migration Policy Institute, *Profile of the Unauthorized Population: New Mexico*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NM (noting 90 percent of undocumented population as Mexican or Central American); Migration Policy Institute, *Profile of the Unauthorized Population: Texas*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX (noting 88 percent of undocumented population as born in Mexico, Central America, or South America).

Ninth Circuit and southern border states, they do not approach the 99% figure seen in prosecutions of Section 1326.

Instead, the extreme proportion of Latinos among those prosecuted under Section 1326 flows from the process outlined above. By creating a designation of "criminal alien"—many of whom are people who have been convicted under 1326—the federal government arms local law enforcement with tools that are used to target Latinos disproportionately, creating wildly disparate rates of conviction by race.

## CONCLUSION

The documented disparate harms that Section 1326 inflicts upon Latinos, combined with the racist and unaddressed intentions of Section 1326 more than suffice to render the statute violative of the Fifth Amendment's equal protection guarantee. *Amici* urge this Court to affirm the district court.

Dated: April 15, 2022    Respectfully submitted,

*/s/ Max S. Wolson*
Max S. Wolson
National Immigration Law Center
P.O. Box 34573
Washington, D.C. 20043
(202) 216-0261
wolson@nilc.org

Lourdes Rosado, President and
General Counsel
Andrew Case, Senior Counsel
Nathalia Varela, Associate Counsel
LatinoJustice PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
(212) 219-3360
lrosado@latinojustice.org
acase@latinojustice.org
nvarela@latinojustice.org

28

Nicholas David Espiritu
National Immigration Law Center
3450 Wilshire Blvd., No. 108-62
Los Angeles, CA 90010
(213) 639-3900
espiritu@nilc.org

*Attorneys for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 21-10233

I am the attorney or self-represented party.

**This brief contains 5,954 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[XX] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Max S. Wolson* **Date** April 15, 2022

# APPENDIX A:

**Declaration of Matthew Light, *United States v. Machic-Xiap*, No. 3:19-cr-407 (D. Or. Mar. 31, 201), ECF No. 52-1**

Michael T. Light, Ph.D.
Associate Professor of Sociology
University of Wisconsin-Madison

*Purpose*

Upon request from the Federal Public Defender for the District of Oregon, I undertook an examination of statistical disparities pertaining to illegal re-entry cases in the sentencing data from the United States Sentencing Commission. Specifically, I was asked to examine the demographic composition of illegal re-entry defendants and the statistical features of how these defendants fare at sentencing compared to other offenders and offense types.

*Expertise*

Professor Light teaches courses on criminology and punishment and is a recognized expert in the field of criminal sentencing. He has published extensively using U.S. Sentencing Commission data.[1] This work appears in leading peer-reviewed, social science journals and has been cited in both state (*State of Wisconsin v. Salas Gayton*, 2016, No. 2013AP646–CR) and federal judicial opinions (*United States v. Valdovinos*, 2014, No. 13–4768). Both the National Science Foundation (SES Award # 1849297) and the National Institute of Justice (Award 2019-R2-CX-0058) currently fund his research on sentencing and criminal case processing.

---

[1] *See* Light, Michael T. 2021. "The Declining Significance of Race in Criminal Sentencing: Evidence from U.S. Federal Courts." *Social Forces* https://doi.org/10.1093/sf/soab018; Light, Michael T. and Julia Thomas. 2021. "Undocumented Immigration and Terrorism: Is there a Connection?" *Social Science Research* 94: https://doi.org/10.1016/j.ssresearch.2020.102512; Light, Michael T., Ellen Dinsmore, and Michael Massoglia. 2019. "How do Criminal Courts Respond in Times of Crisis? Evidence from 9/11." *American Journal of Sociology* 125: 485-533.; King, Ryan D. and Michael T. Light. 2019. "Have Racial and Ethnic Disparities in Sentencing Declined? *Crime and Justice: A Review of Research*, edited by Michael Tonry. Chicago: University of Chicago Press; Light, Michael T. 2017. "Punishing the 'Others': Citizenship and State Social Control in the United States and Germany." *European Journal of Sociology* 58: 33-71; Light, Michael T., Michael Massoglia, and Ryan D. King. 2014. "Citizenship and Punishment: The Salience of National Membership in U.S. Criminal Courts." *American Sociological Review* 79: 825-847; Light, Michael T. 2014. "The New Face of Legal Inequality: Noncitizens and the Long-Term Trends in Sentencing Disparities across U.S. District Courts, 1992-2009." *Law & Society Review* 48: 447-478; Ulmer, Jeffery T., Michael T. Light, and John Kramer. 2011. "Racial Disparity in the Wake of the Booker/Fanfan Decision: An Alternative Analysis to the USSC's 2010 Report." *Criminology & Public Policy* 10: 1077-1118; Ulmer, Jeffery T., Michael T. Light, and John Kramer. 2011. "Does Increased Judicial Discretion Lead to Increased Disparity? The "Liberation" of Judicial Sentencing Discretion In the Wake of the Booker/Fanfan Decision." *Justice Quarterly* 28: 799-837; Ulmer, Jeffery T. and Michael T. Light. 2010. "Federal Case Processing and Sentencing Before and After the Booker/Fanfan Decision: Little Has Changed." *Journal of Gender, Race, and Justice* 14:143-178; Ulmer, Jeffery T. and Michael T. Light. 2011. "Beyond Disparity: Changes in Federal Sentencing Post-Booker and Gall." *Federal Sentencing Reporter* 23(5):333-341.

