No. 21-10233

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

*Appeal from the United States District Court for the*
*District of Nevada, Case No. 3:20-cr-00026-MMD-WGC*
*The Honorable Miranda M. Du, Chief United States District Judge*

BRIEF OF *AMICI CURIAE* ASIAN AMERICANS ADVANCING
JUSTICE, CONFERENCE OF ASIAN PACIFIC AMERICAN LAW
FACULTY, HUMAN RIGHTS FIRST, NORTHWEST IMMIGRANT
RIGHTS PROJECT, AND UNLV IMMIGRATION CLINIC IN
SUPPORT OF APPELLEE AND AFFIRMANCE

Bradley S. Phillips
MUNGER, TOLLES & OLSON LLP
350 S. Grand Ave., 50th Floor
Los Angeles, CA 90071
(213) 683-9100
brad.phillips@mto.com

Sarah Weiner*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW
Suite 500E
Washington, DC 20001
(202) 220-1141
sarah.weiner@mto.com

*Admitted in New York only; Practicing under
the supervision of District of Columbia Bar
members

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), amici curiae state that none of the amici curiae has a parent corporation and no publicly held corporation owns 10% or more of the stock of any of the amici curiae.

## RULE 29 STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), amici curiae state that all parties have consented to the filing of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici curiae state that: (1) no party's counsel has authored this brief in whole or in part; (2) no party or party's counsel has contributed money intended to fund the preparation or submission of the brief; and (3) no person other than amici has contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ................................................................... 1

SUMMARY OF ARGUMENT ................................................................. 5

ARGUMENT ......................................................................................... 8

I.    The Plenary Power Doctrine Is Rooted in Racism Against Asian Immigrants ............................................................... 8

    A.    Early Federal Immigration Restrictions Were Motivated By Anti-Chinese Bias ............................................. 9

    B.    The Plenary Power Doctrine Justified and Perpetuated Racist Immigration Laws ...................................... 12

    C.    The Plenary Power Doctrine Remains Rooted in Racism and Should Be Limited, If Not Discarded Altogether ................................................................. 19

II.   The Plenary Power Doctrine Should Not Be Used To Shield Criminal Laws from Ordinary Constitutional Scrutiny ............... 25

III.  The Plenary Power Doctrine Should Not Be Used To Limit Judicial Review of Race-Based Equal Protection Challenges ....... 31

CONCLUSION ...................................................................................... 38

# TABLE OF AUTHORITIES

**Page**

CASES

*Carlson v. Landon,*
   342 U.S. 524 (1952) ............................................................. 21

*Chae Chan Ping v. United States (Chinese Exclusion Case),*
   130 U.S. 581 (1889) ...................................................... passim

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ......................................................... 33

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ................................................. 22, 23, 36

*Fong Yue Ting v. United States,*
   149 U.S. 698 (1893) ...................................................... passim

*Foucha v. Louisiana,*
   504 U.S. 71 (1992) ............................................................... 26

*Galvan v. Press,*
   347 U.S. 522 (1954) .................................................... 21, 22

*Griffin v. Illinois,*
   351 U.S. 12 (1956) ............................................................... 32

*Harisiades v. Shaughnessy,*
   342 U.S. 580 (1952) ................................................. 22, 23, 26

*Johnson v. California,*
   543 U.S. 499 (2005) ............................................................. 35

*Kleindienst v. Mandel,*
   408 U.S. 753 (1972) ......................................... 22, 23, 25, 26

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*Ledezma-Cosino v. Sessions,*
    857 F.3d 1042 (9th Cir. 2017) ............................................................... 35

*Lopez-Valenzuela v. Arpaio,*
    770 F.3d 772 (9th Cir. 2014) (en banc) ................................................. 30

*Lynch v. Cannatella,*
    810 F.2d 1363 (5th Cir. 1987) ......................................................... 26, 29

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ........................................................... 6, 22, 23, 31

*Ng Fung Ho v. White,*
    259 U.S. 276 (1922) ............................................................................ 25

*Nishimura Ekiu v. United States,*
    142 U.S. 651 (1892) ........................................................ 14, 15, 20, 21

*Plessy v. Ferguson,*
    163 U.S. 537 (1896) .............................................................................. 8

*Plyler v. Doe,*
    457 U.S. 202 (1982) ....................................................................... 6, 31

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) ......................................................... 33, 34

*Regents of Univ. of Cal. v. Dep't of Homeland Security,*
    908 F.3d 476 (9th Cir. 2018),
    *rev'd in part, vacated in part,* 140 S. Ct. 1891 (2020) .................... 33, 34

*Rose v. Mitchell,*
    443 U.S. 545 (1979) ......................................................................... 7, 32

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) ....................................................................... 21, 22

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ......................................................22, 23, 33, 36

*United States ex rel. Knauff v. Shaughnessy,*
338 U.S. 537 (1950) ..................................................................20

*United States ex rel. Turner v. Williams,*
194 U.S. 279 (1904) ..................................................................25

*United States v. Ayala-Bello,*
995 F.3d 710 (9th Cir. 2021) ........................................................29, 35

*United States v. Barajas-Guillen,*
632 F.2d 749 (9th Cir. 1980) ........................................................30, 35

*United States v. Casimiro-Benitez,*
533 F.2d 1121 (9th Cir. 1976) ......................................................28

*United States v. Chen,*
439 F.3d 1037 (9th Cir. 2006) ......................................................28

*United States v. FNU LNU,*
653 F.3d 144 (2d Cir. 2011) ........................................................28

*United States v. Henry,*
604 F.2d 908 (5th Cir. 1979) ........................................................28

*United States v. Hernandez-Guerrero,*
147 F.3d 1075 (9th Cir. 1998) ......................................................29

*United States v. Lopez-Flores,*
63 F.3d 1468 (9th Cir. 1995) ........................................................29, 35

*United States v. Mendoza-Lopez,*
481 U.S. 828 (1987) ..................................................................28

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*United States v. Moya,*
74 F.3d 1117 (11th Cir. 1996) ............................................................28

*United States v. Ruiz-Chairez,*
493 F.3d 1089 (9th Cir. 2007) ......................................................29, 35

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ................................................................7, 32, 35

