No. 21-10233

# In the United States Court of Appeals for the Ninth Circuit

---

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLANT

*v.*

GUSTAVO CARRILLO-LOPEZ,
DEFENDANT-APPELLEE

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA (CR. NO. 20-26)
(THE HONORABLE MIRANDA M. DU)*

---

**BRIEF OF IMMIGRATION SCHOLARS AS AMICI CURIAE
SUPPORTING APPELLEE AND AFFIRMANCE**

---

AMANDA VALERIO
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
*2001 K Street NW
Washington, DC 20006
(202) 223-7300*

ALEXIA D. KORBERG
MELINA MENEGUIN LAYERENZA
PATRICK MCCUSKER
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
akorberg@paulweiss.com*

# TABLE OF CONTENTS

Page

Interest of Amici Curiae ........................................................................1

Introduction and summary of argument...............................................2

Argument ...............................................................................................4

I.    Racial animus infects the origins of Section 1326......................4

     A.    A "nativist" coalition aimed to restrict
non-white immigration as Mexican immigrants
settled into community life...............................................4

     B.    The National Origins Act of 1924 advanced a racist
conception of immigration but failed to fully achieve the
nativists' anti-Mexican goals............................................7

     C.    Congressional debates on Mexican immigration reveal
widespread racism against Mexicans .............................12

     D.    The criminal entry and reentry provisions were crafted in
1929 to "control" the "Mexican problem".......................15

II.   The 1952 reenactment and recodification
of the criminal entry and reentry provisions
did not cure their original discriminatory purpose .................19

     A.    Anti-Mexican racial animus still infected
immigration policy by 1952 ............................................19

     B.    The 1952 Act failed to reconsider, let alone purge, the
racial animus of the criminal entry and reentry provisions.........24

     C.    The post-1952 history confirms that the racist intent of
the 1929 statute remained relevant after recodification ..............30

Conclusion.............................................................................................32

# TABLE OF AUTHORITIES

Page

## CASES

*N.C. State Conf. of NAACP* v. *McCrory*,
831 F.3d 204 (4th Cir. 2016)................................................27

*Ramos* v. *Louisiana*, 140 S. Ct. 1390 (2020)........................2, 24, 32

## STATUTES

8 U.S.C. § 1325 ..............................................................*passim*

8 U.S.C. § 1326 ..............................................................*passim*

Act of March 8, 1903,
Pub. L. No. 57-162, 32 Stat. 1213 ....................................5

Act of March 4, 1929,
Pub. L. No. 70-1018, ch. 690, §§ 1–2, 45 Stat. 1551 ...........*passim*

Emergency Immigration Act of 1921,
Pub. L. No. 67-5, 42 Stat. 5............................................5, 6

Immigration Act of 1882,
Pub. L. No. 47-376, 22 Stat. 214 (1882)...........................5

Immigration Act of 1917,
Pub. L. No. 64-301, 39 Stat. 874 ....................................5

Immigration Act of 1924,
Pub. L. No. 68-139, 43 Stat. 153 ....................................7, 8

Immigration and Nationality (McCarran-Walter) Act,
ch. 477, § 276, 66 Stat. 229 (1952)...............................*passim*

## CONGRESSIONAL AND EXECUTIVE AGENCY MATERIALS

28 Cong. Rec. 2816–17 (1896). .........................................4, 5

69 Cong. Rec. 2817–18 (1928). ....................................11, 17, 18

Congressional and Executive Materials—continued:

71 Cong. Rec. 2946–2947 (1929) ..................................................15, 16

*Agricultural Labor Supply: Hearings on S.J. Res. 86 Before the
S. Comm. On Agriculture & Forestry*, 71st Cong. (1930) ..........................14

*Department of Justice Appropriation Bill for 1948: Hearings
Before the H. Comm. on Appropriations*, 80th Cong. (1947)......................21

Robert F. Foerster, Report Submitted to the U.S. Dep't of
Labor, *The Racial Problems Involved in Immigration from
Latin America and the West Indies to the United States*
(1925) ................................................................................................16, 17

*Immigration and Naturalization: Hearing Before the S.
Subcomm. on Immigr. of the S. Comm. on the Judiciary*,
80th Cong. (1948) ..............................................................................29, 30

*Immigration from Countries of the Western Hemisphere:
Hearings on H.R. 6485 et al. Before the H. Comm. on
Immigr. & Naturalization*, 70th Cong. (1930) ...............................14

*Immigration from Latin America, the West Indies, and
Canada: Hearings Before the H. Comm. on Immigr. &
Naturalization*, 68th Cong. (1925) ...........................................16, 17

*Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the
House and Senate Subcomms. of the Comms. on the
Judiciary*, 82d Cong. (1951) ..........................................................29

President's Commission on Immigration and Naturalization,
*Whom We Shall Welcome* (1953) .............................................25, 26

President's Commission on Migratory Labor,
*Migratory Labor in American Agriculture* (1951)....................20, 21, 26, 27

*Restriction of Western Hemisphere Immigration:
Hearings on S. 1296, S. 1437, and S. 3019
Before the S. Comm. on Immigr.*, 70th Cong. (1928) ...............................9, 12

Congressional and Executive Agency Materials—continued:

S. Res. 137, 80th Cong. (1947) ..............................................................22

S. Rep. No. 81-1515 (1950) ............................................................23, 24

*Seasonal Agricultural Laborers from Mexico:*
    *Hearings on H.R. 6741, H.R. 7559, and H.R. 9036*
    *Before the H. Comm. on Immigr. & Naturalization,*
    69th Cong. (1926) ..............................................11, 13, 14, 15, 18

*Special Message to the Congress on the Employment*
    *of Agricultural Workers from Mexico,*
    1 Pub. Papers 390–93 (July 13, 1951) ..........................................27

*The Eugenical Aspects of Deportation: Hearings Before the H.*
    *Comm. on Immigr. & Naturalization,* 70th Cong. (1928) ..................12, 13

*Veto of Bill to Revise the Laws Relating to*
    *Immigration, Naturalization and Nationality,*
    1 Pub. Papers 441–45 (June 25, 1952) ..........................................25

## BOOKS, PERIODICALS, AND WEBSITES

James J. Davis, *Selective Immigration* (1925)......................................16

James J. Davis, *The Iron Puddler: My Life in the Rolling Mills*
    *and What Came of It* (1922) ........................................................16

Ingrid V. Eagly, *Prosecuting Immigration,*
    104 Nw. U. L. Rev. 1281 (2010).................................28, 29, 30, 31

