No. 21-10233

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

On Appeal from the United States District Court
for Nevada
Case No. 3:20-cr-00026-MMD-WGC
The Honorable Miranda M. Du

BRIEF OF AMICI THE AOKI CENTER FOR CRITICAL RACE AND
NATION STUDIES, THE CENTER FOR IMMIGRATION LAW AND
POLICY, AND THE SOUTHERN POVERTY LAW CENTER

*Filed In Support of Defendant-Appellee and Affirmance*

Ahilan Arulanantham
UCLA School of Law
385 Charles E. Young Dr. E.
Los Angeles, CA 90095
(310) 825-1029

Eric Fish
Acting Professor
UC Davis School of Law
400 Mark Hall Dr.
Davis, CA 95616
*Of Counsel*

Yaman Salahi
EDELSON PC
150 California St., 18th Floor
San Francisco, CA 94111
(415) 212-9300
*Counsel for Amici*

i

# TABLE OF CONTENTS

STATEMENT OF INTEREST ..................................................................1

INTRODUCTION ..................................................................................3

ARGUMENT ........................................................................................9

   A.   The Passage of Time Alone Does Not Cure a Law's Discriminatory Taint ...9

   B.   To Purge the Taint of Discrimination When Reenacting a Law, the Legislature Must Confront Its Discriminatory Past ...............................11

   C.   Neither The 1952 Congress Nor Later Modifications Cured Section 1326's Unconstitutional Purpose ......................................................................19

      1.   Congress in 1952 Did Not Engage With the 1929 Act's Motivations or Evaluate the Merits of the Illegal Reentry Laws ...............................19

      2.   Under Ramos, the 1952 Reenactment and Subsequent Modifications Do Not Purge the Illegal Reentry Statute's Discriminatory Taint .........................22

CONCLUSION ....................................................................................29

CERTIFICATE OF SERVICE .........................................................31

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ..............................................................3, 25

*Anderson v. Pacific Coast S.S. Co.*,
   225 U.S. 187 (1912) ...................................................................17

*Apodaca v. Oregon*,
   406 U.S. 404 (1972) ................................................................... 12

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015) .......................................................6

*Espinoza v. Montana Dept. of Revenue*,
   140 S. Ct. 2246 (2020) ......................................3, 5, 14, 16, 23, 24

*Finley v. United States*,
   490 U.S. 545 (1989) ...............................................................5, 18

*Fourco Glass Co. v. Transmirra Products Corp.*,
   353 U.S. 222 (1957) ...................................................................18

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ...................................................................10

*In re Mark Anthony Const., Inc.*,
   886 F.2d 1101 (9th Cir. 1989).....................................................18

*Johnson v. Governor of the State of Florida*,
   405 F.3d 1214 (11th Cir. 2005).....................................................26

*Johnson v. Louisiana*,
   406 U.S. 356 (1972) ...................................................................12

*Kimbrough v. United States*,
   552 U.S. 85 (2007) .....................................................................25

*Koch Foods, Inc. v. Sec'y, U.S. Dept. of Labor*,
    712 F.3d 476 (11th Cir. 2013)..................................................................18

*Lane v. Wilson*,
    307 U.S. 268 (1939) .............................................................................16

*Mendiola-Martinez v. Arpaio*,
    836 F.3d 1239 (9th Cir. 2016)................................................................9

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020) ..............................................................*passim*

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020)...................................................................2

*United States v. Fordice*,
    505 U.S. 717 (1992) .............................................................................17

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) .............................................................4, 7, 9, 29

*Wooden v. United States*,
    142 S. Ct. 1063 (2022) ...........................................................................6

*Zuber v. Allen*,
    396 U.S. 168 (1969) .............................................................................25

**Congressional Materials**

S. Rep. No. 81-1515 (1950)......................................................................21

**Other Authority**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation*
    *of Legal Texts* (2012) .........................................................................18

Eric S. Fish, *Race, History, and Immigration Crimes*,
    107 Iowa L. Rev. 1051 (2022),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3827488.............*passim*

W. Kerrel Murray, *Discriminatory Taint*,
135 Harv. L. Rev. 1192 (2022) ......................................................................17

**STATEMENT OF INTEREST**

*Amicus* The Aoki Center for Critical Race and Nation Studies ("Aoki Center") is a program of the University of California, Davis, School of Law. It was formed to critically examine legal issues through the lens of race, ethnicity, citizenship, and class. The Aoki Center seeks to advance civil rights, critical race theory, and immigration issues through furthering scholarly research on the intersection of race and the law, and thus has a significant interest in the issues discussed herein.

*Amicus* Center for Immigration Law and Policy, based at the UCLA School of Law, is a hub for immigration scholarship and advocacy. Founded in 2020, the Center generates innovative ideas at the intersection of immigration scholarship and practice. It then works to transform those ideas into meaningful changes in immigration policy at the local, state, and national levels. Among the Center's core areas of concern is the role that racism has played in structuring the immigration laws, both past and present. Faculty Co-Director Professor Hiroshi Motomura has written extensively on that subject and recently served as an expert witness in Congressional hearings on it. Faculty Co-Director Professor Ahilan Arulanantham has also worked extensively on that area. He remains counsel of record in a case of national importance concerning racism in the immigration laws.

