No. 21-10233

# United States Court of Appeals
## For the Ninth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

On Appeal From The United States District Court For The
District of Nevada, No. 3:20-cr-26 (Du, C.J.)

## REPLY BRIEF FOR THE UNITED STATES

JASON M. FRIERSON
United States Attorney

ELIZABETH O. WHITE
Appellate Chief
PETER H. WALKINGSHAW
Assistant United States Attorney
District of Nevada

KENNETH A. POLITE, JR.
Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

SCOTT A.C. MEISLER
Appellate Section, Criminal Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530
(202) 307-3803
scott.meisler@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..............................................................ii

INTRODUCTION AND SUMMARY .......................................... 1

ARGUMENT ................................................................................ 3

I.    SECTION 1326 IS CONSTITUTIONAL UNDER THE
RATIONAL-BASIS STANDARD APPLICABLE TO
FEDERAL STATUTES THAT REGULATE
IMMIGRATION ................................................................. 3

    A.    Carrillo's Challenge Is Subject To Rational-Basis
Review ...................................................................... 4

    B.    Circuit Precedent Does Not Mandate Application of
*Arlington Heights* ................................................. 10

II.    SECTION 1326 IS CONSTITUTIONAL UNDER
*ARLINGTON HEIGHTS* ............................................ 12

    A.    The 1952 Congress Was Not Required To Purge Any
Bad Intent Of Its Predecessor When Enacting Section
1326 ........................................................................ 13

    B.    The District Court Clearly Erred In Assessing The
Intent Of The 1952 Congress .............................. 18

        1.    Presidential veto ................................................ 19

        2.    Anti-harboring law and Ford Letter .................. 20

        3.    Disparate impact ............................................... 23

    C.    Any Discriminatory Intent Was Not Determinative In
Section 1326's Enactment ..................................... 26

CONCLUSION ........................................................................... 31

i

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)............................................................ 3, 13, 16, 17

*Abebe v. Mukasey*,
   554 F.3d 1203 (9th Cir. 2009) (en banc)................................................ 5, 8

*Almendarez-Torres v. United States*,
   523 U.S. 224 (1998) .................................................................. 29

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985) .................................................................. 30

*Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) ........................................................... 1, 5, 13, 23

*Ash v. Tyson Foods, Inc.*,
   546 U.S. 454 (2006) .................................................................. 22

*Castaneda v. Partida*,
   430 U.S. 482 (1977) ...............................................................21, 29

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*
   140 S. Ct. 1891 (2020)..................................................... 10, 14, 25

*Dep't of Homeland Security v. Thuraissigiam*,
   140 S. Ct. 1959 (2019)................................................................. 8

*Dunn v. INS*,
   499 F.2d 856 (9th Cir. 1974) ......................................................... 8

*Easley v. Cromartie*,
   532 U.S. 234 (2001) .................................................................. 21

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020)...............................................................17, 18

*Fiallo v. Bell,*
    430 U.S. 787 (1977) .................................................................... 5

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) ................................................................... 24

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010).................................................... 17

*Heller v. Doe,*
    509 U.S. 312 (1993) ..................................................................... 4

*Hunter v. Underwood,*
    471 U.S. 222 (1985) .................................................. 16, 26, 28

*Jimenez-Angeles v. Ashcroft,*
    291 F.3d 594 (9th Cir. 2002) ..................................................... 5

*Johnson v. Governor of State of Florida,*
    405 F.3d 1214 (11th Cir. 2005) (en banc) ..........................17, 30

*Kwai Fun Wong v. United States,*
    373 F.3d 952 (9th Cir. 2004) ................................................... 10

*Lehmann v. Carson,*
    353 U.S. 685 (1957) ................................................................. 15

*Mathews v. Diaz,*
    426 U.S. 67 (1976)..........................................................4, 5, 7

*Miller v. Johnson,*
    515 U.S. 900 (1995) ................................................................. 13

*NC State Conference of NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) ................................................... 27

*NC State Conference of NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020) ................................................... 14

*NLRB v. Transportation Mgmt. Corp.,*
    462 U.S. 393 (1983) ................................................................. 26

*Pena-Cabanillas v. United States*,
  394 F.2d 785 (9th Cir. 1968) ...................................................... 7

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ...................................................... 19, 24, 26

*Plyler v. Doe*,
  457 U.S. 202 (1982) ...................................................... 7

*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020)...................................................... 17, 18

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ...................................................... 10, 11, 25

*Regents of the Univ. of Cal. v. Dep't of Homeland Security*,
  908 F.3d 476 (9th Cir. 2018), *rev'd*, 140 S. Ct. 1891 (2020)...................................................... 10, 11

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ...................................................... 14

*Reno v. Flores*,
  507 U.S. 292 (1993) ...................................................... 5

*Snyder v. Louisiana*,
  552 U.S. 472 (2008) ...................................................... 26

*Tidewater Oil Co. v. United States*,
  409 U.S. 151 (1972) ...................................................... 15

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)...................................................... 4, 5, 9

*United States v. Ayers*,
  924 F.2d 1468 (9th Cir. 1991)...................................................... 29

*United States v. Calvillo-Diaz*,
  No. 21-cr-445, 2022 WL 1607525 (N.D. Ill. May 20, 2022) .......... 15, 25, 29

*United States v. Castillo-Mendez*,
  868 F.3d 830 (9th Cir. 2017) ...................................................... 16

*United States v. DiSantillo,*
    615 F.2d 128 (3d Cir. 1980) ................................................................ 27

*United States v. Dumas,*
    64 F.3d 1427 (9th Cir. 1995) ..........................................................24, 26

*United States v. Hernandez-Guerrero,*
    147 F.3d 1075 (9th Cir. 1998) .......................................................... 7, 27

*United States v. Johnson,*
    40 F.3d 436 (D.C. Cir. 1994) ............................................................... 26

*United States v. Lopez-Flores,*
    63 F.3d 1468 (9th Cir. 1995) ................................................................. 9

*United States v. Machic-Xiap,*
    552 F. Supp. 3d 1055 (D. Or. Aug. 3, 2021) ................................. 19, 20, 23

*United States v. Martinez-Ramos,*
    184 F.3d 1055 (9th Cir. 1999) ................................................................ 6

*United States v. Mendoza-Lopez,*
    481 U.S. 828 (1987) .......................................................................15, 16

