Case No. 21-10233

# United States Court of Appeals
## for the Ninth Circuit

United States of America,

>             Plaintiff/Appellant,

v.

Gustavo Carrillo-Lopez,

>             Defendant/Appellee.

D.C. No. 3:20-cr-00026-MMD-WGC
(Reno, Nevada)

Appeal from the United States District Court
for the District of Nevada

## Appellant Gustavo Carrillo-Lopez's
## Petition for En Banc Rehearing

Rene L. Valladares
Federal Public Defender
Ellesse Henderson*
Amy B. Cleary*
Wendi L. Overmyer*
Assistant Federal Public Defenders
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577
Ellesse_Henderson@fd.org
Amy_Cleary@fd.org
Wendi_Overmyer@fd.org
*Counsel for Appellee Carrillo-Lopez

Erwin Chemerinsky*
University of California
Berkeley School of Law
215 Boalt Hall
Berkeley, California 94720
(510) 642-6483
echemerinsky@law.berkeley.edu

# Table of Contents

Table of Authorities ................................................................................. iii

Statement in Support of En Banc Review ............................................... 1

Analysis and Authority ........................................................................... 2

I.    The panel opinion conflicts with Supreme Court precedent holding that reenactment, without more, is insufficient to purge the taint of racial discrimination. ........................................... 2

II.    The panel opinion improperly reformulates the *Arlington Heights* framework. ........................................................................... 9

   A.    The panel misapplied *Arlington Heights'* clear error standard of review. .................................................................... 10

   B.    The panel misapplied the *Arlington Heights* totality-of-the-circumstances test. ...................................................................... 14

III.    En banc review is needed to realign this Court's precedent with the Supreme Court, in an area affecting thousands of criminal defendants each year, along with all *Arlington Heights* cases going forward. .................................................................................... 19

Conclusion .............................................................................................. 22

Certificate of Compliance

Certificate of Service

Appendix: *United States v. Carrillo-Lopez*, 68 F.4th 1133 (9th Cir. 2023)

# Table of Authorities

**Federal Cases**                                                                       **Page(s)**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ............................................................... *passim*

*Almendarez-Torres v. United States,*
  523 U.S. 224 (1998) ............................................................... 4

*Anderson v. Bessemer City,*
  470 U.S. 564 (1985) ............................................................ 10, 11, 14

*Arce v. Douglas,*
  793 F.3d 968 (9th Cir. 2015) .................................................. 13, 20, 21

*Arizona v. United States Dist. Court (In re Cement Antitrust Litig.),*
  688 F.2d 1297 (9th Cir. 1982) .............................................. 12

*Ave. 6E Invs., L.L.C. v. City of Yuma,*
  818 F.3d 493 (9th Cir. 2016) ................................................ 20, 21

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021) ........................................................ 8

*Church of Lukumi Babalu Aye v. City of Hialeah,*
  508 U.S. 520 (1993) .......................................................... 17

*Cooper v. Harris,*
  581 U.S. 285 (2017) .......................................................... 13, 14

*Easley v. Cromartie,*
  532 U.S. 234 (2001) .......................................................... 11

*Espinoza v. Montana Department of Revenue,*
  140 S. Ct. 2246 (2020) ....................................................... 6, 7

*Harness v. Watson,*
  143 S. Ct. 2426 (2023) ....................................................... 20

*Hunter v. Underwood,*
  471 U.S. 222 (1985) .......................................................... 4, 5, 11

*Lahoti v. VeriCheck, Inc.*,
  586 F.3d 1190 (9th Cir. 2009) ..................................................... 11, 12

*Lewis v. Ayers*,
  681 F.3d 992 (9th Cir. 2012) ...................................................... 12, 13

*McCreary Cnty. v. ACLU*,
  545 U.S. 844 (2005) ......................................................................... 4

*Monasky v. Taglieri*,
  140 S. Ct. 719 (2020) ..................................................................... 12

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ....................................................................... 17

*Ramos v. Louisiana*,
  140 S. Ct. 1390 (2020) .............................................................. 5, 6, 7

*Reno v. Bossier Par. Sch. Bd.*,
  520 U.S. 471 (1997) ....................................................................... 17

*Rogers v. Lodge*,
  458 U.S. 613 (1982) ....................................................................... 15

*United States v. Arvizu*,
  534 U.S. 266 (2002) ....................................................................... 15

*United States v. Carrillo-Lopez*,
  68 F.4th 1133 (9th Cir. 2023) .................................................. *passim*

*United States v. Dumas*,
  64 F.3d 1427 (9th Cir. 1995) .......................................................... 8

*United States v. Fordice*,
  505 U.S. 717 (1992) ......................................................................... 5

*United States v. Hansen*,
  143 S. Ct. 1932 (2023) .................................................................... 4

*United States v. United States Gypsum Co.*,
  333 U.S. 364 (1948) ....................................................................... 12

*United States v. Valdes-Vega*,
  738 F.3d 1074 (9th Cir. 2013) (en banc) ..................................... 15, 16

iv

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................. *passim*

## Federal Statutes

8 U.S.C. § 1326 ............................................................... *passim*

## Federal Legislative Materials

82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952) ............................ 17, 18

98 Cong. Rec. 791–800 (1952) ............................................... 18

S. Rep. No. 81-1515 (1950) ................................................. 16

## Federal Rules

Fed. R. App. P. 35 ....................................................... 2, 10, 21

## Court Rules

Cir. R. 35-1 .............................................................. 2, 10, 21

## Seconday Sources

Eric S. Fish, *Race, History, and Immigration Crimes*,
    107 Iowa L. Rev. 1051 (2022) .......................................... 3, 4

U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses,
Fiscal Year 2022* (May 2023) ............................................. 20

## Statement in Support of En Banc Review

This case poses important questions about the role of the appellate court in applying the *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), framework, to a federal law used for 25% of all federal criminal prosecutions. En banc review is essential because the panel's decision conflicts with the precedents of this Court and the Supreme Court.

The district court found as a factual matter—under controlling precedent—that 8 U.S.C. § 1326 was motivated by a racially discriminatory purpose when enacted in 1929 and reenacted with little revision in 1952. It found there was a racially discriminatory intent and impact when 99% of prosecutions were against people from Latin American countries. And it made those findings based on largely uncontroverted evidence about the racist origins of the law, originally enacted by "proud" white supremacists, nativists, and followers of eugenics theorists to keep the American bloodline "white and purely Caucasian." 1-SER-104–92, 116, 124, 149, 223; 4-ER-482–83, 565–68.

The panel reversed. App. 1–18.

1

Two aspects of the panel's opinion warrant en banc review. First, in contravention of Supreme Court precedent, the panel treated the law as having been originally adopted in 1952, which meant that it ignored the overtly racist history of the law in the decades before its reenactment. Second, again in contravention of Ninth Circuit and Supreme Court precedent, the panel reformulated the *Arlington Heights* framework, ignoring the clear error standard of review and substituting its own judgment on evidence it reviewed piecemeal.

The panel's errors denigrate *Arlington Heights* and create a conflict between Ninth Circuit and Supreme Court precedent on a recurring issue affecting tens of thousands of criminal defendants each year and all cases litigated under *Arlington Heights* in this Circuit. En banc review is warranted. Fed. R. App. P. 35(a), (b); Cir. R. 35-1.

## Analysis and Authority

I. **The panel opinion conflicts with Supreme Court precedent holding that reenactment, without more, is insufficient to purge the taint of racial discrimination.**

In its analysis of Section 1326, the panel makes a crucial error—and creates a conflict with Supreme Court precedent—in viewing the statute as having been adopted in 1952. App. 10. By doing so, the

panel was able to ignore the racist history of the law as enacted in 1929. *See* App. 8 ("[T]he views of an earlier legislature are generally not probative of the intent of a later legislature."); App. 15–16 (concluding district court clearly erred by considering 1929 statute); App. 16 ("[T]he evidence of the discriminatory motivation for the 1929 Act lacks probative value for determining the motivation of the legislature that enacted the INA."); App. 18 (criticizing district court for considering "evidence unrelated to [Section] 1326"). And this error allowed the panel to ignore Supreme Court precedent about the relevance of statutory history, both as a factor under *Arlington Heights* and as a separate inquiry whether reenactment cured the taint of racial discrimination.

The panel erred by asserting the 1952 Act "was not a 'reenactment' of the 1929 Act, but rather a broad reformulation of the nation's immigration laws." App. 16. Although the panel was correct about the Immigration and Nationality Act *as a whole*, the illegal reentry provision remained substantively the same from 1929. *See* Eric S. Fish, *Race, History, and Immigration Crimes*, 107 Iowa L. Rev. 1051, 1098–100 (2022). In fact, the Supreme Court recently explained that

3

Congress's "cleanup" of a neighboring provision in the 1952 immigration law did not substantively alter the provision from its 1917 roots. *United States v. Hansen*, 143 S. Ct. 1932, 1943–44 (2023); *see also Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (describing the 1990 amendment in particular as mere "housekeeping"). The same is true here, where the core focus of the law—arresting Latinos—remained the same.

Because Section 1326 was a reenactment, not a new statute, the issue before the Court should have been whether the 1952 law cured the discriminatory taint. Supreme Court precedent requires more than silent passage to cure the taint of the 1929 Congress's racial animus. *See McCreary Cnty. v. ACLU*, 545 U.S. 844, 866 (2005) ("[T]he world is not made brand new every morning[.]"). In *Hunter v. Underwood*, the Supreme Court considered a challenge to Alabama's facially neutral voter disenfranchisement law, which was adopted in 1901 to "establish white supremacy in [the] State." 471 U.S. 222, 227–29 (1985). In the next decades, courts struck down "[s]ome of the more blatantly discriminatory selections." *Id.* at 2333. Writing for a unanimous Court, Chief Justice Rehnquist rejected the argument the panel relied on

4

here—that the changes since the original enactment rendered the original history irrelevant. Instead, the Court looked to the continuing impact of the statute, reasoning "its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect." *Id.* at 233; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018); *United States v. Fordice*, 505 U.S. 717, 728 (1992) ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its [explicitly segregated system].").

The Supreme Court continues to examine history when determining whether government action is constitutional. In *Ramos v. Louisiana*, the Court considered the constitutionality of Louisiana's nonunanimous jury verdict system, originally developed at a Constitutional Convention convened for the "avowed purpose" of "establish[ing] the supremacy of the white race." 140 S. Ct. 1390, 1394 (2020). Many years later, Louisiana readopted nonunanimous jury rules without mentioning race. *Id.* at 1426 (Alito, J., dissenting). But *Ramos*'s plurality still analyzed "the racially discriminatory reasons" for adopting the "rule[] in the first place," explaining its "respect for

'rational and civil discourse'" could not excuse "leaving an uncomfortable past unexamined." *Id.* at 1401 & n.44, 1417–18. Those discriminatory reasons led the plurality to reject Justice Alito's dissenting opinion that recodification of the jury non-unanimity rule cleansed it of its racist intent. *Id.* As the plurality explained, in "assess[ing] the functional benefits" of a law, courts cannot "ignore the very functions those rules were"—at inception—"adopted to serve." *Id.* at 1401 & n.44; *see also id.* at 1410 (Sotomayor, J., concurring) (explaining a legislature does not purge discriminatory taint unless the law "otherwise is untethered to racial bias—and perhaps also where a legislature actually confronts a law's tawdry past in reenacting it").

