No. 21-10233

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellant,*

v.

GUSTAVO CARRILLO-LOPEZ,

*Defendant-Appellee.*

On Appeal from the United States District Court for the District of Nevada,
Honorable Miranda M. Du Presiding

## BRIEF OF AMICUS CURIAE DR. S. DEBORAH KANG IN SUPPORT OF DEFENDANT-APPELLEE FOR REHEARING EN BANC

Jeffrey Green
Laura McKenzie
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
jgreen@sidley.com

August 14, 2023

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ii

INTEREST OF AMICUS CURIAE ....................................................... 1

INTRODUCTION .................................................................................. 2

ARGUMENT ......................................................................................... 3

I.   Historical Background: The Expansion of Anti-Mexican Racism in American Immigration Law, 1929-1952 ............................. 3

     A.   Disparate Impact of the 1929 Undesirable Aliens Act and Forced Removals of the 1930s. ........................................ 3

     B.   Exploitation of Mexican Braceros and Undocumented Mexican Workers ..................................................................... 5

     C.   Barring Mexicans from Deportation Relief ............................ 8

II.   Anti-Mexican racism motivated the 1952 McCarran-Walter Act's reenactment of criminal penalties for undocumented reentry .............................................................................................. 9

     A.   Anti-Mexican Legacies of the 1924 Act and 1929 Act Impact the Immigration Law Enforcement Policies of the 1950s ..................................................................................... 9

     B.   Congressional Debates Regarding the 1952 Act Continue the Racist Legacies of the 1924 Act and 1929 Act ...... 11

CONCLUSION .................................................................................... 20

CERTIFICATE OF COMPLIANCE ...................................................... 21

CERTIFICATE OF SERVICE ............................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

8 U.S.C. § 1326 ................................................................... *passim*

Johnson-Reed Act of 1924 (1924) .............................................. 11

McCarran-Walter Act, Pub. Law 82-414, 66 Stat. 163 (1952) ........ *passim*

Undesirable Aliens Act of 1929 (1929) ........................................ *passim*

**Other Authorities**

98 Cong. Rec. 4318, 4320 (April 23, 1952) .................................. 18

98 Cong. Rec. 4403 (April 24, 1952) ..................................... 14, 17

98 Cong. Rec. 5317-5321 (May 13, 1952) .............................. 14, 17

98 Cong. Rec. 5803 (May 22, 1952) ........................................... 16

Abraham Hoffman, *Unwanted Mexican Americans in the
   Great Depression: Repatriation Pressures* (Univ. of Ariz.
   Press 1974) ..................................................................... 5

Adam Goodman, *The Deportation Machine: America's Long
   History of Expelling Immigrants* (Princeton: Princeton
   University Press, 2020) ...................................................... 5

Alexandra Minna Stern, *Eugenic Nation: Faults and Fron-
   tiers of Better Breeding in Modern America* (U.C. Berkeley
   Press 2015) ................................................................... 5, 6

Daniel J. Tichenor, *Dividing Lines: The Politics of
   Immigration Control in America* (Princeton: Princeton
   University Press, 2002) ...................................................... 16

David G. Gutiérrez, *Walls and Mirrors: Mexican Americans,
   Mexican Immigrants, and the Politics of Ethnicity* (U.C.
   Berkeley Press 1995) ......................................................... 3

# TABLE OF AUTHORITIES

**Page(s)**

Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949* ........................................................................ 7

Eric S. Fish, *Race, History, and Immigration Crimes*, Iowa Law Review, vol. 107, n. 3 (2022) ................................... 3, 12, 15

Erika Lee, *America for Americans: A History of Xenophobia in the United States* (New York: Basic Books, 2019) ........................... 5

Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (Albuquerque: University of New Mexico Press, 1995) ....................... 5

Hearings before the Committee on Agriculture and Forestry United States Senate on S. 1207, 83d Cong., 1st Sess, March 23, 24, 1953 ................................................. 14

Hearings before the Subcommittee of the Committee on Appropriations United States Senate: Making Appropriations for the Departments of State, Justice, Commerce, and the Judiciary for the Fiscal Year Ending June 30, 1952, Part 1, 82d Cong., 1st Sess., March 12, 1951 ....................................................... 18