**An Empirical Analysis of § 2L1.2 Offenses in U.S. Federal Courts**

This memo uses the U.S. Sentencing Commission's (USSC) Standardized Research Files from 2015 to 2019 (the five most recent years of data available) to examine cases sentenced under § 2L1.2 - Unlawfully Entering or Remaining in the United States – of the U.S. Sentencing Guidelines. 2L1.2 cases consist almost entirely of those prosecuted under 8 U.S.C. 1326. Over the last 5 years, 99.4% of 2L1.2 cases had only 1 count of conviction. Of the 2L1.2 cases, 99.2% were 8 U.S.C. 1326 convictions.

2L1.2 cases were the second most numerous offense on the federal docket, behind only § 2D1.1 – Unlawful Manufacturing, Importing, Exporting, or Trafficking Drugs. Throughout this memo, I compare 2L1.2 cases to the other guidelines that comprise the 10 most numerous non-immigration offenses. The guidelines section, definition, and number cases for each offense type are shown in Table 1. Combined, these 10 guidelines make up the overwhelming majority (84.5 percent) of cases sentenced over the past 5 years.

**Table 1. 10 Most Numerous Sentencing Guidelines, 2015-2019**

| Section | Description | Cases |
|---|---|---|
| 2D1.1 | Drugs - Unlawful Manufacturing, Importing, Exporting, or Trafficking | 96,062 |
| 2L1.2 | Unlawfully Entering or Remaining in the United States | 87,841 |
| 2B1.1 | Larceny, Embezzlement, and Other Forms of Theft | 32,975 |
| 2K2.1 | Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition | 32,382 |
| 2B3.1 | Robbery | 8,305 |
| 2G2.2 | Trafficking in Material Involving the Sexual Exploitation of a Minor | 7,328 |
| 2S1.1 | Laundering of Monetary Instruments | 5,353 |
| 2A3.5 | Failure to Register as a Sex Offender | 1,963 |
| 2T1.1 | Tax Evasion | 1,963 |
| 2D1.2 | Drug Offenses Occurring Near Protected Locations or Involving Underage or Pregnant Individuals | 1,706 |

*Notes*: Total number for top 10 guidelines is 275,878, representing 84.5% of all cases between 2015 and 2019 where the guideline section is known.

*Demographic Differences*

The demographic composition of 2L1.2 cases is markedly different than the other guidelines. Looking at Figure 1, 99% of all 2L1.2 cases involve Hispanic defendants. As shown in Table 2, none of the other guidelines have a similarly skewed racial/ethnic make-up.

2

**Figure 1. Racial/Ethnic Composition of 2L1.2 Cases**



■ White   ■ Black   ■ Hispanic   ■ Other Race

**Table 2. Racial/Ethnic Composition by Sentencing Guideline**

| Section | White | Black | Hispanic | Other Race |
|---------|-------|-------|----------|------------|
| 2D1.1 | 24% | 25% | 48% | 3% |
| 2L1.2 | 1% | 1% | 99% | 0% |
| 2B1.1 | 44% | 32% | 18% | 7% |
| 2K2.1 | 26% | 51% | 19% | 3% |
| 2B3.1 | 24% | 58% | 15% | 3% |
| 2G2.2 | 81% | 4% | 12% | 3% |
| 2S1.1 | 37% | 20% | 36% | 7% |
| 2A3.5 | 45% | 26% | 11% | 17% |
| 2T1.1 | 64% | 19% | 10% | 7% |
| 2D1.2 | 9% | 23% | 66% | 2% |

3

*Likelihood of a Trial*

Although trials in federal court are generally rare, they are virtually non-existent among 2L1.2 cases. As shown in Figure 2, of the nearly 88,000 2L1.2 cases sentenced over the last 5 years, less than 0.3% of them were convicted by trial. The only other offense that even comes close to such a small number of trials are 2A3.5 cases, "Failure to Register as a Sex Offender." Still, even at a 1% trial rate, this means that 2A3.5 cases are over three times more likely to go to trial than 2L1.2 cases.