*Washington v. Davis,*
426 U.S. 229 (1976) ........................................................................7, 32

*Wong Wing v. United States,*
163 U.S. 228 (1896) ..............................................................26, 27, 30

*Yamataya v. Fisher,*
189 U.S. 86 (1903) ..............................................................................16

*Yick Wo v. Hopkins,*
118 U.S. 356 (1886) ........................................................................6, 31

*Zadvydas v. Davis,*
533 U.S. 678 (2001) ...................................................................passim

**STATUTES**

8 U.S.C. § 1326 ............................................................................passim

Act of Dec. 17, 1943,
ch. 344, 57 Stat. 600 ..........................................................................11

Act of Feb. 5, 1917,
ch. 29, 39 Stat. 874 ............................................................................17

Act of March 3, 1875 (Page Act),
ch. 141, 18 Stat. 477 ..........................................................................10

## TABLE OF AUTHORITIES
### (Continued)

**Page**

Act of May 5, 1892 (Geary Act),
  ch. 60, 27 Stat. 25.................................................................. 11

Act of May 6, 1882 (Chinese Exclusion Act),
  ch. 126, 22 Stat. 58............................................................... 10

Act of October 1, 1888 (Scott Act),
  ch. 1064, 25 Stat. 504....................................................... 10, 11

Immigration Act of 1924,
  ch. 190, 43 Stat. 153............................................................. 18

LEGISLATIVE MATERIALS

Chinese Exclusion Act,
  13 Cong. Rec. 1636 (1882).................................................... 12

Scott Act,
  19 Cong. Rec. 8496 (1888).................................................... 12

OTHER AUTHORITIES

Alina Das,
  *Inclusive Immigrant Justice: Racial Animus and the Origins of*
  *Crime-Based Deportation*,
  52 U.C. Davis L. Rev. 171 (2018) ......................................... 11

Asian Americans Advancing Justice – Asian Law Caucus,
  *Community-Led Solutions to Anti-Asian Hate Violence* (Sept. 20,
  2021),
  https://www.advancingjustice-alc.org/news-
  resources/perspectives/community-led-solutions-to-anti-asian-hate-
  violence ................................................................................. 36

Asian Americans Advancing Justice – Los Angeles,
  *AAPIs Behind Bars: Exposing the School to Prison to Deportation*
  *Pipeline*,

# TABLE OF AUTHORITIES
## (Continued)

**Page**

https://archive.advancingjustice-la.org/media-and-publications/publications/aapis-behind-bars-exposing-school-prison-deportation-pipeline (last visited Mar. 20, 2022) ...............................36

Beth Lew-Williams,
*The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* (2018) .........................................................................9

Gabriel Chin,
*Segregation's Last Stronghold: Race Discrimination and the Constitutional Law of Immigration*,
46 UCLA L. Rev. 1 (1998) ......................................................17, 18, 24

Hiroshi Motomura,
*Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*,
100 Yale L.J. 545 (1990) ........................................................19, 20, 24

Jan Ting,
*"Other Than a Chinaman": How U.S. Immigration Law Resulted From and Still Reflects a Policy of Excluding and Restricting Asian Immigration*,
4 Temp. Pol. & Civ. Rts. L. Rev. 301 (1995)..................................18, 19

Kerry Abrams,
*Polygamy, Prostitution, and the Federalization of Immigration Law*,
105 Colum. L. Rev. 641 (2005)..........................................................9, 10

Louis Henkin,
*The Constitution and United States Sovereignty: A Century of* Chinese Exclusion *and Its Progeny*,
100 Harv. L. Rev. 853 (1987) ...................................................12, 23, 24

Rose Cuison Villazor & Kevin Johnson,
*The Trump Administration and the War on Immigration Diversity*,
54 Wake Forest L. Rev. 575 (2019) ......................................................10

# TABLE OF AUTHORITIES
## (Continued)

<u>**Page**</u>

Stephen Legomsky,
  *Immigration Law and the Principle of Plenary Congressional Power*,
  1984 Sup. Ct. Rev. 255 (1984) ............................................................24

## STATEMENT OF INTEREST

This brief is submitted by all members of **Asian Americans Advancing Justice (Advancing Justice)**, the national affiliation of five nonprofit organizations: Asian Americans Advancing Justice – AAJC, Asian Americans Advancing Justice – Asian Law Caucus, Asian Americans Advancing Justice – Atlanta, Asian Americans Advancing Justice – Chicago, and Asian Americans Advancing Justice – Los Angeles.  The Advancing Justice affiliates are leading civil rights organizations representing the interests of Asian Americans, Native Hawaiians, Pacific Islanders, and other underserved communities, including immigrant members of those communities.  Through community outreach, advocacy, and litigation, Advancing Justice works to advance civil and human rights that empower those communities and to promote a fair and equitable society for all.  The Advancing Justice organizations routinely file briefs as amici curiae on behalf of the communities they represent.

Much of modern immigration law is rooted in racism against Asian immigrants.  Many members of the Asian American community—the same community served by the Advancing Justice organizations—

are affected and harmed by immigration-related incarceration and detention today, including for violations of the illegal reentry law at issue here.  In light of these experiences, Advancing Justice has a strong interest in providing historical and contemporary context for the arguments in this case.

The **Conference of Asian Pacific American Law Faculty (CAPALF)** is a national organization that provides Asian Pacific American law faculty with scholarship support and various networking and professional development opportunities.  CAPALF strives to empower its members by providing resources to help members succeed in their careers.  CAPALF hosts an annual conference that connects Asian Pacific American law faculty through networking events, gives members an opportunity to share their scholarship ideas and receive feedback on their works in progress, and creates an inclusive environment to discuss current affairs impacting society on the local, national, and international levels.

**Human Rights First** is a non-governmental organization established in 1978 that works to ensure the United States' leadership on human rights globally, and compliance domestically with its human

rights commitments. Human Rights First operates one of the largest programs for pro bono legal representation of refugees in the nation, working in partnership with volunteer lawyers at leading law firms to provide free representation to asylum applicants unable to afford counsel. Human Rights First has represented asylum seekers who were prosecuted for unlawful entry into the United States, and has conducted research, observed, and reported on the expanded use of unlawful entry and reentry prosecutions against asylum seekers. Human Rights First is deeply concerned both at the starkly disparate impact of these prosecutions on Hispanic migrants and the resulting violations of Article 31 of the 1951 Convention relating to the Status of Refugees, which prohibits penalizing refugees for their irregular entry or presence in the country of refuge, and sometimes also Article 33 of the same Convention, which prohibits the return of refugees to countries of persecution.