Ingrid V. Eagly, *The Movement to Decriminalize Border*
    *Crossing,* 61 B.C. L. Rev. 1967 (2020)...............................30, 31, 32

Eric S. Fish, *Race, History, and Immigration Crimes,*
    107 Iowa L. Rev. 1051 (2022).................................12, 13, 18, 19, 28

David Gutiérrez, *Walls and Mirrors: Mexican Americans,*
    *Mexican Immigrants, and the Politics of Ethnicity* (1995) .............. *passim*

iv

Books, Periodicals, and Websites—continued:

John Higham, *Strangers in the Land: Patterns of American Nativism, 1860–1925* (1988) .........................................................5, 7

Richard Tait Jarnagin, *The Effect of Increased Illegal Mexican Migration Upon the Organization and Operation of the United States Immigration Border Patrol, Southwest Region* (1957) (M.S. thesis, University of Southern California)..............................21

S. Deborah Kang, *The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917–1954* (2017)............................20, 21, 22

Doug Keller, *Re-Thinking Illegal Entry and Re-Entry,* 44 Loy. U. Chi. L.J. 65 (2012).................................................................28, 29

*Laughlin's Model Law*, Harry Laughlin and Eugenics: A Selection of Historical Objects from Harry H. Laughlin Papers, Truman State University, https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/ (last visited Apr. 15, 2022)............................12

Erika Lee, *America for Americans: A History of Xenophobia in the United States* (2019).....................................................7, 22

Kenneth Wayne Mixon, *The Senatorial Career of Coleman Blease* (1967) (M.A. thesis, University of South Carolina) ........................15

John M. Murrin et al., *Liberty, Equality, Power: A History of the American People, Volume 2: Since 1863* (7th ed. 2015)..............................................................................8

Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the United States, 1921–1965*, 21 L. & Hist. Rev. 69 (2003).............................6, 7

Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (2004).......................................................*passim*

Books, Periodicals, and Websites—continued:

Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants out of America* (2019)...............................................18

Mark Reisler, *Always the Laborer, Never the Citizen: Anglo Perceptions of the Mexican Immigrant During the 1920s,* 45 Pacific Hist. Rev. 231 (1976)...................................................13, 14

George J. Sánchez, *Becoming Mexican American: Ethnicity, Culture, and Identity in Chicano Los Angeles, 1900–1945* (1993) ........................................................................6

Paul Schuster Taylor, *An American-Mexican Frontier, Nueces County, Texas* (1971)..........................................................14

Isaac Stanley-Becker, *Who's Behind the Law Making Undocumented Immigrants Criminals? An 'Unrepentant White Supremacist.'*, Wash. Post, June 17, 2019, http://www.washingtonpost.com/nation/2019/06/27/julian-castro-beto-orourke-section-immigration-illegal-coleman-livingstone-blease/...................................15, 16

Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (2002) ...........................................4, 5, 6, 7

Hans P. Vought, *The Bully Pulpit* (2004)...........................................16

Devra Weber, *Dark Sweat, White Gold: California Farm Workers, Cotton, and the New Deal* (1994) .................................9, 10

## INTEREST OF AMICI CURIAE

Amici are experts on U.S. immigration laws.[1] Ingrid Eagly is Professor of Law and Faculty Director of the Criminal Justice Program at UCLA School of Law. David G. Gutiérrez is Professor of History at UC San Diego. Mae Ngai is the Lung Family Professor of Asian American Studies and Professor of History at Columbia University. George J. Sánchez is Professor of American Studies & Ethnicity and History at University of Southern California. Daniel Tichenor is the Philip H. Knight Chair of Social Science, a professor of Political Science, and director of the Wayne Morse Center's Program on Democratic Governance at University of Oregon. Devra Weber is Professor Emerita of History at UC Riverside.

As leading immigration scholars, Amici have a professional interest in ensuring that the Court is fully and accurately informed regarding the history behind the criminal reentry provision under which Appellee was indicted.

---

[1] Amici state that no counsel for any party authored this brief in whole or in part; no counsel or party contributed money intended to fund the preparation or submission of this brief; and no person other than Amici or their counsel contributed money intended to fund its preparation or submission. All parties have consented to this brief's filing.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government indicted Appellee Carrillo-Lopez under 8 U.S.C. § 1326, a statute enacted in 1929 to solve "the Mexican problem" by criminalizing unauthorized reentry after deportation from the United States. Like its misdemeanor companion provision, 8 U.S.C. § 1325, Section 1326 was designed to target people crossing the Southwest border, rather than Europeans who overstayed their visas. Both statutes authorize extraordinarily harsh results against those who cross by land, who are overwhelmingly Mexican immigrants.

In this brief, Amici describe the unambiguously racist intentions of the legislators who drafted Sections 1325 and 1326. In reviewing this appeal, this Court must acknowledge those disturbing origins in light of the "imperative to purge racial prejudice from the administration of justice." *Ramos* v. *Louisiana*, 140 S. Ct. 1390, 1418 (2020) (Kavanaugh, J., concurring in part) (citation and quotation marks omitted).

In Part I, Amici discuss the context surrounding the entry and reentry provisions' enactment through the Act of March 4, 1929 ("1929 Act"). Amici first describe early legislative efforts by the Nativists—a political faction that opposed non-white immigration—to curb the entry and settlement of Mexicans. Amici then recount how the Nativists enacted highly restrictive immigration legislation in 1924, but failed to curtail Mexican immigration due

to opposition from agribusiness, a burgeoning industrialist constituency in the Southwest that depended economically on Mexican migrant workers. Instead, the two factions brokered a compromise that became the 1929 Act. That statute criminalized unauthorized entry and reentry to further the Nativists' racist goal of preventing long-term Mexican immigration while preserving agribusiness's access to low-cost workers. The 1929 Act was conceived to protect the "desirable character of citizenship" from being tainted by Mexican immigrants, whom the Nativists (and even the agribusiness constituency) saw as an inherently inferior and undesirable racial group.

In Part II, Amici address the reenactment of Sections 1325 and 1326 in the McCarran-Walter Act of 1952 ("1952 Act"), and explain why it did not cure those provisions' original constitutional infirmity. Indeed, the history confirms not only that Congress failed to purge the racial animus traceable to the 1929 Act, but also that the same racist intent to exclude Mexicans infected the reenactment. Unsurprisingly, the 1952 Act's only material revisions made unauthorized reentry easier to prosecute. Congress's continued failure to grapple with the racist history of Sections 1325 and 1326 makes the legislative history discussed here a relevant evidentiary source bearing on the constitutionality of those provisions.