*See Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). The Center therefore has a significant interest in addressing the important issue discussed here.

*Amicus Curiae* Southern Poverty Law Center ("SPLC") is a not-for-profit public interest law firm that is a catalyst for racial justice in the South and beyond, working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people, since its founding in 1971. SPLC litigates across the country on behalf of immigrants who are victims of civil rights abuses, and represents immigrants before immigration courts across the Deep South, many of whom have been prosecuted under 8 U.S.C. § 1326 for "illegal re-entry." SPLC respectfully submits this Brief to underscore the racist history behind the enactment of Section 1326 and how its reenactment does not cure the statute of its constitutional flaws.

No party or party's counsel authored this brief in whole or in part, and no person other than amici curiae, their members, or their counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

# INTRODUCTION[1]

To what extent do a legislature's discriminatory reasons for a facially neutral law continue to taint that law after its later reenactment by another legislature? The Supreme Court has recently spoken to this question, as have several concurring Justices. One principle emerges from these opinions: "racially discriminatory reasons" that motivated a legislative action "in the first place" continue to taint the legislation so long as they go "unexamined" by future legislatures. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020). In particular, "it emphatically does not matter whether [the legislature] readopted [a discriminatory] provision for benign reasons. The provision's 'uncomfortable past' must still be '[e]xamined.' . . . [to ensure] that the animus was scrubbed." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2273 (2020) (Alito, J., concurring). In other words, the legislature must "actually confront[] a law's tawdry past in reenacting it" if it seeks to wipe away the taint of discrimination. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2327 (2018) (original legislature's intent remains relevant even where subsequent legislature makes radical changes to the original law). Nothing

---

[1] This brief contains authorities and analysis not included in amici's brief in *United States v. Rodrigues-Barios*, No. 21-50145 (9th Cir.).

less than *conscious* consideration suffices to comply with the Constitution's anti-discrimination constraints.

How can a court determine whether a reenactment satisfies this standard? As Professor Eric Fish has explained, *Ramos*, *Espinoza* and other precedent concerning reenactment allow us to distinguish between "silent," "benign," and "conscious" reenactments. *See* Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1103-05 (2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3827488. "A silent reenactment is one that happens without substantive consideration—often for technical, organizational, or stylistic reasons. . . .  By contrast, a benign reenactment is one where the legislature reenacts the law for a race-neutral reason," and "debates the ultimate merits of the law and decides to keep it, but . . . does not appear to have racist motivations for doing so."  *Id.* at 1103.  Finally, "[a] conscious reenactment is one where the future legislature reenacts the law for race-neutral reasons *while also acknowledging the law's history*."  *Id*. (emphasis added).

These distinctions should inform what a court makes of the fact that a legislature has reenacted a law with racist origins when evaluating an anti-discrimination challenge under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  A "silent" reenactment clearly does not cure the Fifth Amendment violation arising from the original statute

because it supplies no evidence that the new legislature engaged in any substantive reconsideration of the law's merits or purpose. To ask why the reenacting legislature chose to maintain the original law "would be like asking why King James wrote the Book of Genesis." Fish, *supra*, at 1104.

Outside the race discrimination context, that proposition is uncontroversial. "Under established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Finley v. United States*, 490 U.S. 545, 554 (1989) (Scalia, J.) (quotation omitted). It should be obvious that when a statute is reenacted with only minor modifications, the later-acting legislature's intent is to continue doing what the prior legislature did, and for the same reasons. While that presumption can of course be rebutted by legislative history revealing a new motivation, absent such history we presume Congress has not altered its intent.

"Benign" reenactments also do not negate the animus that originally motivates a law because they fail to "confront" the original enactment's racist origins, and therefore do not cure the unconstitutional discrimination. *See Espinoza*, 140 S. Ct. at 2273 (Alito, J., concurring) (finding reenactment's "benign reasons" insufficient); *Ramos*, 140 S. Ct. at 1418 (Kavanaugh, J., concurring)

5

(existence of neutral reasons now insufficient to justify preserving precedent upholding laws with racist origins).

In contrast, a "conscious" reenactment will almost always satisfy the Fifth Amendment's anti-discrimination requirements because the reenacted law will be "untethered to racial bias" when the legislature has "actually confront[ed] a law's tawdry past," and chosen to "reenact[] it" for race-neutral reasons. *Ramos*, 140 S. Ct. at 1410 (Sotomayor, J., concurring).

Amici's view that neither silent nor benign reenactments purge discriminatory taint enough to satisfy constitutional requirements comports with three other important principles. First, under *Arlington Heights*, "[a] plaintiff does not have to prove that the discriminatory purpose was the *sole* purpose of the challenged action, but only that it was a motivating factor." *Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citation and quotation omitted). As *Ramos* makes clear, as a general matter the discriminatory intent of original legislation will remain a motivating factor until a subsequent legislature consciously confronts and disclaims it.