*United States v. Muñoz-De La O,*
    No. 2:20-cr-134, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022) ............... 19

*United States v. Muria-Palacios,*
    No. 2:21-cr-23, 2022 WL 956275 (E.D. Cal. Mar. 30, 2022) ................... 17

*United States v. Novondo-Ceballos,*
    554 F. Supp. 3d 1114 (D.N.M. 2021) .................................................... 25

*United States v. O'Brien,*
    391 U.S. 367 (1968) ............................................................................. 6

*United States v. Osorto,*
    995 F.3d 801 (11th Cir.), *cert. denied*, 142 S. Ct. 470 (2021) ................. 9

*United States v. Porras,*
    No. 21-cr-158, 2022 WL 1444311 (N.D. Ill. May 6, 2022) ........................ 1

*United States v. Rizo-Rizo*,
    16 F.4th 1292 (9th Cir. 2021) .................................................. 7

*United States v. Ruiz-Chairez*,
    493 F.3d 1089 (9th Cir. 2007)................................................. 9

*United States v. Wence*,
    No. 3:20-cr-27, 2021 WL 2463567 (D.V.I. June 16, 2021) ...................... 20

*United States v. Wooden*,
    693 F.3d 440 (4th Cir. 2012) ................................................ 20

*Village of Freeport v. Barrella*,
    814 F.3d 594 (2d Cir. 2016)................................................... 9

*Virginia Uranium, Inc. v. Warren*,
    139 S. Ct. 1894 (2019)....................................................... 6

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
    945 F.3d 206 (5th Cir. 2019) ................................................ 14

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ........................................................ 24

## STATUTES

8 U.S.C. § 1325 ............................................................. 24

8 U.S.C. § 1326 ..........................................................*passim*

## OTHER AUTHORITIES

98 Cong. Rec. 4442 (1952)................................................... 15

98 Cong. Rec. 5773 (1952)................................................... 14

152 Cong. Rec. 4220 (2006).................................................. 21

S. Rep. No. 80-1515 (1950).................................................. 24

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
    (2012) ..................................................................... 15

Daniel J. Tichenor, *The Politics of Immigration Reform in the United States, 1981-1990*, 26 Polity 333 (1994) ..................................................... 12

Joe C. Ortega, *Plight of the Mexican Wetback*, 58 A.B.A. J. 251 (1972) ................................................................................................... 22

Report of the President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* (1951) ......................................... 21

Richard B. Craig, *The Bracero Program: Interest Groups and Foreign Policy* (1971) ...................................................................................... 20, 22

## INTRODUCTION AND SUMMARY

The district court held that the illegal-reentry statute, although applicable to "any" noncitizen who meets its terms, 8 U.S.C. § 1326(a), violates equal protection because the Congresses that enacted the law decades ago were motivated in part by intent to discriminate against Mexicans and Latinos. That "unprecedented" decision stood alone at the time it issued. 1-ER-31-35.[1] It has become more isolated since, as all "courts invited to follow its reasoning have uniformly declined." *United States v. Porras*, No. 21-cr-158, 2022 WL 1444311, at *2 (N.D. Ill. May 6, 2022) (citing cases).

Our opening brief showed why the collective judicial wisdom is sound. We explained that the district court erred at the threshold in reviewing Carrillo-Lopez's (Carrillo) challenge under the framework of *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), rather than the rational-basis standard that governs equal-protection challenges to federal statutes pertaining to the admission or removal of noncitizens. OB19-32. Our brief further demonstrated that, even if *Arlington Heights* applies, the district court committed clear legal and factual errors in finding that the Congress that enacted Section 1326 in 1952 was motivated in part by intent to discriminate against

---

[1] Citations are to the Excerpts of Record (ER), Supplemental Excerpts of Record (SER), Opening Government Brief (OB), and Answering Brief (AB).

Mexican or Latino individuals.  OB32-54.  Finally, the government established that Congress would likely have enacted Section 1326 absent any discriminatory motive, as confirmed by (*inter alia*) its repeated amendments to Section 1326 since, none of which the district court found to rest on discriminatory motives. OB54-60.  If this Court agrees with any of those arguments, it must reverse.

Carrillo's contrary contentions lack merit.  Although arguing that precedent compelled the district court to apply *Arlington Heights*, Carrillo and his amici cite no appellate decision applying that framework to an Act of Congress in the immigration field.  That is unsurprising, as that expansive framework is antithetical to the limited judicial role in reviewing Congress's immigration laws.  Nor does the fact that the statute prescribes criminal penalties for persons on U.S. soil alter the substantive standard governing an equal-protection challenge, which in immigration cases remains rational basis—a standard sufficient to ensure meaningful judicial review of the animus-based laws hypothesized by the district court.

Carrillo's arguments under *Arlington Heights* fare no better.  He seeks to shift the focus from Section 1326 to its 1929 predecessor, which was passed in an era when congressional debates on immigration issues included shameful remarks about Mexicans and other foreign nationals.  But because Section 1326 substantially altered existing law in 1952, the Congress that passed it is entitled

2

to a presumption of legislative good faith and need not show that it has expiated any sins of its predecessor—the very requirement the Supreme Court rejected in *Abbott v. Perez*, 138 S. Ct. 2305 (2018).

When the focus is properly placed on Section 1326 as enacted in 1952, the district court's finding of discriminatory intent cannot stand. Indeed, Carrillo makes little effort to defend the court's actual rationale in invalidating the law, pivoting to other arguments—such as the high percentage of Latino defendants in recent Section 1326 prosecutions—that fail to support an inference of discriminatory intent. Carrillo's further contention that such intent was determinative in the statute's passage depends on dismissing the legitimate reasons for a reentry prohibition, and Congress's various amendments to Section 1326 since 1952, as legally irrelevant. This Court should reject those contentions and reverse the district court's outlier ruling.

**ARGUMENT**

## I. SECTION 1326 IS CONSTITUTIONAL UNDER THE RATIONAL-BASIS STANDARD APPLICABLE TO FEDERAL STATUTES THAT REGULATE IMMIGRATION

Carrillo does not meaningfully dispute that, if his equal-protection challenge is subject to rational-basis review, Section 1326 is constitutional. He suggests (AB24 n.12) only that a remand would be required because the rationale supporting Section 1326 is "factual" in nature. The rational-basis

3

standard, however, does not require extrastatutory evidence to support the deterrence rationale evident from Section 1326's text and history. *See Heller v. Doe*, 509 U.S. 312, 320 (1993). And because circuit precedent establishes both that deterring illegal reentry is a legitimate government interest and that Section 1326 is reasonably calculated to advance that interest, this Court can hold as a matter of law that the statute has a rational basis. *See* OB24-25.