And in *Espinoza v. Montana Department of Revenue*, the Supreme Court reviewed the Montana Supreme Court's decision to exclude religious schools from the state scholarship program. 140 S. Ct. 2246, 2251 (2020). Writing for the Court, Chief Justice Roberts discussed the "checkered tradition" and "shameful pedigree" of similar religious exclusions, born of anti-Catholic bigotry in the 1870s. *Id.* at 2258–59. Like Louisiana's nonunanimous jury system, Montana reenacted its religious exclusion in the 1970s, purportedly "for reasons unrelated to

6

anti-Catholic bigotry." *Id.* But the Court again considered the original

enactment a relevant consideration in its analysis. *Id.*

Justice Alito, unlike in *Ramos*, joined the majority opinion. But

he also wrote separately about the same issue here—the relevance of

history. *Id.* at 2267–74 (Alito, J., concurring). Although Justice Alito

would have struck down the provision under the Free Exercise Clause

regardless of its discriminatory past, he also recognized "the provision's

origin is relevant under ... *Ramos*[.]" *Id.* at 2267 (Alito, J., concurring).

Justice Alito had argued in his *Ramos* dissent "that this original

motivation, though deplorable, had no bearing on the laws'

constitutionality," but he acknowledged "[he] lost, and *Ramos* is now

precedent." *Id.* at 2268 (Alito, J., concurring). Thus, under *Ramos*,

Justice Alito concurred to elaborate on the original anti-Catholic

motivation for Montana's ban. *Id.* at 2268–74.

These cases teach that a statute's prior versions, when known to

be motivated by racial animus, infect the current version unless

Congress actively confronts the statute's racist past and chooses to

reenact it for race-neutral reasons notwithstanding that history.

*Abbott*—which the panel relied on to hold the opposite, App. 7–9, 14–

7

16—follows this principle.[1] *Abbott* considered Texas's redistricting plans, enacted in 2013 after a court determined prior plans were unconstitutionally discriminatory. 138 S. Ct. at 2313. The Court rejected the argument that the 2013 plans merely carried forward the discriminatory intent from the earlier plans. *Id.* at 2313–14. But the Court did not rule that evidence of a prior legislature's intent was always irrelevant—just the opposite. The prior legislature's intent was relevant "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the 2013 Legislature." *Id.* There, the prior legislature's intent did not give rise to an inference about the 2013 legislature because the prior legislature's redistricting plan was *not* reenacted in 2013. *Id.* at 2325.

The facts here fall outside the specific scenario in *Abbott*. In 1952, despite adopting almost identical statutory language and knowing the

---

[1] The panel also cited *United States v. Dumas*, 64 F.3d 1427 (9th Cir. 1995), and *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021). App. 8, 16. But in *Dumas*, the challenger relied only on disparate impact. 64 F.3d at 1429–30. As for *Brnovich*, the Supreme Court simply held it was reasonable for the district court, as factfinder, to discount the probative value of evidence from "a substantially different composition of legislators." 141 S. Ct. at 2349 n.22.

disparate impact of the 1929 law, Congress never debated or even acknowledged the statute's racist origins. 1-ER-19–26; 2-ER-191–93. And the core purpose of the 1929 and 1952 enactments—allowing for arrest, prosecution, and imprisonment of Latinos—is identical. 1-ER-27–28. The district court thus appropriately looked to the intent underlying Section 1326's first enactment in 1929 to assess Carrillo-Lopez's discrimination claim, 1-ER-13–16, and the panel created a conflict with Supreme Court precedent by ruling this evidence irrelevant.

## II. The panel opinion improperly reformulates the *Arlington Heights* framework.

Acknowledging the insidious nature of race discrimination, the Supreme Court in *Arlington Heights* provided the framework for determining whether racial animus motivated a facially neutral statute. Trial courts must engage in "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," examining, inter alia, the disparate impact, legislative history, and historical background of a law. *Arlington Heights*, 429 U.S. at 266–67. And because legislatures are "[r]arely … motivated solely by a single

concern," it is enough to show that racial discrimination was "*a motivating factor*," even if it was not the only—or even the primary—concern. *Id.* at 265–66 (emphasis added). The appellate court's role on appeal is deferential, so long as the district court did not clearly err. *See Abbott*, 138 S. Ct. at 2326; *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985).

The panel opinion upsets this balance. It substitutes the appellate court's view of the evidence for the district court's. And it considers evidence separately, rejecting factors that, in the panel's view, do not on their own directly prove intentional discrimination. This reformulation of *Arlington Heights* conflicts with cases from both this Court and the Supreme Court, resulting in a new standard no challenger is likely to meet. Rehearing en banc is necessary to realign the panel opinion with longstanding precedent. Fed. R. App. P. 35(a), (b); Cir. R. 35-1.

## A. The panel misapplied *Arlington Heights*' clear error standard of review.

The standard of review for challenges to legislation under *Arlington Heights* is well-settled—"a finding of intentional discrimination is a finding of fact," *Anderson*, 470 U.S. at 573, which this Court reviews for clear error. *Abbott*, 138 S. Ct. at 2326; *Hunter*,

471 U.S. at 229. The deferential clear error standard determines "whether, 'on the entire evidence,' [the reviewing court] is 'left with the definite and firm conviction that a mistake has been committed.'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (citation omitted). And mere disagreement is not enough. "So long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009) (citation omitted).

Although the panel acknowledged this deferential standard of review, App. 7, its analysis shows no signs of deference. The full historical record the district court considered included unrebutted expert testimony and post-hearing briefing specifically on the 1952 Congress and legislation. 1-ER-2. The district court concluded the evidence, in total, proved racial animus motivated Section 1326. 1-ER-2–44. But the panel relied on its own judgment of limited, piecemeal evidence to hold the opposite. App. 9–19. By assuming the role of factfinder, rather than deferring to the district court's factual findings,

the panel opinion creates conflict with this Court's and the Supreme Court's clear-error precedent. *See, e.g.*, *Monasky v. Taglieri,* 140 S. Ct. 719, 730 (2020); *Arizona v. United States Dist. Court* (*In re Cement Antitrust Litig.*), 688 F.2d 1297, 1305–06 (9th Cir. 1982) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)).

Not only did the panel not historically examine the statute's 1929 origins, but the 1952 reenactment, too, had a racist history itself that the panel minimized through its piecemeal review. For example, the panel individually weighed documents, such as President Truman's veto and the use of the racial slur "wetback" in contemporaneous letters, reports, debates, and legislation, finding the weight of each individual document "attenuated" and not individually "probative" of discriminatory intent. App. 15. But under this Court's longstanding precedent, that the appellate court may have weighed factors differently does not amount to clear error. *See, e.g.*, *Lewis v. Ayers,* 681 F.3d 992, 998–99 (9th Cir. 2012); *Lahoti*, 586 F.3d at 1196. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Lewis*, 681 F.3d at 999.

Indeed, in race discrimination cases, animus findings are "plausible" "even if another [explanation] is equally or more so." *Cooper v. Harris*, 581 U.S. 285, 293 (2017) ("A finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern."); *see also Arce v. Douglas*, 793 F.3d 968, 977–78 (9th Cir. 2015) ("[A] plaintiff need provide 'very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder.'").

Other examples occur throughout the panel's decision. *Compare* App. 10–18, *with* 1-ER-9–31. The panel gave no weight to evidence of discrimination from the law's origins in 1929—evidence that *Arlington Heights* expressly allows. *Compare* App. 15–16, *with* 1-ER-13–15, 17; *see Arlington Heights*, 429 U.S. at 264–68. The panel characterized the 1952 Act as "a broad reformulation of the nation's immigration laws," rather than a reenactment that kept the substance of Section 1326 identical. *Compare* App. 16, *with* 1-ER-18, 29–31. The panel rejected stark disparate impact data as "highly attenuated." *Compare* App. 16–18, *with* 1-ER-9–13, 26–28. And the panel minimized the relevance of

13

Congress's repeated use of a racial slur.  *Compare* App. 10, 14–15, *with*

1-ER-24–26.

Clear error is a well-established standard of review across this

Court's criminal and civil cases.  "Under that standard, [this Court]

may not reverse just because [it] 'would have decided the [matter]

differently.'"  *Cooper*, 581 U.S. at 293 (quoting *Anderson,* 470 U.S. at

573) (last alteration in original).  The panel's decision conflicts with this

precedent, resulting in an opinion that not only wrongly interprets the

record, but also contravenes clear error review, improperly placing this

Court in a factfinding role.

> **B.    The panel misapplied the *Arlington Heights* totality-of-the-circumstances test.**

To assess the constitutionality of congressional action, the

Supreme Court requires courts to engage in a "sensitive inquiry" of all

available evidence of congressional intent to discern if discriminatory

animus was "a motivating factor" in that action.  *Arlington Heights*, 429

U.S. at 265–66.  This "sensitive inquiry" requires assessing the totality

of the relevant facts, including both "circumstantial and direct

evidence," as racial animus is rarely explicitly expressed.  *Id.* at 266;

*Rogers v. Lodge*, 458 U.S. 613, 618 (1982).

14

Though the panel stated these controlling principles, App. 7–8, its analysis failed to apply the "sensitive inquiry" required. Instead, the panel does not discuss several items the district court found compelling in its analysis—the bulk of which the government never rebutted. And the panel engaged in a divide-and-conquer analysis, considering limited pieces of evidence individually instead of the collective totality demonstrating racial animus was at least one of the motivations underlying Section 1326. *Cf. United States v. Arvizu*, 534 U.S. 266, 274–77 (2002); *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc).

There are several examples of the panel's improper piecemeal approach.[2] *Compare* App. 10–19, *with* 1-ER-9–31. The panel minimized the relevance of Congress's repeated use of a racial slur, along with inclusion of the slur in a letter from then-Attorney General Peyton Ford. *See* App. 10, 14–15. The panel gave no weight to evidence of discrimination from 1929, despite *Arlington Heights* expressly

---

[2] Carrillo-Lopez adopts the Petition for Rehearing and Suggestion for Rehearing En Banc in *United States v. Rodrigues-Barios*, No. 21-50145 (9th Cir.), which documents additional errors in the panel's evidentiary analysis.

allowing consideration of historical background. App. 15–16; *see Arlington Heights*, 429 U.S. at 264–68; *see also Valdes-Vega*, 738 F.3d at 1080. The panel claimed the key Senate report underlying the 1952 reenactment contained no "racist or derogatory language"—even though this report repeatedly referred to Mexicans and other Latin Americans using a racial slur and expressed Congress's desire to maintain the country's "white population." App. 14; *see* S. Rep. 81-1515 (1950) at 445–46, 473, 573, 579, 580, 584, 585, 586. The panel rejected evidence that some of the same legislators from 1929 remained in office to debate and vote on the 1952 Act, and those same members "praised the 1952 Congress for protecting American homogeneity and keeping 'undesirables' away from American shores." App. 15–16. The panel rejected evidence that Congress's lack of debate on or acknowledgment of the provision's past supported the district court's finding of purposeful discrimination. App. 12. And the panel rejected evidence of

the stark disparate impact of Section 1326 on people from Latin America as "highly attenuated."[3]  App. 16–17.