Hearings on S. Res. 137, Before the Senate Subcommittee on Immigration and Naturalization of the Committee on the Judiciary, 80th Cong., 2d Sess., 88, RG 46, National Archives, Washington, D.C. ....................................... 15

Ingrid Eagly, *Prosecuting Immigration*, Northwestern University Law Review, vol. 104, n. 4, 1326 (2010) ................................ 19

Jonathan Spiro, *Defending the Master Race: Conservation, Eugenics and the Legacy of Madison Grant* (Univ. Vt. Press, 2008) ....................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

Justin Hart, "Making Democracy Safe for the World: Race, Propaganda, and the Transformation of U.S. Foreign Policy during World War II," Pacific Historical Review, vol. 72, n. 1 (February 2004): 59, 62...................................6, 10

Leonard Nadel, "Braceros were fumigated with DDT while others stand in line at the Hidalgo Processing Center, Texas," in Bracero History Archive, Item #3000, accessed December 6, 2021, http://braceroarchive.org/items/show/3000 ........................10

S. Deborah Kang, *The INS on the Line: Making Immigration Law on the U.S.-Mexico Border 1717-1954* (Oxford University Press, 2017)...............................................17

S. Poverty L. Center, "Pioneer Fund." https://www.splcenter.org/fighting-hate/extremist-files/group/pioneer-fund ......................................12

Selene River, "A former bracero farmworker breaks his silence, recalling abuse and exploitation," *Los Angeles Times,* July 18, 2022 (citing Mexican historian Zárate Macias), https://www.latimes.com/california/story/2022-07-18/former-bracero-farmworker-breaks-silence.............................11

Statement of John B. Trevor, President, American Coalition, Unpublished Hearings on S. Res. 137, Before the Senate Subcommittee on Immigration and Naturalization of the Committee on the Judiciary (Nov. 9, 1948) ........................13

Statement of Peyton Ford, Deputy Attorney General, Revision of Immigration, Naturalization, and Nationality Laws (May 14, 1951) .........................................19

*The Immigration and Naturalization Systems of the United States*, Report of the Committee on the Judiciary pursuant to S. Res. 137, S. Rpt. No. 1515, April 20, 1950 .........*passim*

## INTEREST OF *AMICUS CURIAE*

Amicus, S. Deborah Kang ("Dr. Kang"), is Associate Professor of History and the John L. Nau III Associate Professor of the History and Principles of Democracy in the Corcoran Department of History and the Karsh Institute of Democracy at the University of Virginia..

Her research and teaching focus on both the historical and contemporary aspects of U.S. immigration and border policy. Her first book, *The INS on the Line: Making Immigration Law on the U.S.-Mexico Border 1917-1954* (Oxford Univ. Press, 2017), traces the history of U.S. immigration agencies on the U.S.-Mexico border and won six awards and accolades. Her second book, *Pathways to Citizenship: A History of Immigration Legalization in the United States, 1906-1986* (in preparation) is a history of U.S. immigration legalization policies from the early twentieth century to the present. Her co-edited anthology, *The Hidden Histories of Unauthorized European Immigration in the United States* (under contract, Univ. of Ill. Press), will recount the little-known history of unauthorized European immigrants in the United States. She has also published numerous academic articles on the history of U.S. immigration policy. Additionally, Dr. Kang has testified as an expert on

the history of amendments to 8 U.S.C. § 1326 (Section 1326) in U.S. District Court.

Dr. Kang has a professional interest in ensuring the Court is fully and accurately informed about the history behind the reenactment and late-twentieth-century amendments to the criminal reentry provision at issue here. Dr. Kang previously submitted an amicus brief in this case and files this additional amicus brief to illustrate the errors in the panel opinion holding that Section 1326 was not motivated by racial animus.[1]

## INTRODUCTION

Anti-Mexican racism motivated legislators to pass the 1952 McCarran-Walter Act[2] (1952 Act), which reenacted undocumented reentry criminal penalties from the 1929 Undesirable Aliens Act (1929 Act). Against a backdrop of anti-Mexican racism and pervasive exploitation of Mexican labor, the 1952 Act codified racist stereotypes about the

---

[1] Both parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored any part of the brief, and no party, party's counsel, or person, other than the amicus, contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

[2] McCarran-Walter Act, Pub. Law 82-414, 66 Stat. 163 (1952).

unsuitability of ethnic Mexicans for citizenship and disparately impacted Mexican immigrants.