**Figure 2. Percent of Cases Convicted at Trial by Sentencing Guideline, 2015-2019**



*Likelihood of Incarceration*

2L1.2 cases are among the guidelines most likely to result in incarceration. As shown in Figure 3, 97% of 2L1.2 cases result in a prison sanction, a higher proportion than Drug Trafficking (2D1.1), Larceny (2B1.1), Money Laundering (2S1.1), Tax Evasion (2T1.1), and even Firearms offenses (2K2.1).

4

**Figure 3. Percent of Cases Sentenced to Prison by Sentencing Guideline, 2015-2019**



*Severity of Cases*

The comparatively high rate of incarceration for 2L1.2 offenses could be a result of the severity of cases. I examine this possibility in two ways. First, I examine the average final offense level (ranging from 1-43) for each guideline. As shown in Figure 4, 2L1.2 cases are in fact the least severe among the top 10 most numerous sentencing guidelines. The juxtaposition between 2L1.2 cases, drug trafficking and money laundering is illuminating. The average offense level for both drug trafficking (2D1.1) and money laundering (2S1.1) cases is roughly 2.5 times the average offense level for 2L1.2 cases. Yet, 2L1.2 cases are more likely to result in a prison sanction.

The second approach is to examine the average statutorily required minimum sentence based on all counts of conviction. These results are shown in Figure 5. There is considerable variation across these different offenses, ranging from 68 months for 2D1.2 cases (Drug Offenses Occurring Near Protected Locations or Involving Underage or Pregnant Individuals) to virtually no required imprisonment. Important for this memo, the statutory minimum sentence is lowest for 2L1.2 cases, at 0.01 months on average. Combined, the results in Figures 3-5 suggest that 2L1.2 offenders are among the most likely to receive a prison sentence despite having the lowest mandatory minimums and final offense levels.

5

**Figure 4. Average Final Offense Level by Sentencing Guideline, 2015-2019**



**Figure 5. Average Statutory Minimum Sentence by Sentencing Guideline, 2015-2019**



Exhibit Y
Page 6 of 10

*Do 2L1.2 Cases Predict Incarceration net of Offense Severity, Criminal History, and Mandatory Minimums?*

The results thus far provide suggestive evidence that 2L1.2 cases are punished uniquely in U.S. federal courts. However, one would need to account for other relevant sentencing factors before drawing strong conclusions. I thus turn to multivariate regression analysis to examine the influence of 2L1.2 cases on sentencing outcomes. As the U.S. Sentencing Commission notes, "the goal of multivariate regression analysis is to determine whether there is an association between the factors being studied and, if so, to measure the extent to which each factor contributes to the observed outcome…The principal benefit of multivariate regression analysis is that it controls for the effect of each factor in the analysis by comparing offenders who are similar to one another in relevant ways" (USSC 2017: 3).[2]

In this analysis, I compare the likelihoods of receiving a prison sentence among different guidelines, controlling for the three most important determinants of sentencing in U.S. federal courts: the final offense level (ranging 1-43), the final criminal history category (ranging from 1-6), and the statutory minimum penalty based on all counts of conviction (measured in months). I use a linear probability model to examine the likelihood of incarceration. For illustrative purposes, in Figure 6 I show the predicted probability of prison for each guideline holding all variables constant at their means. In other words, the results in the figure show the likelihood of incarceration for offenders sentenced under different guidelines but with the same offense severity, the same criminal history, and same statutory minimum (the full regression results are shown in Appendix Table 1).

The results in Figure 6 make clear that the sentencing differences observed above are not driven by statutory minimums, offense severity, or criminal history. When these three factors are held constant at their means, 2L1.2 offenders are effectively guaranteed to receive a prison sentence (the predicted probability is 1). Save for 2A3.5 cases (Failure to Register as a Sex Offender), the likelihood of incarceration is higher among 2L1.2 offenders than all other guidelines in the study. Indeed, none of the other offenses have a predicted probability above 95%, including drug trafficking, sexual exploitation of a minor, robbery, money laundering, or firearms offenses.

---

[2] *See* U.S. Sentencing Commission. 2017. "Demographic Differences in Sentencing: An Update to the 2012 Booker Report." Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171114_Demographics.pdf.