**Northwest Immigrant Rights Project (NWIRP)** is a nonprofit legal organization dedicated to the defense and advancement of the rights of noncitizens in the United States through direct legal services, systemic advocacy, and community education. NWIRP provides direct

representation to low-income immigrants applying for benefits before U.S. Citizenship and Immigration Services and the Federal District Courts, and to immigrants facing removal proceedings before the Immigration Court, the Board of Immigration Appeals, and the Federal Courts of Appeals.

The **UNLV Immigration Clinic** is a law school clinic in Las Vegas, Nevada, which offers free legal defense to people in immigration detention and to unaccompanied children in removal proceedings, and comprehensive immigration services to members of the University of Nevada, Las Vegas (UNLV) and College of Southern Nevada communities.  The clinic trains law students in immigration practice through live client experiential learning, and employs licensed attorneys at its Community Advocacy Office to represent people in removal proceedings.  Many of its clients enter the country without inspection, many are fleeing violence or abuse and apply for asylum, and some have prior removal orders.  The UNLV Immigration Clinic does not represent the views of the Board of Regents of the Nevada System of Higher Education, UNLV, nor the William S. Boyd School of Law.

## SUMMARY OF ARGUMENT

Amici write to address the government's troubling argument that the plenary power doctrine justifies applying minimal constitutional scrutiny in this case.[1] The doctrine emerged in the late 1800s to rationalize racist laws excluding Asian immigrants from this country. According to the doctrine, immigration laws are largely immune from judicial review because of the federal government's "absolute and unqualified" power over immigration. *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893). Rooted in racism against Asian immigrants, the plenary power doctrine should be carefully limited in scope, if not discarded altogether. The doctrine's discriminatory origins cannot be segregated from contemporary racial disparities in criminal and immigration law. This history should give the Court serious pause before applying the doctrine.

The Court should be especially wary of applying the plenary power doctrine in this case because it involves a race-based equal

---

[1] Several amici here also participated as amici in *United States v. Manuel Rodrigues-Barios. See Brief of Amici Curiae Asian Americans Advancing Justice et al.*, *United States v. Manuel Rodrigues-Barios*, No. 21-50145 (9th Cir. 2021).

protection challenge to a criminal law. Neither the Supreme Court nor the Ninth Circuit has used the doctrine to shield a criminal law or race-based equal protection challenge from ordinary constitutional review. Historically, the doctrine has been applied mainly to cases involving the exclusion and deportation of noncitizens. This Court should not extend the doctrine to limit judicial review in cases (including and especially criminal cases) that involve detention or imprisonment—serious liberty interests that "lie[] at the heart of" the Fifth Amendment's protections. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects.").

Likewise, the Court should not extend the doctrine to cases involving race-based equal protection challenges. The Constitution's equal protection guarantee applies to all "persons" in the United States, including those who are unlawfully present. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). Racial discrimination, which is "especially pernicious" in the criminal context, is the central concern of

the equal protection guarantee. *Rose v. Mitchell*, 443 U.S. 545, 555 (1979); *see Washington v. Davis*, 426 U.S. 229, 239 (1976). The Court should not rely on the plenary power doctrine, which is rooted in racism against Asian immigrants, to minimize review of race-based equal protection challenges.

Instead, the Court should apply ordinary constitutional scrutiny and review defendant Gustavo Carrillo-Lopez's claim under the standard set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Carrillo-Lopez argues that 8 U.S.C. § 1326, which criminalizes the reentry of noncitizens who were previously deported, was enacted with a discriminatory purpose and has disparate impact on Latinx people. Under ordinary constitutional analysis, this challenge falls squarely under the *Arlington Heights* framework. The district court properly applied that standard here, and this Court should do the same.

This Court should decline to depart from precedent and use the plenary power doctrine to shield criminal laws and race-based equal protection challenges from ordinary review. The plenary power doctrine belongs on the ash heap of history, along with other racist doctrines

- 7 -

handed down by the Fuller Court. *See, e.g.*, *Plessy v. Ferguson*, 163 U.S. 537 (1896). The doctrine has never outgrown its racist origins. Modern cases simply reiterate the old rationalizations offered for excluding Asian immigrants and apply them to other immigrants, even as those rationalizations have grown more indefensible. If Congress were to enact a law today excluding all Asian immigrants for the express purpose of preserving racial purity, it would be difficult to imagine that this Court would uphold such a law, even under the broad pronouncements of the plenary power doctrine. The Court should not continue to rely on a doctrine that was first used to achieve that result. Eschewing the plenary power doctrine, moreover, would not deprive the federal government of its broad power to regulate immigration. It would simply subject immigration-related laws to the same constitutional constraints that apply to all other laws.

## ARGUMENT

## I. The Plenary Power Doctrine Is Rooted in Racism Against Asian Immigrants

Racism against Asian immigrants forms the basis of the plenary power doctrine and much of modern immigration law. The earliest federal immigration restrictions were designed to exclude Chinese

immigrants, and the plenary power doctrine was created to justify those laws. Later cases never revisited the racist underpinnings of the doctrine and continued to rely on the Chinese exclusion cases. The plenary power doctrine belongs on the ash heap of history and should be carefully limited in scope, if not discarded altogether. The Court should not apply the doctrine in this case.

### A.    Early Federal Immigration Restrictions Were Motivated By Anti-Chinese Bias

History shows that anti-Chinese animus lies at the foundation of federal immigration law. For the first hundred or so years of this country's history, the federal government imposed no restrictions on immigration. *See* Kerry Abrams, *Polygamy, Prostitution, and the Federalization of Immigration Law*, 105 Colum. L. Rev. 641, 664–65 (2005). That changed after the first significant wave of Chinese migrants came to the United States starting in the late 1840s. In the decades following their arrival, anti-Chinese sentiment grew and erupted into racial violence against the Chinese. *See* Beth Lew-Williams, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* 19 (2018).