The district court correctly concluded that the Government violated appellee's constitutional rights by indicting him under a statute tainted by racial prejudice. The judgment below should be affirmed.

## ARGUMENT

## I. RACIAL ANIMUS INFECTS THE ORIGINS OF SECTION 1326

The statutes criminalizing unauthorized entry (§ 1325) and reentry after deportation (§ 1326) trace their origins to the 1920s. The contemporaneous congressional debates establish that legislators saw Mexican immigrants as a "social problem" that threatened white hegemony. This perception was the animating motivation behind the 1929 Act as a whole, and the criminal entry and reentry provisions in particular.

### A. A "Nativist" Coalition Aimed To Restrict Non-White Immigration As Mexican Immigrants Settled Into Community Life

Since the 1890s, a group of white lawmakers known as the "Nativists" had been pushing an agenda that demonized all immigrants from anywhere other than certain favored European countries. Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* 174–75 (2002); Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 26 (2004) [hereinafter Ngai, *Impossible*]. Early on, the Nativists championed a literacy requirement that they expected would be particularly onerous for eastern and southern Europeans and the "hurtful and undesira-

4

ble" "birds of passage" who engaged in seasonal work (such as Mexican immigrants). *See* 28 Cong. Rec. 2816–17 (1896) (speech by Sen. Henry Cabot Lodge); Tichenor, *supra*, at 126, 184. By contrast, the Nativists anticipated that the literacy requirement would minimally impact English speakers and their "most closely related" and "desirable" "kindred races," such as Germans, Scandinavians, and French. 28 Cong. Rec. 2817 (1896); Tichenor, *supra*, at 126.

By the early 1920s, the Nativists achieved significant, if partial, legislative victories in their quest for American racial homogeneity. The first was the Immigration Act of 1917 ("1917 Act"), which implemented the literacy test previously vetoed by three Presidents, excluded immigrants from most of Asia,[2] and imposed an increased entrance "head tax" on all immigrants.[3] Pub. L. No. 64-301, 39 Stat. 874; Ngai, *Impossible*, *supra*, at 19; John Higham, *Strangers in the Land: Patterns of American Nativism, 1860–1925*, at 193 (1988). The second was the Emergency Immigration Act of 1921,

---

[2] Expanding existing restrictions under the Chinese Exclusion laws, the 1917 Act created a "barred Asiatic zone" from Afghanistan to the Pacific, with exceptions for the Philippines—a U.S. territory—and Japan—where laborer migration was already restricted under a U.S.-Japan diplomatic agreement. Ngai, *Impossible*, *supra*, at 36.

[3] Since 1882, certain immigrants had to pay a head tax, but Mexican nationals had been exempted in 1903. Pub. L. No. 47-376, 22 Stat. 214, 214 (1882); Pub. L. No. 57-162, 32 Stat. 1213, 1213 (1903); *see also* Tichenor, *supra*, at 107, 185, 192.

which temporarily set an unprecedented annual cap on immigration and restricted the number of immigrants per country to 3% of the people from that country living in the United States as of the 1910 census. Pub. L. No. 67-5, 42 Stat. 5. But these temporary and relatively cabined measures were insufficient to mollify the Nativists, many of whom demanded a whites-only immigration system.

Meanwhile, at least one to one-and-a-half million Mexican immigrants steadily entered the United States between 1890 and 1929. David Gutiérrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* 40 (1995). In the 1900s and 1910s, immigration inspectors prioritized enforcement at seaports over land borders and largely ignored Mexican immigrants' entries. Mae M. Ngai, *The Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the United States, 1921–1965*, 21 L. & Hist. Rev. 69, 81–82 (2003) [hereinafter Ngai, *Career*]. Officials saw Mexican immigration as outside their purview and, in light of American employers' needs, left it to be regulated by labor market demand. *Id.*; *see also* George J. Sánchez, *Becoming Mexican American: Ethnicity, Culture, and Identity in Chicano Los Angeles, 1900–1945*, at 51–53 (1993).

Even as the 1917 Act generally imposed extensive entry requirements for immigrants, the Labor Secretary acceded to pressure from employers by

granting temporary waivers for Mexican laborers. Tichenor, *supra*, at 253. Unlike other aspiring immigrants, Mexicans neither had to submit to inspection at the border until 1919, nor had to pass a literacy test or pay an $8 head tax until 1921. *Id.*; *see also* Ngai, *Career*, *supra*, at 82, 85. But eventually, Mexicans not only became subject to all the 1917 Act's entry requirements (including a degrading health exam and separate visa fee)—they were singled out during inspection. After 1924, *only Mexicans* had to undergo bathing, naked inspection, and delousing and clothing fumigation with gasoline and other toxic chemicals (unless they arrived via first class rail). Ngai, *Career*, *supra*, at 85–86; Erika Lee, *America for Americans: A History of Xenophobia in the United States* 346 (2019).

Despite that harsh introduction, many Mexican migrants settled permanently and built families in American cities and rural areas. *See* Ngai, *Impossible, supra*, at 133; Gutiérrez, *supra*, at 45. The Nativists saw these burgeoning communities as threats. Emboldened in a climate of ascendant eugenics and Ku Klux Klan expansion, they sponsored increasingly racially restrictive immigration legislation in the 1920s. Higham, *supra*, at 264–99.

### B. The National Origins Act Of 1924 Advanced a Racist Conception of Immigration But Failed To Fully Achieve the Nativists' Anti-Mexican Goals

The Nativists next achieved a significant victory by enacting the National Origins Act of 1924 ("1924 Act"), which aimed to reshape the composi-

tion of the immigrant pool to exclude immigrants the Nativists considered "undesirables." Pub. L. No. 68-139, 43 Stat. 153; *see* Gutiérrez, *supra*, at 52–53.

The law excluded all Asian immigrants on grounds that they were ineligible for citizenship (including Japanese immigrants who were previously exempted from statutory restrictions); restricted immigration to 155,000 people a year; established temporary quotas on Eastern-Hemisphere immigration pegged to 2% of the U.S. population from each country as of the 1890 census;[4] and mandated permanent immigration caps by 1927 styled as "quotas" based on "national origins." Ngai, *Impossible*, *supra*, at 21–23, 36.

While the 1924 Act's limitations on non-European immigration were draconian, the Nativists had pushed for *even greater* restrictions. The 1924 Act ultimately did not numerically limit Western-Hemisphere immigration only because the Southwestern economy depended on Mexican immigrant workers. *Id.* at 49–50.