Second, it is a hornbook principle of both statutory construction and equal protection doctrine that a law's "history and purpose," including the history of predecessor statutes, is relevant to interpreting the law today. *See*, *e.g.*, *Wooden v. United States*, 142 S. Ct. 1063, 1072-74 (Mar. 7, 2022) (in interpreting Armed

Career Criminal Act, looking to "[s]tatutory history and purpose," including the language of the statute "[f]or the first four years of its existence" to understand the significance of later amendments); *Arlington Heights*, 429 U.S. at 267-68 (requiring consideration of a decision's "historical background"). It follows that the legislative history of the original law will remain relevant to analyzing a reenactment unless the original law's discriminatory purpose is explicitly confronted and rejected.

Third, requiring legislatures to consciously confront a statute's past history of discriminatory animus serves the important purpose of disrupting structural racism, which often works to perpetuate racial injustice even when contemporary actors have no conscious desire to do so. Indeed, "[i]f a legislature reenacts an old racist law without acknowledging or confronting the racism that inspired it, it does not really cure the constitutional harm. If anything, such a reenactment represents the original legislature's ultimate success. It hid its intentions in a race-neutral law, only to have them hidden even better by a future legislature." Fish, *supra*, at 1105.

Application of these principles to this case makes clear that the federal illegal reentry statute violates the Fifth Amendment's prohibition on race discrimination. Defendant has established beyond any reasonable dispute that the Undesirable Aliens Act of 1929, which created the predecessor to 8 U.S.C. § 1326,

7

was motivated by a desire to discriminate against Mexicans. Amici will not rehearse the overwhelming—and disturbing—evidence supporting that conclusion.

The Government has argued that when the Undesirable Aliens Act was reenacted in 1952, that enactment cured the taint of discriminatory intent from the 1929 statute, but nothing in the 1952 Act's history even remotely suggests that it was a *conscious* reenactment. Defendant argues with some force (and the district court found), that the 1952 Act was itself enacted with discriminatory purpose. *See* Appellees' Opening Brief at 61-68. Others, such as Professor Fish, have argued that the 1952 Act was more akin to a silent reenactment, as "the reenactment was *pro forma*. It was part of a general reorganization and recodification of the immigration laws. It involved no debate over the merits of these crimes. Congress understood itself to be simply keeping the same law in place." Fish, *supra*, at 1058-59. And the Government contends (albeit without using the term) that the 1952 Act was a benign reenactment, hypothesizing various race-neutral reasons that *could* have motivated Congress to reenact the illegal reentry prohibition in 1952, despite the absence of any evidence as to what that Congress's motives actually were. Appellant's Opening Brief (hereinafter "Gov't Br.") at 54-60.

However, as governing Supreme Court precedent makes clear, only conscious reenactment—confrontation with the uncomfortable past—suffices to cure discriminatory intent. No conceivable reading of the history of the 1952

reenactment, or indeed any other reenactment of the illegal reentry statute, could leave one with the impression that Congress has ever recognized the law's troubling history and consciously chosen to re-enact it despite that sordid past. Indeed, the Government itself appears to describe the record as "silen[t]." Gov't Br. at 40. Absent a conscious reenactment of the illegal reentry statute, it remains tainted by its discriminatory purpose, and therefore violates the Fifth Amendment's anti-discrimination protections.

## ARGUMENT

### A. __The Passage of Time Alone Does Not Cure a Law's Discriminatory Taint__

The Supreme Court and this Court have long recognized that the history of a statute is highly relevant in assessing whether its enactment is tainted with discriminatory animus. *Arlington Heights* itself held that relevant evidence may include the "historical background of the decision," and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *See* 429 U.S. at 267-68; *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016) ("In determining whether a discriminatory intent or purpose exists, we may consider . . . the historical background of the policy").

Nor does it matter that a statute is very old. Courts have never recognized any principle akin to a statute of limitations that might wipe away legislative intent

based on its age.  On the contrary, in determining whether a law violates *Arlington Heights*, courts look first and foremost to the legislature's motivation at the time the challenged law was adopted, not to new rationales that may develop later.

For example, in *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court reviewed the constitutionality of a 1901 provision of the Alabama Constitution which disenfranchised persons convicted of a crime involving moral turpitude.  The Court observed that "[p]roving the motivation behind official action is often a problematic undertaking," particularly for multi-member legislative bodies.  *Id.* at 228.  Nevertheless, the Court held that racial animus was a motivating factor influencing the legislators who enacted the challenged constitutional provision at the Alabama Constitutional Convention of 1901.  The Court observed that the convention "was part of a movement that swept the post-Reconstruction South to disenfranchise blacks," that "[t]he delegates to the all-white convention were not secretive about their purpose," and that the convention's president had explicitly noted in his opening address that the convention's goals were "to establish white supremacy in this State."  *Id.* at 229.

At the Supreme Court, Alabama did not dispute the racist origins of the constitutional provision, but argued that the state nevertheless had "a legitimate interest in denying the franchise to those convicted of crimes involving moral turpitude."  *Id.* at 232.  It further argued that "events occurring in the succeeding

80 years had legitimated the provision," including, for example, that state courts had invalidated the portion of the provision disenfranchising persons convicted of miscegenation. *Id.* at 233.