The key question, therefore, is whether the district court erred in applying the *Arlington Heights* framework, rather than conducting rational-basis review. It did. *See* OB19-32. In arguing otherwise, Carrillo cannot show that the court's novel decision is sound in principle or compelled by precedent.

### A. <u>Carrillo's Challenge Is Subject To Rational-Basis Review</u>

1. Equal-protection challenges to federal immigration laws trigger review no more exacting than rational basis. *See* OB19-23. Application of that standard is not, as Carrillo and his amici suggest, a relic of the past. Rather, it reflects a sound recognition that the political branches are the primary actors in the immigration field, where the decisions they make may "implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Courts have accordingly applied rational basis (or less searching) review to numerous immigration

4

statutes, including those that draw distinctions that garner heightened scrutiny in other contexts. *See Fiallo v. Bell*, 430 U.S. 787, 789-99 (1977) (gender); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 602-03 (9th Cir. 2002) (national origin).

In so doing, courts have afforded leeway to Congress in particular. *See, e.g.*, *Abebe v. Mukasey*, 554 F.3d 1203, 1206 (9th Cir. 2009) (en banc) (per curiam) (because "Congress has particularly broad and sweeping powers when it comes to immigration," it is "entitled to an additional measure of deference when it legislates as to admission, exclusion, removal, naturalization or other matters pertaining to aliens"). The Supreme Court, for example, has repeatedly emphasized the breadth of Congress's immigration powers. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 305-06 (1993). And it has made clear that "it is not the judicial role … to probe and test the justifications for" Congress's decision-making in that field. *Fiallo*, 430 U.S. at 799.

The *Arlington Heights* inquiry is antithetical to those principles. Its examination of a law's impact along, *e.g.*, national-origin lines, *see* 429 U.S. at 266, is incompatible with the immigration context, in which the political branches are free to make nationality-based classifications, *see Mathews*, 426 U.S. at 81-82; *Hawaii*, 138 S. Ct. at 2415. And as the district court's opinion lays bare, the multi-factor *Arlington Heights* analysis can put individual lawmakers' motivations under the judicial microscope years (or decades) after the fact. If a

court finds that a challenged law was motivated even in part by forbidden intent, the burden then flips to the government to establish that a multi-member legislature would have passed the same law anyway—despite the recognized difficulties in discerning what prompts legislative majorities to support a law. *See, e.g.*, *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907-08 (2019) (plurality); *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Given the evident tension between that framework and the limitations on judicial review in immigration matters, it is no wonder that Carrillo and his amici cite *no* appellate precedent applying *Arlington Heights* to a federal immigration statute in the 45 years since that decision.

2. Carrillo offers several reasons why the district court was nonetheless correct to forgo rational-basis review. None is availing.

First, Carrillo suggests (AB31-33) that, although enacted as part of the Immigration and Nationality Act (INA), Section 1326 is not an immigration law warranting deferential review but a "purely criminal law" focused on "carceral punishment." Carrillo's own authorities (AB31) belie that description, explaining that the statute applies only to noncitizens who have experienced a specific set of immigration outcomes. *See United States v. Martinez-Ramos*, 184 F.3d 1055, 1058 (9th Cir. 1999) ("[a] defendant cannot be guilty of violating § 1326(a) unless he has previously been denied admission, excluded, deported, or removed

from the United States") (quotation marks omitted). His characterization is also at odds with the rationale of decisions upholding Section 1326's constitutionality and defining its scienter element. As he acknowledges (AB32), in holding that Congress has the power to enact the statute, this Court explained that Section 1326's "text … plainly reveals its immigration-regulation purpose" and called it "a necessary piece of the immigration-regulation framework." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). Likewise, Section 1326's status as "a regulatory statute enacted to assist in the control of unlawful immigration," was central to decisions interpreting it to require a *mens rea* of general, not specific, intent. *United States v. Rizo-Rizo*, 16 F.4th 1292, 1297 (9th Cir. 2021) (quoting *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968)). Those decisions confirm that Section 1326 is an immigration-regulation measure and that challenges to it should be reviewed for rationality.

Second, Carrillo observes (AB29-30) that rational-basis cases such as *Hawaii* and *Fiallo* involved the initial entry of noncitizens into the United States, whereas Section 1326 defendants will have physically (though unlawfully) entered the country. Even putting aside that Section 1326 *is* a law about entry, Carrillo's citations establish only that noncitizens present in the United States are among the "persons" entitled to raise equal-protection challenges in the first place. *See Plyler v. Doe*, 457 U.S. 202, 210-15 (1982); *Mathews*, 426 U.S. at 77; *cf.*

*Dep't of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959, 1982-83 (2019) (noncitizen who has *not* effected entry is entitled to only those rights "that Congress has provided by statute"). Those decisions do not dictate the standard of scrutiny that governs such challenges; that standard instead depends upon the nature of the challenge and substantive body of law applicable to it. And in the context of federal immigration laws, the applicable standard is no higher than rational basis even when challenges are lodged by persons located in, and with lasting ties to, the United States. *See, e.g., Abebe*, 554 F.3d at 1206-07 (reviewing under rational-basis standard a lawful permanent resident's challenge to statutory scheme denying deportable aliens eligibility for discretionary relief); *Dunn v. INS*, 499 F.2d 856, 858-59 (9th Cir. 1974) (same in Mexican national's challenge to law authorizing relief from deportation for natives of Eastern, but not Western, Hemisphere countries).

Third, Carrillo contends (AB30-31) that Section 1326 must receive "higher scrutiny" because it prescribes criminal penalties. But Carrillo's page-long effort (AB34) to distinguish the legion of criminal cases where courts have applied ordinary equal-protection standards shows otherwise. For example, when this Court addressed challenges to federal criminal and sentencing provisions that classify based on alienage, it did not ask what standard applied, ascertain that it was rational basis, and then ratchet up the level of scrutiny

because the law had penal consequences. The Court instead applied the same substantive standard (rational basis) that would govern outside the criminal context. *See United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091-92 (9th Cir. 2007); *United States v. Lopez-Flores*, 63 F.3d 1468, 1473-75 (9th Cir. 1995); *see also United States v. Osorto*, 995 F.3d 801, 811 (11th Cir.), *cert. denied*, 142 S. Ct. 470 (2021).