Looking at the first example—the panel's minimized relevance of Congress's repeated use of a racial slur—illustrates how the panel's opinion endangers the totality analysis required by *Arlington Heights*. The panel objected to the district court's reliance on the 1952 Congress's use of a racially charged and derogatory slur—"wetback."  The panel attributed no import to the fact that the legislators who enacted Section 1326 in 1952 repeatedly referred to "wetbacks" and the "wetback problem" throughout the legislative record, including criminal legislation referred to as the "Wetback Bill" enacted just two months before Section 1326.  1-ER-24 (citing 82 Cong. ch. 108, 66 Stat. 26

---

[3] The panel attributed the stark disparity to the number of people crossing the 1900-mile southern border, not discriminatory intent.  App. 17–18.  But both can be true.  The "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."  *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997).  Here, it was reasonable for the district court to find that Congress criminalized reentry "'because of,' not merely 'in spite of,'" the disparate effect it would have on the group most frequently reentering the country—Latinos.  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 & n.25 (1979); *see Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 535–38 (1993).

(March 20, 1952)); 98 Cong. Rec. 791–800 (1952).  Instead, the panel minimized the racist slur, asserting "individual lawmakers' name for a separate bill is not sufficient evidence to meet Carrillo-Lopez's burden of showing that Congress acted with racial animus when it enacted [Section] 1326."  App. 15.

Besides failing to consider this evidence within the totality of the circumstances, the panel ignored that the 1952 legislators' use of the slur was not limited to the bill's name.  The slur was used 89 times by 12 different legislators, and a subcommittee of the Committee on Labor and Public Welfare was explicitly charged with "investigating the wetback situation," and enacting "legislation to deal with the wetback problem."  98 Cong. Rec. 791–800 (1952).  This "wetback problem" was one the 1952 Congress deemed "a blight and a shame on the American Republic," and "the No. 1 problem" America faced "in terms of illegal entries."  *Id.* at 794, 798.

Based on its individualized, limited review of the evidence, the panel concluded the district court failed to apply "[t]he strong 'presumption of good faith' on the part of the 1952 Congress."  App. 18. This conclusion was central to the panel's holding that the district court

clearly erred in finding discriminatory animus.  App. 18.  But the

district court *did* apply the presumption, while also recognizing "that

presumption is not insurmountable."[4]  1-ER–2–44; *see Abbott*, 138 S. Ct.

at 2327 (presumption is not "unassailable").  The panel's holding to the

contrary changes the presumption into a per se rule, insulating policies

from judicial review, so long as each piece of evidence, on its own, is

insufficient to establish discriminatory intent.

En banc review is necessary to realign this Court's caselaw with

*Arlington Heights*.

## III. En banc review is needed to realign this Court's precedent with the Supreme Court, in an area affecting thousands of criminal defendants each year, along with all *Arlington Heights* cases going forward.

This case presents recurring issues of exceptional importance:

(1) how to interpret *Arlington Heights* consistently with its core purpose

of weeding out insidious purposeful discrimination; and (2) whether a

---

[4] It is unsettled whether the presumption of good faith applies outside the specific context of a state's election redistricting plans, "the most vital of *local* functions."  *Abbott*, 138 S. Ct. at 2324–25 (citation omitted) (emphasis added); *see* Petition for Rehearing and Suggestion for Rehearing En Banc, *United States v. Rodrigues-Barios*, No. 21-50145 (9th Cir. August 4, 2023). But even applying it here, the district court reasonably concluded the presumption was overcome.

legislature can "cure" past discrimination by silent reenactment. *See, e.g.*, *Harness v. Watson,* 143 S. Ct. 2426, 2426–28 (2023) (Jackson, J., dissenting from denial of cert.). And this case presents these issues in the context of one of the most highly prosecuted federal statutes. Illegal reentry accounted for over 25% of all federal criminal prosecutions in Fiscal Year 2022—the vast majority involving Latin American defendants. U.S. Sent. Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2022* (May 2023), https://www.ussc.gov/sites/default/files/ pdf/research-and-publications/quick-facts/Illegal_Reentry_FY22.pdf. Section 1326 thus continues to be wielded as a discriminatory tool driving the mass incarceration of Latino people.

In addition, the panel's reformulation of *Arlington Heights* will affect cases in a wide variety of contexts outside criminal prosecutions for illegal reentry. For example, the panel's reasoning would have precluded the successful challenges in two of this Court's previous published opinions, *Arce*, 793 F.3d at 977–81, and *Ave. 6E Invs., L.L.C. v. City of Yuma*, 818 F.3d 493, 504–09 (9th Cir. 2016). In *Arce*, this Court, after considering the *Arlington Heights* factors, reversed summary judgment for the defendant and held genuine issues of

material fact existed about the discriminatory intent underlying the government policy. *Arce*, 793 F.3d at 977–81. And in *Ave. 6E*, this Court reversed dismissal of an equal protection claim involving the denial of rezoning permits for higher-density development when the plaintiff plausibly alleged that Arizona city's zoning decision was driven by anti-Hispanic animus. *Ave. 6E Invs., L.L.C.*, 818 F.3d at 504–09. Both *Arce* and *Avenue 6E* considered the totality of the evidence, even though each piece individually may not have satisfied the challengers' burdens.

By leaving the panel opinion in place, legislatures need do nothing more than remain silent, either when originally enacting a discriminatory statute, or reenacting a statute with a racist past. The totality of evidence will not be examined, and courts need only find that individual pieces of evidence, alone, do not each prove racial animus. This holding not only conflicts with Supreme Court precedent, but also allows legislatures to leave racist laws in place, perpetuating a history of discrimination on new generations. En banc rehearing is needed. *See* Fed. R. App. P. 35(a), (b); Cir. R. 35-1.

## Conclusion

Because the panel decision conflicts with Ninth Circuit and Supreme Court precedent on issues of exceptional importance, this Court should grant rehearing en banc.

Dated: Aug. 4, 2023.                    Respectfully submitted,

                                        *s/ Erwin Chemerinsky*
                                        ERWIN CHEMERINSKY
                                        University of California Berkeley
                                        School of Law

                                        RENE L. VALLADARES
                                        Federal Public Defender

                                        *s/ Ellesse Henderson*
                                        ELLESSE HENDERSON
                                        Assistant Federal Public Defender

                                        *s/ Amy B. Cleary*
                                        AMY B. CLEARY
                                        Assistant Federal Public Defender

                                        *s/ Wendi L. Overmyer*
                                        WENDI L. OVERMYER
                                        Assistant Federal Public Defender

                                        Counsel for Appellee Carrillo-Lopez

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form11instructions.pdf

**9th Cir. Case Number(s)** | 21-10233

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is (*select one*):

○ Prepared in a format, typeface, and type style that complies with Fed. R. App.
P. 32(a)(4)-(6) and **contains the following number of words**: | 4,150 |.

*(Petitions and responses must not exceed 4,200 words)*

**OR**

○  In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** | s/Wendi Overmyer | **Date** | Aug 4, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 11**                                                     *Rev. 12/01/2021*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 21-10233

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Gustavo Carrillo-Lopez, #1231425
> High Desert State Prison
> P.O. Box 650
> Indian Springs, Nevada 89070

**Description of Document(s)** *(required for all documents)*:

> Appellant Gustavo Carrillo-Lopez's Petition for En Banc Rehearing

**Signature** | s/Wendi Overmyer | **Date** | Aug 4, 2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*

# Appendix

*United States v. Carrillo-Lopez*,
68 F.4th 1133 (9th Cir. 2023)

68 F.4th 1133
United States Court of Appeals, Ninth Circuit.

UNITED STATES of America, Plaintiff-Appellant,

v.

Gustavo CARRILLO-LOPEZ, Defendant-Appellee.

No. 21-10233
|
Argued and Submitted December
8, 2022 Pasadena, California
|
Filed May 22, 2023

**Synopsis**

**Background:** After the United States District Court for the District of Nevada, Miranda Du, Chief Judge, 🚩 555 F.Supp.3d 996, dismissed indictment charging Mexican citizen with illegally reentering United States following prior removal, government appealed.

**Holdings:** The Court of Appeals, Ikuta, Circuit Judge, held that:

[1] district court clearly erred when it relied on Congress's decision to override President's veto of Immigration and Nationality Act (INA) as evidence of discriminatory animus;

[2] deputy attorney general's use of term "wetback" in letter commenting on INA was not evidence of Congress's discriminatory animus;

[3] district court committed clear error when it determined that Congress's failure to expressly repudiate discriminatory purpose motivating prior immigration law tainted INA; and

[4] district court clearly erred when it relied on evidence of illegal reentry statute's disproportionate impact as evidence of racial animus.

Reversed and remanded.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (26)

**[1]** **Criminal Law** 🔑 Review De Novo

Court of Appeals reviews de novo statute's constitutionality as question of law, as well as dismissal of indictment on ground that underlying statute is unconstitutional.

**[2]** **Criminal Law** 🔑 Questions of Fact and Findings

Determination that statute was enacted in part due to discriminatory animus is factual finding reviewed for clear error.

**[3]** **Constitutional Law** 🔑 Discrimination and Classification

**Constitutional Law** 🔑 Relationship to equal protection guarantee

Fifth Amendment's Due Process Clause contains equal protection component prohibiting United States from invidiously discriminating between individuals or groups. U.S. Const. Amend. 5.

**[4]** **Constitutional Law** 🔑 Relationship to equal protection guarantee

Cases analyzing claims of state discrimination in violation of Equal Protection Clause are equally applicable to claims of federal discrimination under Fifth Amendment's equal protection guarantee. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[5]** **Constitutional Law** 🔑 Equal protection

**Constitutional Law** 🔑 Race, national origin, or ethnicity

When statute makes express classification on basis of race, it is presumptively invalid under equal protection principles and can be upheld only upon extraordinary justification. U.S. Const. Amends. 5, 14.

**[6]**    **Constitutional Law** 🔑 Statutes and other written regulations and rules

Statute that is facially neutral may violate equal protection principles, but only if discriminatory purpose was motivating factor for legislation. U.S. Const. Amends. 5, 14.

**[7]**    **Constitutional Law** 🔑 Equal protection

Whenever party asserting equal protection challenge claims that law was enacted with discriminatory intent, burden of proof lies with challenger. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[8]**    **Constitutional Law** 🔑 Statutes and other written regulations and rules

To establish that lawmakers had discriminatory purpose in enacting specific legislation, it is not enough for party asserting equal protection challenge to show that lawmakers had awareness of consequences of legislation for affected group, that those consequences were foreseeable, or that legislature acted with indifference to effect on that group; rather, lawmaking body must have selected or reaffirmed particular course of action at least in part because of, not merely in spite of, its adverse effects upon identifiable group. U.S. Const. Amends. 5, 14.

**[9]**    **Civil Rights** 🔑 Weight and Sufficiency of Evidence

**Constitutional Law** 🔑 Intentional or purposeful action requirement

There is no bright-line rule for determining whether plaintiff has carried burden of proving purposeful discrimination in violation of equal protection principles; rather, determining whether invidious discriminatory purpose was motivating factor demands sensitive inquiry into such circumstantial and direct evidence of intent as may be available. U.S. Const. Amends. 5, 14.

**[10]**    **Constitutional Law** 🔑 Statutes and other written regulations and rules

Most important evidence of legislative intent, when addressing claim of purposeful discrimination in violation of equal protection, is historical evidence relating to enactment at issue; court considers factors such as historical background of decision, specific sequence of events leading up to challenged decision, departures from normal procedural sequence, substantive departures, and legislative or administrative history. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[11]**    **Constitutional Law** 🔑 Equal protection

**Constitutional Law** 🔑 Statutes and other written regulations and rules

When addressing claim of purposeful discrimination in violation of equal protection, there is strong presumption of good faith on part of legislators, and it is plaintiffs' burden to overcome presumption of legislative good faith and show that legislature that enacted current law acted with invidious intent. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[12]**    **Constitutional Law** 🔑 Statutes and other written regulations and rules

In evaluating contemporary statements by members of decisionmaking body, minutes of its meetings, or reports, court addressing claim of purposeful discrimination in violation of equal protection must be aware that statements of handful of lawmakers may not be probative of intent of legislature as a whole. U.S. Const. Amends. 5, 14.