This Court's prior opinion misread and failed to consider the anti-Mexican animus incorporated into the 1952 Act, and further failed to consider the totality of the evidence presented under the *Arlington Heights* framework. This brief examines how anti-Mexican animus pervaded the historical background, legislative history, and congressional debates pertaining to the 1952 Act.

## ARGUMENT

## I. Historical Background: The Expansion of Anti-Mexican Racism in American Immigration Law, 1929-1952.

### A. Disparate Impact of the 1929 Undesirable Aliens Act and Forced Removals of the 1930s.

The 1952 reenactment of the 1929 Undesirable Aliens Act occurred against a backdrop of anti-Mexican racism and the widespread exploitation of Mexican labor that had existed in the United States for decades.[3] By the 1930s, anti-Mexican animus worsened as a result of the disproportionate impact of the 1929 Act on Mexican immigrants.[4]

---

[3] David G. Gutiérrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* (U.C. Berkeley Press, 1995).

[4] Eric S. Fish, *Race, History, and Immigration Crimes*, Iowa L. Rev., vol. 107, 1090 n. 3 (2022).

As Mae Ngai, one of the world's foremost immigration historians, has concluded, immigration law enforcement following the 1929 Act created a negative stereotype of Mexican immigrants as the nation's iconic illegal alien.[5] And as the Great Depression began, ethnic Mexican communities were wrongly blamed for both taking the jobs of native-born Americans and consuming an unfair share of welfare benefits. A 1950 study commissioned by Senator Patrick McCarran (D-NV), confirms the consequences of this widespread animus, finding that between 1924 and 1948, Mexicans constituted 90% of deportation and voluntary departure cases.[6]

Meanwhile, eugenicists lobbied for immigration and sterilization laws to curtail the ethnic Mexican population; in 1935, Charles M. Goethe wrote to Harry H. Laughlin, co-creator of the 1924 national origins

---

[5] Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern Am.* (Princeton Univ. Press 2004).
[6] *The Immigration and Naturalization Sys. of the United States*, Rep. of the Comm. on the Judiciary pursuant to S. Res. 137, S. Rpt. No. 1515, at 635 (Apr. 20, 1950).

quota system, "It is this high birthrate that makes Mexican peon immigration such a menace. Peons multiply like rabbits."[7]

The resulting xenophobia led federal, state, and local governments to implement scare tactics to force Mexican immigrants to leave the United States.[8] These tactics were so severe that not only undocumented Mexican migrants, but also Mexican-American citizens and documented Mexican immigrants were driven out of the country.[9]

## B. Exploitation of Mexican Braceros and Undocumented Mexican Workers.

As forced removals stigmatized persons of Mexican descent,[10] southwestern agribusiness used racist arguments to advocate for the

---

[7] Stern, *Eugenic Nation* (citing Charles M. Goethe, press release, Harry H. Laughlin Papers, C-4-6, Special Collections, Truman State University (Mar. 21, 1935)).

[8] Abraham Hoffman, *Unwanted Mexican Americans in the Great Depression: Repatriation Pressures*, 1929-1939 (Univ. of Ariz. Press 1974); Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (Univ. N.M. Press 1995); Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (Princeton Univ. Press 2020).

[9] By 1940 at least half a million ethnic Mexicans were forcibly repatriated. Goodman, *Deportation Machine*, 46.