7



**Figure 6. Predicted Probability of Incarceration by Sentencing Guideline, 2015-2019**

*Do 2L1.2 Cases Help Explain Sentencing Disparities between White and Hispanic Defendants?*

The results thus far reach two general conclusions: (a) 2L1.2 cases disproportionately involve Hispanic defendants and (b) 2L1.2 cases are significantly more likely to result in a prison sentence compared to similarly situated non-2L1.2 offenders. Combining these insights, this next analysis examines how much of the sentencing difference between white and Hispanic offenders in U.S. federal courts is attributable to 2L1.2 cases. I do this by conducting a multivariate analysis where the dependent variable is the likelihood of incarceration. Here again, I use a linear probability model and calculate predicted probabilities of prison by race after controlling for the final offense level, the final criminal history category, and the statutory minimum penalty. These results are shown in two models in Figure 7 (full regression results are shown in Appendix Table 2). The first shows the predicted probability of incarceration for white and Hispanic offenders without accounting for the guideline offense. In this model, I observe a 13.5-percentage point gap, favoring white offenders. The second model adds an indicator for 2L1.2 cases to the explanatory variables. With this inclusion, the relative incarceration gap between white and Hispanic offenders decreases substantially, down to an 8-percentage point gap. In other words, adjusting for the punitive sanctions 2L1.2 offenders receive decreases the amount of Hispanic-white disparity in federal sentences by roughly 40 percent (1 - [8.1 / 13.5] = .4).

8

**Figure 7. Predicted Probabilities of Incarceration for White and Hispanic Defendants**



*Notes*: Both models include controls for final offense level, criminal history category, and the statutory minimum penalty.

*Summary*

Using U.S. Sentencing Commission data from 2015 to 2019, this analysis examined the key sentencing features involving cases sentenced under § 2L1.2 - Unlawfully Entering or Remaining in the United States. The data reveal several notable findings, summarized as follows:

- 99% of all 2L1.2 cases involve Hispanic defendants. Such large demographic disparities are observed for no other guideline among the 10 most numerous non-immigration offense types.
- 2L1.2 cases are the least likely to be convicted at trial.
- Despite having the lowest statutory minimums and offense levels, 2L1.2 cases are among the most likely to receive a prison sentence (97%).
- Accounting for previous criminal history, offense severity, and the statutory minimum sentence, 2L1.2 offenders are still substantially more likely to be incarcerated.
- The differential punishment of 2L1.2 cases explains roughly 40% of the observed sentencing differences between white and Hispanic defendants, net of controls for offense severity, criminal history, and mandatory minimums. Put differently, 2L1.2 offenses contribute significantly to the differential likelihood that white and Hispanic offenders are sentenced to incarceration in U.S. Federal Courts.

9

**Appendix**

**Appendix Table 1. Linear Probability of Incarceration, 2015-2019**

| Measures | b | se | |
|---|---|---|---|
| *Offense Type* | | | |
| 2D1.1 (reference) | -- | -- | |
| 2L1.2 | 0.14 | (0.00) | *** |
| 2B1.1 | -0.15 | (0.00) | *** |
| 2K2.1 | 0.02 | (0.00) | *** |
| 2B3.1 | 0.02 | (0.00) | *** |
| 2G2.2 | -0.01 | (0.00) | *** |
| 2S1.1 | -0.06 | (0.00) | *** |
| 2D1.2 | 0.04 | (0.01) | *** |
| 2T1.1 | -0.23 | (0.01) | *** |
| 2A3.5 | 0.10 | (0.01) | *** |
| | | | |
| Final Offense Level | 0.01 | (0.00) | *** |
| Criminal History Category | 0.01 | (0.00) | *** |
| Statutory Minimum | 0.00 | (0.00) | *** |
| Constant | 0.70 | (0.00) | *** |
| *N* | 275,695 | | |

*Notes* : *** $p < .001$

**Appendix Table 2. Linear Probability of Incarceration by Ethnicity, 2015-2019**

| | Model 1 - No Offense Controls | | | Model 2 - Controlling for 2L1.2 | | |
|---|---|---|---|---|---|---|
| Measures | b | se | | b | se | |
| White (reference) | -- | -- | | -- | -- | |
| Hispanic | 0.14 | (0.00) | *** | 0.08 | (0.00) | *** |
| *Offense Type* | | | | | | |
| 2L1.2 | -- | -- | | 0.14 | (0.00) | *** |
| | | | | | | |
| Final Offense Level | 0.01 | (0.00) | *** | 0.01 | (0.00) | *** |
| Criminal History Category | 0.03 | (0.00) | *** | 0.02 | (0.00) | *** |
| Statutory Minimum | 0.00 | (0.00) | | 0.00 | (0.00) | ** |
| Constant | 0.68 | (0.00) | *** | 0.61 | (0.00) | *** |
| $R^2$ | 0.10 | | | 0.138 | | |
| *N* | 208,292 | | | 208,292 | | |

*Notes* : *** $p < .001$; ** $p < .01$

10

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 */s/ Max S. Wolson*
Max S. Wolson