In response, Congress began passing a series of laws closing the country's borders to Chinese immigrants. *See* Rose Cuison Villazor & Kevin R. Johnson, *The Trump Administration and the War on Immigration Diversity*, 54 Wake Forest L. Rev. 575, 581–82 (2019). The first such law, the Page Act of 1875, prohibited the entry of prostitutes and people with felony convictions. Act of March 3, 1875 (Page Act), ch. 141, 18 Stat. 477 (repealed 1974). In enforcing the Page Act, government officials presumed all but wealthy Chinese women to be prostitutes and excluded virtually all Chinese women from the United States. *See* Abrams, *supra*, at 698. In 1882, Congress passed the Chinese Exclusion Act, which barred the immigration of Chinese laborers for ten years. Act of May 6, 1882 (Chinese Exclusion Act), ch. 126, 22 Stat. 58 (repealed 1943).

After that, Congress passed numerous other laws that further restricted Chinese immigration. In 1888, Congress passed the Scott Act, which prohibited the entry of all Chinese workers, including those who had once legally resided in the United States. Act of October 1, 1888 (Scott Act), ch. 1064, 25 Stat. 504 (repealed 1943). The law did not require the deportation of Chinese laborers in the country but barred

the reentry of those who traveled outside the country. *Id.* Then, in 1892, Congress passed the Geary Act, which extended the Chinese Exclusion Act for ten years. Act of May 5, 1892 (Geary Act), ch. 60, 27 Stat. 25 (repealed 1943). The law also linked criminal penalties to immigration status for the first time. *See* Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. 171, 191 (2018). Under the law, Chinese laborers in the United States had to satisfy onerous requirements to register and prove their legal status. Geary Act § 6, 27 Stat. at 25–26. Those unable to prove legal residency could be convicted, sentenced to up to one year of imprisonment at hard labor, and deported. Geary Act §§ 4, 6, 27 Stat. at 25–26. All in all, Chinese exclusion remained in effect for over sixty years, until it was finally repealed during World War II. Act of Dec. 17, 1943, ch. 344, 57 Stat. 600.

The legislative history of the Chinese exclusion laws underscores the racism evident in the statutory texts. For example, in defending the Chinese Exclusion Act, Senator Henry Teller argued: "The Caucasian race has a right, considering its superiority of intellectual force and

mental vigor, to look down upon every other branch of the human family . . . .  We are the superior race to-day.  We are superior to the Chinese."  13 Cong. Rec. 1645 (1882).  Likewise, Representative Peter Deuster said:  "The Chinaman is neither socially, morally, nor politically fit to assimilate with us."  *Id.* at 2031.  Senator James Slater argued that the Chinese, whom he described as "hordes of heathens that swarm like rats in a cellar," must not be allowed to "compete with and degrade American labor."  *Id.* at 1636.  Similarly, in support of the Scott Act, Senator William Stewart said:  "In every little town you will find a Chinatown, polluting and corrupting the youth, spreading disease among them . . . .  [T]he coolies that come here bring nothing but evil to our country."  19 Cong. Rec. 8496 (1888).  There is no serious dispute that Chinese exclusion was the product of a virulent mix of "nativism, racism, and xenophobia."  Louis Henkin, *The Constitution and United States Sovereignty:  A Century of* Chinese Exclusion *and Its Progeny*, 100 Harv. L. Rev. 853, 855 (1987) (internal quotation marks omitted).

## B.   The Plenary Power Doctrine Justified and Perpetuated Racist Immigration Laws

The plenary power doctrine emerged to affirm and rationalize these racist laws.  The doctrine is typically traced to *Chae Chan Ping v.*

*United States*, commonly known as the *Chinese Exclusion Case*. 130 U.S. 581 (1889). That case upheld the constitutionality of the Scott Act, which prohibited the entry of all Chinese workers, including those who had once legally resided in the United States. *Id.* at 589, 609. The petitioner in the case, Chae Chan Ping, lawfully resided in the United States for over a decade before traveling to China in 1887. *Id.* at 582. Before he left, Ping obtained a certificate allowing him to return to the United States. *Id.* But upon arrival, he was barred from reentering because of the Scott Act, which had been enacted during his trip. *Id.*

The *Chinese Exclusion Case* gave Congress broad discretion to exclude noncitizens and provided cover for a racist law. The Court held that Congress had constitutional authority to expel even immigrants who had established long-term, lawful residence in the United States. 130 U.S. at 603–04. The Court set forth an expansive view of the federal government's power to exclude noncitizens: "That the government of the United States . . . can exclude aliens from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. . . . 'The jurisdiction of the nation within its own

territory is necessarily exclusive and absolute.  It is susceptible of no limitation not imposed by itself.'"  *Id.* (citation omitted).

The Court in the *Chinese Exclusion Case* also echoed the racist sentiments that motivated the passage of Chinese exclusion laws.  For example, the Court explained that there was a "well-founded apprehension—from the experience of years—that a limitation to the immigration of certain classes from China was essential to the peace of the community on the Pacific coast, and possibly to the preservation of our civilization there."  *Chinese Exclusion Case*, 130 U.S. at 594.  The Court also stated that "[i]t seemed impossible for [Chinese immigrants] to assimilate with our people" and "differences of race added greatly to the difficulties" of Chinese immigration.  *Id.* at 595.

The Supreme Court's decisions following the *Chinese Exclusion Case* further cleared the path for racist immigration laws.  In *Nishimura Ekiu v. United States*, the Court drastically limited the due process rights of noncitizens seeking admission.  142 U.S. 651, 660 (1892).  *Nishimura Ekiu* held that courts could not review immigration officials' findings of fact regarding the admissibility of noncitizens.  *Id.* at 663–64.  The Court explained that, as to unadmitted noncitizens,

"the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Id.* at 660.