---

[4]    By setting immigrant caps based on U.S. statistics from 1890 rather than 1910, Nativists sought to undo a recent demographic shift in European immigration:  The 1890 baseline favored certain groups (such as British, Germans, and Scandinavians) over others that the Nativists thought less desirable (such as Italians, Greeks, and Poles).  Ngai, *Impossible*, *supra*, at 21; John M. Murrin et al., *Liberty, Equality, Power: A History of the American People, Volume 2: Since 1863*, at 659 (7th ed. 2015).

By the turn of the twentieth century, places like California and Texas required "a massive infusion of labor" due to railroad expansion and the growth of specialized irrigated agriculture, mining, and construction. Gutiérrez, *supra*, at 42–43. But white American itinerant labor was declining, and restrictionist immigration policies since the 1880s had already cut off labor immigration from China and Japan. *Id.* at 43–44; Ngai, *Impossible*, *supra*, at 50. Testifying for himself and livestock raisers' associations before Congress, California rancher Fred Bixby lamented: "[W]e have no Chinamen, we have not the Japs. The Hindu is worthless; the Filipino is nothing, and the white man will not do the work." *Restriction of Western Hemisphere Immigration: Hearings on S. 1296, S. 1437, and S. 3019 Before the S. Comm. on Immigr.*, 70th Cong. 24, 26 (1928) [hereinafter *Restriction*].

Southwestern agribusiness therefore strenuously opposed any Western-Hemisphere quota that may have interfered with their labor supply. By the late 1920s, Mexican immigrants constituted a substantial proportion of the low-wage workforce in the Southwest, accounting for 65 to 85% of workers cultivating vegetables, fruit, and truck crops; more than 50% of workers in the sugar-beet industry; 60% of common labor in mining; and 60 to 90% of regional railroads' track crews. Gutiérrez, *supra*, at 45. As the manager of the Agricultural Committee of the Los Angeles Chamber of Commerce put it, "[w]e are totally dependent … upon Mexico for agricultural and indus-

9

trial common or casual labor. It is our only source of supply." *See* Devra Weber, *Dark Sweat, White Gold: California Farm Workers, Cotton, and the New Deal* 35 (1994). Faced with pro-business opposition and foreign-policy concerns about what a quota would do to inter-American governmental cooperation, the proponents of Western-Hemisphere quotas lost in the Senate 60 to 12. Ngai, *Impossible*, *supra*, at 48–50.

As an alternative, some Nativists called for the application of the 1924 Act's racial ineligibility-for-citizenship bar to Mexicans. At the time, only "free white persons" and "persons of African nativity or descent" were statutorily eligible for naturalized citizenship. *Id.* at 37. But Mexican nationals had been naturalized *en masse* after the Mexican-American war.[5] *Id.* at 50. And because they had been deemed citizenship-eligible then, Mexicans were effectively categorized as white for naturalization purposes. Moreover, revisiting the issue in the 1920s would have posed administrability challenges. As Labor Secretary James Davis observed, "[t]he Mexican people are of such a mixed stock and individuals have such a limited knowledge of their racial

---

[5]  The 1848 Treaty of Guadalupe Hidalgo, which governed Mexico's defeat in the Mexican-American War, stipulated that certain inhabitants of the ceded territory automatically became U.S. citizens unless they either announced an intent to remain Mexican citizens or left the territory. Ngai, *Impossible*, *supra*, at 50.

composition" that it would be "practically impossible" "to determine their racial origin." *Id.* at 54.

Mexicans' "legal whiteness," such as it was, did not immunize them from the Nativists' racist stereotypes about the "colored races." *Id.* at 49–51, 54. For example, the president of the California Commission of Immigration and Housing, Edward Hanna, said: "Mexicans as a general rule become a public charge under slight provocation" and "are very low mentally and are generally unhealthy," traits he attributed to his belief that Mexicans "are for the most part Indians." *Id.* at 53 (citation omitted). Similarly, Congressman John C. Box described Mexicans as a "blend" of "low-grade Spaniard, peonized Indian, and negro slave mixe[d] with negroes, mulattoes, and other mongrels, and some sorry whites, already here." 69 Cong. Rec. 2817–18 (1928). Unsurprisingly, he opined that "[t]he continuance of a desirable character of citizenship . . . will be violated by increasing the Mexican population of the country." *Seasonal Agricultural Laborers from Mexico: Hearings on H.R. 6741, H.R. 7559, and H.R. 9036 Before the H. Comm. on Immigr. & Naturalization*, 69th Cong. 124 (1926) [hereinafter *Seasonal Laborers*].

The 1924 Act, with its Western-hemisphere exception, did not assuage Nativists' concerns. One Congressman wondered: "What is the use of closing the front door to keep out undesirables from Europe when you permit

11

Mexicans to come in here by the back door by the thousands and thousands?" *Gutiérrez*, *supra*, 52–53.  And Mexicans continued to immigrate into the United States in significant numbers, prompting further Nativist backlash.

### C. Congressional Debates On Mexican Immigration Reveal Widespread Racism Against Mexicans

Though the Western-Hemisphere quotas failed, Congress considered bills to curtail Mexican immigration in 1926 and 1928 under the slogan "close the back door."  Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1067 (2022).  While those debates ostensibly pitted Nativists against agribusiness, both sides spoke of Mexican immigrants in openly racist terms.

The Nativists voiced their usual fears about the United States' shifting demographic composition.  For example, the Immigration Restriction League warned the Senate that "[o]ur great Southwest is rapidly creating for itself a new racial problem, as our old South did when it imported slave labor from Africa."  *Restriction*, *supra*, at 188.  And eugenicist Harry Laughlin[6] testified before the House that "[i]f we do not deport the undesirable individ-

---

[6]  Dr. Laughlin, the director of the Eugenics Record Office, was well known for designing a model sterilization law used by many regimes as a template, including Nazi Germany.  Ngai, *Impossible*, *supra*, at 24; *Laughlin's Model Law*, Harry Laughlin and Eugenics: A Selection of Historical Objects from Harry H. Laughlin Papers, Truman State University, https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.

ual, we can not get rid of his blood[] no matter how inferior it may be, because we can not deport his off-spring born here." *The Eugenical Aspects of Deportation: Hearings Before the H. Comm. on Immigr. & Naturalization*, 70th Cong. 45 (1928), *quoted in* Fish, *supra*, at 1072.