Notwithstanding the possible existence of race neutral justifications for the provision today, however, the Court rejected Alabama's attempt to divorce the law from its origins, viewing the later-developed justifications as irrelevant to assessing the intent of the legislature at the time of the law's enactment. "[W]hether [the provision] would be valid if enacted today without any impermissible motivation" was irrelevant. "[I]ts original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect. As such, it violates equal protection under *Arlington Heights*." *Id.*

*Hunter* establishes that what matters under anti-discrimination doctrine is the historical motivation—i.e., purpose—behind a law. If a discriminatory purpose animates a law's passage, then that law violates the Constitution even if a legislature (or court) could imagine valid justifications for enacting the same law today, without illicit motivation.

**B.**     **To Purge the Taint of Discrimination When Reenacting a Law, the Legislature Must Confront Its Discriminatory Past**

A more difficult issue arises when one asks what a law-making body must do to purge a law of the discriminatory purpose that originally motivated it. *Hunter* does not answer that question, as it did not involve a reenactment of the

challenged provision.  But other Supreme Court precedent—in particular *Ramos v. Louisiana*—does.  It makes clear that the mere passage of a new statute is not enough.  The reenacting legislature must confront a law's racist history in order to purge its discriminatory taint.

*Ramos* involved a situation much like this one—in which a provision originally passed with an intent to discriminate had been reenacted, apparently without the same racist motivation.  *Ramos*, 140 S. Ct. at 1394.  It held that the Sixth Amendment right to jury trial requires a unanimous verdict to convict a defendant of a serious offense, invalidating a Louisiana state constitutional rule permitting non-unanimous convictions.  In doing so, the Court overruled its prior decisions in *Apodaca v. Oregon*, 406 U.S. 404 (1972) and *Johnson v. Louisiana*, 406 U.S. 356 (1972), both of which had upheld non-unanimous jury verdicts.  Justice Gorsuch's majority opinion observed that "Louisiana first endorsed nonunanimous verdicts for serious crimes at a constitutional convention in 1898," the purpose of which was "to 'establish the supremacy of the white race.'"  *Id.* at 1394.  The Court highlighted that the delegates in 1898 were aware that a law explicitly barring participation of African Americans would be struck down, so they "sought to undermine African-American participation on juries in another way."  *Id.*  "With a careful eye on racial demographics, the convention delegates

12

sculpted a 'facially race-neutral' rule permitting 10-to-2 verdicts in order 'to ensure that African-American juror service would be meaningless.'" *Id.*

Although *Ramos*'s conclusion that the Sixth Amendment requires a unanimous jury verdict was based on common law history, its argument for overruling *Apodaca* and *Johnson* turned on a distinct holding of critical importance here: that a rule's racist origins remain relevant even after benign reenactment for race-neutral reasons. *Id.* at 1401. Indeed, Justice Alito's dissenting opinion objected to the Court's holding on this particular point, arguing that the Court's reliance on the provisions' racist origins was misplaced because, "whatever the reasons why Louisiana and Oregon originally adopted their rules many years ago, both States readopted their rules under different circumstances in later years." *Id.* at 1426-27 (Alito, J., dissenting). But the Court rejected this objection, holding that the fact that those constitutional provisions were later "recodified . . . in new proceedings untainted by racism," could "not supply an excuse for leaving an uncomfortable past unexamined." *Id.* at 1401 n.44 (majority opinion).

Two concurring opinions in *Ramos* confirm that it established a rule that a later legislature must consciously confront a law's racist past to purge the original discriminatory animus. First, Justice Sotomayor wrote separately to underscore that "[a]lthough Ramos does not bring an equal protection challenge, the history is worthy of this Court's attention" because "the States' legislatures never truly

13

grappled with the laws' sordid history in reenacting them." 140 S. Ct. at 1410 (Sotomayor, J., concurring). Based on this background, Justice Sotomayor argued that "[w]here a law otherwise is untethered to racial bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it—the new law may well be free of discriminatory taint." *Id.* Justice Sotomayor's view that a reenacted provision be "untethered to racial bias" is consonant not only with the majority's rule, but also with *Hunter*, which had previously relied on the fact that the provision in question there continued to have racially discriminatory effects.

Justice Kavanaugh's concurrence in *Ramos* also relied in part on the racist origins of the rule permitting nonunanimous verdicts. As he explained, "the Jim Crow origins [of the rule] and [its] racially discriminatory effects (and the perception thereof)" weighed in favor of overruling prior precedent upholding it. *Id.* at 1418 (Kavanaugh, J., concurring); *see also id*. at 1419 ("Why stick by an erroneous precedent that . . . tolerates and reinforces a practice that is thoroughly racist in its origins and has continuing racially discriminatory effects?").

Despite dissenting in *Ramos* (on stare decisis grounds), Justice Alito subsequently recognized *Ramos*'s holding regarding the effect of reenactments as binding precedent—and endorsed its reasoning—in his concurrence in *Espinoza*. 140 S. Ct. at 2267-68 (Alito, J., concurring). *Espinoza* concerned the lawfulness of a publicly-funded scholarship program for private schools in Montana, which the

14

Montana Supreme Court had struck down as violating state law to the extent it permitted publicly-funded scholarships to be used at religiously-affiliated schools. *Id.* at 2252-53 (majority opinion). *Espinoza* held the Montana law prohibiting the use of public funds at religiously-affiliated schools violated the First Amendment's Free Exercise Clause. *Id.* at 2262.