Finally, Carrillo repeats the "concern that applying rational-basis review would render criminal immigration laws 'free from constitutional equal protection constraints.'" AB36 (quoting 1-ER-4). But Carrillo does not explain his suggestion that rational-basis review is tantamount to *no* review or respond to the point (OB28-29) that, under Supreme Court precedent, immigration classifications that cannot be explained on grounds other than racial animus are unlikely to survive rational-basis review. *See Hawaii*, 138 S. Ct. at 2420-21. Nor does Carrillo explain how declining to extend *Arlington Heights* to facially neutral immigration laws would suddenly free Congress to pass discriminatory statutes, when rational-basis review has long applied to federal laws drawing overt distinctions based on national origin, which may be correlated with race. *See Village of Freeport v. Barrella*, 814 F.3d 594, 606 (2d Cir. 2016) ("[C]laims based on race and national origin may substantially overlap or even be indistinguishable depending on the specific facts of a case.") (quotation marks omitted). These concerns therefore do not justify deviation from the rational-basis standard.

9

**B.** **Circuit Precedent Does Not Mandate Application of** ***Arlington Heights***

Carrillo relies (AB24-28, 30-31) on the premise that this Court has "settled whether *Arlington Heights* applies to certain types of official actions" in the immigration field. But as the careful wording of that phrase lets on, Carrillo's cited decisions do not control here because none addressed a challenge to a facially neutral federal immigration statute analogous to Section 1326.

Carrillo's lead case—*Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004)—does not mention *Arlington Heights*. The noncitizen there sued individual immigration officers for allegedly discriminating against her on the basis of race and/or national origin when denying her applications for adjustment of status and advance parole. *Id.* at 967-68. In holding that the noncitizen had stated a plausible equal-protection claim, this Court declined to settle on a standard of scrutiny. *Id.* at 974 n.29. The Court instead deemed it enough to decide at the pleading stage that the complaint contained allegations sufficient to "prevail even under the 'wholly irrational' standard" set forth in *Mathews v. Diaz*, *supra*—*i.e.*, a standard akin to the one that we urge here. *Id.*

Carrillo's reliance on *Regents of the Univ. of Cal. v. Dep't of Homeland Security*, 908 F.3d 476 (9th Cir. 2018), *rev'd*, 140 S. Ct. 1891 (2020); and *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), is similarly misplaced. As we explained (OB29-31), the standard-of-review discussion in the Supreme Court's *Regents* decision

10

centered on the choice between applying *Arlington Heights* and no judicial review at all.[2] And while this Court's *Regents* opinion discussed the then-recent decision in *Hawaii, supra*, it did so to distinguish *Hawaii* on its facts, not to address the Supreme Court's application of rational-basis review there. *See* 908 F.3d at 519-20 (explaining why *Hawaii* did "not foreclose" the equal-protection claim).

This case is also distinguishable from *Ramos*, which involved an Executive Branch decision to terminate four countries from a program providing a "nationality-based humanitarian harbor for foreign citizens." 975 F.3d at 896. In explaining why it was not applying the rational-basis standard from *Hawaii*, this Court stated that "the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress *for foreign nationals who have lawfully resided in the United States for some time*." *Id.* (emphasis added). Carrillo thus errs in asserting (AB27) that "*Ramos* did not rely on lawful status in its reasoning." And he is likewise wrong to suggest (AB27-28) that a statute

---

[2] Carrillo misapprehends (AB26 & n.13) the relevant "dispute[]" between the parties in *Regents*, which involved whether the plaintiffs had raised a selective-enforcement claim "barred" under Supreme Court precedent, 140 S. Ct. at 1915, *not* the statutory question of reviewability the Court addressed earlier in its opinion, *see id.* at 1905-07.

designed to deter illegal reentry by other countries' nationals does not implicate delicate foreign-policy concerns akin to those that have long justified deferential judicial review in the immigration field. *See* OB31.

*Wong*, *Ramos* and *Regents*, in short, do not require application of the *Arlington Heights* framework to an Act of Congress in the immigration field.

## II. SECTION 1326 IS CONSTITUTIONAL UNDER *ARLINGTON HEIGHTS*

Section 1326 is constitutional even under *Arlington Heights*. Carrillo grounds his contrary position in a selective historical account that sprinkles in references to Hitler (AB15, 62) while minimizing the import of post-INA laws that abolished the national-origin quota system, 3-ER-323; barred race and national-origin discrimination in issuing immigrant visas, 3-ER-329; and, in the words of one amicus, "enabled Asian, Caribbean, and Latin American migrants to continue to dominate the nation's immigration," Daniel J. Tichenor, *The Politics of Immigration Reform in the United States, 1981-1990*, 26 Polity 333, 337 (1994). But this case is not a judicial referendum on 20th-century U.S. immigration policy. It presents a narrow, and novel, constitutional challenge to Section 1326. And Carrillo's arguments cannot mask the significant errors of law and fact that the district court committed in resolving that challenge.

## A.    The 1952 Congress Was Not Required To Purge Any Bad Intent Of Its Predecessor When Enacting Section 1326

1.    The district court held Section 1326 unconstitutional based on information concerning the statute's 1952 enactment and its 1929 predecessor. 1-ER-17-18.  The parties agree that the court could consider evidence from both time frames.  *See* OB34-35; AB46.  Under *Abbott v. Perez*, 138 S. Ct. 2305 (2018), the court could consider the 1929 Act as "historical background," *id.* at 2325 (quotation marks omitted), and weigh the 1929 Congress's intent "to the extent" that it "naturally give[s] rise to—or tend[s] to refute—inferences regarding" congressional intent in 1952.  *Id.* at 2327.