**[13]**    **Constitutional Law** 🔑 Statutes and other written regulations and rules

When addressing claim of purposeful discrimination in violation of equal protection, earlier legislature's views are generally not

probative of later legislature's intent, particularly when subsequent legislature has substantially different composition. U.S. Const. Amends. 5, 14.

**[14]    Constitutional Law** 🔑 Equal protection

In evaluating claim that statute violates equal protection principles, because past discrimination cannot, in manner of original sin, condemn governmental action that is not itself unlawful, presumption of legislative good faith is not changed by finding of past discrimination. U.S. Const. Amends. 5, 14.

**[15]    Constitutional Law** 🔑 Equal protection
**Constitutional Law** 🔑 Statutes and other written regulations and rules

When legislation is challenged as violating equal protection principles, there is no requirement that government show that subsequent legislature somehow purged taint of prior legislature, such as by expressly disavowing earlier body's discriminatory intent; rather, all that matters is intent of legislature responsible for enactment at issue, and it is plaintiffs' burden to overcome presumption of legislative good faith and show that legislative body acted with invidious intent. U.S. Const. Amends. 5, 14.

**[16]    Civil Rights** 🔑 Admissibility of Evidence
**Civil Rights** 🔑 Weight and Sufficiency of Evidence

In evaluating claim that legislation violates equal protection principles, in addition to historical evidence relating to enactment at issue, courts may consider evidence that legislation at issue has disproportionate impact on identifiable group of persons, but while disproportionate impact is not irrelevant, it is generally not dispositive, and there must be other evidence of discriminatory purpose. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[17]    Constitutional Law** 🔑 Intentional or purposeful action

Even if neutral law has disproportionately adverse effect upon racial minority, it is unconstitutional under Equal Protection Clause only if that impact can be traced to discriminatory purpose. U.S. Const. Amend. 14.

**[18]    Constitutional Law** 🔑 Intentional or purposeful action

In evaluating claim that state action violates equal protection principles, court may not infer discriminatory motive based solely on evidence of disproportionate impact except in rare cases where clear pattern, unexplainable on grounds other than race, emerges from effect of state action. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[19]    Constitutional Law** 🔑 Equal protection

In assessing equal protection challenge, if enactment of legislation and disproportionate impact are not close in time, inference that statute was enacted "because of" its impact on identifiable group is limited. U.S. Const. Amends. 5, 14.

**[20]    Constitutional Law** 🔑 Equal protection
**Constitutional Law** 🔑 Intentional or purposeful action requirement

If party asserting equal protection challenge satisfies burden of showing discriminatory purpose was motivating factor, burden then shifts to government to show that same decision would have resulted even had impermissible purpose not been considered; if government carries this burden, there is no equal protection violation even if there is evidence that legislature had discriminatory motive. U.S. Const. Amends. 5, 14.

**[21]** **Constitutional Law** 🔑 Race, national origin, or ethnicity

If party asserting equal protection challenge succeeds in showing that legislation or official action is motivated in part by discrimination based on race or national origin, and government would not have enacted same legislation absent such motivation, enactment violates equal protection principles unless government has compelling reason for enacting it. U.S. Const. Amends. 5, 14.

**[22]** **Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

**Constitutional Law** 🔑 Discrimination Between Classes of Aliens

District court clearly erred when it relied on Congress's decision to override President's veto as evidence that Immigration and Nationality Act (INA) provision criminalizing illegal reentry into United States following removal was enacted in part by discriminatory animus against Mexicans and other Central and South Americans, in violation of Fifth Amendment's equal protection guarantee, even though President's veto was premised on his opposition to national-origin quota system; Mexicans and other Central and South Americans were not part of national-origin quota system, President did not explicitly address racism as to Mexicans or other Central and South Americans, President did not mention provision specifically, and President's opinion was not evidence of Congress's motivation. U.S. Const. Amend. 5; Immigration and Nationality Act § 276, 🚩 8 U.S.C.A. § 1326.

4 Cases that cite this headnote

**[23]** **Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

**Constitutional Law** 🔑 Discrimination Between Classes of Aliens

Deputy attorney general's use of term "wetback" in letter commenting on Immigration and

Nationality Act (INA) and expressing support for expanding grounds for prosecution and conviction of unlawful reentry did not evince any discriminatory intent by Congress in enacting INA provision criminalizing illegal reentry into United States, in violation of Fifth Amendment's equal protection guarantee; letter's use of term "wetback" shed no light on Congress's views, it stated that "Department of Justice favors the removal of racial bars to immigration," and it merely suggested clarifying language for proposed bill's "found in" clause. U.S. Const. Amend. 5; Immigration and Nationality Act § 276, 🚩 8 U.S.C.A. § 1326.

**[24]** **Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

**Constitutional Law** 🔑 Discrimination Between Classes of Aliens

District court committed clear error when it determined that Congress's failure to expressly repudiate racially discriminatory purpose motivating prior immigration law when it enacted Immigration and Nationality Act (INA) evinced discriminatory intent in recodification of reentry provision when passing INA, in violation of Fifth Amendment's equal protection guarantee, even though two legislators who had participated in enacting prior act praised INA for protecting American homogeneity and keeping "undesirables" away from American shores; INA was enacted 23 years after prior act, and was attributable to legislature with substantially different composition, and INA was not reenactment of prior act, but rather broad reformulation of nation's immigration laws. U.S. Const. Amend. 5; Immigration and Nationality Act § 276, 🚩 8 U.S.C.A. § 1326.

2 Cases that cite this headnote

**[25]** **Constitutional Law** 🔑 Intentional or purposeful action

In evaluating claim that legislation violates equal protection principles, new enactment cannot be

deemed to be tainted by discriminatory intent motivating prior act due to fact that legislators failed expressly disavow prior act's racism. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[26]** **Aliens, Immigration, and Citizenship** 🔑 Constitutional and statutory provisions

**Constitutional Law** 🔑 Discrimination Between Classes of Aliens

District court clearly erred when it relied on evidence of disproportionate impact of Immigration and Nationality Act (INA) provision criminalizing illegal reentry into United States as evidence demonstrating that racial animus was motivating factor in provision's passage, in violation of Fifth Amendment's equal protection guarantee, notwithstanding evidence that majority of persons apprehended at border between 2000 and 2010 were of Mexican descent; there was no direct evidence of provision's impact on Mexicans and other Central and South Americans in years following INA's enactment, 21st century evidence had little probative value as to why provision was enacted in 1952, and there was clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans. U.S. Const. Amend. 5; Immigration and Nationality Act § 276, 🚩 8 U.S.C.A. § 1326.

**\*1136** Appeal from the United States District Court for the District of Nevada Miranda M. Du, Chief District Judge, Presiding, D.C. No. 3:20-cr-00026-MMD-WGC-1, D.C. No. 3:20-cr-00026-MMD-WGC

**Attorneys and Law Firms**

Scott A.C. Meisler (argued), Attorney; Lisa H. Miller, Deputy Assistant Attorney General; Kenneth A. Polite Jr., Assistant Attorney General; Appellate Section, Criminal Division, United States Department of Justice; Washington, D.C.; Peter H. Walkingshaw and Robert L. Ellman, Assistant United States Attorneys; Elizabeth O. White, Appellate Chief; Jason M. Frierson, United States Attorney for the District of Nevada; Reno, Nevada; for Plaintiff-Appellant.

Erwin Chemerinsky (argued), UC Berkeley School of Law, Berkeley, California; Lauren Gorman, Ellesse Henderson, Amy B. Cleary, and Wendi L. Overmyer, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender of the District of Nevada; Federal Public Defenders' Office; Las Vegas, Nevada; for Defendant-Appellee.

Christopher J. Hajec, Center for Individual Rights, Washington, D.C.; Gina M. D'Andrea, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

Philip L. Torrey, Attorney; Rachel Landry, Certified Law Student; Harvard Law School Immigration and Refugee Clinical Program; Cambridge, Massachusetts; for Amicus Curiae Dr. S. Deborah Kang.

Ann Garcia and Khaled Alrabe, National Immigration Project of the National Lawyers Guild, Washington, D.C.; Sarah Thompson, National Immigrant Justice Center, San Diego, California; for Amici Curiae Legal Service Providers and Immigrant Rights Organizations.

Max S. Wolson, National Immigration Law Center, Washington, D.C.; Nicholas David Espiritu, National Immigration Law Center, Los Angeles, California; Lourdes Rosado, Andrew Case, and Nathalia Varela, Latinojustice PRLDEF, New York, New York; for Amici Curiae Basic Legal Equality, Justice Strategies, Latinojustice PRLDEF, Legal Aid Justice Center, Massachusetts Law Reform Institute, National Immigration Law Center, and Office of the Marin County Public Defender.

Bradley S. Phillips, Munger Tolles & Olson LLP, Los Angeles, California; Sarah Weiner, Munger Tolles & Olson LLP, Washington, D.C.; for Amici Curiae Asian Americans Advancing Justice, Conference of Asian Pacific American Law Faculty, Human Rights First, Northwest Immigrant Rights Project, and UNLV Immigration Clinic.

Amanda Valerio, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C.; Alexia D. Korberg, Melina Meneguin Layerenza, and Patrick McCusker, Paul Weiss Rifkind Wharton & Garrison LLP, New York, New York; for Amici Curiae Immigration Scholars.

Ahilan Arulanantham, UCLA School of Law, Los Angeles, California; Eric Fish, UC Davis School of Law, Davis, California; Yaman Salahi, Edelson P.C., San Francisco, California; for Amici Curiae The Aoki Center of Critical Race and Nation Studies, the Center for Immigration Law and Policy, and the Southern Poverty Law Center.

Before: Carlos T. Bea, Sandra S. Ikuta, and Morgan Christen, Circuit Judges.

## OPINION

IKUTA, Circuit Judge:

**\*1137** Gustavo Carrillo-Lopez, a citizen of Mexico, was indicted for illegally reentering the United States following prior removal, **\*1138** in violation of 🚩8 U.S.C. § 1326. He successfully moved to dismiss the indictment on the ground that 🚩§ 1326 violates the equal protection guarantee of the Fifth Amendment and is therefore facially invalid. Because Carrillo-Lopez did not carry his burden of proving that 🚩§ 1326 was enacted with the intent to discriminate towards Mexicans and other Central and South Americans, and the district court erred factually and legally in holding otherwise, we reverse.

## I

Carrillo-Lopez is a citizen of Mexico. He was removed from the United States twice, once in 1999 and once in 2012. Before his removal in 2012, he was convicted of felony drug possession and misdemeanor infliction of corporal injury on a spouse. On some date after 2012, he reentered the United States. On June 13, 2019, a search of his residence uncovered two firearms and plastic bags containing methamphetamine, cocaine, and heroin. Carrillo-Lopez was arrested and subsequently pleaded guilty to a single count of trafficking a controlled substance. On June 25, 2020, he was indicted for illegal reentry following prior removal, in violation of 🚩8 U.S.C. § 1326(a), and subject to enhanced penalties under 🚩§ 1326(b) due to his prior convictions. Under 🚩§ 1326(a), "any alien who ... has been denied admission, excluded, deported, or removed ... and thereafter ... enters, attempts to enter, or is at any time found

in, the United States," without proper authorization, is subject to criminal penalties. 🚩8 U.S.C. § 1326(a). **[1]** 🚩Section 1326(b) imposes enhanced criminal penalties for aliens who have previously been convicted of specified offenses. 🚩*Id.* § 1326(b).