[10] Erika Lee, *America for Americans: A History of Xenophobia in the United States*, Kindle Loc. 3007 (Basic Books 2019).

admission of Mexican immigrant farm workers.[11] Drawing upon longstanding eugenicist theories, southwestern growers and their congressional allies claimed that Mexican migrants made the ideal farm labor workforce because they were genetically inclined to undertake "stoop labor" rather than skilled and white-collar work.[12]

These racist arguments reflected the prevalence of anti-Mexican racism in the United States and led high level figures such as George S. Messersmith, ambassador to Mexico, to oppose admitting Mexican workers when "the question of discrimination against Mexicans in the United States is one of the few outstanding problems we have with Mexico."[13] To protect its nationals, Mexico conditioned its participation in the Bracero Program upon the provision of wage, working, and living guarantees and the right to remove workers from states that racially discriminated against Mexicans. But from the start of the program,

---

[11] Mireya Loza, *Defiant Bracero: How Migrant Workers Fought for Racial, Sexual, and Political Freedom*, 34 (Univ. N.C. Press 2016).

[12] On the widespread role of eugenicists in shaping immigration policy from 1920 to 1970, *see* Stern, *Eugenic Nation*.

[13] Justin Hart, *Making Democracy Safe for the World: Race, Propaganda, and the Transformation of U.S. Foreign Policy during World War II*, Pac. Historical Rev.*, vol. 72, 59, 62, 65n. 1 (Feb. 2004) (citing George S. Messersmith to the Sec'y of State, 811.4016 Decimal File, 1940-1944, RG 59, Nat'l Archives, College Park, Md. (Nov. 12, 1942).

these guarantees were not fulfilled, and Mexican braceros faced widespread discrimination and abuse.

By 1943, the Bracero Program triggered an unprecedented increase in the number of undocumented entries; southwestern growers encouraged many Mexicans to make unauthorized entries so that they would not be bound by labor protections stipulated in the Bracero contracts. During the Bracero era (1942-1964), the federal government adopted an approach to immigration law enforcement that protected grower access to a steady supply of both legal and undocumented Mexican labor and, more broadly, sustained longstanding racist stereotypes of Mexican migrants as an exploitable low-skilled workforce.[14]

Together with other lawmakers, Senator McCarran helped create policies that maintained anti-Mexican animus in American immigration law and preserved a system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers. Senator

---

[14] DOJ, *Annual Rep. of the Immigration & Naturalization Serv. for the Fiscal Year Ended June 30, 1949*, 32.

McCarran even observed that outside the Bracero program "a farmer can get a wetback and he does not have to go through that red tape."[15]

### C. Barring Mexicans from Deportation Relief.

Lawmakers further implemented anti-Mexican racist views by thwarting suspension of deportation applications by Mexican immigrants, enabled by Congress's power to authorize suspensions of deportation under the Alien Registration Act. Despite Mexicans being eligible for relief, in 1949 Senator McCarran rejected the suspension petitions of 32 Mexican families submitted in 1947 and 1948.[16] An INS analysis of these rejections determined an apparent establishment of policy "to refuse suspension of deportation in the case of aliens who are from nearby nonquota countries and who have recently illegally entered the United States, and who seek suspension of deportation on the basis of an

---

[15] Hearings before the Subcommittee of the Comm. on Appropriations U.S. Sen., H.R. 4974, 246.

[16] James A. Hamilton to A.R. Mackey, Deputy Comm'r, file 56086/550F, RG 85, Nat'l Archives (June 20, 1949) (referring to S. Cong. Res. 22, 81st Cong., 1st Sess. (Mar. 16, 1949), and S. Cong. Res. 40, 81st Cong., 1st Sess. (May 16, 1949). In the House, Rep. Frances Walter [D-PA] oversaw the review and passage of both Senate resolutions on March 22, 1949 and May 24, 1949, respectively.)

alleged serious economic detriment to a native born citizen child."[17] The INS then used these cases, which "reflected the Congressional attitude" to "serve us as a 'guide' in the disposition of similar cases hereafter."[18] This restriction on deportation relief was characterized as racially discriminatory by contemporaries, including Rep. Lloyd M. Bentsen (D-TX).[19] Yet, despite these objections, lawmakers would pursue the permanent exclusion of Mexican nationals from the suspension of deportation provisions of the law.

## II. Anti-Mexican racism motivated the 1952 McCarran-Walter Act's reenactment of criminal penalties for undocumented reentry.