The following year, in *Fong Yue Ting*, the Court extended this seemingly unbridled power over the exclusion of noncitizens to deportations. 149 U.S. 698. The Court held that it was constitutional to deport without a jury trial Chinese laborers who were lawfully residing in the United States, if they were found without a certificate of residence and could not establish legal residence through a "credible white witness." *Id.* at 728–29. The Court explained that the federal government's power to deport immigrants was as "absolute and unqualified" as its power to exclude them. *Id.* at 707. According to the Court, "[t]he right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, [is] an inherent and inalienable right of every sovereign and independent nation." *Id.* at 711. In dissent, Justice Brewer presciently observed that the plenary power doctrine, used to justify Chinese exclusion at the time, could allow other groups of people to be targeted in the future. *See id.* at 743 (Brewer, J., dissenting).

- 15 -

Like in earlier cases, the Court in *Fong Yue Ting* affirmed the racist sentiments underlying the Chinese exclusion laws. The Court said that the federal government believed that "large numbers of Chinese laborers, of a distinct race and religion, remaining strangers in the land, residing apart by themselves, tenaciously adhering to the customs and usages of their own country, unfamiliar with our institutions, and apparently incapable of assimilating with our people, might endanger good order, and be injurious to the public interests." *Fong Yue Ting*, 149 U.S. at 717. The Court then concluded that Congress had the power to deport Chinese laborers "whenever, in its judgment, their removal is necessary or expedient for the public interest." *Id.* at 724. Indeed, even Justice Brewer's dissenting opinion referred to Chinese immigrants as the "obnoxious Chinese" and a "distasteful class." *Id.* at 743 (Brewer, J., dissenting).

Later, the Supreme Court confirmed that its decisions had "firmly established" the principle that "Congress may exclude aliens of a particular race from the United States." *Yamataya v. Fisher*, 189 U.S. 86, 97 (1903). By 1903, the constitutionality of such exclusions was "no longer open to discussion" in the Court. *Id.*

The *Chinese Exclusion Case* and its progeny thus gave the Court's imprimatur to a steady stream of immigration laws excluding Asians and Pacific Islanders. The Chinese Exclusion Act of 1882, initially effective for only ten years, was renewed in 1892 and made permanent in 1902. *See* Gabriel Chin, *Segregation's Last Stronghold: Race Discrimination and the Constitutional Law of Immigration*, 46 UCLA L. Rev. 1, 36–37 (1998). Later immigration laws excluded immigrants from other Asian countries. For instance, when immigrants from Japan began to arrive in the United States in significant numbers, the two countries entered the Gentlemen's Agreement of 1907–1908, which provided that Japan would not issue documents for travel to the United States. *See id.* at 13. In 1917, as immigration from India and Southeast Asia began to grow, Congress extended immigration exclusions to the "Asiatic Barred Zone," which it defined to include nearly all of Central and Southeast Asia and the Pacific Islands. Act of Feb. 5, 1917, ch. 29, § 3, 39 Stat. 874, 876.

These exclusionary laws were consolidated in the Immigration Act of 1924, which effectively stemmed any further Asian immigration. The law denied admission to all "alien[s] ineligible to citizenship," with

limited exceptions. Immigration Act of 1924, ch. 190, § 13(c), 43 Stat. 153, 162. "This phrase was a euphemism for Asians because the act defined an alien 'ineligible to citizenship' as one covered by the Chinese Exclusion Act or racially ineligible to naturalize." Chin, *supra*, at 13–14; *see* Immigration Act of 1924 § 28(c), 43 Stat. at 168. After the law was enacted, nearly all Asians were barred from immigrating to the United States, and even Asian immigrants lawfully present in the United States were barred from becoming citizens. Chin, *supra*, at 14. These exclusions were explicitly racial in nature: Even if a person of Chinese descent sought to immigrate to the United States from a country subject to no comparable exclusion, for example, the racial exclusion applied to that person. *Id.*

Only after the United States allied with China during World War II did Congress begin to repeal its exclusions of Asian immigrants. Jan Ting, *"Other Than a Chinaman": How U.S. Immigration Law Resulted From and Still Reflects a Policy of Excluding and Restricting Asian Immigration*, 4 Temp. Pol. & Civ. Rts. L. Rev. 301, 305 (1995). Even then, direct discrimination against Asians persisted in federal immigration policy into the 1960s. Although immigration from China

was allowed, for instance, the strictest possible quota applied: Only 100 persons were admitted each year. *Id.* This quota, like the Immigration Act of 1924, operated based on race: Only 100 persons of Chinese descent were allowed in the country each year, whether or not they were born in China. *Id.* at 305–06. Similar quotas applied to other Asian immigrants. *Id.* at 306. When these quotas were abolished in 1965, it was only amidst assurances that immigration patterns were not expected to change significantly. *Id.* at 307.

### C. The Plenary Power Doctrine Remains Rooted in Racism and Should Be Limited, If Not Discarded Altogether

Despite the apparent racism underlying the development of the plenary power doctrine, courts have not seriously revisited the doctrine. As described above, the initial decisions on plenary power invoked conclusory notions of national sovereignty to justify open racism against Asian Americans. In the years since, invocations of plenary power have simply reiterated the reasoning in those earlier cases, even as the flaws in that reasoning have grown more apparent. *See* Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom*

*Constitutional Norms and Statutory Interpretation*, 100 Yale L.J. 545, 554–60 (1990).

Misguided reliance on the early plenary power cases is particularly clear in the Supreme Court's decisions following World War II. For example, in *United States ex rel. Knauff v. Shaughnessy*, the Court held that the Attorney General could constitutionally exclude a German immigrant without a hearing, based solely on undisclosed, confidential information that her entry would be "prejudicial to the interests of the United States." 338 U.S. 537, 539–41 (1950). Citing *Nishimura Ekiu* and *Fong Yue Ting*, the Court reasserted the federal government's expansive power over exclusion: "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *Id.* at 543. The Court also emphasized that immigrants have very limited due process rights, again citing *Nishimura Ekiu*: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* at 544.

In decisions over the next few years, the Court repeatedly affirmed the plenary power doctrine based solely on its prior cases

upholding Chinese exclusion. In *Carlson v. Landon*, the Court stated that the plenary power doctrine was "not questioned and require[d] no reexamination," citing *Nishimura Ekiu* and *Fong Yue Ting*. 342 U.S. 524, 534 (1952). Likewise, *Shaughnessy v. United States ex rel. Mezei* grounded the plenary power doctrine in the *Chinese Exclusion Case* and *Fong Yue Ting*. 345 U.S. 206, 210 (1953).