While the Southwestern agricultural lobby fought against proposals to curtail Mexican immigration, they accepted their racist premise. In 1926, lobbyist S. Parker Frisselle testified before Congress that "[w]e, gentlemen . . . are just as anxious as you are not to build the civilization of California or any other Western district upon a Mexican foundation." *Seasonal Laborers*, *supra*, at 7. "With the Mexican comes a social problem. . . . It is a serious one. It comes into our schools, it comes into our cities, and it comes into our whole civilization in California." *Id.* at 6–7.

Agribusiness disagreed with the Nativists on whether Mexican migrants intended to stay. Southwestern lobbyists believed the Mexican migrant was more like a "pigeon," who "goes home to roost" at the end of each season. *Seasonal Laborers*, *supra*, at 6, 10, 14. And they believed that settling Mexicans could easily be deported if necessary. *See* Mark Reisler, *Always the Laborer, Never the Citizen: Anglo Perceptions of the Mexican Immigrant During the 1920s*, 45 Pacific Hist. Rev. 231, 252 (1976).

Embracing racial animus, agribusiness also raised the specter of an influx of Filipino and Black Puerto Rican workers that might replace Mexi-

cans. *Id.* at 251. Agribusiness lobbyist George Clements warned that Puerto Ricans would pose a greater menace because "[w]hile they all have negro blood within their veins, the greater part of them are without those physical markings which can only protect society." *Id.* (citation omitted). And California Congressman Arthur M. Free lamented that "with [Filipinos] comes the sex problem. This is what make[s] the race problem become acute on the Pacific coast." *Id.* (citing *Agricultural Labor Supply: Hearings on S.J. Res. 86 Before the S. Comm. On Agriculture & Forestry*, 71st Cong. 84–85 (1930)). By contrast, agribusiness touted that Mexicans "do not intermarry like the negro with white people. They do not mingle. They keep to themselves. That is the safety of it." *Id.* at 252 (citing *Immigration from Countries of the Western Hemisphere: Hearings on H.R. 6485 et al. Before the H. Comm. on Immigr. & Naturalization*, 70th Cong. 61–69 (1930) (testimony of landowner Harry Chandler)).

While the two camps had their differences, the congressional debates show that both Nativists and agribusiness industrialists agreed that Mexican immigration presented a "social problem" to be managed. A Texas businessman put it plainly: "If we could not control the Mexicans and they would take this country, it would be better to keep them out, but we can and do control them." Paul Schuster Taylor, *An American-Mexican Frontier, Nueces County, Texas* 286 (1971). Frisselle likewise promised: "We, in Cali-

fornia, think we can handle that social problem" of permanent Mexican settlement. *Seasonal Laborers*, *supra*, at 6. For example, he highlighted an initiative to set up labor organizations that could shuffle immigrant workers across the state based on different crops' harvesting periods. *Id.* at 13–15. The program's goal was to get migrants "out of the congested areas" where they were "congregating" (like Los Angeles) and "keep them moving." *Id.* at 14–15.

### D.    The Criminal Entry And Reentry Provisions Were Crafted In 1929 To "Control" The "Mexican Problem"

By 1929, the Nativists believed the agricultural industry's assurances that it could "handle" the so-called Mexican "problem" were hollow. In stepped Senator Coleman Livingston Blease and his close ally Labor Secretary James Davis with a compromise that became the 1929 Act: criminalizing unauthorized immigration.

There can be no doubt that the two chief architects of the 1929 Act were racist. According to one biographer, Senator Blease exhibited a "Negro-phobia that knew no bounds." Kenneth Wayne Mixon, *The Senatorial Career of Coleman Blease* 5 (1967) (M.A. thesis, University of South Carolina). He infamously opposed a world court because it would require Anglo-Americans to "sit side by side with a full blooded '[n*****].'" *Id.* at 30. Another time, he attempted to introduce a formal resolution that included a poem titled "(N******) in the White House" to protest that the First Lady

15

had invited a congressman's African American wife to tea. Isaac Stanley-Becker, *Who's Behind the Law Making Undocumented Immigrants Criminals? An 'Unrepentant White Supremacist.'*, Wash. Post, June 17, 2019, http://www.washingtonpost.com/nation/2019/06/27/julian-castro-beto-orourke-section-immigration-illegal-coleman-livingstone-blease/; 71 Cong. Rec. 2946–2947 (1929). And Secretary Davis—an adherent of Dr. Laughlin's eugenics theories, *see* Hans P. Vought, *The Bully Pulpit* 173 (2004); *supra* pp. 12–13 & n.6—had warned of the "rat-men" arriving via the southern border who would jeopardize the American gene pool. James J. Davis, *The Iron Puddler: My Life in the Rolling Mills and What Came of It* 61 (1922). Like others, Davis criticized the 1924 Act for closing "the front door to immigration" while leaving the "back door wide open." James J. Davis, *Selective Immigration* 207 (1925).

After the 1924 Act became law, Davis sponsored a study by Princeton economics professor Robert Foerster on the "racial problems" of Latin American immigration, which was incorporated into the permanent records of the House Committee on Immigration and Naturalization. Robert F. Foerster, Report Submitted to the U.S. Dep't of Labor, *The Racial Problems Involved in Immigration from Latin America and the West Indies to the United States* (1925); *Immigration from Latin America, the West Indies, and Canada: Hearings Before the H. Comm. on Immigr. & Naturalization,*

16

68th Cong. 303–38 (1925) [hereinafter *Latin America*]. In his report, Professor Foerster provided a racial analysis of Mexico and other Latin American countries, finding that most of their inhabitants were Indian, Black, or mixed race, all of which he described as "dubious race factor[s]." *Latin America*, *supra*, at 334–35. He strongly recommended curtailing further southern immigration because "a race element or unit is added into the race stock of the country" when an immigrant is admitted. *Id.* at 335.

In 1929, Senator Blease and Secretary Davis saw an opportunity to curtail Mexican immigration through novel means. Their idea, which became the 1929 Act, would not restrict *authorized* immigration—as previously attempted—but instead would criminally punish *unauthorized* immigration. Unlawfully entering the United States would become a misdemeanor punishable by a $1,000 fine, up to one year in prison, or both. Act of March 4, 1929, Pub. L. No. 70-1018, ch. 690, § 2, 45 Stat. 1551. Unlawfully returning to the United States after deportation would be a felony punishable by a $1,000 fine, up to two years in prison, or both. *Id.* § 1(a). These provisions are now codified as Sections 1325 and 1326, respectively.