In his concurring opinion, Justice Alito emphasized that "*Ramos* is now precedent," and that under *Ramos*, a legal "provision's origin is relevant" to whether it is motivated by unconstitutional animus, even if later reenacted for other reasons. *Id.* at 2268 (Alito, J., concurring). He noted that the law at issue in *Espinoza* "was prompted by virulent prejudice against immigrants, particularly Catholic immigrants," in the 1850's, *id.*, that those who promoted the law and a failed federal Congressional amendment on which it was modeled "either held nativist views or capitalized on them," *id.* at 2270, and that the historical record showed that Catholics were the main target of Montana's version of the rule, *id.* (noting that "Montana's religious schools—and its private schools in general— were predominantly Catholic, and anti-Catholicism was alive in Montana too") (citation omitted).

Most important for present purposes, Justice Alito considered and rejected the argument that "Montana's no-aid provision was cleansed of its bigoted past because it was readopted for non-bigoted reasons in Montana's 1972 constitutional

15

convention." *Id.* at 2273. Justice Alito explained that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be '[e]xamined.' And here, it is not so clear that the animus was scrubbed." *Id.* (citation omitted). To the contrary, Justice Alito concluded that "[w]hether or not the State [reenacted the provision] for any reason that could be called legitimate, the convention delegates recognized that the provision would 'continue to mean and do whatever it does now,' and the discrimination in this case shows that the provision continues to have its originally intended effect." *Id.* at 2274 (citation omitted).[2]

While *Ramos* and *Espinoza* contain the clearest recent discussion of the equal protection principles involving reenactments, their analysis comports with longstanding anti-discrimination doctrine. Long before those cases, the Supreme Court had held that a facially-neutral statute could be infected not only by the animus of the legislature enacting that particular provision, but also by the animus of a prior legislature when it enacted a predecessor statute. For example, *Lane v. Wilson*, 307 U.S. 268 (1939) involved a facially-neutral voter registration requirement that, when read against the backdrop of a prior enactment that

---

[2] Justice Sotomayor disagreed with Justice Alito's historical account in *Espinoza*— in particular, on the question whether support by Catholics for the 1972 Amendments showed that it had purged the discriminatory taint. But she never disclaimed the test articulated in *Ramos*. *See Espinoza*, 140 S. Ct. at 2293 n.2 (Sotomayor, J., dissenting).

discriminated against Black voters, had the effect of perpetuating pre-existing voter disenfranchisement. The Supreme Court struck the facially-neutral provision down because the new law "partakes too much of the infirmity of" its explicitly discriminatory predecessor, without citing any evidence of discriminatory intent on the part of the reenacting legislature. *Id*. at 275; *see also United States v. Fordice*, 505 U.S. 717, 729, 733 (1992) (in university desegregation context, finding several facially-neutral aspects of Mississippi's university system "constitutionally suspect," because "even after a State dismantles its segregative *admissions* policy, there may still be state action that is traceable to the State's prior *de jure* segregation and that continues to foster segregation") (emphasis in original). As these cases show, the rule established in *Ramos* comports with a general understanding that has long animated anti-discrimination doctrine. *See generally* W. Kerrel Murray, *Discriminatory Taint*, 135 Harv. L. Rev. 1192 (2022) (collecting cases).

Discrimination law aside, the *Ramos* rule also comports with the established canon of statutory construction that "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect, unless such intention is clearly expressed." *Anderson v. Pacific Coast S.S. Co.*, 225 U.S. 187, 199 (1912) (statutory revision that "placed portions of what was originally a single section in two separated sections" did not alter scope and purpose of original

17

statute).  Rather, such silent reenactments carry forward the prior legislative intent.

*See Finley*, 490 U.S. at 554 (Scalia, J.) (finding revision to Federal Tort Claims Act

did not broaden scope of statute to extend jurisdiction to non-federal defendants

because "[w]e have found no suggestion, much less a clear expression [under

*Anderson*], that the minor rewording at issue here imported a substantive change");

*Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 227 (1957)

(revision and recodification splitting a single section into two separate sections did

not alter the scope and purpose of venue provision in patent infringement cases).

Because such a "revision does not result from legislative reconsideration of the

substance of codified statutes," "new language does not amend prior enactments

unless it does so clearly."  Antonin Scalia & Bryan A. Garner, *Reading Law: The*

*Interpretation of Legal Texts* 257 (2012).

Just as the law "bars a court from construing a statute to have . . . established

a new rule of law, without clear evidence in favor of such a construction," *In re*

*Mark Anthony Const., Inc.*, 886 F.2d 1101, 1107 (9th Cir. 1989), so too the law

does not permit a court to assume that minor amendments to a statute have erased

the legislative purpose behind the original enactment.  *See also Koch Foods, Inc. v.*

*Sec'y, U.S. Dept. of Labor*, 712 F.3d 476, 486 (11th Cir. 2013) ("[W]hile changes

in statutory language often indicate legislative intent to change a statute's meaning,

such an inference is inapplicable to consolidations and recodifications of laws").