The focus, however, must remain on the "challenged [legislative] action," *Arlington Heights*, 429 U.S. at 265, which is Section 1326 as enacted in 1952 and amended since.  Given the substantial changes Congress introduced in the INA, the district court was *not* entitled to deny the 1952 Congress a presumption of good faith based on findings about its intent in 1929, *Abbott*, 138 S. Ct. at 2325, or to demand that the 1952 Congress "purge[]" any "bad intent of its predecessor," *id.* at 2326 n.18.[3]  And the court was bound by the Supreme

---

[3] Carrillo errs in suggesting (AB39 n.17) that the presumption of good faith is limited to challenges to state redistricting plans.  *Abbott* said that placing the burden on the equal-protection "challenger … takes on special significance in districting cases," 138 S. Ct. at 2324, not that this rule applies *only* in such cases.  Moreover, the first districting decision to apply the presumption—*Miller v. Johnson*, 515 U.S. 900, 915 (1995)—drew it from *Regents of the Univ. of Cal. v.*

Court's instruction that historical background evidence carries less weight when it is "remote in time," *Regents*, 140 S. Ct. at 1916, and concerns a legislature whose composition has changed substantially, OB35, 46.

2.     Carrillo offers three grounds for affording the 1929 Act greater significance than the statute he actually challenges.  All lack merit.

*First*, Carrillo contends that the 23-year gap and legislative turnover "mattered little here" (AB40) because some legislators who "actually knew" the intent underlying the 1929 Act remained in Congress and referred back to the 1920s when speaking in support of the INA.  But Carrillo does not dispute that the continuity he touts (30 Members out of approximately 530, *see* AB54) amounts to an almost 95% turnover, or that the main villains in his account— *e.g.*, Senator Blease, Representatives Johnson and Box, AB8-9—were either dead or out of office by 1952.  And as is true of many remarks Carrillo cites, the ones he quotes from two Members still serving in 1952 do not address Section 1326 or mention noncitizens from Mexico.  *See* 98 Cong. Rec. 5773-74 (1952) (Sen. George's defense of national-origin quotas enacted in 1924, which did not

---

*Bakke*, 438 U.S. 265 (1978), a challenge to a university admissions policy.  If university administrators are entitled to the presumption, then so too is Congress.  *See also NC State Conference of NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020) (voter-ID law); *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 216 (5th Cir. 2019) (dormant Commerce Clause challenge).

apply to Mexico); *id.* at 4442 (Rep. Jenkins expresses concern over arrival of "non-Christians" and communists). Those remarks thus provide no basis for attributing to the 1952 Congress the intent of its 1929 predecessor. *See United States v. Calvillo-Diaz*, No. 21-cr-445, 2022 WL 1607525, at *10 (N.D. Ill. May 20, 2022) (defendant identified no evidence that the 1952 Congress was aware "of the history behind the original 1929 criminalization of illegal reentry").

*Second*, Carrillo argues (AB41-42) that the intent underlying the 1929 Act remains controlling because Congress "reenact[ed]" the illegal-reentry law "without significantly altering it." In support, he invokes case law involving a canon of construction applicable in the limited context of recodification projects, such as the 1948 revision of the Judicial Code, where reviser's notes indicate that no substantive changes from prior law were intended. *See Tidewater Oil Co. v. United States*, 409 U.S. 151, 162-63 (1972); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 257 (2012). Carrillo identifies no precedent applying that principle to the INA, which "substantially changed the law" "in many respects." *Lehmann v. Carson*, 353 U.S. 685, 687 (1957).

Section 1326 was one such significant alteration. The INA repealed the 1929 Act and related laws and replaced them with a single reentry offense that (i) altered the penalties previously applicable to some defendants, *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 n.10 (1987); (ii) deleted "language that

would have permitted collateral challenges to the validity of deportation proceedings in a criminal prosecution," *id.* at 836; and (iii) added a clause that created a "separate" version of the offense applicable to noncitizens "found in" the United States without authorization, *see United States v. Castillo-Mendez*, 868 F.3d 830, 836 (9th Cir. 2017). *See* OB44-45. Even the district court agreed that the latter change was "substantive." 1-ER-24.

That Congress effected these changes through legislation distinguishes this case from *Hunter v. Underwood*, 471 U.S. 222 (1985) (cited at AB42-43). *Hunter* rejected the argument that a felon-disenfranchisement law originally motivated by discriminatory intent was constitutional in its present form in light of *judicial* decisions that had invalidated "[s]ome of [its] more blatantly discriminatory" portions. 471 U.S. at 232-33. Yet as *Abbott* confirmed, 138 S. Ct. at 2325, *Hunter* reserved whether legislative revisions to such a law may render it constitutional.[4] *Hunter* therefore does not suggest that significant "*legislative* changes" like those in Section 1326 are "insufficient to remove an earlier discriminatory intent."

---

[4] Carrillo twice quotes (AB47, 70) out of context language from *Abbott* describing *Hunter*. *See* 138 S. Ct. at 2325 (explaining that *Hunter* rejected an argument that judicial pruning of a law "alter[ed] the intent with which the [law], including the parts that remained, had been adopted"). That description is fully consistent with our point that meaningful *legislative* changes present a different case and trigger the presumption of good faith for successor provisions.

*Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1223 n.20 (11th Cir. 2005) (en banc); *accord Hayden v. Paterson*, 594 F.3d 150, 166 (2d Cir. 2010).

*Third*, and more ambitiously, Carrillo contends (AB45) that the intent underlying the 1929 Act "infect[s] the current version" of Section 1326 because Congress has not "actively confront[ed] the statute's racist past and cho[sen] to reenact it for race-neutral reasons." Carrillo does not explain what would satisfy his active-confrontation rule or how it differs from the core error the Supreme Court corrected in *Abbott*, where a lower court had required a state legislature "to expiate its predecessor's bad intent," "'cure' the earlier Legislature's 'taint,'" and show that it "had experienced a true 'change of heart.'" 138 S. Ct. at 2325. Indeed, Carrillo's multi-paragraph discussion of *Abbott* does not acknowledge that the viability of the lower court's purge-the-taint rationale was "[t]he primary question" before the Court. *Id.* at 2324.

The decisions in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), do not support Carrillo's position. As multiple courts have observed, *e.g.*, *United States v. Muria-Palacios*, No. 2:21-cr-23, 2022 WL 956275, at *2 (E.D. Cal. Mar. 30, 2022), neither decision involved an equal-protection challenge or even cited *Arlington Heights*. The Court in *Ramos*, though describing the racist roots of laws authorizing

nonunanimous jury verdicts, ultimately held that "a jurisdiction adopting a non-unanimous jury rule even for benign reasons would still violate the Sixth Amendment." 140 S. Ct. at 1401 n.44. In *Espinoza*, the Court rejected the relevance of 19th-century laws evincing anti-Catholic bias to the historical understanding of the Free Exercise Clause. 140 S. Ct. at 2259. Accordingly, neither *Ramos*, *Espinoza*, nor any other "binding precedent," 1-ER-43, supports the novel proposition that any bad intent underlying the 1929 Act "infect[s]" Section 1326 unless and until Congress "repudiat[es]" (AB45, 47) the statute's history.