[1]
🚩Section 1326(a) provides in full:
Subject to subsection (b) [(imposing enhanced penalties)], any alien who—
(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or
(B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
shall be fined under title 18, or imprisoned not more than 2 years, or both.
🚩8 U.S.C. § 1326(a).

Carrillo-Lopez moved to dismiss the indictment on the ground that 🚩§ 1326 violates the Fifth Amendment because it discriminates against Mexicans and other Central and South Americans. **[2]** The district court granted the motion in a detailed opinion, holding that Carrillo-Lopez established that 🚩§ 1326 was enacted with a discriminatory purpose, and that the government failed to prove that 🚩§ 1326 would have been enacted absent such motive. The government timely appealed.

[2]
In his brief, Carrillo-Lopez primarily refers to Latinos, and states that " 'Latino' refers to people from Latin American countries, including Mexico." Elsewhere in the record, this population group is variously referred to as Hispanics, Latinx, and Central and South Americans. For purposes of consistency and clarity, we refer to the group that

§ 1326 allegedly targets as Mexicans and other Central and South Americans.

**[1]** **[2]** We have jurisdiction under 18 U.S.C. § 3731, and we review de novo "the constitutionality of a statute as a question of law," *United States v. Huerta-Pimental*, 445 F.3d 1220, 1222 (9th Cir. 2006), as well as "the dismissal of an indictment on the **\*1139** ground that the underlying statute is unconstitutional," *United States v. Rundo*, 990 F.3d 709, 713 (9th Cir. 2021) (per curiam). A determination that a statute was enacted in part due to discriminatory animus is a factual finding reviewed for clear error. *Abbott v. Perez*, —— U.S. ——, 138 S. Ct. 2305, 2326, 201 L.Ed.2d 714 (2018).

## II

### A

**[3]** **[4]** The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Supreme Court has determined that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).[3] Therefore, cases analyzing claims of state discrimination in violation of the Equal Protection Clause are equally applicable to claims of federal discrimination under the equal protection guarantee of the Fifth Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

[3] The Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

**[5]** Assessing an equal protection challenge requires a court to "measure the basic validity of [a] legislative classification." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). When a statute makes an express classification on the basis of race, it "is presumptively invalid and can be upheld only upon an extraordinary justification." *Shaw v. Reno*, 509 U.S. 630, 643–44, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (quoting *Feeney*, 442 U.S. at 272, 99 S.Ct. 2282).

**[6]** **[7]** **[8]** A statute that is facially neutral may also violate equal protection principles, but only if a discriminatory purpose was a motivating factor for the legislation. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "Whenever a challenger claims that a ... law was enacted with discriminatory intent, the burden of proof lies with the challenger." *Abbott*, 138 S. Ct. at 2324. To establish that the lawmakers had a discriminatory purpose in enacting specific legislation, it is not enough to show that the lawmakers had an "awareness of [the] consequences" of the legislation for the affected group, that those consequences were "foreseeable," *Feeney*, 442 U.S. at 278–79, 99 S.Ct. 2282, or that the legislature acted "with indifference to" the effect on that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020). Rather, the lawmaking body must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282. Therefore, the plaintiff must "prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision." *Harness v. Watson*, 47 F.4th 296, 304 (5th Cir. 2022) **\*1140** (citing *Hunter v. Underwood*, 471 U.S. 222, 227–28, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985)).

**[9]** There is no bright-line rule for determining whether the plaintiff has carried this burden. Rather, the Supreme Court has recognized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. Courts must consider the totality of the evidence presented by the plaintiff in light of certain

presumptions and principles established by the Supreme Court.

**[10]** The most important evidence of legislative intent is the historical evidence relating to the enactment at issue. The Court considers factors such as (1) the "historical background of the decision," (2) the "specific sequence of events leading up to the challenged decision," (3) "[d]epartures from the normal procedural sequence," (4) "[s]ubstantive departures," and (5) "legislative or administrative history." *Id.* at 267–68, 97 S.Ct. 555.

**[11]** **[12]** **[13]** This evidence must be considered in light of the strong "presumption of good faith" on the part of legislators. *Miller v. Johnson*, 515 U.S. 900, 916, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). It is "the plaintiffs' burden to overcome the presumption of legislative good faith and show that the [legislature that enacted the current law] acted with invidious intent." *Abbott*, 138 S. Ct. at 2325. We must also consider the evidence in context. In evaluating "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555, a court must be aware that the statements of a handful of lawmakers may not be probative of the intent of the legislature as a whole. *See United States v. O'Brien*, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it ...."); *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 939 (11th Cir. 2023) ("[A] statement or inquiry by a single legislator would constitute little evidence of discriminatory intent on the part of the legislature."). And the views of an earlier legislature are generally not probative of the intent of a later legislature, *see, e.g., Abbott*, 138 S. Ct. at 2325; *United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995), particularly when the subsequent legislature has "a substantially different composition," *Brnovich v. Democratic Nat'l Comm.*, ––– U.S. ––––, 141 S. Ct. 2321, 2349 n.22, 210 L.Ed.2d 753 (2021) (citation and quotation marks omitted).

**[14]** **[15]** Because "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Abbott*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74, 100 S.Ct. 1490,

64 L.Ed.2d 47 (1980) (plurality opinion)), "the presumption of legislative good faith [is] not changed by a finding of past discrimination," *id.* In *Abbott*, for instance, the Texas legislature enacted a 2013 redistricting plan in response to a challenge to its original 2011 plan. *Id.* at 2316–17. A three-judge Texas court invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id.* at 2318. The Supreme Court reversed, stating "there can be no doubt about what matters: It is the intent of the 2013 Legislature." *Id.* at 2325. Because "it was the plaintiffs' burden to overcome the presumption of legislative good faith and show that the 2013 Legislature **\*1141** acted with invidious intent," the Texas court erred in reversing the burden of proof and imposing on the state "the obligation of proving that the 2013 Legislature had experienced a true 'change of heart' and had 'engage[d] in a deliberative process to ensure that the 2013 plans cured any taint from the 2011 plans.'" *Id.* (citation omitted). Therefore, there is no requirement that the government show that a subsequent legislature "somehow purged the 'taint'" of a prior legislature, such as by expressly disavowing the earlier body's discriminatory intent. *Id.* at 2324. Rather, as stated in *Abbott*, all that matters is the intent of the legislature responsible for the enactment at issue, and it is the "plaintiffs' burden to overcome the presumption of legislative good faith and show that" the legislative body "acted with invidious intent." *Id.* at 2325.

**[16]** **[17]** **[18]** **[19]** In addition to historical evidence relating to the enactment at issue, courts may consider evidence that the legislation at issue has a disproportionate impact on an identifiable group of persons. But while "[d]isproportionate impact is not irrelevant," it is generally not dispositive, and there must be other evidence of a discriminatory purpose. *Davis*, 426 U.S. at 242, 96 S.Ct. 2040. "[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272, 99 S.Ct. 2282. A court may not infer a discriminatory motive based solely on evidence of a disproportionate impact except in rare cases where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. Moreover, if the enactment of the legislation

and the disproportionate impact are not close in time, the inference that a statute was enacted "because of" its impact on an identifiable group is limited. 🚩*Feeney*, 442 U.S. at 279, 99 S.Ct. 2282. Thus, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." 🚩*McCleskey v. Kemp*, 481 U.S. 279, 298 n.20, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *see also* 🚩*Johnson v. Governor of the State of Fla.*, 405 F.3d 1214, 1222 n.17 (11th Cir. 2005) (en banc) (rejecting reliance on "present" day evidence of disparate impact where the plaintiffs challenged a 1986 law as discriminatory).

 **[20]**  If the challenger satisfies the burden of showing a discriminatory purpose was a motivating factor, the burden then shifts to the government to show that "the same decision would have resulted even had the impermissible purpose not been considered." 🚩*Arlington Heights*, 429 U.S. at 270 n.21, 97 S.Ct. 555. If the government carries this burden, there is no equal protection violation even if there is evidence that the legislature had a discriminatory motive. 🚩*Id.*

 **[21]**  If the challenger succeeds in showing that the legislation or official action is motivated in part by discrimination based on race or national origin, and the government would not have enacted the same legislation absent such motivation, the enactment violates equal protection principles unless the government has a compelling reason for enacting it. *See* 🚩*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

B

The government contends that the standard described above is inapplicable to immigration laws. Rather, it argues, such laws should be evaluated through a more deferential framework because the Court **\*1142** has held that courts must defer "to the federal government's exclusive authority over immigration matters."

It is true that the Court has "long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." 🚩*Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting 🚩*Shaughnessy v. United States ex rel. Mezei*, 345

U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). More recently, the Court has stated that "[b]ecause decisions in these [immigration] matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.' " 🚩*Trump v. Hawaii*, —— U.S. ——, 138 S. Ct. 2392, 2418–19, 201 L.Ed.2d 775 (2018) (quoting 🚩*Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)). Further, the Court has (without precise explanation) applied a deferential standard, akin to rational basis review, in some contexts involving immigration cases. *See, e.g.,* 🚩*Fiallo*, 430 U.S. at 792–96, 97 S.Ct. 1473 (giving minimal scrutiny to a gender-based distinction in an immigration law); *cf.* 🚩*Hawaii*, 138 S. Ct. at 2441 (Sotomayor, J., dissenting) (arguing that the majority, "without explanation or precedential support, limits its review of the [Presidential Proclamation barring entry of aliens from countries that were predominantly Muslim] to rational-basis scrutiny").

Nevertheless, the Supreme Court has also (again, without precise explanation) applied higher scrutiny to immigration actions. For instance, in considering whether the Executive Branch's rescission of an administrative immigration relief program violated the equal protection guarantee of the Fifth Amendment, the Court considered whether the plaintiffs raised "a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." 🚩*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, —— U.S. ——, 140 S. Ct. 1891, 1915, 207 L.Ed.2d 353 (2020) (quoting 🚩*Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555). Neither the Supreme Court nor we have directly addressed the issue regarding which standard of review applies to equal protection challenges to immigration laws. [4] We decline to address this issue, because (as explained below), Carrillo-Lopez's equal protection challenge fails even under the usual test for assessing such claims set forth in 🚩*Arlington Heights*.

4

🚩*Ramos v. Wolf* also held that a higher standard of scrutiny applies to a congressional enactment and the lower standard of scrutiny is limited to enactments by the Executive Branch. 🚩975 F.3d 872, 895–96 (9th Cir. 2020). But that decision has

been vacated and scheduled for rehearing en banc, *see Ramos v. Wolf*, 59 F.4th 1010, 1011 (9th Cir. 2023), and therefore has no precedential effect. *See, e.g.,* ⚠️*Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been *vacated* has no precedential authority whatsoever.").

### III

We now turn to the question whether the district court erred in concluding that Carrillo-Lopez carried his burden of proving that 🚩 § 1326 is invalid under equal protection principles because it discriminates against Mexicans and other Central and South Americans.

### A

🚩 Section 1326 provides that "any alien who ... has been denied admission, excluded, deported or removed" from the **\*1143** United States and, without permission, later "enters, attempts to enter, or is at any time found in, the United States" shall be imprisoned for up to two years. 🚩 8 U.S.C. § 1326(a).