### A. Anti-Mexican Legacies of the 1924 Act and 1929 Act Impact the Immigration Law Enforcement Policies of the 1950s.

The McCarran-Walter Act of 1952 did not break with the racist legacies left by the 1924 Act and the 1929 Act, instead perpetuating the underlying racial animus as the kinds of racist, eugenicist thinking

---

[17] James A. Hamilton to A.R. Mackey, Deputy Comm'r, file 56086/550F, RG 85, Nat'l Archives (June 20, 1949).

[18] Hearing Rev. Section, *Suspension of Deportation: Suspension not favored by 81st Congress Mexican families recently arrived*, file 55086/550F, RG 85, Nat'l Archives (Oct. 31, 1949).

[19] Rep. Lloyd M. Bentsen, Jr. to Comm'r Gene. Watson B. Miller, file 56086/550F, RG 85, Nat'l Archives (Nov. 18, 1949).

prevalent in the 1920s continued to influence the sponsors and drafters of the 1952 Act. While undocumented European immigrants benefited from legalization policies that enabled them to become U.S. citizens, tens of thousands of undocumented Mexican immigrants were deported, criminally prosecuted, or legalized under a procedure that did not afford them a pathway to citizenship but instead funneled them back into the Bracero Program as temporary farm workers.

Mexican migrants experienced "Juan Crow" racism paralleling the forms of de facto and de jure racial discrimination endured by Blacks in the wake of *Plessy v. Ferguson*, 163 U.S. 537 (1896).[20] Immigration authorities also subjected Braceros to dehumanizing screening processes, for example being fumigated with DDT at processing centers upon entrance to the United States.[21] During their medical exams, immigration

---

[20] Hart, *Making Democracy Safe for the World*, 62 (citing Ernest W. Trimble to Lawrence Cramer, 811.4016, Decimal File, 1940-1944, RG 59 NARA (Oct. 26, 1942); William P. Blocker, *Some Places Where Mexicans are Discriminated Against in Texas Either by Denying Them Service or by Segregating Them from Anglo-Americans*, in *ibid.* (Jan. 15, 1945)).
[21] Leonard Nadel, "Braceros were fumigated with DDT while others stand in line at the Hidalgo Processing Center, Texas," in Bracero Histo. Archive, Item #3000 (accessed Dec. 6, 2021), http://braceroarchive.org/items/show/3000.

officials "squeezed their arms, their legs. They saw if their hands had calluses. They opened their mouths and then they chose the strongest, youngest and healthiest, just as they did with the Black slaves."[22]

## B. Congressional Debates Regarding the 1952 Act Continue the Racist Legacies of the 1924 Act and 1929 Act.

Against this background, Congress determined in the early 1950s that the national origins quota system, established through the Johnson-Reed Act of 1924 (1924 Act) to maintain the white population as constituted in 1920, had failed because too many "undesirable" immigrants had entered the country.[23] The sponsors and drafters of the 1952 Act determined it was necessary to restrict immigration from "undesirable" countries by reimposing criminal reentry penalties, originally enacted in the 1929 Act. To do so, they expressly embraced the racist arguments that had motivated passage of the 1924 Act and the 1929 Act

---

[21] Selene River, *A former bracero farmworker breaks his silence, recalling abuse and exploitation*, L.A. Times (July 18, 2022), https://www.latimes.com/california/story/2022-07-18/former-bracero-farmworker-breaks-silence (citing Mexican historian Zárate Macias).
[22] *Id.* (citing Mexican historian Zárate Macias).
[23] *The Immigration and Naturalization Sys. of the United States*, Rep. of the Comm. on the Judiciary pursuant to S. Res. 137, S. Rpt. No. 1515, 430, 445, 473 (Apr. 20, 1950).

and made those same arguments in advocating for passage of the 1952 Act.