The following Term, the Court acknowledged the dangers of leaving the plenary power doctrine unexamined, noting that "[i]n light of the expansion of the concept of substantive due process as a limitation upon all powers of Congress, even the war power, . . . much could be said for the view, were we writing on a clean slate, that the Due Process Clause qualifies the scope of political discretion heretofore recognized as belonging to Congress in regulating the entry and deportation of [noncitizens]." *Galvan v. Press*, 347 U.S. 522, 530–31 (1954) (citation omitted). But the Court concluded that "the slate is not clean," observing that "there is not merely 'a page of history,' but a whole volume." *Id.* at 531 (citation omitted). That this volume of history is inscribed with racism and exclusion received no comment.

Chinese exclusion also remains close beneath the surface of the Supreme Court's more recent affirmations of the plenary power doctrine. The Court in *Fiallo v. Bell* stated that it "'ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" 430 U.S. 787, 792 (1977) (quoting *Mezei*, 345 U.S. at 210). *Fiallo* cited the *Chinese Exclusion Case* and *Fong Yue Ting* to support this proposition. 430 U.S. at 792. Likewise, the Court's distinction between citizens and noncitizens in *Mathews v. Diaz* was built on an artifice of Chinese exclusion cases. 426 U.S. 67. *Mathews* cited *Galvan* and a pair of other decisions: *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952). 426 U.S. at 80. *Kleindienst* and *Harisiades*, in turn, rested their assertions of plenary power on the *Chinese Exclusion Case* and *Fong Yue Ting*. *Kleindienst*, 408 U.S. at 765; *Harisiades*, 342 U.S. at 587–88. Recently, in *Trump v. Hawaii*, the Court invoked the plenary power doctrine to limit judicial review of a Presidential Proclamation restricting the entry of nationals from several Muslim-majority countries. 138 S. Ct. 2392, 2418–20 (2018). In

doing so, the Court relied on earlier decisions that directly cited the Chinese exclusion cases.  *Id.* (citing *Fiallo*, *Mathews*, *Kleindienst*, and *Harisiades*).

The failure to take stock of the origins of the plenary power doctrine has grown even more glaring over time.  When the *Chinese Exclusion Case*, *Nishimura Ekiu*, and *Fong Yue Ting* were decided, "the Bill of Rights had not yet become our national hallmark and the principal justification and preoccupation of judicial review.  It was an era before United States commitment to international human rights [and] before enlightenment in and out of the United States brought an end both to official racial discrimination at home and to national-origins immigration laws."  Henkin, *supra,* at 862.  If Congress were to pass a law today excluding all Asian immigrants for the express purpose of preserving racial purity, it would be difficult to imagine that courts would uphold such a law as within the federal government's plenary power.  Yet courts persist in applying the doctrine that was crafted to achieve that indefensible result.

Scholars have singled out the plenary power doctrine "for the sharpest criticism," Henkin, *supra*, at 858, and have "argued forcefully

for years that [the doctrine] should be reexamined or abolished," Chin, *supra*, at 7–8; *see also* Motomura, *supra*, at 547. They have suggested that the plenary power doctrine—like other discriminatory decisions in *Korematsu v. United States*, *Dred Scott v. Sandford*, and *Plessy v. Ferguson*—belongs on the ash heap of history. *See, e.g.*, Chin, *supra*, at 5; Henkin, *supra*, at 862; Stephen Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 Sup. Ct. Rev. 255, 306–07 (1984).

Given its racist history, the plenary power doctrine should be carefully limited in scope, if not discarded altogether. In this case, Carrillo-Lopez has raised a race-based equal protection challenge to a criminal law. Neither the Supreme Court nor the Ninth Circuit has used the plenary power doctrine to shield a criminal law or race-based equal protection challenge from ordinary constitutional review. This Court should not extend the plenary power doctrine to this case to avoid applying the same standard of review that it would apply to all other laws. Limiting or discarding the plenary power doctrine would not deprive Congress of the power to make laws regarding immigration. It

would simply require that immigration-related laws, like all laws of this country, be subject to otherwise applicable constitutional constraints.

## II. The Plenary Power Doctrine Should Not Be Used To Shield Criminal Laws from Ordinary Constitutional Scrutiny

Under ordinary equal protection standards, Carrillo-Lopez's challenge to Section 1326 would be evaluated under the *Arlington Heights* framework. Neither the Supreme Court nor this Court has used the plenary power doctrine to shield a criminal law from ordinary constitutional scrutiny. In fact, the Supreme Court has repeatedly emphasized the serious liberty interests involved in criminal cases and cautioned against applying the doctrine in that context. The district court properly declined to extend the plenary power doctrine to this case, and this Court should do the same.

Since its inception, the plenary power doctrine has mainly concerned the exclusion and expulsion of noncitizens. *See, e.g.*, *Chinese Exclusion Case*, 130 U.S. at 603 (exclusion); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 289–90 (1904) (exclusion and expulsion); *Ng Fung Ho v. White*, 259 U.S. 276, 280 (1922) (expulsion); *Kleindienst*, 408 U.S. at 765–66 (exclusion). The doctrine is based on the concept of sovereign self-determination, which involves deciding who may enter

and remain in the country. *See Kleindienst*, 408 U.S. at 765–66. According to the Supreme Court, Congress and the President have plenary power over such decisions because they involve foreign policy judgments that are best left to the political branches. *See id.*; *Harisiades*, 342 U.S. at 586–89. For those reasons, courts are extremely deferential in cases involving exclusion and deportation, to the point that such matters are "largely immune from judicial inquiry or interference." *Harisiades*, 342 U.S. at 589.

By contrast, courts are not so deferential in criminal and detention cases, where an immigrant's physical liberty is at issue. As the Supreme Court has made clear, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *see Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *Wong Wing v. United States*, 163 U.S. 228, 236–38 (1896). In addition, the federal government's interest in controlling immigration, which forms the basis of the plenary power doctrine, is not as salient in detention and criminal cases. *See Lynch v. Cannatella*, 810 F.2d 1363, 1373–74 (5th Cir. 1987). The Court has

thus recognized that there are "important constitutional limitations" on the federal government's broad authority to regulate immigration in the civil detention and criminal contexts. *Zadvydas*, 533 U.S. at 695; *see Wong Wing*, 163 U.S. at 237.