Senator Blease and Secretary Davis found likeminded legislators in the House of Representatives. One was Representative John C. Box, discussed above, who saw "the protection of American racial stock from further degradation or change through mongrelization" as the goal of immigration law. 69

17

Cong. Rec. 2817 (1928). Another was Representative Albert Johnson, Chair of the House Immigration and Naturalization Committee, who also headed the Eugenics Research Association. Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants out of America* 271, 326 (2019). Speaking in support of legislation that would have excluded the "Mexican race," Representative Johnson explained that while prior reform was economically motivated, now "the fundamental reason for it is biological." *Id.* at 3 (quoting Albert Johnson, *Immigration, a Legislative Viewpoint*, Nation's Bus., July 1923, at 26, 26).

Unlike in the past, agribusiness supported the 1929 Act; they liked the idea of taking advantage of inexpensive labor to meet "peak labor demands" while having "these laborers returned to their country" after the harvest. *See, e.g.*, *Seasonal Laborers*, *supra*, at 8. Sections 1325 and 1326 became law.

Notably, the 1929 Act did not contain any provision criminalizing the act of overstaying a nonimmigrant visa, a form of unauthorized immigration in which Europeans participated; it only authorized punishment for those who crossed by land, who were overwhelmingly Mexicans. In the first seven years after the 1929 Act's enactment, the government pursued over 40,000 prosecutions for entry and reentry crimes, with a roughly 90% conviction rate—the significant majority of them Mexicans. Fish, *supra*, at 1090.

Those prosecutions worked in conjunction with a government campaign to expel thousands of people based on their Mexican ethnicity. *Id.*

## II. THE 1952 REENACTMENT AND RECODIFICATION OF THE CRIMINAL ENTRY AND REENTRY PROVISIONS DID NOT CURE THEIR ORIGINAL DISCRIMINATORY PURPOSE

Anti-Mexican racial animus remained a driving force motivating immigration policy throughout the 1940s and 1950s. And while Congress recodified and reenacted the unauthorized entry and reentry provisions in 1952, it never purged the racial animus underlying them. In fact, the historical record unambiguously shows that Congress's actions affirmatively maintained the racist intent that had driven the enactment of Sections 1325 and 1326.

### A. Anti-Mexican Racial Animus Still Infected Immigration Policy By 1952

As many U.S. citizens enlisted during World War II, southwestern farmers faced severe domestic labor shortages. Ngai, *Impossible*, *supra*, at 135–37. In response, the U.S. and Mexican governments entered into agreements enabling migration of short-term Mexican contract laborers, known as braceros, under the auspices of the Bracero Program. *Id.* at 95, 138–39.

The Bracero Program represented "a momentous break with past policy and practice" because foreign contract labor had been outlawed in the mainland United States since 1885 and was either abolished or never instituted in U.S. territories. *Id.* at 137–38. Indeed, after the Civil War, contract

19

labor had generally been perceived as "unambiguously unfree" and hence, "like slavery," antithetical to the voluntary labor "upon which democracy depended." *Id.* By resorting to a long-rejected "colonial labor practice" considered unconscionable for all other people, the United States "racialized [Mexican workers] as a foreign people, an 'alien race' not legitimately present or intended for inclusion in the polity" who could therefore be subjected to "the legacies of slavery and conquest." *Id.* at 138. Nevertheless, the Bracero Program found many willing participants desperate for a higher income than they could earn in rural Mexico. *Id.* at 141.

Paradoxically, the Bracero program was thus a catalyst for a *spike* in unauthorized immigration into the United States. *Id.* at 147. First, many Mexicans did not qualify for the program, which accepted only young, healthy men with agricultural experience. S. Deborah Kang, *The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917–1954*, at 104 (2017). Second, the program excluded States that enforced racial segregation because Mexico objected to race discrimination against Mexican workers. Ngai, *Impossible*, *supra*, at 147. As a result, Texas, Arkansas, and Missouri growers "increasingly resorted to illegal labor during the 1940s." *Id.* Third, some braceros left their contracts because of inhumane work conditions that violated the terms of the Bracero Program, including severe underpayment, illegal pay deductions, threats, mistreatment, and serious

safety risks. *Id.* at 137–46; *see also* President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* 5, 69–88, 105, 130, 137 (1951) [hereinafter *Migratory Labor*]. Braceros who left their contracts but did not depart from the United States lost their immigration status. *Ngai*, *Impossible*, *supra*, at 147.

Facing growing unauthorized entries at the southern border, U.S. immigration and deportation policies became focused on Mexico. Kang, *supra*, at 103. Starting in the mid-1940s, the Border Patrol concentrated its personnel along the Mexican border, including by redeploying officers who had been stationed along the northern border. Richard Tait Jarnagin, *The Effect of Increased Illegal Mexican Migration Upon the Organization and Operation of the United States Immigration Border Patrol, Southwest Region* 91–92 (1957) (M.S. thesis, University of Southern California); *see also Department of Justice Appropriation Bill for 1948: Hearings Before the H. Comm. on Appropriations*, 80th Cong. 168 (1947). The United States also secured Mexico's cooperation to deport Mexican immigrants to the Mexican interior to ensure they could not easily return to the United States. Kang, *supra*, at 159–60.

As the U.S.-Mexico border was reshaped by these policies, national sentiment in and out of government coalesced around a stereotype of the "'wetback' as a dangerous and criminal social pathogen [that] fed the general

21

racial stereotype 'Mexican.'" Ngai, *Impossible*, *supra*, at 149. Within INS, a "conventional view" took hold "that illegal aliens were by definition criminal" because once "the 'wetback' starts out by violating a law . . . it is easier and sometimes appears even more necessary for him to break other laws." *Id.* Gradually, any effort to distinguish between the supposed characteristics of unauthorized entrants and the local population of Mexican descent was lost. *Id.* (citation omitted).