Thus, binding anti-discrimination doctrine, and in particular *Ramos*, establishes that where a law had a discriminatory purpose when first enacted, a subsequent reenactment of the law by a different group of lawmakers does not, in and of itself, suffice to purge the law of discriminatory taint where the later legislature leaves the "uncomfortable past unexamined." *Ramos*, 140 S. Ct. at 1401 n.44. Rather, the reenacting legislature must actually confront that past, and consciously choose to reenact the law notwithstanding its racist origins. "Silent" reenactments do not suffice; rather, they perpetuate the original discrimination.

**C. Neither The 1952 Congress Nor Later Modifications Cured Section 1326's Unconstitutional Purpose**

As noted above, there can be no serious dispute that the 1929 Act which created the predecessor to Section 1326 was motivated by racial animus. The question is whether the 1952 McCarran-Walter Act, which reenacted Section 1326, or subsequent modifications to ancillary provisions of the illegal reentry statute somehow wiped the slate clean, such that the motivations behind the 1929 Act are no longer relevant. The answer is no.

**1. Congress in 1952 Did Not Engage With the 1929 Act's Motivations or Evaluate the Merits of the Illegal Reentry Laws**

Nothing in the 1952 Act's provisions or history suggests, even remotely, any Congressional effort to repudiate the illegal reentry statute's racist origins. The McCarran-Walter Act "brought together in a single omnibus bill all of the

disparate immigration and naturalization provisions that were [previously]

scattered throughout the U.S. Code." Fish, *supra*, at 1098 (citing Marion T.

Bennett, *The Immigration and Nationality (McCarran-Walter) Act of 1952, as

Amended to 1965*, 367 Annals Am. Acad. Pol. & Soc. Sci. 127, 127 (1966)). More

than 200 enactments in some way related to immigration were brought together in

the bill. *Id.* A significant portion of this undertaking was ministerial, as "[t]he

resulting law largely preserved existing immigration policies, reorganizing and

recodifying them into a modern legislative code." *Id.* at 1098-99.

In addition to moving the felony statute at issue here to 8 U.S.C. § 1326, the

McCarran-Walter Act made one change to the text: "[i]t added a new 'found in'

element to the felony, so that a defendant could now be convicted if he or she

'enters, attempts to enter, or is at any time found in, the United States.'" *Id.* at

1099 (quoting 8 U.S.C. § 1326 (2018)). In a letter from Deputy Attorney General

Peyton Ford to Senator McCarran endorsing the new element, Deputy Attorney

General Peyton used a racially derogatory term to explain that "[s]tatutory

clarification on the above points will aid in taking action against the conveyors and

receivers of the wetback." *Id.* at 1099 n.401. This technical fix to cure a

jurisdictional problem (albeit one that made the statute significantly easier to prosecute) was the *only modification* to Section 1326 by the 1952 Congress.[3]

With respect to the 1952 Act's legislative history, a comprehensive review and analysis of the 925-page Senate report concerning the McCarran-Walter Act reveals "almost no discussion" of Sections 1325 (the misdemeanor unauthorized entry provision) or Section 1326 (the felony reentry provision at issue here). Fish, *supra*, at 1099. "In one section [the report] says that the committee heard testimony from witnesses who complained about the difficulties of enforcing alien smuggling and illegal entry laws," but did not consider the issue to merit legislative attention. *Id.* (citing S. Rep. No. 81-1515, at 654 (1950)). In another section, "the report advocates repealing two minor reentry provisions (these are separate laws giving higher penalties to prostitutes and anarchists) and consolidating them with the general felony reentry provision." *Id.* at 1099-1100. The sole recommendation was that "the present act of March 4, 1929, should be reenacted to cover any and all deportations." *Id.* at 1100 (quoting S. Rep. No. 81-1515, at 655). There was no mention of these crimes in any of the floor debates in the House or Senate. *Id.*

---

[3] Apart from Ford's letter, the legislative history of the 1952 Act, including the Senate Judiciary Committee report and the debate in Congress, contains no discussion of the new "found-in" provision. Fish, *supra*, at 1098-1100.

Based on a record indicating scant engagement with the laws in question, and certainly no engagement with the 1929 Congress's motivations, "[i]t is clear from this record that Congress in 1952 did not debate the merits of these crimes. It did not consider whether unlawful immigration should be criminalized in the first place. This was a recodification project. Congress understood itself to be rationalizing and reorganizing an existing set of laws. . . . Congress did not understand itself to be creating a new law. It was keeping the existing law in place, with some technical modifications, and changing its code section." *Id.* at 1100.

Similarly, while Congress made other changes to the illegal reentry statute in subsequent years—including alterations to the sentencing scheme, adding a provision permitting collateral attacks, and certain other changes, *see* Gov't Br. at 57—the Government cites no legislative history suggesting that Congress consciously re-evaluated the statute's prohibition on illegal reentry or the rationale for that prohibition.