## B. The District Court Clearly Erred In Assessing The Intent Of The 1952 Congress

Once the focus is placed on Section 1326 as enacted in 1952, the district court's finding of discriminatory intent cannot stand. The government showed that the court committed fundamental errors in assessing at least three historical events central to its ruling—President Truman's veto of the INA, a letter from Deputy Attorney General Ford, and anti-harboring legislation colloquially known as the "Wetback Bill." OB46-51.[5] As explained below, Carrillo does not refute that showing and cannot rescue the court's ruling through findings the court never made or a reconfigured disparate-impact argument.

---

[5] Carrillo does not respond to our point (OB40-42) that the district court additionally erred in inferring discriminatory intent from congressional silence. 1-ER-19-20.

### 1.    Presidential veto

The district court inferred prohibited intent from "Congress' decision to proceed with the INA" after President Truman, in vetoing the legislation, "denounced [it] as discriminatory."  1-ER-22.  Other courts have soundly rejected any such inference, *see, e.g.*, *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1075 (D. Or. Aug. 3, 2021); *United States v. Muñoz-De La O*, No. 2:20-cr-134, 2022 WL 508892, at *13 (E.D. Wash. Feb. 18, 2022), and the government explained (OB47) why the veto sheds no light on Congress's intent in enacting Section 1326 in particular.

Carrillo's response concedes that Truman's veto message "said nothing about § 1326 specifically."  AB64; *see* 3-ER-274-75.  He nevertheless echoes the district court's view that, by "'fail[ing] to heed President Truman's call to reimagine immigration'" and enacting Section 1326, Congress showed "'at least indifference to the nativist motivations of the'" 1929 Act.  AB63 (quoting 1-ER-22).  But Carrillo must establish that Congress acted "'because of'" Section 1326's anticipated adverse effects on Mexicans and Latinos, *see Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); "indifference" is not enough.  OB34.  Additionally, Carrillo overlooks that the veto message approved certain aspects of the INA that lowered racial barriers and that some members of Congress therefore believed that overriding the veto was necessary to combat

19

discrimination.  *See United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567, at *7 (D.V.I. June 16, 2021) (citing floor statements); *see also Machic-Xiap*, 552 F. Supp. 3d at 1075 n.71 (calling it "equally possible that Congress overrode [the] veto because they disagreed that the legislation was racially discriminatory").

### 2.  Anti-harboring law and Ford Letter

Two pillars of the district court's reasoning were (a) that Congress passed the "Wetback Bill" two months before passing Section 1326 and (b) that, when it enacted Section 1326, Congress made the law more punitive by following a recommendation that Deputy Attorney General Ford made in a letter that elsewhere used the term "wetback."  1-ER-22-28.  But Carrillo does not deny that the court misunderstood the pre-INA legislation, believing it to target Mexican laborers to the exclusion of all others, 1-ER-25-26, when in fact it targeted those who smuggled or harbored such laborers.  OB50-51; *see* Richard B. Craig, *The Bracero Program: Interest Groups and Foreign Policy* 98 (1971) (bill "finally legislated against those who would willfully import, transport, or harbor illegal aliens").  Nor does he dispute that the court was equally wrong as to Ford: his letter did not propose the found-in clause but instead commented on a draft bill already containing it.  OB49-50.[6]

---

[6] The clear-error standard of review does not insulate these errors from correction.  That standard, while "deferential, … is not toothless."  *United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012) (quotation marks omitted).  And

Carrillo does defend the district court's apparent view that the use of the term "wetback" in governmental debates and materials of the era was inherently derogatory and indicative of racial animus. 1-ER-23, 25-28, 31. But Carrillo's defense of that view is ahistorical, grounded largely in cases that addressed workplace discrimination in the late 20th (or early 21st) century. *See* AB65-66.

The relevant context here, by contrast, is immigration legislation debated and enacted in 1952. As offensive as the term is now, "the parlance of the time," 152 Cong. Rec. 4220 (2006) (Sen. Edward Kennedy), was to refer to unlawfully present Mexicans as "wetbacks," with no derogatory meaning necessarily intended. *See* OB48. The Presidential Commission quoted in Ford's letter said so explicitly.[7] Carrillo's expert witness recognized as much. 2-ER-225-26. And Carrillo's own citation to *Castaneda v. Partida*, 430 U.S. 482 (1977)—where the Supreme Court quoted a state court's use of the term without evident hesitation, *id.* at 498—confirms that the term remained in accepted public use into the

---

precedent cited by both parties (OB18-19, AB22) illustrates that in a case such as this one, where no trial was held and intent turns primarily on public legislative materials routinely examined by courts, a court may more readily be "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quotation marks omitted).

[7] Report of the President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* 69 (1951) ("The term wetback is widely accepted and is used without derision; hence for convenience it is used here."), at https://hdl.handle.net/2027/uc1.31822024166522.

1970s.[8] These examples, and those cited in our opening brief, illustrate why the district court was wrong to reflexively infer animus from the term's use at the time. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (explaining that a "speaker's meaning may depend on," *inter alia*, "context, … local custom, and historical usage").

Carrillo faults the government (AB67) for emphasizing the foregoing flaws in the district court's analysis given the "wealth of other evidence" the court considered. But the court made clear that only in their "totality" did the factors it considered "show discriminatory intent on behalf of the 1952 Congress." 1-ER-34; *see* 1-ER-19. And when (at least) three of those considerations are excised, the court's ultimate finding cannot stand.

In any event, the supposed "wealth of other evidence" (AB67) dissolves upon inspection. Three of Carrillo's four record citations on that page concern the 1929 Act, not Section 1326. Elsewhere, Carrillo asserts (AB59) that the district court "properly relied on [Congress's] departure from normal procedures" in 1952, which would be a valid consideration under *Arlington*

---

[8] *See also, e.g.*, Joe C. Ortega, *Plight of the Mexican Wetback*, 58 A.B.A. J. 251 (1972) (explaining that the term "generally applie[s] to all Mexicans who are here illegally," and "is generally not considered derogatory by the group"); Craig, *supra*, at ix n.1 ("As used in this study, … 'wetback' indicates an illegal entrant.").