As drafted, 🚩 § 1326 is facially neutral as to race. Therefore, we turn to the question whether Carrillo-Lopez has carried his burden of showing "that racial discrimination was a substantial or motivating factor in" enacting 🚩 § 1326. 🚩 *Hunter*, 471 U.S. at 225, 105 S.Ct. 1916 (citation omitted). Because the most important evidence of legislative intent is the relevant historical evidence, we start with the history of 🚩 § 1326, which was enacted in 1952 as part of the Immigration and Nationality Act. S. 2842, 82d Cong., 2d Sess., § 276 (1952); Immigration and Nationality Act of 1952, 🚩 8 U.S.C. § 1101 *et seq.* [hereinafter INA].

### B

The history of the INA began in 1947, when the Senate directed the Senate Committee on the Judiciary "to make a full and complete investigation of [the country's] entire immigration system" and to provide "recommendations for changes in the immigration and naturalization laws as it

may deem advisable." S. REP. NO. 81-1515, at 803 (1950) [hereinafter Senate Report]. This effort was "a most intensive and searching investigation and study over a three year period." 🚩*Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968). The subcommittee tasked with this investigation examined "a great volume of reports, exhibits, and statistical data," examined officials and employees of the Immigration and Naturalization Service (INS) and various divisions of the State Department, and made field investigations throughout Europe and the United States, as well as at the Mexican border, in Canadian border cities, and in Havana, Cuba. Senate Report, at 2–4. Recognizing that the immigration law of the United States was established by "2 comprehensive immigration laws which are still in effect" and "over 200 additional legislative enactments," as well as "treaties, Executive orders, proclamations, and a great many rules, regulations and operations instructions," the subcommittee determined that it would "draft one complete omnibus bill which would embody all of the immigration and naturalization laws." *Id.* at 4.

The extensive 925-page Senate Report provided a comprehensive analysis of immigration law. Part 1 set out a detailed review of the immigration system, providing (among other things) a description of the "[r]aces and peoples of the world," a "[h]istory of the immigration policy of the United States," a "[s]ummary of the immigration laws," and a discussion of the "characteristics of the population of the United States." *Id.* at iii–iv. It included a discussion of excludable and deportable classes of aliens, as well as discussing admissible aliens, with special focus on so-called "quota" and "nonquota" immigrants.[5] *Id.* at iii, 68–71.

5
>    A "quota immigrant is ... an alien entering for permanent residence" who is "subject to numerical restriction, as distinguished from the nonquota immigrant who is likewise entering for permanent residence but who is not subject to numerical restriction." Senate Report, at 420.

In connection with the discussion of the characteristics of the population of the United States in Part 1, the Senate Report provided an overview of specified characteristics of different population groups in the Americas, including Canadians and Mexicans. These sections all followed the same template for each population group. In discussing Mexicans, the Senate Report covered (among other things) the population change since 1820 due to Mexican **\*1144** immigrants who had legally and illegally entered the United States, the

geographical distribution of native-born and foreign-born Mexicans, the "naturalization and assimilation" of Mexicans, and employment and crime data. *Id.* at 149–50. This section also included this data for "other Latin Americans." *Id.* at 150–52.

One of the longest sections in Part 1, covering some 173 pages, discussed whether to continue "the numerical restriction of immigration through the imposition of quotas." *Id.* at 417. As explained in the Senate Report, the existing quota system fixed the number of persons from each covered nation who could enter the United States for permanent residence at the "number which bears the same ratio to 150,000 as the number of inhabitants in the United States in 1920 of that nationality bears to the total number of inhabitants in the continental United States in 1920." *Id.* at 420. Historically, "[t]he first numerical restriction" on immigration into the United States "was imposed by the Quota Act of May 19, 1921," to address concerns "in the period immediately following [World War I], as a result of growing labor unrest, increasing unemployment, and general alarm over the potential flood of 'newer' immigrants from war-torn Europe." *Id.* at 419. Over the decades, limitations on quota immigrants changed, such as the removal of the bar to Chinese immigration. *See id.* at 422, 426. Immigrants from Western Hemisphere countries (including Mexico and other countries in Central and South America) were excluded from this national-origin quota system. *Id.* at 459.

The Senate Report acknowledged that the national-origin quota system was controversial because some opponents labeled it as "discriminatory in the treatment of certain nationalities of Europe," *id.* at 448, and therefore attempted to "examine this controversial subject objectively in order to present an unbiased appraisal of the quota system." *Id.* at 417. The Senate Report ultimately recommended retaining the quota system, but making "changes in existing law both with respect to the manner in which quotas [were] established for intending immigrants and the determination of preferences within the quotas." *Id.* at 588.

Part 1 also included a chapter on procedures relating to immigrants and nonimmigrants. *Id.* at viii–ix. This section discussed procedures for admission, exclusion, expulsion, bonds, and immigration offenses. *Id.* at 612–56. In the section on immigration offenses, the Senate Report discussed illegal reentry after deportation, and explained that a prior immigration law, the Act of March 4, 1929, "ma[de] it a felony for any deported alien who ha[d] not received

permission to reapply for admission to enter or attempt to enter the United States." *Id.* at 646 (citation omitted). In making "[s]uggestions relating to criminal provisions," the Senate Report noted that statements from witnesses and field offices of the INS stressed the "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area" because "many flagrant violators of the immigration laws [were] not prosecuted or, if prosecuted, [got] off with suspended sentences or probation." *Id.* at 654. The Senate Report recommended that "enact[ing] legislation providing for a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the problem." *Id.* at 654–55. Instead, it recommended that the "provisions relating to reentry after deportation ... be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." *Id.* at 656.

Part 2 of the Senate Report provided a detailed overview of the naturalization system, including the history of naturalization **\*1145** laws and citizenship. *See id.* at x–xii. In the context of discussing eligibility for naturalization, the Senate Report stated that the subcommittee had held "special hearings" on "[t]he subject of racial eligibility to naturalization." *Id.* at 710. The subcommittee concluded that "in consideration of our immigration laws, the subcommittee fe[lt] that the time ha[d] come to erase from our statute books any discrimination against a person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination [was] based solely on race." *Id.* The subcommittee recommended that "all prerequisites for naturalization based solely on the race of the petitioner be eliminated from our naturalization laws," as set forth in the Senate Report. *Id.* [6]

6    Part 3 of the Senate Report discussed communism and "subversive" aliens, and Part 4 contained appendices. Senate Report, at xii–xviii.

After the issuance of the Senate Report, Senator Pat McCarran introduced S. 3455 in the Senate, which provided for the repeal of then-current immigration and naturalization laws and the enactment of a completely revised immigration and naturalization code. Off. of the Historian, U.S. Dep't of State, *Foreign Relations of the United States, 1952-54, General: Economic and Political Matters, Vol. 1, Pt. 2*, at 1569–70 (William Z. Slany ed., 1983). After input from the staff of the Senate Immigration Subcommittee as well as experts from the INS and the Department of State, and extensive revisions, Senator McCarran introduced S. 716, a revised version of

S. 3455, and Representative Francis E. Walter introduced an identical companion House bill, H.R. 2379. *Id.* at 1570. Extensive joint hearings were conducted by various House and Senate subcommittees. *Id.*

Following the joint hearings, and in the course of numerous conferences, Senator McCarran and Representative Walter introduced the final versions of the bill in the Senate and the House (S. 2550 and H.R. 5678, respectively). *Id.* According to a Senate Judiciary Committee Report, the revised bill made several significant changes from prior law. The changes included a "system of selective immigration within the national origins quota system." S. REP. NO. 82-1137, at 3 (1952) [hereinafter Senate Judiciary Committee Report]. The national-origin quota system was revised to use a new formula and with an alteration in quota preferences to aliens with specified skills and relatives of United States citizens and alien residents. 98 Cong. Rec. 5796 (1952); *id.* at 4996 (statement of Sen. Thye) (stating that he was impressed with the argument that quotas should be given "to facilitate reunion of families and relatives" and "provide needed workers and desirable skills for this country"). The bills also removed "[r]acial discriminations and discriminations based upon sex." Senate Judiciary Committee Report, at 3; *see also* 98 Cong. Rec. 5765 (1952) (statement of Sen. McCarran) ("Under the provisions of S. 2550, no one will be inadmissible to the United States solely because of race and since the bill is removing discriminations from the law in this regard, it cannot be said that new racial discriminations are being introduced."). Further, "[s]tructural changes [were] made in the enforcement agencies for greater efficiency;" and the bills strengthened "[t]he exclusion and deportation procedures." Senate Judiciary Committee Report, at 3. The Senate Judiciary Committee Report made only one mention of the reentry provisions. It stated: "In addition to the foregoing, criminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation and concealment of facts, for reentry of certain deported aliens, for aiding **1146** and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes." *Id.* at 37.[7] The Senate Judiciary Committee Report did not specifically reference the provision that penalized reentry after removal (Section 276 of Senate Bill 2550).

[7]  A House Report on H.R. 5678, states only:
    In addition to the foregoing, criminal sanctions are provided for entry of an alien at an improper time or place, for misrepresentation

and concealment of facts, for reentry of certain deported aliens, for aiding and assisting subversive aliens to enter the United States, and for importation of aliens for immoral purposes.
    H.R. REP. NO. 82-1365, at 68 (1952).

Congressional debates over the final bill focused on the national-origin quota system. Critics argued that this system was arbitrary because it favored the "so-called Nordic strain" of immigrants but disfavored "people from southern or eastern Europe." 98 Cong. Rec. at 5768 (1952) (statement of Sen. Lehman). Senator Hubert Humphrey and Senator Herbert Lehman sponsored a competing bill, S. 2842, which aimed at making "the entire quota system more flexible and more realistic," *id.* at 2141, but the bill did not garner enough support to be given a hearing, *id.* at 5603.

Congressional debates did not mention the illegal reentry provision, Section 276. "An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but 🚩 §§ 1325 and 🚩 1326 were not among the debated sections." 🚩*United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977). Carrillo-Lopez concedes that "[c]ongressional debate focused on the national-origins provisions, not the illegal reentry statute." There was no discussion of Section 276's impact on Mexicans or other Central and South Americans.

The controversy over the national-origin quota system continued even after the bill (now referred to as H.R. 5678) passed both houses of Congress, because President Truman vetoed the bill due to his opposition to the national-origin quota system. *See Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality*, 1 PUB. PAPERS 441–45 (June 25, 1952). In his veto statement, President Truman first made clear that the bill "contains certain provisions that meet with my approval," including removing "[a]ll racial bars to naturalization." *Id.* at 441. Nevertheless, President Truman opposed a number of the bill's features, most significantly its provisions continuing "the national origins quota system." *Id.* at 442. President Truman explained that he had "no quarrel" with the general idea of quotas, but stated that the national-origin quota system was "too small for our needs today and ... create[d] a pattern that [was] insulting to large numbers of our finest citizens, irritating to our allies abroad, and foreign to our purposes and ideals." *Id.* According to President Truman, the system perpetuated by the bill discriminated against people of Southern and Eastern Europe, in favor of immigrants from

England, Ireland, and Germany, which President Truman argued was improper both on moral and political grounds. *Id.* at 442–43. In particular, President Truman noted the United States' alliance with Italy, Greece, and Turkey, and the need to help immigrants from Eastern Europe who were escaping communism. *Id.* at 443. President Truman did not mention Mexicans or other Central and South Americans, to whom the national-origin quota system did not apply. **[8]** Nor did he mention the provision criminalizing reentry, Section **\*1147** 276. Congress enacted the INA over President Truman's veto. 98 Cong. Rec. 8253–68 (1952).