Lawmakers and other individuals with the most influence over the preparation, drafting, and passage of the 1952 Act received support from multiple white supremacist individuals and organizations. These included Wycliffe Draper, a New York millionaire and founder of the Pioneer Fund;[24] John B, Trevor, who helped to create the national origins quota system; Charles Mattias Goethe, the last president of Madison Grant's[25] Eugenics Research Association and the founder of the Eugenics Society of Northern California and the Immigration Study Commission, which fought to bar the entry of Mexicans, Puerto Ricans, and Filipinos.[26] Each of these individuals and groups had played a role in the

---

[24] Founded in 1937, Draper's Pioneer Fund was committed to eugenics and race science and aimed to "pursue 'race betterment' by promoting the genetic stock of those 'deemed to be descended predominantly from white persons who settled in the original thirteen states prior to the adoption of the Constitution." S. Poverty L. Ctr., "Pioneer Fund," https://www.splcenter.org/fighting-hate/extremist-files/group/pioneer-fund (accessed Feb. 11, 2023).

[25] On Grant's anti-Mexican racism and his influence upon the lawmakers who drafted the 1924 and 1929 Acts, *see* Fish, *Race, History, and Immigration Crimes*, 13, 26, 44.

[26] Jonathan Spiro, *Defending the Master Race: Conservation, Eugenics and the Legacy of Madison Grant*, 350 (Univ. Vt. Press, 2008).

passage of the immigration restriction laws of the 1920s and, after helping to win passage of the 1952 Act, would fight to preserve and even expand those restrictions well into the 1950s and 1960s. Invited to provide formal and informal testimony, they expressed anti-Mexican views during the congressional hearings regarding the McCarran and Walter immigration bills; Trevor, for example, testified that Mexican braceros "have been proved detrimental in as far as they had little conception of the ideals of American democracy."[27] They also made campaign contributions to the sponsors and supporters of the 1952 Act, underwrote publicity campaigns defending the 1952 Act,[28] and celebrated the sponsors and drafters with honors and awards.[29]

---

[27] Statement of John B. Trevor, Pres., Am. Coalition, Unpublished Hearings on S. Res. 137, Before the Sen. Subcommittee on Immigration and Naturalization of the Committee on the Judiciary, 80th Cong., 2d Sess., 482 (Nov. 9, 1948).

[28] For example, Trevor's nativist organization, American Coalition for Patriotic Societies, established an "Action Front" to defend the 1952 Act.

[29] For example, a Texas chapter of the Ku Klux Klan sent Rep. Walter a "Certificate of Merit for outstanding accomplishment in the Aryan Knights Ku Klux Klan Religion for White People Only . . .." The cover letter congratulated Walter for "your 'McCarran-Walter Act' on immigration." Horace Sherman Miller, Aryan Knights, Ku Klux Klan, Box 86, Papers of Congressman Francis E. Walter, SC MS 065, Special Collections, Linderman Library, Lehigh Univ., Bethlehem  (Dec. 14, 1958).

During the debates regarding the 1952 Act, lawmakers displayed racial animus by referring to Mexican farmworkers as "wetbacks," which was understood to be a racial slur. [30] Despite the widely recognized negative connotations of this term, however, lawmakers on both sides of the aisle used the slur while discussing the incorporation of S. 1851 (the so-called "wetback bill") into the 1952 Act. [31]

The racist legacies of the 1924 Act and the 1929 Act were further evident in a 1950 Senate report (1950 Report), *The Immigration and Naturalization Systems of the United States*, that served as the intellectual foundation of the 1952 Act. [32] The authors of this report subscribed to the ideas of race science, concepts of which are reflected in the report, [33] and white supremacy. The report portrayed Mexican migrants as

---

[30] *Extension of the Mexican Farm Labor Program*, Hearings before the Comm. on Agric. & Forestry U.S. Sen. on S. 1207, 83d Cong., 1st Sess., 47 (March 23, 24, 1953).

[31] 98 Cong. Rec. 4403 (Apr. 24, 1952); 98 Cong. Rec. 5317-5321 (May 16, 1952).

[32] *The Immigration and Naturalization Sys. of the United States*, Rep. of the Comm. on the Judiciary pursuant to S. Res. 137, S. Rpt. No. 1515 (Apr. 20, 1950).