Indeed, courts have refused to use the plenary power doctrine to shield criminal laws from ordinary constitutional scrutiny, even at the height of Chinese exclusion. One example is *Wong Wing v. United States*. In that case, the Supreme Court struck down a provision of the Geary Act that sentenced Chinese migrants found unlawfully present in the United States to hard labor without a jury trial. *Wong Wing*, 163 U.S. at 238. The Court explained that, although the federal government's power to exclude and expel noncitizens is plenary, its power to impose criminal punishment on noncitizens is not. *Id.* at 236–37. In criminal cases, where the immigrant's liberty is at issue, the government's power is subject to the normal constraints of the Fifth and Sixth Amendments. *Id.* at 238. The Court struck down the law in question because it violated ordinary due process principles. *Id.* at 237–38.

More recent cases have also applied ordinary constitutional analysis to a range of issues involving the detention or criminal punishment of unauthorized immigrants. For example, courts have used the *Miranda* framework to determine whether the statements of unauthorized immigrants were constitutionally obtained. *See, e.g.*, *United States v. FNU LNU*, 653 F.3d 144, 148–55 (2d Cir. 2011); *United States v. Chen*, 439 F.3d 1037, 1040–43 (9th Cir. 2006); *United States v. Moya*, 74 F.3d 1117, 1119–20 (11th Cir. 1996); *United States v. Henry*, 604 F.2d 908, 912–20 (5th Cir. 1979); *United States v. Casimiro-Benitez*, 533 F.2d 1121, 1124 (9th Cir. 1976). This Court has explained that *Miranda*'s protections attach when the questioning is conducted for the purpose of a criminal investigation, even if the questioning is done by immigration officers. *Chen*, 439 F.3d at 1040–41. Likewise, courts have analyzed various due process issues in the criminal and detention contexts under ordinary standards of review. *See, e.g.*, *Zadvydas*, 533 U.S. at 690–96 (indefinite detention of noncitizens pending deportation); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837–39 (1987) (availability of review for deportation order forming basis of

criminal charges); *Lynch*, 810 F.2d at 1372–74 (physical abuse of excludable noncitizens).

To the extent that courts have applied the plenary power doctrine to the criminal context, they have not shielded immigration-related criminal laws from ordinary constitutional review. *See* Opening Br. 22, 25–26. For example, in *United States v. Hernandez-Guerrero*, the Ninth Circuit held that Congress had the authority to pass Section 1326 under the plenary power doctrine. 147 F.3d 1075, 1076–77 (9th Cir. 1998). But the court did not otherwise evaluate the constitutionality of the law. In addition, although this Court has reviewed some equal protection challenges to immigration-related criminal laws under the rational basis standard, none of those challenges involved a suspect classification that would have triggered heightened scrutiny under normal constitutional analysis. *See United States v. Ayala-Bello*, 995 F.3d 710, 714 (9th Cir. 2021) (classification based on criminal conduct); *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (classification based on prior conviction for illegal entry); *United States v. Lopez-Flores*, 63 F.3d 1468, 1473 (9th Cir. 1995) (federal criminal classification based on citizenship); *United States v. Barajas-Guillen*,

632 F.2d 749, 753 (9th Cir. 1980) (classification based on wealth). Thus, in those cases, the Court had no need to deviate from normal constitutional analysis by invoking the plenary power doctrine, as it would in this case.

Moreover, the Court should avoid applying the plenary power doctrine, regardless of whether Section 1326 facilitates the regulation of immigration. *See* Opening Br. 22–23. *Zadvydas* has long established that laws imposing criminal detention or punishment infringe on fundamental liberty interests and are subject to "important constitutional limitations." 533 U.S. at 695; *see Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780–81 (9th Cir. 2014) (en banc). That the law might "promote" immigration policy does not exempt it from these constraints. *Wong Wing*, 163 U.S. at 237; *see Zadvydas*, 533 U.S. at 695.

Because of the serious liberty interests involved, criminal laws must be subject to more than the minimal judicial review available under the plenary power doctrine. This does not abrogate the federal government's power to enact criminal laws that may advance

immigration policy.  It just means that immigration-related criminal laws must be subject to the same constitutional scrutiny as other laws.

## III. The Plenary Power Doctrine Should Not Be Used To Limit Judicial Review of Race-Based Equal Protection Challenges

The plenary power doctrine does not apply in this case because Section 1326 is a criminal law, not an immigration law.  Separately, the Court should not rely on the doctrine because this case involves a race-based equal protection challenge.  The Constitution's equal protection guarantee extends to all people in the United States, including those who are unlawfully present.  *See Plyler*, 457 U.S. at 210; *Mathews*, 426 U.S. at 77; *Yick Wo*, 118 U.S. at 369.  Under traditional analysis, a race-based challenge like the one presented here would be subject to the *Arlington Heights* test.  Even in cases involving immigration laws, the Supreme Court and Ninth Circuit have applied the *Arlington Heights* framework and refused to apply a more deferential standard under the plenary power doctrine.  This Court should follow precedent and review Section 1326 under the *Arlington Heights* standard as well.

It is especially important to guard against equal protection violations in cases involving race-based challenges to criminal laws.

- 31 -

The "central purpose" of the Constitution's equal protection guarantee is "the prevention of official conduct discriminating on the basis of race." *Washington*, 426 U.S. at 239. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose*, 443 U.S. at 555. As the Supreme Court has recognized, the "central aim" of the judicial system is to ensure that "all people charged with crime . . . 'stand on an equality before the bar of justice in every American court.'" *Griffin v. Illinois*, 351 U.S. 12, 17 (1956) (citation omitted).