Meanwhile, the Senate Judiciary Committee convened a subcommittee to conduct a comprehensive study of the "history and development" of U.S. immigration policy and the "administration of our immigration and deportation laws, and practices thereunder." S. Res. 137, 80th Cong. (1947). The subcommittee's work, which would culminate in the 1952 Act's enactment, was heavily influenced by Senator Pat McCarran, who was well-known for his xenophobic and anti-Semitic views. *See* Lee, *supra*, at 227–28; Kang, *supra*, at 228 n.88. Senator McCarran had warned that "untold millions" were "storming our gates for admission" while "there are hard-core, indigestible blocks who have not become integrated into the American way of life." Lee, *supra*, at 227. He viewed the 1952 Act as necessary to preserve "this Nation, the last hope of Western civilization" against efforts (by foreigners) to "overrun, pervert[], contaminate[], or detroy[]" it. *Id.*

The Government seeks to portray the subcommittee's 925-page report as neutral and comprehensive; it was neither. While the report placed race front and center—opening its overview of the immigration system with a discussion of the "classification of races"—it did not call for reexamination of "the will of Congress to preserve" "a predominance of persons of northwestern European origin in the composition of [the] total population" through racialized national origin quotas. *See* S. Rep. No. 81-1515, at 7, 442–43 (1950). To the contrary, the report recognized that the 1920s legislation still in force was predicated on a congressional "belief in the necessity for the maintenance of a preponderance of strains" from earlier immigration waves "if the fundamental institutions of the Nation were to be preserved." *See id.* at 443. Openly acknowledging that this "sentiment . . . still prevail[ed]" in the lead-up to the 1952 Act, the report endorsed the existing system. *Id.* at 448. The report also highlighted the "increasingly difficult immigration problem" from the "tide of migrants" who entered the United States without authorization, including the "thousand illegal Mexican-border crossers" apprehended and deported each week. *Id.* at 25. And far from providing "a full and complete investigation of our entire immigration system," Gov. Br. at 6, the report barely made passing reference to the 1929 Act despite acknowledging that the illegal-entry offense was "the most widely used of all the criminal provisions of the law." S. Rep. No. 81-1515, at iii, 57–65, 646. Even the testimony

the subcommittee heard was "devoted, not so much to the [criminal immigration] law itself, but to difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area." *Id.* at 654. And while the subcommittee emphasized the need to streamline the existing provisions criminalizing reentry after deportation, it only recommended against increasing penalties for illegal entry or smuggling to prevent convictions from becoming harder to secure. *Id.* at 644–47. That was the extent of the subcommittee's grappling with the 1929 Act.

### B. The 1952 Act Failed To Reconsider, Let Alone Purge, The Racial Animus Of The Criminal Entry and Reentry Provisions

Although the 1952 Act recodified the criminal entry and reentry provisions, with some revisions, the anti-Mexican racist views that underpinned the 1929 legislation remained a motivating factor. The 1952 Act may have been "free of discriminatory taint" had Congress "actually confront[ed] [the 1929 Act's] tawdry past in reenacting it" and produced a law "untethered to racial bias." *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring). But Congress did neither.

The 1952 Act changed immigration law and policy in several ways, none of which meaningfully alleviated the impact of Sections 1325 and 1326 on the Mexican immigrants singularly burdened by them. First, Congress repealed the complete exclusion of Asian immigrants from naturalization but maintained quotas for them. Ngai, *Impossible*, *supra*, at 238. Second, the

1952 Act codified suspension of deportation for individuals who had been continually present in the country for seven years with spouses or children who were United States citizens. *Id.* at 239. Of the approximately 35,000 suspensions of deportation from 1941–1960, nearly three-quarters were of Europeans; only 8% involved Mexicans. *Id.* at 88 & n.120.

The 1952 Act also "brought the many fragments of the nation's immigration and naturalization laws under a single code." Ngai, *Impossible*, *supra*, at 237. Still, it was "less an overhaul than a hardening of existing policy, with a few reforms and innovations tailored for the Cold War." *Id.* Indeed, the 1952 Act only reinforced the 1929 debates' central view: that the arrival and assimilation of "aliens" who could undermine the uniformity of the United States' white "cultural background" was undesirable and posed a national-security threat. *Id.* at 237.

President Truman vetoed the 1952 Act because of its racist features, which dated back to the 1920s, and its "harsher restrictions" on relief from deportation. *See Veto of Bill to Revise the Laws Relating to Immigration, Naturalization and Nationality*, 1 Pub. Papers 441–45 (June 25, 1952). While his message did not specifically address Section 1326, President Truman invited Congress to "undertake a reassessment of our immigration policies and practices." *Id.* at 446. And the presidential commission he subsequently convened to do just that—in an explicit rebuke of Congress—found

25

that the 1952 Act "rests upon an attitude of hostility and distrust against all aliens" and "applies discriminations against human beings on account of national origin, race, creed and color." President's Commission on Immigration and Naturalization, *Whom We Shall Welcome* 263 (1953). The Commission's report also explicitly acknowledged that unauthorized immigration across the Southern border was "[o]ne of the most troublesome problems arising out of the administration of the immigration laws." *Id.* at 257. The Commission did not make further recommendations on that topic only because the President had already convened a separate commission focused on those issues. *Id.*

To be sure, neither presidential commission was immune from anti-Mexican bias. *Id.* (using pejorative term "wetbacks"); *see also, e.g.*, *Migratory Labor*, *supra*, at 52 (same). The Commission on Migratory Labor wrote at length about the "invasion" by Mexican migrants who enter unlawfully and, unlike official braceros, "often bring or acquire families" thereby "intensif[ying]" the "social complications" of immigration. *Migratory Labor*, *supra*, at 69–88. In that Commission's view, there was "little difficulty of prosecution and conviction" of Mexican migrants who violated the immigration laws, other than the volume of cases, but enforcement was inadequate against conspirators who transported, harbored, and concealed migrants. *Id.* at 86. To curtail unauthorized immigration, the Commission therefore rec-

ommended increased penalties for those offenses, the criminalization of hiring undocumented workers, and the elimination of paths to legalization for unauthorized Mexican migrants. *Id.* at 88. Far from taking a pro-immigrant stance, President Truman endorsed those recommendations. *See Special Message to the Congress on the Employment of Agricultural Workers from Mexico*, 1 Pub. Papers 390–93 (July 13, 1951). However, President Truman's own expressions of racial animus do not change the most salient fact: His veto put Congress on notice—if it was not already—that the 1952 Act was infected by the racism of its legislative predecessors.

Nonetheless, untroubled by the infirmities highlighted by President Truman, Congress declined to reassess the immigration system. To the contrary, it openly embraced the discriminatory features of the 1952 Act by overwhelmingly overriding President Truman's veto. That explicit commitment to retaining racist provisions should dispel any notion that Congress simultaneously intended to confront and purge the racism from predecessor statutes, including the 1929 Act that introduced the unauthorized reentry provision. *See N.C. State Conf. of NAACP* v. *McCrory*, 831 F.3d 204, 223–24 (4th Cir. 2016) ("A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose."), *cert. denied*, 137 S. Ct. 1399 (2017).