### 2. Under *Ramos*, the 1952 Reenactment and Subsequent Modifications Do Not Purge the Illegal Reentry Statute's Discriminatory Taint

Under *Ramos*, neither the reenactment of Section 1326 by the 1952 Congress nor any of the subsequent amendments justifies ignoring the 1929 Congress's motivations. It is clear that none of the later enactments "actually

confront [the illegal reentry statute's] tawdry past," *Ramos*, 140 S. Ct. at 1410

(Sotomayor, J., concurring) or "examine" its "uncomfortable past," *Espinoza*, 140

S. Ct. at 2273 (Alito, J., concurring) (cleaned up). Accordingly, they are *not*

examples of "conscious reenactment," through which "the future legislature

reenacts the law for race-neutral reasons while also acknowledging the law's racist

history." Fish, *supra*, at 1103.

In particular, the Government does not appear to dispute that the legislative

history for the 1952 law does not include any statement of Congress's purpose in

reenacting Section 1326, thus providing no basis to ascertain any race-neutral

reason for the reenactment that would allow courts to characterize it even as a

"benign," rather than "silent" reenactment of the racist 1929 law. And there can be

no doubt that nothing in that history even acknowledges, let alone engages with,

the sordid 1929 history. The sparse legislative record shows the 1952 Congress

left this provision's "uncomfortable past unexamined," *Ramos*, 140 S. Ct. at 1401

n.44, and falls well short of demonstrating that, as a result of the 1952 Act, Section

1326 became "untethered to racial bias," even if Congress "reenact[ed] it" for race-

neutral reasons. *Id.* at 1410 (Sotomayor, J., concurring); *accord Espinoza*, 140 S.

Ct. at 2273 (Alito, J., concurring) ("Under *Ramos*, it emphatically does not matter

whether Montana readopted the no-aid provision *for benign reasons*.") (emphasis

added).

Indeed, to use Justice Alito's words, it is far from "clear that the animus was scrubbed" when Congress passed the 1952 law.  *Espinoza*, 140 S. Ct. at 2273 (Alito, J., concurring).  If anything, the scant record which exists confirms only that Congress made it *easier* to prosecute violations of Section 1326 by adding the "found in" provision, which Deputy Attorney General Ford had endorsed in order to facilitate the prosecution of "wetback[s]."  Fish, *supra*, at 1099 n.401.  In other words, the lone amendment merely made the law more effective at accomplishing the 1929 Congress's desire to target Mexicans because of their race.

Because it is clear that the 1952 Congress did not engage in a "conscious reenactment" of Section 1326, it is not necessary to decide whether the reenactment is a "silent" one—entirely ministerial—or instead a "benign" one where the later legislature acted for race-neutral reasons, as neither suffices to purge the law of its discriminatory taint under *Ramos*.  Nevertheless, *amici* believe the 1952 reenactment bears greater resemblance to a "silent" reenactment due to the dearth of evidence of any substantive engagement with the law, or any record evidence of independent, race-neutral reasons for passing it.

Similarly, the various later alterations to Section 1326, including alterations to its penalties, Gov't Br. 57, involve nothing remotely resembling actual confrontation with the law's racist past.  The Government's assertion that *any* alteration to a statute's penalties "necessarily means" that Congress has evaluated

the law anew, Gov't Br. 58-59, simply cannot be reconciled with the Supreme Court's recognition that a law's racist past must be acknowledged rather than swept under the rug.

Although the Government never discusses *Ramos* or *Espinoza* (except to note that the district court did not treat them as "binding"), Gov't Br. 59, it nonetheless argues that courts "should not give weight to a legislature's failure to expressly grapple with the history underlying earlier laws." *Id*. at 42. As the discussion above makes clear, that view is foreclosed by *Ramos* and *Espinoza*. Unsurprisingly then, the authority on which the Government relies provides no support for its view, at least in this context. *Kimbrough v. United States* is not about reenactment at all. It rejects an inference from Congressional silence regarding appropriate sentence lengths. 552 U.S. 85, 103 (2007). *Zuber v. Allen* is also far afield, as the passage on which the Government relies concerns inferences drawn from Congress's *failure* to act rather than reenactment, 396 U.S. 168, 185 n.21 (1969), and the case as a whole concerns inferences drawn from a statute that *changed* critical language (by permitting price "differentials customarily applied" to permit local variations when setting milk prices). *Id.* at 181.

The government also seeks support from *Abbott v. Perez*, 138 S. Ct. 2305 (2018), Gov't Br. at 43, but *Abbott* is entirely consistent with the Court's subsequent holding in *Ramos* requiring conscious reenactment to purge

discriminatory taint from prior legislation motivated by racial animus. *Abbott*
bears a superficial resemblance to this case because the plaintiffs claimed Texas's
2013 redistricting plan violated the Equal Protection Clause (and Section 2 of the
Voting Rights Act of 1965) based on its alleged connection to Texas's 2011
redistricting plans, which had already been found to be "tainted by discriminatory
intent." *Id.* at 2313. But the similarity ends there. Unlike this case, *Abbott* was
*not* "a case in which a law originally enacted with discriminatory intent is later
reenacted by a different legislature. The 2013 Texas Legislature did not reenact
the plan previously passed by its 2011 predecessor. Nor did it use criteria that
arguably carried forward the effects of any discriminatory intent on the part of the
2011 Legislature." *Id.* at 2325. Rather, the state legislature repealed the 2011
plans and instead adopted an interim plan that had been crafted by a three-judge
court to cure the discriminatory taint behind the 2011 plans. *Id.* at 2317. Nothing
in *Abbott* contravenes the principles later established in *Ramos* and described in
Justice Alito's opinion in *Espinoza*.