*Heights*, 429 U.S. at 267. But the court made no such finding as to the 1952 Congress. Nor would the record support one. *See Machic-Xiap*, 552 F. Supp. 3d at 1076 (explaining why the evidence presented through the same two defense experts "reveals the opposite of procedural or substantive irregularities").

### 3. Disparate impact

Carrillo cannot compensate for the district court's errors by shifting the focus to the court's final consideration—that Congress enacted Section 1326 despite its supposed "knowledge" of the 1929 Act's disparate impact on Mexicans and Latinos. 1-ER-26-27. The court treated that as "some evidence that racial animus was a motivating factor" in 1952. 1-ER-27. But Carrillo goes further. Citing the percentage of illegal-reentry defendants who were Hispanic in FY2020 (99%), he argues for the first time on appeal that Section 1326's "impact on Latino immigrants is so stark" that it alone supports an inference of discriminatory intent. AB49-50; *compare* 1-ER-10 ("Carrillo-Lopez acknowl-edges, and in fact does not contend, that disparate impact alone in this case is enough to meet his burden.").

But even assuming that Carrillo's citations show congressional awareness (and not just foreseeability, AB54), his statistics do not establish the kind of disparity that matters under *Arlington Heights*—*i.e.*, one that "supports an inference of intentional discrimination," AB48 n.19. To start, Carrillo does not

explain how contemporary sentencing statistics can shed light on the intent of the 1952 Congress, *see* OB35 n.5, especially when those statistics may be affected by prosecutorial policies that—as Carrillo and amici recognize—can vary over time.  *See* AB18; Legal Services Providers' Br. 7-13.[9]

Moreover, this case is unlike the infamous examples Carrillo cites:  *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).  Those decisions stand for the proposition that stark numerical disparity can be highly probative of discriminatory intent when "the disparate impact is [un]explainable on grounds other than race."  *United States v. Dumas*, 64 F.3d 1427, 1431 (9th Cir. 1995); *see Feeney*, 442 U.S. at 270, 275, 279 n.25 (foreseeable disparate impact of veterans' preference on women did not ripen into inference of discriminatory intent).  Here, however, the explanation for the high percentage of Mexican and Latino defendants in Section 1326 prosecutions is obvious.  It reflects the geography of a shared 2,000-mile border; economic conditions that have long propelled migration from Mexico and points south, *see* S. Rep. No. 80-1515, at 633 (1950); and the fact that those who have

---

[9] Carrillo's numbers are unilluminating for another reason:  at times, they conflate Section 1326 cases with the separate category of illegal-*entry* prosecutions under 8 U.S.C. § 1325.  The 2018 Attorney General remarks he quotes (AB18), for example, concerned a zero-tolerance policy for offenses under Section 1325.  4-ER-576; *see* 4-ER-589-90 (statistics in expert declaration on "unlawful entry" cases).

experienced the prior immigration outcomes that make them eligible for prosecution under Section 1326 are themselves disproportionately Latino. OB38-39; *see Calvillo-Diaz*, 2022 WL 1607525, at *4; *United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114, 1122-23 (D.N.M. 2021).

In these circumstances, the relevant precedents are not *Yick Wo* and *Gomillion*, but *Regents* and *Ramos*, *supra*. *See* OB36-38. Courts in those cases declined to infer discriminatory intent even though the termination of certain programs disproportionately affected particular groups: Latinos from Mexico in *Regents*, 140 S. Ct. at 1915, and nationals of non-white, non-European countries in *Ramos*, 975 F.3d at 898. Carrillo does not meaningfully engage with the reasoning of the decisions, recasting them (AB52-53) as cases where challengers failed to tie disparate-impact evidence to other proof of discriminatory intent. That reading is implausible, OB39; both decisions viewed disparate impact as adding nothing to the other intent evidence the challengers proffered. *See Regents*, 140 S. Ct. at 1915 (impact did not, "singly or in concert" with other factors, state a claim); *Ramos*, 975 F.3d at 898 (impact was not even "circumstantial evidence" of "discriminatory intent"). And as Carrillo says elsewhere (AB75), the sum of zeros remains zero.

This Court's decision in *Dumas* was also not, as Carrillo suggests (AB54), an impact-only case. The challenger paired statistics about the crack-powder

ratio's disproportionate effect on African Americans—evidence this Court deemed to have "some appeal," 64 F.3d at 1429—with arguments that discriminatory intent could be inferred from the racist history of a predecessor law, conflicting views about the scientific basis for the crack-powder distinction, and "the hasty manner in which" Congress adopted the distinction. *Id.* at 1430; *see United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994). This Court found the totality of that evidence insufficient to establish that Congress enacted the law "at least in part because of, not merely in spite of," the effects on African Americans that Dumas had identified. *Dumas*, 64 F.3d at 1430 (quoting *Feeney*, 442 U.S. at 279). The Court should reach the same result here.

## C. Any Discriminatory Intent Was Not Determinative In Section 1326's Enactment

1. The district court erred at the final step of the *Arlington Heights* analysis as well. The inquiry at that stage is whether the government established, "by a preponderance of the evidence," that Congress would have enacted the same law "even if, hypothetically, [it] had not been motivated by" prohibited intent. *See NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 403 (1983). The question here, then, is whether any intent to discriminate against Mexicans and Latinos "was a 'but-for' motivation for" Section 1326's passage, *Hunter*, 471 U.S. at 232—*i.e.*, was such intent "determinative" in Congress's decision to enact it? *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008).

The government showed that it was not, based on three considerations: (i) the strong, race-neutral reasons that undergird Section 1326, OB54-56; (ii) historical context making it implausible Congress would have dispensed with a reentry prohibition in the INA, OB56-57, 59-60; and (iii) amendments to Section 1326 that demonstrate Congress's support for that prohibition in legislation unsoiled by discriminatory intent, OB57-59.