**8**    The 1924 Act, which introduced the national-origin quota system, exempted all Western Hemisphere countries from the system.

As enacted, Section 276 (subsequently codified as 8 U.S.C. § 1326), replaced the reentry offenses set forth in three prior statutory sections. **[9]** In creating a single offense, it also eliminated the three different criminal penalties imposed by these three prior statutes, and instead subjected all reentry defendants to the same penalty: two years' imprisonment and a fine. H.R. 5678, 82d Cong., 2d Sess., § 276 (Apr. 28, 1952); *see* *United States v. Mendoza-Lopez*, 481 U.S. 828, 835–36, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). The new Section 276 also added a new basis for liability: "being 'found in' the United States" after a prior deportation —a "continuing" offense that "commences with the illegal entry, but is not completed until" the defendant is discovered.

*United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000). Finally, § 1326 eliminated the language that would permit aliens to bring collateral challenges to the validity of their deportation proceedings in subsequent criminal proceedings. *See* *Mendoza-Lopez*, 481 U.S. at 836, 107 S.Ct. 2148. **[10]**

**9**    The Supreme Court explained that

[b]efore § 1326 was enacted, three statutory sections imposed criminal penalties upon aliens who reentered the country after deportation: 8 U.S.C. § 180(a) (1946 ed.) (repealed 1952), which provided that any alien who had been "deported in pursuance of law" and subsequently entered the United States would be guilty of a felony; 8 U.S.C. § 138 (1946 ed.) (repealed 1952), which provided that an alien deported

for prostitution, procuring, or similar immoral activity, and who thereafter reentered the United States, would be guilty of a misdemeanor and subject to a different penalty; and 8 U.S.C. § 137–7(b) (1946 ed., Supp. V) (repealed 1952), which stated that any alien who reentered the country after being deported for subversive activity would be guilty of a felony and subject to yet a third, more severe penalty.

*United States v. Mendoza-Lopez*, 481 U.S. 828, 835, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) (citing H.R. REP. NO. 82-1365, at 219–20 (1952)).

**10**    After the Supreme Court ruled that precluding such collateral challenges would violate an alien's due process rights, *see* *Mendoza-Lopez*, 481 U.S. at 832, 839, 107 S.Ct. 2148, "Congress responded by enacting § 1326(d)," which "establishe[d] three prerequisites that defendants facing unlawful-reentry charges must satisfy before they can challenge their original removal orders." *United States v. Palomar-Santiago*, —— U.S. ——, 141 S. Ct. 1615, 1619, 209 L.Ed.2d 703 (2021) (citing Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 441, 110 Stat. 1279).

### C

We now turn to Carrillo-Lopez's arguments that Congress was motivated in part by discrimination against Mexicans and other Central and South Americans in enacting § 1326 as part of the INA in 1952.

### 1

Because historical evidence relating to the enactment at issue is most probative, we first consider Carrillo-Lopez's arguments relating to the legislature's enactment of § 1326 in 1952. Carrillo-Lopez begins by arguing that the Senate Report, the basis for the 1952 legislation, is "replete with racism." He points to certain statements in Part 1 of the Senate Report, which discussed different population groups. In the subsection on Mexicans, the Senate Report stated that since 1820, "over 800,000 immigrants have legally entered," and "it has been reliably estimated that Mexican aliens are coming into the United States illegally at a rate of 20,000

per month." Senate Report, at 149. Later in Part 1, a chapter discussing the historical **\*1148** background and current law regarding excludable and deportable classes of aliens noted that a 1917 immigration law excluded from admission aliens who were previously deported from the United States. *Id.* at 335–36. The Senate Report stated that "[t]he largest number of persons, who as aliens are deported twice, are deported to Mexico. The problem appears, therefore, to be principally a southern border problem and is discussed in the section on deportation problems." *Id.* at 365.

Carrillo-Lopez argues that the statements that "Latino immigrants were 'coming into the United States illegally at a rate of 20,000 per month,' and the statement that people entering illegally after being deported is 'principally a southern border problem,' " evince racism. Carrillo-Lopez also describes statements in Part 1 as "denigrat[ing] Latino immigrants as particularly undesirable due to alleged: low-percentage of English speakers; inability to assimilate to 'Anglo-American' culture and education, with Latino students believed to be 'as much as 3 years behind'; and a high number receiving 'public relief.' " [11]

[11]    The district court did not identify any language in either the Senate Report or congressional record that evinced racism, but rather relied on the 1952 Congress's failure to repudiate a prior immigration law, Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (the "1929 Act"), as well as other historical evidence discussed below.

We disagree. In context, the statements Carrillo-Lopez identified in the Senate Report merely provided a factual description of Mexicans and other Latin Americans, along with all other "races and peoples." There is no language that "denigrates Latino immigrants as particularly undesirable." Indeed, neither Carrillo-Lopez nor the district court identified any racist or derogatory language regarding Mexicans or other Central and South Americans in these pages, or anywhere else in the 925-page Senate Report.

 **[22]**   Second, Carrillo-Lopez contends that Congress's discriminatory intent in enacting 🚩 § 1326 can be inferred from Congress's decision to enact the INA over President Truman's veto. The district court agreed with this argument. [12] But President Truman's opposition to the national-origin quota system, the central reason for his veto, sheds no light on whether Congress had an invidious intent to discriminate against Mexicans and other Central

and South Americans in enacting 🚩 § 1326. Mexicans and other Central and South Americans were not part of the national-origin quota system, *see* Senate Report, at 472, and as the district court conceded, "President Truman did not explicitly address racism as to Mexican[s] or" other Central and South Americans, and "did not address 🚩 Section 1326 specifically." Further, President Truman's opinion on the legislation is not evidence of Congress's motivation in enacting 🚩 § 1326. *See United States v. Barcenas-Rumualdo*, 53 F.4th 859, 867 (5th Cir. 2022). The district court clearly erred when it relied on Congress's decision to override President Truman's veto as evidence that 🚩 § 1326 was enacted in part by discriminatory animus.

[12]    The district court concluded that Congress's "failure to heed President Truman's call to 'reimagine' immigration while simultaneously making the INA, and particularly 🚩 Section 1326, more punitive in nature, is evidence of at least indifference to the nativist motivations of the statute's predecessor," and therefore "contribute[d] to [the] finding that Carrillo-Lopez [had] met his burden" of showing that enacting 🚩 § 1326 was motivated by discriminatory intent. This conclusion ignores the presumption of legislative good faith, which compels the conclusion that indifference to prior legislation is not evidence of discriminatory animus. 🚩 *Abbott*, 138 S. Ct. at 2325.

 **\*1149**   Finally, Carrillo-Lopez contends that Congress's intent to discriminate against Mexicans and other Central and South Americans can be inferred from the Department of Justice's use of the word "wetback" in a letter commenting on the INA. The district court agreed. The record shows that after Senator McCarran introduced S. 716 (a revised version of S. 3455), the Senate Judiciary Committee "request[ed] the views of the Department of Justice" relating to this draft. Letter from Peyton Ford, Deputy Att'y Gen., to Sen. Pat McCarran, Chairman of the Comm. on the Judiciary (May 14, 1951). As requested, Deputy Attorney General Peyton Ford provided a comment letter. *Id.* In commenting on Sections 201 and 202, which removed racial ineligibility from the quota system, the Ford letter stated that the "Department of Justice favors the removal of racial bars to immigration." *Id.* Next, in commenting on Section 276 (the provision at issue here), the Ford letter stated that Section 276 "adds to

existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States," and observed that "[t]his change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the [INS] to establish the place of reentry." *Id.* The Ford letter recommended some clarifications in the language of this section. *Id.* Finally, in commenting on Section 287 of the proposed act, which granted authority to officers of the INS to conduct searches of applicants for admission under certain circumstances, the Ford letter asked that Congress give specific authority to immigration officers to go onto private property to search for "aliens or persons believed to be aliens." *Id.* In making this suggestion, the letter quoted a 1951 "report of the President's Commission on Migratory Labor," which recommended that immigration officers be given authority to investigate private farms, in order to assist in "taking action against the conveyors and receivers of the wetback," referring to alien smugglers and employers who harbor aliens. *Id.* Carrillo-Lopez argues that this letter is probative of Congress's discriminatory intent because it refers to Mexicans as "wetback[s]," which shows an animus that Carrillo-Lopez claims should be imputed to Congress.

**[23]** We reject this attenuated argument. The Ford letter's use of the term "wetback" sheds no light on Congress's views. The Ford letter quoted a separate report that employed that term when recommending that Congress clarify immigration officers' search authority to assist in enforcing the law against smugglers and persons who harbored illegal entrants. [13] **\*1150** And contrary to Carrillo-Lopez's argument, the Ford letter did not recommend that Congress add a provision allowing enforcement when an alien was "found in" the United States that was then adopted by Congress. Rather, both prior drafts of the bill that became the INA included this offense; the Ford letter merely suggested clarifying language. [14] Because the Ford letter did not evince discriminatory intent, the argument that it shows Congress's discriminatory intent fails.

[13]    The district court also erred in relying on the passage of an act some dubbed the "Wetback Bill" as evidence of Congress's discriminatory intent. The district court held that "both the derogatory nickname of the Wetback Bill and its criminalization of Mexican immigrant laborers while shielding employers evidence[d] the racially discriminatory motives and intent of the same

Congress who enacted Section 1326 only two months later." But individual lawmakers' name for a separate bill is not sufficient evidence to meet Carrillo-Lopez's burden of showing that Congress acted with racial animus when it enacted § 1326. Further, the district court's depiction of the act was erroneous. The act provided that any person who knowingly transports into the United States, harbors, or conceals a person in the country illegally, or encourages such a person to enter the United States, is guilty of a felony, and included a proviso that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." Act of Mar. 20, 1952, Pub. L. No. 82-283, 66 Stat. 26 (1952). Based on the statement of senators in the congressional record, the act was enacted in connection with negotiations with Mexico to secure an extension of an existing migratory-labor agreement, because Mexico wanted the United States to strengthen its immigration laws to restrict migration of Mexicans to the United States. *See* 98 Cong. Rec. 791–92, 795 (1952). The act did not impose criminal penalties on Mexicans or other Central and South Americans.

[14]    Thus, the district court erred in indicating that the Ford letter's "recommendation" to include a "found in" clause was adopted by Congress as "the only substantive change made to Section 1326 in 1952." Rather, the Ford letter merely suggested clarifying language for the proposed bill's "found in" clause, and as explained above, the new § 1326 made multiple changes to the 1929 Act.

Given the lack of historical evidence that the Congress that enacted § 1326 in 1952 was motivated in part by a desire to discriminate against Mexicans or other Central and South Americans, Carrillo-Lopez next turns to the legislative history of a prior immigration law, the 1929 Act. The 1929 Act was one of three statutes that "imposed criminal penalties upon aliens who reentered the country after deportation." *Mendoza-Lopez*, 481 U.S. at 835, 107 S.Ct. 2148. The parties do not dispute that the 1929 Act was motivated in part by racial animus against Mexicans and other Central and South Americans.