[33] The Senate subcommittee staffer who authored the first two chapters of the 1950 Report, explained his intentions for the chapter, "Races and Peoples of the World": "The study throughout portrays the

itinerant, uneducated, and dependent on welfare[34] and cited two studies by Laughlin that reflected longstanding racial animus against Latin American immigrants and defended the eugenicist principles underlying the national origins quota system and the 1929 Act.[35] Throughout the 1950 Report, the authors repeatedly used the racial slur "wetback" to refer to Mexican nationals.[36]

Richard Arens, the staff director of the Senate Subcommittee on Immigration and Naturalization, supervised the drafting of the 1950 Report and played a major role in the drafting and passage of the 1952 Act. Arens frequently took the place of Senator McCarran or Senator

---

acknowledged major importance of the white race as the most progressive and farthest civilized of the universe, while in the CONCLUSION it is authoritatively shown that economic rehabilitation of the nations, composed principally of members of the white race, is primarily absolutely essential to the economic stabilization and political levity of the world." Emphasis in original. Charles A. Grefe to Mr. Arens, Box 99, Folder 1, RG 46, Nat'l Archives, Wash., D.C. (Mar. 16, 1949).

[34] *The Immigration and Naturalization Sys. of the United States*, 150-52, 176.

[35] Fish, *Race, History, and Immigration Crimes*.

[36] *The Immigration and Naturalization Sys. of the United States*, 446, 473, 573, 579, 580, 584, 585, 586.

Chapman Revercomb (R-WV)[37] when they were unable to appear at the Subcommittee meetings, oversaw the Senate hearings surrounding the 1952 Act, and ultimately was credited as a principal author of the 1952 Act.[38]

As a result of his extensive involvement, the 1952 Act reflected Arens's racist worldview. His xenophobia, particularly his anti-Semitism, was widely reported in the press.[39] During the Senate Immigration Subcommittee hearings that informed the drafting of the McCarran-Walter Act, Arens routinely used a racial slur in discussing

[37] Before working for McCarran, Arens was a staffer for Senator Revercomb who defended the immigration laws of the 1920s. As a result, in his own time, the B'nai B'rith Anti-Defamation League listed Revercomb in its report on bigotry. "Reactionaries Ask that Arens Head Immigration," 2. *See also*, Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* , 185, 187 (Princeton Univ. Press, 2002).
[38] Senator McCarran thanked Drury H. Blair, Ethel L. Johnson, and Richard Arens for drafting the bill. 98 Cong. Rec. 5803 (May 22, 1952). Government payroll records, the records of the Senate Subcommittee on Immigration and Naturalization, media reports, and archival documents indicate that Arens was the principal author of the bill. *See*, *e.g.*, *Again Study Arab Refugees*, The Ariz. Post*,* 14 (Apr. 17, 1953).
[39] *See, for example*, *Missourian Blamed for "Evils" in Immigration Affairs*, The Kansas City Star, 3 (Mar. 25, 1950); Milton Friedman, *Reactionaries Ask that Arens Head Immigration*, The Jewish Press, 2 (Dec. 30, 1952); Milton Friedman, *Washington Week*, The Wis. Jewish Chronicle, 2 (Oct. 30, 1953).

Mexican immigrants.[40] He and his staff cultivated close relationships with Draper and Trevor, soliciting their advice and testimony during the congressional debates on the McCarran-Walter Act.

The 1952 Act compounded anti-Mexican racism by excluding Mexican migrants from suspension of deportation relief and incorporating provisions of S. 1851 (referred to as the "wetback bill" during congressional debates regarding the 1952 Act)[41] that granted immigration officials additional power to search private property within twenty-five miles of the border without a warrant, which, per congressional debates, was intended to enable the Border Patrol to access border farms that employed undocumented Mexican workers.[42] The 1952 Act also released INS officials from Fourth Amendment search and seizure requirements within a reasonable distance from any external boundary of

---

[40] *See, for example*, Investigation of Immigration and Naturalization Pursuant to S. Res. 137 of the 80th Congress, Unpublished Hearings on S. Res. 137, Before the Sen. Subcommittee on Immigration & Naturalization of the Comm. on the Judiciary, 80th Cong., 2d Sess., 678, 680 (Aug. 3, 1948).