Here, absent application of the plenary power doctrine, Carrillo-Lopez's challenge would be evaluated under the *Arlington Heights* standard because he argued that Section 1326, a facially neutral law, was passed with a discriminatory purpose and has disparate impact on Latinx people. Such a challenge falls squarely under the framework articulated in *Arlington Heights*. *See Arlington Heights*, 429 U.S. at 265–68. The Court should not rely on the plenary power doctrine, which is steeped in racism against Asian Americans, to avoid analyzing whether racial discrimination motivated the passage of Section 1326.

The Supreme Court and Ninth Circuit have both applied the *Arlington Heights* standard in the immigration context. For example, in *Regents of the University of California v. Department of Homeland Security*, the Ninth Circuit applied *Arlington Heights* to determine whether the rescission of the Deferred Action for Childhood Arrivals program was unconstitutional. 908 F.3d 476, 518–19 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020). The Supreme Court also applied the *Arlington Heights* standard on appeal. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915–16 (2020); *see Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (recognizing that the Supreme Court applied the *Arlington Heights* standard in *Regents*). Then, in *Ramos*, the Ninth Circuit applied the *Arlington Heights* analysis to a similar race-based equal protection challenge to immigration policy. 975 F.3d at 895–96.

This Court should do the same here. In *Regents* and *Ramos*, the Ninth Circuit distinguished *Trump v. Hawaii*, 138 S. Ct. 2392, which applied the plenary power doctrine and rational basis review, "in several potentially important respects, including the physical location of the plaintiffs within the geographic United States, the lack of a national

security justification for the challenged government action, and the nature of the constitutional claim raised." *Regents*, 908 F.3d at 520 (citation omitted); *see Ramos*, 975 F.3d at 896. Like in *Regents* and *Ramos*, the defendant here is physically located in the United States, which entitles him to certain constitutional protections unavailable to people outside of the country. *See Zadvydas*, 533 U.S. at 693. Likewise, there is no "terrorism or other special circumstances" here that warrant "heightened deference to the judgments of the political branches with respect to matters of national security." *Id.* at 696. In addition, this case involves the same race-based equal protection claim at issue in *Regents* and *Ramos*. Indeed, there is even less reason to apply the plenary power doctrine here than in *Regents* and *Ramos*, since this case involves a criminal law, not an immigration law.

The government's approach is ill-advised because it would immunize all race-based equal protection challenges to immigration-related laws from review. *See* Opening Br. 27–29. For example, consider a law that is analogous to Section 1326 but facially discriminates by criminalizing the unlawful reentry of only Latinx individuals. The government's approach would require review of such a

law under the rational basis standard, which is clearly wrong. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505–06, 509 (2005) (explaining that express racial classifications are "immediately suspect" and subject to strict scrutiny (citation omitted)). This case is no different, except Section 1326 is not so explicit. Like facially discriminatory laws, facially neutral laws enacted with a discriminatory purpose are subject to heightened scrutiny. *Arlington Heights*, 429 U.S. at 265. In both cases, the Court should adhere to traditional equal protection standards of review.

There is no precedent applying rational basis review to race-based equal protection challenges to immigration-related laws. *See* Opening Br. 21–23. The cases applying rational basis review are all distinguishable. The Ninth Circuit has applied rational basis review in some equal protection cases, but those involved classifications that do not trigger heightened scrutiny under the traditional equal protection framework. *See Ayala-Bello*, 995 F.3d at 714; *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017); *Ruiz-Chairez*, 493 F.3d at 1091; *Lopez-Flores*, 63 F.3d at 1473; *Barajas-Guillen*, 632 F.2d at 753. Similarly, the cases in which the Supreme Court has applied rational

basis review have not involved a race-based equal protection challenge or criminal law. *See Fiallo*, 430 U.S. 787; *Hawaii*, 138 S. Ct. 2392. The government could not cite in its opening brief to a single case applying rational basis review to a race-based equal protection challenge in the immigration context.

This Court should not use the plenary power doctrine to break new ground, given its legacy of racism. Racism against Asian immigrants formed the basis for the plenary power doctrine and much of modern immigration law. Racism against Asian Americans and other immigrant communities persists today, as evidenced by systemic and interpersonal violence against members of those communities. *See, e.g.*, Asian Americans Advancing Justice – Asian Law Caucus, *Community-Led Solutions to Anti-Asian Hate Violence* (Sept. 20, 2021), https://www.advancingjustice-alc.org/news-resources/perspectives/community-led-solutions-to-anti-asian-hate-violence; Asian Americans Advancing Justice – Los Angeles, *AAPIs Behind Bars: Exposing the School to Prison to Deportation Pipeline*, https://archive.advancingjustice-la.org/media-and-publications/publications/aapis-behind-bars-exposing-school-prison-deportation-

pipeline (last visited Mar. 20, 2022). Because of these real dangers—

and the history of racism on which the plenary power doctrine is built—

the Court should decline to extend the doctrine into new territory.

## CONCLUSION

For the reasons above, the Court should not apply the plenary power doctrine to this case.  The plenary power doctrine is rooted in racism and should be limited in scope, if not discarded altogether.  The Court should not extend the doctrine to shield a criminal law from normal constitutional review.  Instead, the Court should analyze Section 1326 under the ordinary equal protection framework and apply the *Arlington Heights* standard.

Respectfully submitted.

DATED:  April 15, 2022

By: */s/ Bradley S. Phillips*
Bradley S. Phillips

<table>
<tr><td>
Bradley S. Phillips<br>
MUNGER, TOLLES & OLSON LLP<br>
350 S. Grand Ave., 50th Floor<br>
Los Angeles, CA 90071<br>
(213) 683-9100<br>
brad.phillips@mto.com
</td><td>
Sarah Weiner*<br>
MUNGER, TOLLES & OLSON LLP<br>
601 Massachusetts Ave. NW<br>
Suite 500E<br>
Washington, DC 20001<br>
(202) 220-1141<br>
sarah.weiner@mto.com<br><br>
*Admitted in New York only; Practicing under the supervision of District of Columbia Bar members
</td></tr>
</table>

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s):** 21-10233

    I am the attorney or self-represented party.

    **This brief contains 6,971 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
       [ ] it is a joint brief submitted by separately represented parties;
       [ ] a party or parties are filing a single brief in response to multiple briefs; or
       [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** */s/ Bradley S. Phillips*         **Date:** April 15, 2022