Unsurprisingly, the same Congress that preserved and *renewed* the 1920s-era racist quotas took no steps to purge the taint of racism inherent in the criminal entry and reentry laws. Indeed, the 1952 Act made no substantive changes to ameliorate those provisions' original racist purpose. *See* Immigration and Nationality (McCarran-Walter) Act, ch. 477, § 276, 66 Stat. 229 (1952); *see also* Ingrid V. Eagly, *Prosecuting Immigration*, 104 Nw. U. L. Rev. 1281, 1326–27 (2010) [hereinafter Eagly, *Prosecuting*]; Doug Keller, *Re-Thinking Illegal Entry and Re-Entry*, 44 Loy. U. Chi. L.J. 65, 83 (2012); Fish, *supra*, at 1099. Rather, the 1952 Act's changes made unlawful entry and reentry easier to prosecute, thereby exacerbating rather than diminishing their racially discriminatory harm.

As to reentry, Congress carried forward a streamlined general provision that resembled the 1929 Act's version of Section 1326, and eliminated specific reentry provisions targeting those deported for involvement in anarchism and prostitution. Keller, *supra*, at 84. Additionally, the criminal reentry provision was amended to make prosecution *easier* by penalizing being "found in" the United States after deportation (unless the Attorney General grants permission to return). *Id.* at 84–85 & nn.99–100. Because the Sixth Amendment requires criminal defendants to be tried in the district in which the "crime shall have been committed," prosecutors previously had to determine where a defendant actually reentered. *Id.* at 85. As the relevant

committee report explained, the 1952 Act tweaked the definition of the offense to facilitate prosecution where "it is not possible" for the INS "to establish the place of reentry, and hence the proper venue" to try "a deported alien under the 1929 act." *See Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the H. & S. Subcomms. of the Comms. on the Judiciary*, 82d Cong. 716 (1951). Going forward, defendants could be tried wherever they were found.

Similarly, a revision to the unauthorized entry provision not at issue here made the statute less harshly punitive on the surface but actually facilitated conviction and deprived defendants of procedural protections. The 1952 Act turned unauthorized entry without a previous deportation order into a petty offense by reducing the maximum imprisonment penalty from one year to six months. Eagly, *Prosecuting*, *supra*, at 1326; Keller, *supra*, at 83–84 & n.94. The reduced penalty and petty-crime classifications, which were retained through subsequent reenactments, stripped defendants of their right to a jury trial and eventually allowed bench trials to proceed before magistrate judges rather than Article III judges. Eagly, *Prosecuting*, *supra*, at 1326–27 & n.268; Keller, *supra*, at 84. Indeed, circumventing juries was the point: Congress had recently learned that 1940s grand juries in El Paso refused to indict in more than 90% of cases because the criminal entry laws were "locally unpopular." Eagly, *Prosecuting*, *supra*, at 1327 & n.269

29

(quoting *Immigration and Naturalization: Hearing Before the S. Subcomm. on Immigr. of the S. Comm. on the Judiciary*, 80th Cong. 30 (1948)).

Together, the 1952 amendments laid the groundwork for the enduring and massive prosecution of illegal entries and reentries. *See* Eagly, *Prosecuting*, *supra*, at 1281–82, 1353 & fig.4; Ingrid V. Eagly, *The Movement to Decriminalize Border Crossing*, 61 B.C. L. Rev. 1967, 1984 & fig.2, 1988 & tbl.1 (2020) [hereinafter Eagly, *Movement*].

### C. The Post-1952 History Confirms That The Racist Intent Of The 1929 Statute Remained Relevant After Recodification

The inhumane treatment of Mexican immigrants at the border continued and intensified after the 1952 Act's enactment. In 1954, President Eisenhower appointed retired Army General Joseph Swing as INS Commissioner to focus on the agency's militarization. Ngai, *Impossible*, *supra*, at 154. According to Swing, the "'alarming, ever-increasing, flood tide' of undocumented migrants from Mexico constituted 'an actual invasion of the United States'" that necessitated a reciprocal response. *Id.* at 155 (citation omitted).

The government responded with "Operation Wetback," an intensive law enforcement campaign designed as a "direct attack ... upon the hordes of aliens facing [the United States] across the border." *Id.* at 155. Under that Operation, the INS redirected resources from the northern and eastern districts to the southern border and deployed Border Patrol officers, vehi-

cles, airplanes, and other equipment to sweep across the southwestern United States performing raids and mass deportations. *Id.* The policy of discouraging illegal reentry by relocating apprehended migrants "far into" the Mexican interior also continued in full force. *Id.* at 156.

"Operation Wetback" resulted in mass deportations on an enormous scale. Between 1953 and 1955, the INS reported capturing 801,069 Mexican immigrants—twice the apprehensions from 1947 through 1949. *Id.* (citation omitted). General Swing also sought to build a fence along sections of the California and Arizona borders to deter "the illegal migration of 'disease-ridden' women and children whom he said comprised over 60 percent of those entering surreptitiously after Operation Wetback." *Id.*

Criminal entry and reentry prosecutions also surged during this period. Eagly, *Prosecuting*, *supra*, at 1352–53. In what the Attorney General called the "wet-back" cases, thousands of laborers were criminally charged, served little if any jail time, and were sent back across the Southwest border. *Id.* at 1352. In Arizona, the U.S. Attorney's Office instituted a zero-tolerance policy of prosecuting *all* unauthorized border crossers. *Id.* Unauthorized entry quickly became the most prosecuted crime on the entire federal docket, and such prosecutions have only increased since. *Id.*; *see also* Eagly, *Movement*, *supra*, at 1984. Likewise, unauthorized reentry prosecutions

have increased precipitously since the early 2000s. Eagly, *Movement*, *supra*, at 1988 & tbl.1.

*     *     *     *     *

Sections 1325 and 1326 have remained virtually unchanged since their tainted enactment. Congress's repeated failure to grapple with the "sordid history" of those provisions makes clear that their original intent remains a motivating factor behind them to this day. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring).

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ Alexia D. Korberg   

AMANDA VALERIO
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
   *2001 K Street NW*
   *Washington, DC 20006*
   *(202) 223-7300*

ALEXIA D. KORBERG
MELINA MENEGUIN LAYERENZA
PATRICK MCCUSKER
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
   *1285 Avenue of the Americas*
   *New York, NY 10019*
   *(212) 373-3000*
   *akorberg@paulweiss.com*

APRIL 15, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-10233 |

I am the attorney or self-represented party.

**This brief contains** | 6,998 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Alexia D. Korberg | **Date** | Apr 15, 2022 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

## CERTIFICATE OF SERVICE

I, Alexia D. Korberg, counsel for amici curiae and a member of the Bar of this Court, certify that, on April 15, 2022, a copy of the attached Brief of Immigration Scholars as Amici Curiae was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Alexia D. Korberg
ALEXIA D. KORBERG