The Government also relies on the Eleventh Circuit's decision in *Johnson v.
Governor of the State of Florida*, 405 F.3d 1214 (11th Cir. 2005), but that pre-
*Ramos* decision also provides little support. *Johnson* rejected an Equal Protection
challenge to a felon disenfranchisement provision in the Florida Constitution,
finding that the 1968 reenactment cured the racism that allegedly motivated the

original 1868 version (from exactly 100 years earlier). *Id.* at 1217. But *Johnson* held that the original enactment was *not* motivated by racism, rendering its subsequent discussion of that provision's reenactment *dicta*. *Id.* at 1219. To the extent it nonetheless remains relevant, it is easily distinguishable. *Johnson* found the reenactment "markedly different from Florida's 1868 version," because "the 1868 provisions disenfranchised persons convicted of certain misdemeanors" while the 1968 provision only disenfranchised persons convicted of felonies. *Id.* at 1220-21. *Johnson* thus distinguished *Hunter*, where "the Alabama legislature neither altered the provision nor reenacted it in a political atmosphere free of racial bias." *Id.* at 1222.

As shown above, the record here shows the reenactment here was not "markedly different" from the original, and the environment Congress acted in— less than 25 years after the original—was still infected by racism. To the extent that *Johnson* rejected the notion that the plaintiffs there had to "affirmatively prove that racial discrimination was not a substantial or motivating factor behind the disenfranchisement law in 1968" by, for example, "acknowledg[ing] that racial discrimination tainted the 1868 provision" and "knowingly reenact[ing] the disenfranchisement provision for non-discriminatory reasons," *id.* at 1224-25, that portion of its analysis is inconsistent with *Ramos*.

27

As *Ramos*, *Espinoza*, and the body of precedent on which they are built make clear, Congress did nothing in 1952 (or later) that would justify ignoring the discriminatory purpose that led to Section 1326's adoption in 1929. Applying *Arlington Heights*, the discriminatory animus from 1929 continues to infect the 1952 law, and the burden should shift to the government to prove that the law would have passed—in 1929—even without a discriminatory purpose.

As others have explained in exhaustive detail, the "uncomfortable," *Ramos*, 140 S. Ct. at 1401 n.44, history of the illegal reentry prohibition makes clear it "would [not] have resulted" absent the 1929 Congress's "impermissible purpose." *Arlington Heights*, 429 U.S. at 270 n.21. Congress wanted Mexican agricultural workers to enter the U.S., but also wanted to criminalize them for staying here, so as to prevent them from polluting the country's gene pool. Had Congress not been motivated by racism, it would not have criminalized that conduct. *See generally* Fish, *supra*, at 1095 (collecting evidence regarding 1929 Congress, including that Canadian immigration during the period did not result in a comparable prohibition, and that there was no criminal prohibition on illegal reentry until anti-Mexican racist concerns arose in the 1920's).[4]

---

[4] Contrary to the Government's assertion, Gov't Br. at 54, *Arlington Heights* itself makes clear that the focus of the inquiry once the burden has shifted should be on whether the 1929 Congress would have enacted this law if it were not motivated by racial animus. It directs courts to consider whether "the same decision would have

**CONCLUSION**

*Amici* respectfully submit that the District Court's holding that Section 1326

violates the Fifth Amendment should be affirmed.

Respectfully submitted,

*/s/ Yaman Salahi*

Yaman Salahi
EDELSON PC
150 California St., 18th Floor
San Francisco, CA 94111
(415) 212-9300
ysalahi@edelson.com
*Counsel for Amici*

Ahilan Arulanantham
UCLA School of Law
385 Charles E. Young Dr. E.
Los Angeles, CA 90095
(310) 825-1029
arulanantham@law.ucla.edu
*Of Counsel*

Eric Fish
Acting Professor
UC Davis School of Law

---

resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. This reading also comports with *Hunter* and *Ramos*, which do not permit a court to uphold a law motivated by animus merely because a hypothetical later legislature acting for different reasons might have enacted the same law. For that reason, the Government's extensive arguments for why a legislature today should enact a statute like Section 1326 are appropriately addressed to Congress, not this Court. *Arlington Heights* does not permit courts to uphold this statute based on non-discriminatory reasons that might justify its enactment today.

29

400 Mark Hall Dr.
Davis, CA 95616
efish@ucdavis.edu
*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April 2022, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

*/s/ Yaman Salahi*

Yaman Salahi
*Counsel for Amici*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-10233

I am the attorney or self-represented party.

**This brief contains** | 6,474 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
   29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
   *(select only one):*

   ○ it is a joint brief submitted by separately represented parties;

   ○ a party or parties are filing a single brief in response to multiple briefs; or

   ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |            | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Yaman Salahi          **Date** | 4/15/2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/2018*