2.   Carrillo dismisses the first two of these considerations as examples of "rational-basis review" not relevant under *Arlington Heights*.  AB68, 73.  They are not.  "[T]he substantiality of the state's proffered non-racial interest and how well the law furthers that interest" are plainly proper considerations at this stage. *NC State Conference of NAACP v. McCrory*, 831 F.3d 204, 233-34 (4th Cir. 2016). It is therefore highly relevant that this Court and others have recognized the strong, legitimate interest in deterring unauthorized reentry that underlies Section 1326, *see Hernandez-Guerrero*, 147 F.3d at 1078; *United States v. DiSantillo*, 615 F.2d 128, 135 (3d Cir. 1980)—an interest that explains the prevalence of analogous criminal prohibitions worldwide.  OB55.

That deterrence interest is not, as Carrillo suggests (AB73), merely a "theoretical" reason that could have supported Section 1326.  Deterring repeat violations of the immigration laws was *the* rationale given in the committee reports leading to Section 1326's predecessor.  1-SER-261-62 (Senate); 1-SER-

27

271 (House). And Carrillo offers no response to our point that, if courts may consider prohibited intent gleaned from floor statements preceding the 1929 Act, they should also consider legitimate reasons evident from that Act's legislative history. OB55-56. Tellingly, despite his extensive focus on the 1929 Act, Carrillo does not cite the 1929 committee reports at all.[10]

Carrillo also misunderstands the relevance of Congress's post-1952 amendments to Section 1326 at this stage. The government did not cite those amendments to show that Congress had "'grapple[d]'" with the history of Section 1326 and its predecessor, AB70; as explained above, p. 18, *supra*, no "binding precedent" supports such a requirement, 1-ER-43, much less makes it relevant to the final step of the *Arlington Heights* analysis. *See Hunter*, 471 U.S. at 232-33 (analyzing separately whether the prohibited purpose "was a 'but-for' motivation for the" law and whether intervening "events … had legitimated" that law). Rather, we invoked the post-INA amendments principally because they demonstrate that an illegal-reentry law and animus toward Mexicans and Latinos have *not* gone hand in hand—*i.e.*, that Congress has strengthened and

---

[10] Those reports also undercut Carrillo's puzzling assertion (AB52, 59) that animus can be inferred from Congress's failure to criminalize overstaying a visa. The reports, and other record evidence (2-ER-112-13), show that Section 1326 and its predecessor targeted the particular problem of noncitizens repeatedly returning after deportation, 1-SER-262—not the distinct scenario where a noncitizen lawfully enters the country and impermissibly remains.

adjusted Section 1326 absent evidence of animus toward those individuals. *See Calvillo-Diaz*, 2022 WL 1607525, at *11. And that makes it even less likely that racial animus was a determinative factor in Section 1326's enactment years earlier. *Cf. United States v. Ayers*, 924 F.2d 1468, 1473 (9th Cir. 1991) (subsequent acts can shed light on earlier state of mind).

Carrillo responds to that point by minimizing the amendments as non-substantive or "mere 'housekeeping'" measures. AB71 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 233-34 (1998)). But the Supreme Court used this quoted language in explaining that Congress did not intend the recidivist enhancements it added to Section 1326(b) to constitute a new offense element that, under the Constitution, must be proved to a jury beyond a reasonable doubt. *See* 523 U.S. at 233-34, 239. Nothing in that analysis undermines the significance of Congress's decision to recalibrate the statute multiple times between 1988 and 1996, or refutes our point that Congress did so for reasons untethered to racial animus. OB57-58.

3. Carrillo's remaining arguments lack merit. Citing *Castaneda*, *supra*, he chides the government (AB68) for failing to produce "independent" rebuttal evidence. In *Castaneda*, the constitutionality of a county's grand-jury-selection procedure depended on how that process operated in practice, yet the record contained no evidence on that central point. 430 U.S. at 497-99. This case, by

contrast, raises "a counter-factual scenario," *Johnson*, 405 F.3d at 1224, about what Congress would have done absent a discriminatory motive. The government appropriately introduced information responsive to that question by examining Carrillo's witnesses and supplying a pertinent congressional report. OB59-60.

Finally, Carrillo argues (AB73-75) that the district court was entitled to credit his witness's view that *none* of Congress's concededly valid reasons for enacting Section 1326 could be separated from racial animus. But Carrillo does not dispute that the court reached that result by declining to consider the valid reasons in their totality. OB60. Moreover, one of the quoted snippets (AB74) illustrates why crediting his witness's account was an error correctable under any standard of review. *See Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (reviewing court may find clear error where, *inter alia*, "[d]ocuments or objective evidence … contradict the witness' story" or that story is "internally inconsistent or implausible on its face"). Specifically, the witness's view that Mexico was "a junior partner" that did not "dictat[e] … to the United States" at the relevant time, 2-ER-108, contravenes historical evidence that Mexico leveraged renewal of the *bracero* migratory-labor program in order to secure changes in U.S. law. OB56; *see also* Imm. Scholars Br. 20 (certain states excluded from that program based on Mexico's objections). The district court's decision to overlook flaws

of that significance and credit the witness's view that *every* proffered justification

for Section 1326 was "racialized," 2-ER-120-22, is clear and reversible error.

## CONCLUSION

The judgment should be reversed.

Respectfully submitted,

JASON M. FRIERSON                     KENNETH A. POLITE, JR.
United States Attorney                Assistant Attorney General

ELIZABETH O. WHITE                    LISA H. MILLER
Appellate Chief                       Deputy Assistant Attorney General
PETER H. WALKINGSHAW
Assistant United States Attorney      s/  Scott Meisler
District of Nevada                    SCOTT A.C. MEISLER
                                      Criminal Division, Appellate Section
                                      U.S. Department of Justice
                                      950 Pennsylvania Avenue, NW
                                      Washington, DC  20530
                                      (202) 307-3803
                                      scott.meisler@usdoj.gov


May 27, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Ninth Cir. R. 32-1(a), I hereby certify that this brief contains 6,997 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(f)) and has been prepared in a proportionally spaced, 14-point typeface using Microsoft Word 2013.

s/ Scott Meisler
Scott A.C. Meisler


## STATEMENT OF RELATED CASES

The same constitutional challenge at issue in this appeal is presented in *United States v. Rodrigues-Barrios*, No. 21-50145; in *United States v. Machic-Xiap*, No. 22-30023; and in two cases in which briefing has been held in abeyance: *United States v. Gutierrez-Barba*, No. 21-10232; and *United States v. Vasquez-Ortiz*, No. 21-10309.

s/ Scott Meisler
Scott A.C. Meisler