Carrillo-Lopez argues that the discriminatory purpose motivating the 1929 Act tainted the INA and 🚩 § 1326 because some of the legislators were the same in 1952 as in 1929. In particular, Carrillo-Lopez observes that two of the members of Congress who had participated in enacting the 1929 Act praised the 1952 Congress for protecting American homogeneity and keeping "undesirables" away from American shores. *See* 98 Cong. Rec. 5774 (1952) (statement of Sen. George) (stating that the purpose of the 1924 immigration law was to "preserve something of the homogeneity of the American people"); *id.* at 4442 (statement of Rep. Jenkins) (stating that the House debate had "been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now"). Carrillo-Lopez also argues that the fact that the 1952 Congress did not expressly disavow the 1929 Act indicates that Congress was motivated by the same discriminatory intent. Finally, Carrillo-Lopez argues that the INA constituted a reenactment of the 1929 Act. The district court largely agreed with each of these points.

**[24]** This interpretation of the legislative history is clearly erroneous. The INA was enacted 23 years after the 1929 Act, and was attributable to a legislature with "a substantially different composition," in that Congress experienced a more than 96 percent turnover of its personnel in the intervening years. 🚩 *Brnovich*, 141 S. Ct. at 2349 n.22 (citation omitted). The statements of Representative Thomas Jenkins and Senator Walter George, which in any event were made in the context of debating the national-origin quota system rather than in discussing 🚩 § 1326, are not probative of the intent of the legislature as a whole. 🚩 *O'Brien*, 391 U.S. at 384, 88 S.Ct. 1673; *see also League of Women Voters of Fla. Inc.*, 66 F.4th at 931–32, 939.

**\*1151** **[25]** Further, the Supreme Court has rejected the argument that a new enactment can be deemed to be tainted by the discriminatory intent motivating a prior act unless legislators expressly disavow the prior act's racism. *See* 🚩 *Abbott*, 138 S. Ct. at 2325–26. Contrary to Carrillo-Lopez and the district court's reasoning, a legislature has no duty "to purge its predecessor's allegedly discriminatory intent." 🚩 *Id.* at 2326. [15] The district court suggested that it "might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint," but stopped short of reaching this issue, and such a ruling would be contrary to Supreme Court precedent. Therefore, the

evidence of the discriminatory motivation for the 1929 Act lacks probative value for determining the motivation of the legislature that enacted the INA. *See, e.g.,* 🚩 *id.* at 2325–26; *Dumas*, 64 F.3d at 1430 (examining the legislative debates of the crack cocaine criminal legislation at issue in 1986, not the legislative debates from the first law criminalizing cocaine in 1914).

[15]       Further weakening the claim that 🚩 § 1326, in its current form, was motivated by discriminatory animus, is the fact that 🚩 § 1326 has been amended multiple times since its enactment. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471 (1988); Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059 (1990); Pub. L. No. 103-322, § 130001(b), 108 Stat. 1796, 2023 (1994); Pub. L. No. 104-132, § 441(a), 110 Stat. 1214, 1279 (1996); Pub. L. No. 104-208, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), 110 Stat. 3009, 3009-606, 3009-618 to 3009-620, 3009-629 (1996). Carrillo-Lopez does not allege that each successive Congress was motivated by discriminatory purpose. The district court recognized that 🚩 § 1326 had been amended four times after its enactment. But based on its mistaken belief that a subsequent legislature must disavow an earlier body's discriminatory intent, the district court focused on Congress's failure to provide such a disavowal in enacting the amendments, and thus failed to recognize that "by amendment, a facially neutral provision ... might overcome its odious origin." *Barcenas-Rumualdo*, 53 F.4th at 866 (citation omitted).

Finally, the INA was not a "reenactment" of the 1929 Act, but rather a broad reformulation of the nation's immigration laws, which included a recommendation "that the time ha[d] come to erase from our statute books any discrimination against a person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination [was] based solely on race." Senate Report, at 710. 🚩 Section 1326 itself incorporated provisions from three acts and made substantial revisions and additions, H.R. 5678, 82d Cong., 2d Sess., § 276 (Apr. 28, 1952); *see supra* pp. 1146–47 & n.9; *see also* 🚩⚠ *Mendoza-Lopez*, 481 U.S. at 835–36, 107 S.Ct. 2148. The district court therefore clearly erred in stating that 🚩 § 1326 was not "substantially different" from the 1929 Act.

2

In addition to the legislative history, Carrillo-Lopez argues that 🔖 § 1326's disproportionate impact on Mexicans and other Central and South Americans is evidence that Congress was motivated by a discriminatory intent in enacting the statute. Evidence that legislation had a disproportionate impact on an identifiable group is generally not adequate to show a discriminatory motive, and here, the evidence that 🔖 § 1326 had a disparate impact on Mexicans and other Central and South Americans—and that Congress knew of this impact and enacted 🔖 § 1326 because of the impact—is highly attenuated.

Carrillo-Lopez does not provide direct evidence of the impact of 🔖 § 1326 on Mexicans and other Central and South Americans in the years following the 1952 enactment of the INA. Rather, Carrillo-Lopez points to evidence that Mexicans were apprehended **\*1152** at the border and subject to immigration laws. He first points to the Senate Report's statements (in a subsection on problems with deportation procedures) that "[i]n 1946 and 1947 the percentages of voluntary departures were 90 percent and 94 percent Mexicans, respectively," Senate Report, at 633, and that "[d]eportations and voluntary departures to Canada were very small, since approximately 90 percent of the cases were Mexicans," *id.* at 635 (footnote omitted). In the same vein, the district court stated that the 1952 Congress knew that 🔖 § 1326 would "disparately impact Mexican[s]" and other Central and South Americans because the Senate Report discussed "difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area." While these statements indicate that Mexicans and other Central and South Americans were apprehended at the border and deported when they entered illegally, and that there was a lack of enforcement of immigration laws at the Mexican border area, the statements do not show that a statute criminalizing illegal reentry disproportionately impacted Mexicans and other Central and South Americans. [16]

16     Carrillo-Lopez and the district court rely on a declaration by UCLA Professor Kelly Lytle Hernandez, which states that in the late 1930s, before the enactment of the INA, "the U.S.

Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants" and that "[s]ome years, Mexicans comprised 99 percent of immigration offenders." The declaration concludes that "[t]herefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States." But the declaration does not provide a source for its statements or conclusion, or any basis for the conclusion that Mexicans had been imprisoned for illegal reentry, and so provides little support for Carrillo-Lopez's claims.

Carrillo-Lopez also provides information about the current impact of 🔖 § 1326. Before the district court, Carrillo-Lopez provided statistics regarding border apprehensions from 2000 to 2010, which showed that the majority of persons apprehended at the border during that period were of Mexican descent, and argued that the Department of Justice had a policy of prosecuting apprehensions. On appeal, Carrillo-Lopez cites additional information from the United States Sentencing Commission in 2020 for the proposition that 99% of prosecutions for illegal reentry are against Mexican or Central and South American defendants. [17] He also argues that in 2018, the Department of Justice's policy was to prosecute "100% of southern border crossings." [18] This data has little probative value, however, because it relates to a period that is more than 45 years after the INA was enacted. After such a long passage of time, **\*1153** this information does not raise the inference that Congress enacted 🔖 § 1326 in 1952 because of its impact on Mexicans and other Central and South Americans. *See, e.g.,* 🔖 *McCleskey*, 481 U.S. at 298 n.20, 107 S.Ct. 1756; 🔖 *Johnson*, 405 F.3d at 1222 n.17. The district court's reliance on this contemporaneous data was clearly erroneous.

17     This statistic comes from two United States Sentencing Commission "Quick Facts" sheets, which state "99.1% of illegal reentry offenders were Hispanic" in fiscal year 2020, and "99.0% of illegal reentry offenders were Hispanic" in fiscal year 2019. U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020*, at 1 (May 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/

Illegal_Reentry_FY20.pdf; U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry Offenses, Fiscal Year 2019*, at 1 (May 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf.

18  This statement does not appear to be correct, as it refers to a press release announcing "a new 'zero-tolerance policy' for offenses under 8 U.S.C. § 1325(a)." Off. of Pub. Affs., Dep't of Just., *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry. Section 1325 relates to improper entry by an alien. The press release does not indicate a policy of prosecuting "100% of southern border crossings," as Carrillo-Lopez contends.

**[26]** But even if Carrillo-Lopez had provided direct evidence that § 1326 had a disproportionate impact on Mexicans and other Central and South Americans in the years following the enactment of the INA, he would still not carry his burden of showing that Congress enacted § 1326 because of its impact on this group, because the clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans undermines any inference of discriminatory motive. "The United States' border with Mexico extends for 1,900 miles, and every day thousands of persons ... enter this country at ports of entry on the southern border." *Hernandez v. Mesa*, ––– U.S. ––––, 140 S. Ct. 735, 746, 206 L.Ed.2d 29 (2020). Therefore, it is "common sense ... that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so." *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003). The Court has explained that "because Latinos make up a large share of the unauthorized alien population," *Regents*, 140 S. Ct. at 1915, "virtually any generally applicable immigration policy could be challenged on equal protection grounds" if disproportionate impact were sufficient to state a claim, *id.* at 1916. Therefore, the claim that a law has a "disparate impact ... on Latinos from Mexico" is not "sufficient to state" a "plausible equal protection claim." *Id.* at 1915–

16. Applied here, the fact that § 1326, which criminalizes reentry, has a greater impact on the individuals who share a border with the United States, and "make up a large share of the unauthorized alien population," *id.* at 1915, than those who do not, does not prove that penalizing such individuals was a purpose of this legislation. [19] The district court clearly erred when it relied on the evidence of disproportionate impact without further evidence demonstrating that racial animus was a motivating factor in the passage of the INA.

19  The district court stated it was "unpersuaded by the government's argument that geography explains [§ 1326's] disparate impact" because a group can raise an equal protection challenge against legislation that has a disproportionate impact on a racial group even when " 'geography' might arguably explain the disparity." To the extent the district court meant that a group may succeed on such a claim merely because the challenged legislation "bears more heavily on" one race than another, it was incorrect. The Supreme Court has made clear that a group may raise an equal protection claim only if a discriminatory purpose was a motivating factor for the legislation, *see Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555, and evidence that a disproportionate impact was not "because of" a discriminatory purpose may defeat the claim, *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282.

### 3

We hold that the district court clearly erred in its finding that Congress's enactment of § 1326 was motivated in part by the purpose of discriminating against Mexicans or other Central and South Americans. The strong "presumption of good faith" on the part of the 1952 Congress is central to our analysis. *Miller*, 515 U.S. at 916, 115 S.Ct. 2475. Rather than applying this presumption, the district court construed evidence in a light unfavorable to Congress, including finding that evidence unrelated to § 1326 indicated that Congress enacted § 1326 due to discriminatory **\*1154** animus against Mexicans and other Central and South Americans. The district court also erred in finding that Congress's failure

"to repudiate the racial animus clearly present in 1929" was indicative of Congress's discriminatory motive in enacting the INA.

We conclude that Carrillo-Lopez did not meet his burden to prove that Congress enacted 🚩 § 1326 because of discriminatory animus against Mexicans or other Central and South Americans. "This conclusion ends the constitutional inquiry," 🚩 *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. 555, and we reject Carrillo-Lopez's equal protection claim. In reaching this conclusion, we join the Fifth Circuit, which in a case raising substantially identical arguments and relying on the same evidence, held that the evidence was "insufficient to establish that Congress enacted 🚩 § 1326 with racial animus." *Barcenas-Rumualdo*, 53 F.4th at 866–67.

**REVERSED AND REMANDED.**

**All Citations**

68 F.4th 1133

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.