[41] 98 Cong. Rec. 4403 (Apr. 24, 1952); 98 Cong. Rec. 5317-5321 (May 16, 1952).

[42] S. Deborah Kang, *The INS on the Line: Making Immigration Law on the U.S.-Mexico Border 1717-1954, INS on the Line,* 143-49 (Oxford Univ. Press, 2017).

the United States and exempted INS deportation hearings from compliance with the 1946 Administrative Procedures Act, depriving Mexican migrants of its procedural protections. The 1952 Act also preserved the 1924 national origins quota system, inspired by eugenicist theories, changes to which would "destroy the white race."[43]

Although Congress rarely directly discussed recodifying the 1929 Act while deliberating the McCarran and Walter bills, the Congressional record demonstrates lawmakers' awareness of the disparate impact of criminal penalties on Mexican nationals[44] as the 1952 Act specifically strengthened the clauses regarding unlawful entry and re-entry by making them easier to prosecute. Further, Congress lessened the penalty for a first unauthorized entry from one year to six months and

---

[43] 98 Cong. Rec. 4318-4320 (Apr. 23, 1952).

[44] In one instance, on Mar. 12, 1951, representatives from the Department of Justice testified before a Senate appropriations subcommittee, chaired by McCarran, that immigration violations caused an increase in its criminal caseload resulting from "Mexican laborers coming across the Rio Grande and at other points along the southern border to seek employment in the Southwestern States and in California." Hearings before the Subcommittee of the Committee on Appropriations United States Senate: Making Appropriations for the Departments of State, Justice, Commerce, and the Judiciary for the Fiscal Year Ending June 30, 1952, Part 1, 82d Cong., 1st Sess., Mar. 12, 1951, 161.

thereby rendered it a petty offense, meaning defendants charged under this provision lost their right to a jury trial.[45]

The anti-Mexican animus underlying these enforcement efforts is evident in a letter from Deputy Attorney General Peyton Ford to Senator McCarran, which evidences the intention of lawmakers to continue prosecutorial streamlining through the provisions of Section 1326, as reenacted through the 1952 Act. In his letter, Ford expressed approval of, or suggested, features designed to make it easier to prosecute Mexican-American immigrants under the new law. Ford's justification for these enforcement aids was that "Statutory clarification on the above points will aid in taking action against the conveyors and receivers of the wetback."[46]

---

[45] The INS, seeking a way to manage the increasing number of criminal prosecutions under the 1929 Act, "lobbied Congress to establish a misdemeanor court that would allow for criminal immigration enforcement 'at less expense and with a greater amount of effectiveness' than was possible with Article III courts.'" Ingrid Eagly, *Prosecuting Immigration*, Northwestern University L. Rev., vol. 104, n. 4, 1326 (2010).

[46] Statement of Peyton Ford, Deputy Attorney General, Revision of Immigration, Naturalization, and Nationality Laws, 718 (May 14, 1951) (citing President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* (Washington, D.C.: U.S. Government Printing Office, 1951)).

Despite the clear racial animus underlying the 1952 Act, multiple subsequent reenactments failed to acknowledge or address its racist origins, thus perpetuating its anti-Mexican animus. As further described in the brief previously filed by Amicus, amendments to Section 1326 in the late twentieth century failed to engage substantively with underlying motivations of the 1952 Act, allowing the discriminatory taint that was codified in the 1920s laws and sustained through the 1952 Act to continue to pervade Section 1326 in its modern form.

## CONCLUSION

For the foregoing reasons, we respectfully request that this Court grant Defendant's petition for rehearing *en banc*.

Respectfully submitted,

*/s/ Jeffrey Green*

August 14, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(5), 32(a)(6), and 29(a)(5) of the Federal Rules of Appellate Procedure, and Ninth Circuit Rule 32-1, I certify that the attached brief is in 14-point proportionally spaced Century Schoolbook font, and contains 4,037 words, as counted by my word processing program, exclusive of the portions of the brief excepted by Rule 32(f).

By: _/s/ *Jeffrey Green*_____
      Jeffrey Green

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all registered attorneys of record.

By: _/s/ Jeffrey Green_____
Jeffrey Green